# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
In re                                        :        Chapter 11
                                             :
BLUE BIRD BODY COMPANY , et al.,             :        Case No. 06-_____(_____)
                                             :
                         Debtors.            :        (Jointly Administered)
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED JOINT PLAN OF REORGANIZATION OF BLUE BIRD BODY COMPANY AND CERTAIN AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Van C. Durrer
Mark A. McDermott
4 Times Square
New York, New York 10036-6552
(212) 735-3000

-and-

LIONEL SAWYER & COLLINS
Jennifer A. Smith
1100 Bank of America Plaza
50 W. Liberty St.
Reno, Nevada 89501
(775) 788-8666

Attorneys for Blue Bird Body Company, et al.

Dated:   Reno, Nevada
         January 24, 2006

On January 26, 2006 (the "Petition Date"), Blue Bird Body Company and several of its affiliates (collectively, the "Debtors") intend to file petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada, Reno Division, subject to receiving in advance requisite acceptances of the Debtors' proposed Chapter 11 plan (the "Plan"). If petitions are filed, the Debtors will seek immediate confirmation of the Plan on January 27, 2006. A copy of the Plan that the Debtors intend to file is attached to this Disclosure Statement as Exhibit A.

The Debtors are distributing this Disclosure Statement in connection with their solicitation of votes on the Plan. All holders of Claims against and Interests in the Debtors are urged to read the Disclosure Statement and Plan in full. The boards of directors and the management of the Debtors believe that the plan is in the best interests of holders of Claims against and Interests in the Debtors. Accordingly, holders of Bank Group Claims against the Debtors entitled to vote on the Plan are urged to vote in favor of the Plan.

No person has been authorized to give any information or to make any representation about the Plan not contained in this Disclosure Statement. The statements in this Disclosure Statement are made as of the date hereof. Neither the Disclosure Statement's distribution nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof. All summaries herein are qualified by reference to the Plan as a whole. In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations. Unless otherwise indicated, the Debtors' management has provided the factual information in this Disclosure Statement. The Debtors believe that the information herein is accurate but are unable to warrant that it is without any inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of Chapter 11. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "SEC"), nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

In making a decision in connection with the Plan, holders of Impaired Bank Group Claims must rely on their own examination of the Debtors and the terms of the plan, including the merits and risks involved. They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice and each Bank Group member should consult its own advisors with respect to those matters.

## SECURITIES LAW MATTERS

We are relying on section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance and distribution of the New Peach County Holdings Stock from the registration requirements of the Securities Act and state securities and "blue sky" laws insofar as (i) the securities are issued by a debtor, an affiliate of the debtor, or a successor to a debtor under a plan approved by a bankruptcy court; (ii) the recipients of securities hold a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The Debtors also believe that the issuance and distribution of the New Peach County Holdings Common Stock will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and any state or local laws requiring registration, by reason of one or more exemptions therefrom, including section 4(2) of the Securities Act as a transaction not involving any public offering. Persons who receive Stock under the Plan are urged to consult their own legal advisor with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information. These statements involve known and unknown risks and relate to future events, our future financial performance or our projected business results. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential" or "continue" or the negative of these terms or other comparable terminology. Forward-looking statements are only predictions. Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, events, levels of activity, performance or achievements. We expressly disclaim a duty to update any of the forward-looking statements.

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..........................................................................................................1

    A.  Notice to Holders of Claims and Interests ...........................................................1
    B.  Voting Procedures, Ballots and Voting Deadline ................................................2
    C.  Confirmation Hearing and Deadline for Objections ...........................................2

II.     PLAN SUMMARY .......................................................................................................3

III.    HISTORY OF THE DEBTORS .....................................................................................5

    A.  Overview of Business Operations ........................................................................5
    B.  Corporate Structure .............................................................................................6
    C.  Capital Structure of the Debtors ..........................................................................6
    D.  Events Leading to the Chapter 11 Filings ...........................................................7

IV.     TIMING OF THE CHAPTER 11 CASES ....................................................................8

V.      THE PLAN ....................................................................................................................9

    A.  Overall Structure of the Plan ...............................................................................9
    B.  Classification and Treatment of Claims and Interests .........................................9
    C.  Means for Implementation of the Plan ...............................................................11
    D.  Provisions Governing Distributions ...................................................................13
    E.  Treatment of Executory Contracts and Unexpired Leases .................................14
    F.  Conditions Precedent to the Plan's Confirmation and Consummation ..............15
    G.  Modification; Withdrawal ..................................................................................16
    H.  Retention of Jurisdiction ....................................................................................16
    I.  Effects of Confirmation .....................................................................................17
    J.  Governing Law ...................................................................................................19

VI.     CERTAIN RISK FACTORS TO BE CONSIDERED ..................................................19

    A.  Failure to Confirm the Plan ...............................................................................19
    B.  Potential Adverse Effects of Chapter 11 ...........................................................19
    C.  Potential Adverse Effects on Borrowing Needs .................................................19
    D.  Seasonal Nature of Business ..............................................................................20
    E.  Competition.........................................................................................................20
    F.  Risks Associated With Halted Production...........................................................20
    G.  Inherent Uncertainty of Financial Projections ...................................................20
    H.  Environmental Matters .......................................................................................20
    I.  Dependence on Key Personnel............................................................................21
    J.  Absence of Public Market; Restriction on Transferability .................................21
    K.  Dividends ............................................................................................................21
    L.  Reduction or Elimination of Tax Attributes ......................................................21

VII.    CONFIRMATION OF THE PLAN ..............................................................................21

    A.  Voting Requirements...........................................................................................22
    B.  Feasibility of the Plan .........................................................................................22
    C.  Best Interests Test ..............................................................................................22
    D.  Confirmation Without Acceptance of All Impaired Classes -- "Cramdown"..........23

VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN...........................24

IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN............25

    A.    Certain United States Federal Income Tax Consequences to the Debtors......................................27
    B.    Certain United States Federal Income Tax Consequences to Holders of Claims..........................27
    C.    Information Reporting and Backup Withholding..........................................................................29
    D.    Importance of Obtaining Professional Tax Assistance.................................................................29

X.    OTHER MATTERS .....................................................................................................................29

XI.    RECOMMENDATION AND CONCLUSION ...............................................................................30


THE PLAN ............................................................................................................... EXHIBIT A

LIQUIDATION ANALYSIS ..................................................................................... EXHIBIT B

PROJECTIONS ......................................................................................................... EXHIBIT C

## I.    INTRODUCTION

Blue Bird Body Company ("Blue Bird"), Blue Bird Corporation, Blue Bird Investment Corporation, Henlys Holding Corp., Henlys US Investments, Inc., and Peach County Holdings, Inc. ("Peach County Holdings" and collectively, the "Debtors") hereby transmit this disclosure statement (the "Disclosure Statement") in accordance with section 1125 of the United States Bankruptcy Code, 11 U.S.C. " 101-1532, as amended (the "Bankruptcy Code"), for use in the solicitation of votes to accept their prepackaged joint plan of reorganization dated January 24, 2006 (the "Plan"). A copy of the Plan is annexed to this Disclosure Statement as Exhibit A.

The Plan provides for the restructuring of the Debtors' senior secured liabilities in a manner designed to maximize recoveries to all creditors and to enhance the financial stability of the Reorganized Debtors. Specifically, the Plan leaves unimpaired the rights of all Claim holders, with the one exception that it does restructure the Debtors' senior secured debt obligations arising out of that certain Second Amended and Restated Credit Agreement, dated October 18, 2004 (the "Credit Agreement"), among the Debtors, Lloyds TSB Bank plc and The Royal Bank of Scotland plc, as arrangers, and the other lenders party thereto (collectively, the "Bank Group"). The Plan also contemplates the Debtors' receipt of a new revolving lending facility from certain members of the Bank Group, and cancellation of the existing equity of Peach County Holdings, Inc., including all common and preferred stock, and issuance of new equity for the benefit of holders of the Bank Group claims.

This Disclosure Statement, among other things, (i) contains certain information regarding the Debtors' prepetition history, (ii) describes the Plan, the new financing, alternatives to the Plan, effects of confirmation of the Plan, and distributions under the Plan, and (iii) discusses the confirmation process and voting procedures that holders of Bank Group Claims must follow for their votes to be counted. Because the Bank Group Claims are the only claims being compromised under the Plan, only members of the Bank Group are entitled to vote on the Plan. All other creditors' claims will be fully honored in the ordinary course. They therefore are deemed to accept the Plan, and their votes will not be solicited.

### A.    Notice to Holders of Claims and Interests

This Disclosure Statement is being transmitted to certain holders of Claims and Interests for the purpose of soliciting votes on the Plan and for informational purposes. The primary purpose of this Disclosure Statement is to provide adequate information to enable members of the Bank Group to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or to reject the Plan. Subject to receiving requisite acceptances of the Plan, the Debtors will file Chapter 11 petitions on January 26, 2006. On January 27, 2006, the Debtors will request Bankruptcy Court approval of this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of such Claims to make an informed judgment about the Plan. The Debtors simultaneously will request the Bankruptcy Court to confirm the Plan.

WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF BANK GROUP CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTORS OTHER THAN THE INFORMATION CONTAINED HEREIN.

B.       **Voting Procedures, Ballots and Voting Deadline**

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of (i) the Plan (Exhibit A); and (ii) for holders of Bank Group Claims who are entitled to vote on the Plan, one or more Ballots.  If you did not receive a Ballot in your package and believe that you are entitled to vote on the Plan, please contact the Debtors' counsel or Voting Agent at the addresses and telephone numbers set forth on the cover of this Disclosure Statement and below.

After carefully reviewing the Plan, this Disclosure Statement, and the instructions on the enclosed Ballot, holders of Bank Group Claims should indicate their acceptance or rejection of the Plan by checking the appropriate box on the Ballot.  Moreover, they must complete and sign their Ballots and return them so that they are RECEIVED by the Voting Deadline (as defined below).

IN PARTICULAR, IF YOU ARE A HOLDER OF A BANK GROUP CLAIM, FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER YOUR BALLOT SO THAT YOUR VOTE IS RECEIVED BY THE VOTING AGENT NO LATER THAN **10:00 A.M. EASTERN STANDARD TIME ON JANUARY 26, 2006 (THE "VOTING DEADLINE")**.  IN ORDER TO PROMPTLY TRANSMIT YOUR BALLOT, YOU MUST **SEND IT VIA FAX, EMAIL, OR OVERNIGHT DELIVERY** TO THE FOLLOWING:

> Donlin Recano & Company, Inc.
> Attn:  Blue Bird Plan Voting
> 419 Park Avenue South, Suite 1206
> New York, New York 10016
> Telephone:         (212) 481-1411
> Fascimile:          (212) 481-1416
> Email:               rhoward@donlinrecano.com

You may obtain additional copies of the Plan, Disclosure Statement, or other material in this Solicitation Package from the Voting Agent.

C.       **Confirmation Hearing and Deadline for Objections**

As noted above, the Debtors will ask the Bankruptcy Court to consider the adequacy of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") on **January 27, 2006 at 4:00 p.m.**, **Pacific Time** before the United States Bankruptcy Court for the District of Nevada, 300 Booth Street, Reno, Nevada.  At the Confirmation Hearing, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, if necessary.  See "Confirmation of the Plan B Confirmation Without Acceptance of All Impaired Classes -- 'Cramdown'".  The Debtors may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3019, as necessary to confirm the Plan.

Notice of the anticipated Confirmation Hearing and the time to present objections was provided to holders of Bank Group Claims on January 20, 2006.  Objections, if any, to confirmation of the Plan must be presented to the Bankruptcy Court at the Confirmation Hearing.  Any written objections must also be served so that they are RECEIVED on or before January 26, 2006, at 5:00 p.m. Eastern Daylight Time by:

**Counsel to the Debtors:**

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
4 Times Square
New York, NY  10036-6552
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
Attn:  Jay M. Goffman

- and -

LIONEL SAWYER & COLLINS
1100 Bank of America Plaza
50 W. Liberty St.
Reno, Nevada 89501
Telephone:  (775) 788-8666
Facsimile:  (775) 788-8682
Attn:  Jennifer A. Smith

**Counsel to the Bank Group:**

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY  10020
Telephone:  (212) 610-6300
Facsimile:  (212) 610-6399
Attn:  Hugh McDonald

- and -

**United States Trustee:**

OFFICE OF THE UNITED STATES TRUSTEE
C. Clifton Young Federal Bldg.
300 Booth Street, Room 2129
Reno, Nevada, 89509
Telephone:  (775) 784-5335
Facsimile:  (775 784-5531
Attn:  Nicholas Strozza

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.     PLAN SUMMARY

The following table summarizes the classification and treatment under the Plan of the Claims against and Interests in the Debtors.  The summary contained therein is qualified in its entirety by reference to the provisions of the Plan, a copy of which is annexed hereto as Exhibit A, and by the balance of this Disclosure Statement.  The classification and treatment for all Classes of Claims and Interests are described in more detail elsewhere in this Disclosure Statement.  *See* "The Plan - Certain Matters Regarding Classification and Treatment of Claims and Interests".

| **Description of Claims and Interests** | **Treatment Under the Plan** |
| --- | --- |
| UNCLASSIFIED CLAIMS<br>    Administrative Claims | • *Unimpaired* -- The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.<br><br>• *Estimated Recovery* -- 100% |

3

| **Description of Claims and Interests** | **Treatment Under the Plan** |
|---|---|
| Priority Tax Claims | • *Unimpaired* -- The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.<br><br>• *Estimated Recovery* -- 100% |

**CLASSIFIED CLAIMS**

| | |
|---|---|
| Class 1 - Bank Group Claims | • *Impaired* -- The Bank Group Claims are Allowed Claims. On the Distribution Date, each holder of an Allowed Bank Group Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Group Claim, (a) its pro rata share of the Converted Term Loan and (b) its pro rata share of the New Peach County Stock Distribution.<br><br>• *Estimated Recovery* -- Greater than in a liquidation. |
| Class 2 - Other Secured Claims | • *Unimpaired* -- The rights of each holder of an Other Secured Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of an Other Secured Claim shall retain its Lien on the Collateral securing such Other Secured Claim, and such Lien shall survive the Effective Date and continue in accordance with the contractual terms of any underlying agreements and applicable law until such Other Secured Claim is satisfied in full. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.<br><br>• *Estimated Recovery* -- 100% |
| Class 3 - Other Priority Claims | • *Unimpaired* -- The rights of each holder of an Other Priority Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Thus, each holder of an Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtors and such holder shall have agreed upon in writing. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.<br><br>• *Estimated Recovery* -- 100% |

4

| **Description of Claims and Interests** | **Treatment Under the Plan** |
|---|---|
| Class 4 - General Unsecured Claims | • The rights of each holder of a General Unsecured Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of a General Unsecured Claim shall receive Cash equal to the unpaid portion of its General Unsecured Claim on the date on which its General Unsecured Claim becomes payable under applicable law or any agreement relating thereto. |
| | • *Estimated Recovery* -- 100% |
| Class 5 - Intercompany Claims | • *Unimpaired* – At the option of the Reorganized Debtors, Intercompany Claims shall either be Reinstated, in full or in part, or cancelled and discharged, in full or in part. This Class is deemed to have accepted the Plan and therefore is not entitled to vote. |
| | • *Estimated Recovery* -- 100% |
| Class 6 - Interests | • *Unimpaired* – Holders of Interests in Peach County Holdings, Inc. shall not be Impaired by the Plan. Specifically, holders of such Interests shall receive the following treatment: (a) the Interests of any holder who has executed or otherwise indicated that it accepts the Restructuring Agreement as of the Confirmation Date shall be cancelled in accordance with the Restructuring Agreement and (b) the Interests of any holder who has not executed or otherwise indicated that it accepts the Restructuring Agreement as of the Confirmation Date shall be cancelled, but the rights and remedies of any such holder under applicable non-bankruptcy law with respect to such Interests otherwise shall not be Impaired by, the Plan. Interests in all subsidiary Debtors shall be Reinstated under, and shall not be Impaired by, the Plan. |
| | • *Estimated Recovery* -- 100% |

## III.     HISTORY OF THE DEBTORS

### A.     Overview of Business Operations

Blue Bird Body Company is one of North America's largest manufacturers of school buses with annual sales of approximately $700 million and a market share of approximately 30 percent. The company makes five models of school buses that range in size. Smaller school buses carry ten students, whereas the larger buses can carry up to ninety students. The average retail price of Blue Bird's school buses ranges between $35,000 and $82,500. While sales of school buses account for the great majority of Blue Bird's total annual sales – approximately 85 percent for the fiscal year ended September 30, 2005 – Blue Bird also manufactures and distributes a broad range of other buses and related products, including transit and shuttle buses, touring and charter coaches, and luxury motor-homes. Transit and shuttle buses cost between $170,000 and $310,000; touring and

charter coaches cost between $330,000 and $360,000; and luxury motor-homes cost between $350,000 and $680,000.

School districts and private business are the ultimate purchasers of Blue Bird's buses. Blue Bird sells most of its buses through approximately 45 authorized dealers located throughout the United States and Canada. Blue Bird's dealers sell exclusively Blue Bird buses, and the dealers have on average 20 years' experience selling and servicing the company's products. Blue Bird manufactures its buses at two large plants located in Fort Valley, Georgia, which is also the location of the company's corporate headquarters; a plant in Lafayette, Georgia; and a plant (owned through a non-debtor subsidiary) located in Brantford, Ontario. As of January 2006, Blue Bird employed approximately 1,900 salaried and hourly employees at these plants.

Blue Bird has two main competitors in the school bus market and three main competitors in the non-school bus market. The school bus market is driven by competition among Blue Bird and its two primary competitors; government tax revenues and budgets; student enrollment among school districts; and safety and environmental regulations. The school bus manufacturing business is highly seasonal, as dealers typically order new buses from the start of the budget year (e.g., on July 1) for delivery by the start of the following budget year. There are approximately 500,000 school buses in service in North America. The average useful life of a bus is approximately 12.5 years.

      **B.**      **Corporate Structure**



      **C.**      **Capital Structure of the Debtors**

Peach County Holdings, the ultimate parent of the corporate group, was formed in September 2004 as part of an out-of-court restructuring (the "2004 Restructuring") of the financial indebtedness of Blue Bird, certain affiliates of Blue Bird, and Blue Bird's former ultimate parent, Henlys Group plc, a United Kingdom public limited company. As a result of that restructuring, which was consummated on October 18, 2004, Henlys Group plc transferred its shares of common stock in Peach County Holdings in the following percentages to: (i) the Bank Group (42.5 percent); (ii) Volvo Truck and Bus Limited, a corporation incorporated under the laws of England and Wales ("Volvo") (42.5 percent); (iii) a group of senior management employees of Blue Bird (the "Senior Management Group") (10 percent); and (iv) the Henlys Group plc Pension Scheme established by an interim deed dated April 17, 1968, a United Kingdom pension fund (5 percent). In addition, Henlys Group plc also transferred

6

shares in three series of preferred stock in Peach County Holdings to the Bank Group and Volvo, including Series A Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock.

Furthermore, as part of the 2004 Restructuring, the parties agreed to an amendment and restatement of that certain First Amended and Restated Credit Agreement dated December 9, 2003 (the "2003 Credit Agreement") arranged by Lloyds TSB Bank plc and The Royal Bank of Scotland plc. Under the 2003 Credit Agreement, the arrangers and certain lenders had agreed to loan to Blue Bird and Henlys Group plc an amount up to approximately $325.8 million. Henlys U.S. Investments, Inc., Henlys Holding Corp., Blue Bird Corporation, and Blue Bird Investment Corporation were guarantors of Blue Bird's and Henlys Group plc's obligations under the 2003 Credit Agreement.

The 2003 Credit Agreement was amended and restated pursuant to that certain Second Amended and Restated Credit Agreement, dated October 18, 2004 (the "Credit Agreement"), pursuant to which the Bank Group agreed to compromise and reduce the previously outstanding indebtedness and loan to Blue Bird and Peach County Holdings an amount up to $215 million, with Henlys U.S. Investments, Inc., Henlys Holding Corp., Blue Bird Corporation, and Blue Bird Investment Corporation as guarantors of Blue Bird's and Peach County Holdings' obligations under the Credit Agreement. As of the Petition Date, approximately $213 million in obligations were outstanding under the Credit Agreement. These obligations are secured by liens on substantially all of the assets of Blue Bird plus the stock of each of the Debtors.

Blue Bird estimates that, as of January 24, 2006, it had approximately $129 million in unsecured debt obligations comprised of, among other things, $8.4 million in accrued wages and employee benefits; $14.1 million on account of reserves for warranties; approximately $53 million on account of trade and related debt; and approximately $41.5 million in funding obligations under the company pension plan. There are intercompany obligations among the Debtors, including amounts owed by Blue Bird to Blue Bird Investment Corporation on account of royalty obligations in connection with a license of certain trademarks. Blue Bird also owes its non-debtor Canadian subsidiary for management fees incurred in manufacturing buses at the Brantford, Ontario facility.

### D.    Events Leading to the Chapter 11 Filings

While Blue Bird is a significant participant in the bus manufacturing industry whose products are highly regarded by its customers, Blue Bird has experienced operating losses for its most recent fiscal years. These losses have been a result of budgetary constraints facing school districts and other buyers of school buses which have negatively affected sales of Blue Bird buses. Budget constraints of this sort are cyclical, and the most recent downturn in the market appears to be nearing an end. However, Blue Bird also has experienced losses as a result of problems it encountered after closing a plant located in Mt. Pleasant, Iowa and relocating the production facilities to its plants in Georgia. These problems resulted in a significant amount of re-work plus additional warranty and related claims by purchasers.

During the latter half of 2003 and the early part of 2004, Blue Bird retained a new management team, each of whose members has significant experience in manufacturing and turning around troubled companies. This management team has developed and implemented numerous operational initiatives designed to improve quality, raise revenues, and cut costs. For instance, management transferred various production lines among its facilities in order to achieve efficiencies; it implemented a new product ordering and simplified product offering system; it began out-sourcing certain fabrication work in order to reduce high sub-assembly costs; and it streamlined the inventory management process to ensure on-time part delivery and to minimize shortages of materials.

Despite these improvements, Blue Bird has had too much secured bank debt on its balance sheet that was incurred when Henlys Group plc, Blue Bird's previous owner, acquired the company. As noted above, in October 2004, Blue Bird completed the 2004 Restructuring, pursuant to which equity ownership in Blue Bird's ultimate parent was transferred by Henlys to the Bank Group, Volvo, the Management Group, and the Henlys Group plc Pension Scheme and the obligations to the Bank Group were reduced from approximately $325 million to approximately $215 million. However, Blue Bird's operating performance has not met the projections made at the time of the 2004 Restructuring. Moreover, the company's balance sheet has remained too highly leveraged.

Although Blue Bird's management moved rapidly since the consummation of the 2004 Restructuring to effectuate an operational turn-around, Blue Bird does not anticipate that it will begin to reap the dividends of this turn-around until 2007. In the meantime, the company continues to have more bank debt than it can support and insufficient sources of liquidity. As a consequence, Blue Bird is not able to continue making interest and amortization payments on the approximately $213 million in debt owing to the Bank Group, and Blue Bird projects that it will be unable to do so, despite its anticipated operational turn-around, absent conversion of a significant portion of this debt into equity of a reorganized enterprise.

Faced with this set of circumstances, in September 2005, Blue Bird began evaluating its strategic alternatives. The principal alternatives available to Blue Bird were a sale of the company or a stand-alone restructuring of the balance sheet to reduce debt-service requirements and improve free cash flow. Blue Bird and the Bank Group pursued talks with Volvo Holdings Sverige AB pursuant to which Volvo considered purchasing the Bank Group's stock in Peach County Holdings, the Debtors' ultimate parent, and recapitalizing the entire corporate group. On or about January 2, 2006, Volvo Holdings Sverige AB determined not to proceed with the purchase. Blue Bird and the Bank Group thereafter focused on negotiating a stand-alone out-of-court restructuring that would convert a portion of the Bank Group's debt under the Credit Agreement into equity and, in essence, transfer substantially all ownership of the company to the Bank Group. Blue Bird and the Bank Group determined that an out-of-court restructuring, as opposed to a Chapter 11 reorganization, would minimize disruptions to the company's operations and maximize the value of the company for the benefit of its stakeholders, and therefore pursued this alternative vigorously.

By January 18, 2006, Blue Bird had reached an understanding with all but one member of the Bank Group on the terms under which the Bank Group was willing to consent to an out-of-court restructuring, including the Bank Group's agreement to afford additional liquidity to the Company. The one Bank Group member holds approximately 7% of the Bank Group debt, meaning that an out-of-court restructuring was supported by holders of 93% of the Bank Group debt. However, since the terms of the Credit Agreement required unanimous consent of the members of the Bank Group for the proposed out-of-court restructuring, including the provision of a new senior revolving lending facility and compromise of a portion of the Bank Group debt, Blue Bird and the consenting members of the Bank Group were unable to proceed with executing the out-of-court restructuring.

Given these circumstances, Blue Bird and the members of the Bank Group who had consented to the out-of-court restructuring concluded that the proposed restructuring should be implemented through a prepackaged plan of reorganization according to the terms described in this Disclosure Statement and embodied in the Plan.

## IV.    TIMING OF THE CHAPTER 11 CASES

Subject to receiving the requisite acceptances on the Plan, the Debtors intend to commence their Chapter 11 Cases on January 26, 2006. The Debtors have no debtor-in-possession financing and very limited sources of their own cash. The Debtors therefore do not expect the Chapter 11 Cases to be protracted. **In fact, the Debtors will request confirmation of the plan at the earliest possible opportunity.** Specifically, the Debtors will request that the hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan occur as early as **January 27, 2006**. Assuming that the Plan is confirmed at that hearing, the Plan provides that the Effective Date will be the Business Day on which all conditions to the consummation of the Plan have been satisfied or waived (as provided in Article VIII of the Plan). *See* "The Plan -- Conditions Precedent to the Plan's Confirmation and the Effective Date" below. The Effective Date could be the same day as the Confirmation Hearing. In fact, the Debtors will endeavor to cause the Plan to become effective on that date. **Under this timetable, if approved, the Debtors would emerge from Chapter 11 the day after they commence the Chapter 11 cases.** Obviously, there can be no assurance that this projected timetable can be achieved.

The Debtors believe it is important that the length of their stay in Chapter 11 be as short as possible. The reason is that Chapter 11 poses serious risks to a business like Blue Bird's, which is highly dependent on the company's ability to represent to its dealers and purchasers of its buses – most of whom are government agencies who require evidence of financial stability and ability to perform – that the company will deliver products as and when promised in accordance with strict safety and other customer order specifications, and that it will be around

8

long-term to honor warranties and provide parts and service.  Indeed, Blue Bird's business and enterprise value are so dependent on its reputation and goodwill that it believes that a prolonged Chapter 11 proceeding likely will result in the complete collapse of the business and the total evaporation of all going concern value.  Blue Bird's business is highly seasonal, and it is now at that point in its annual business cycle when bus orders are placed for the entire year, and when its liquidity is at its tightest as it ramps up inventory purchases and manufacturing operations.  It therefore is critical that the simple, straightforward restructuring of the Bank Group debt contemplated by the Plan be effectuated as expeditiously as possible.

## V.    THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMEN-TATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTER-ESTS UNDER THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A.    Overall Structure of the Plan

Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.  If the Plan is confirmed by the Bankruptcy Court and consummated, every Class of Claims will receive distributions in the ordinary course equal to the full amount of the Claims, with the exception that the Bank Group Claims will be compromised as described herein.  As noted above, holders of approximately 93% of the Bank Group Claims have indicated that they agree to the proposed treatment of their Claims under the Plan.

### B.    Classification and Treatment of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and interest holders.  In accordance with section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, and Priority Tax Claims which, pursuant to section 1123(a)(1), need not be and have not been classified).  The Debtors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes which contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this Solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the

9

Plan.  Furthermore, a reclassification of a Claim or Interest after approval of the Plan could necessitate a re-solicitation of acceptances of the Plan.

## 1.  *Unclassified Claims*

### a.  Administrative Claims

Administration Claims are Claims for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.  The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.

### b.  Priority Tax Claims

Priority Tax Claims are Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code.  The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.

## 2.  *Classified Claims and Interests*

### a.  Class 1 - Bank Group Claims

Bank Group Claims are Claims arising from or related to that certain Restructuring Agreement dated October 18, 2004 between Henlys Group plc and Peach County Holdings, Inc. and Others and Lloyds TSB Bank plc and The Royal Bank of Scotland plc, as Arrangers, including the Amended and Restated Credit Agreement dated October 18, 2004, entered into pursuant to the terms thereof, relating to a Credit Agreement dated September 14, 1999, as amended and restated by an amendment and restatement agreement dated December 9, 2003, each as amended, supplemented, or modified.

The Bank Group Claims are Allowed, Impaired Claims.  On the Distribution Date, each holder of an Allowed Bank Group Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Group Claim, (a) its pro rata share of the Converted Term Loan and (b) its pro rata share of the New Peach County Stock Distribution.  The Converted Term Loan shall be comprised of a loan secured by a Lien on substantially all of the Reorganized Debtors' assets, junior only to the Lien securing the Senior Secured Financing Facility, in a principal amount equal to $100 million.

### b.  Class 2  - Other Secured Claims

Other Secured Claims include Secured Claims against the Debtors other than the Bank Group Claims.  The rights of each holder of an Other Secured Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Other Secured Claim shall retain its Lien on the Collateral securing such Other Secured Claim, and such Lien shall survive the Effective Date and continue in accordance with the contractual terms of any underlying agreements and applicable law until such Other Secured Claim is satisfied in full.  This Class is deemed to have accepted the Plan and therefore is not entitled to vote.

c.    Class 3 - Other Priority Claims

Other Priority Claims are Claims entitled to priority under section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.  Under the Plan, the rights of each holder of an Other Priority Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Thus, each holder of an Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtors and such holder shall have agreed upon in writing.  This Class is deemed to have accepted the Plan and therefore is not entitled to vote.

d.    Class 4 - General Unsecured Claims

General Unsecured Claims are Claims that are not Administrative Claims, Bank Group Claims, Other Priority Claims, Other Secured Claims, or Priority Tax Claims.  The rights of each holder of a General Unsecured Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Thus, each holder of a General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtors and such holder shall have agreed upon in writing. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.

e.    Class 5 - Intercompany Claims

Intercompany Claims are Claims by a Debtor or an affiliate against another Debtor or affiliate.  Under the Plan, at the option of the Reorganized Debtors, Intercompany Claims shall either be Reinstated, in full or in part, or cancelled and discharged, in full or in part.  This Class is deemed to have accepted the Plan and therefore is not entitled to vote.

f.    Class 6 - Interests

Interests include the legal, equitable, contractual and other rights of any Person with respect to any shares in any of the Debtors or any other right thereto, including, but not limited to, common stock, preferred stock, stock options and warrants.  Holders of Interests in Peach County Holdings, Inc. shall not be Impaired by the Plan. Specifically, holders of such Interests shall receive the following treatment:  (a) the Interests of any holder who has executed or otherwise indicated that it accepts the Restructuring Agreement as of the Confirmation Date shall be cancelled in accordance with the Restructuring Agreement and (b) the Interests of any holder who has not executed or otherwise indicated that it accepts the Restructuring Agreement as of the Confirmation Date shall be cancelled, but the rights and remedies of any such holder under applicable non-bankruptcy law with respect to such Interests otherwise shall not be Impaired by, the Plan.  Interests in all subsidiary Debtors shall be Reinstated under, and shall not be Impaired by, the Plan.

C.    **Means for Implementation of the Plan**

1.    **Continued Corporate Existence**

The Reorganized Debtors shall continue to exist as separate corporate entities, in accordance with the applicable law in the respective jurisdictions in which they are incorporated, under their respective certificates of incorporation and by-laws in effect before the Effective Date, except as their certificates of incorporation and by-laws are amended by the Plan.

## 2.        Certificates of Incorporation and By-laws

The certificate of incorporation and by-laws of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, under section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities.

## 3.        Restructuring Transactions

### (i)        *New Peach County Stock*

As of the Effective Date, the issuance of New Peach County Stock is hereby authorized without further act or action under applicable law, regulation, order or rule.  All such Stock to be issued will be deemed issued as of the Distribution Date regardless of the date on which it is actually distributed.

### (ii)        *New Senior Secured Financing Facility*

The Reorganized Debtors will enter into one or more post-confirmation loan facilities, including the New Senior Secured Financing Facility, in order to (a) make payments required to be made on the Effective Date or the Distribution Date, and (b) provide the additional borrowing capacity required by the Reorganized Debtors and the non-Debtor subsidiaries following the Effective Date to maintain their operations.

### (iii)        *Converted Term Loan and Subordination Agreement*

The Reorganized Debtors will enter into the Converted Term Loan secured by a Lien on the Reorganized Debtors' assets, subordinate to the Lien securing the Senior Secured Financing Facility pursuant to the terms of the Subordination Agreement.

## 4.        Directors and Officers

On the Effective Date, the Board of Directors of Reorganized Peach County Holdings shall be comprised of the following persons selected by holders of the Bank Group Claims, consistent with the amended certificate of incorporation and bylaws:  Steven F. Cooper, Executive Chairman; Bob Bingham, Chief Restructuring Officer; Leonard LoBiondo, Vice Chairman; Jeffry D. Bust, Chief Executive Officer; and Tom Weber.  The officers and directors of the other Reorganized Debtors shall be as determined by Reorganized Peach County Holdings.

## 5.        Revesting of Assets

The property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Debtor on the Confirmation Date.  Thereafter, each Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Confirmation Date, all property of each Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.  Without limiting the generality of the foregoing, each Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Confirmation Date for professional fees and expenses.

## 6.        Preservation of Rights of Action

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or the Estates may hold against any Person or entity.  Each Debtor or its

successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights. Notwithstanding the foregoing, the Debtors hereby release any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code.

### 7.     Exemption from Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers or mortgages by or from a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 8.     Effectuating Documents; Further Transactions

The chairman of the Board of Directors, president, chief financial officer, or any other appropriate officer of the Debtors, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the appropriate Debtor shall be authorized to certify or attest to any of the foregoing actions.

### D.     Provisions Governing Distributions

### 1.     Delivery of Distributions; Undeliverable or Unclaimed Distributions

#### (i)     Delivery of Distributions in General

Reorganized Peach County shall make distributions to each holder of an Allowed Claim at the address reflected in the books and records of the Debtors.

#### (ii)     Undeliverable and Unclaimed Distributions

##### (a)     Holding of Undeliverable and Unclaimed Distributions

If any holder's distribution is returned as undeliverable, no further distributions to that holder shall be made unless and until Reorganized Peach County receives notice of the holder's then-current address, at which time all outstanding distributions shall be made to the holder.  Undeliverable distributions made through Reorganized Peach County shall be returned to Reorganized Peach County until such distributions are claimed.  Reorganized Peach County shall establish a segregated account to serve as the unclaimed distribution reserve, and all undeliverable and unclaimed distributions shall be deposited therein, for the benefit of all similarly situated Persons until such time as a distribution becomes deliverable or is claimed.

##### (b)     Failure to Claim Undeliverable Distributions

Any undeliverable or unclaimed distribution under the Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefore against, or seeking to recover its distribution from, the Debtors, the Estates, the Reorganized Debtors, or their property.  After the second anniversary of the Effective Date, Reorganized Peach County shall withdraw any amounts remaining in the unclaimed distribution reserve for distribution in accordance with the Plan.

3.        **Calculation Of Distribution Amounts Of New Common Stock**

No fractional shares of New Peach County Stock shall be issued or distributed under the Plan or by the Reorganized Debtors or Disbursing Agent.  Each Person entitled to receive New Peach County Stock will  receive the total number of whole shares of New  Peach County Stock to which such Person is entitled.

4.        **Withholding and Reporting Requirements**

In connection with the Plan and all distributions thereunder, Reorganized Peach County shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions shall be subject to those requirements.  Reorganized Peach County shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim that is to receive a distribution of its pro rata share of the Converted Term Loan and shares of New Peach County Stock shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations or has, to the Disbursing Agent's satisfaction, established an exemption therefrom.  Any distribution of a pro rata share of the Converted Term Loan or shares of New Peach County Stock to be made pursuant to the Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article V(C)(ii) thereof.

5.        **Setoffs**

Reorganized Peach County may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the Claim's holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any claim that the Debtors or Reorganized Debtors may have.

E.        **Treatment of Executory Contracts and Unexpired Leases**

1.        **Assumed Contracts and Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the contract and lease assumptions as of the Effective Date.

2.        **Payments Related to Assumption of Contracts and Leases**

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure in the ordinary course of business.

3.        **Compensation, Benefit, and Pension Programs**

All employee compensation, benefit, indemnification and pension programs of the Debtors, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Article VI. A of the Plan, but only to the extent that rights under such programs are held by a Debtor or Persons who are employees of a Debtor as of the Confirmation Date, and the Debtors' obligations under

14

such programs to persons who are employees of a Debtor on the Confirmation Date shall survive confirmation of the Plan.

### 4.        Indemnification Obligations

Except as otherwise specifically provided herein, any obligations or rights of any Debtor to indemnify its present and former directors, officers, or employees under its certificate of incorporation, by-laws, employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by the Plan's confirmation, and remain an obligation of the respective Reorganized Debtor, regardless of whether the right to indemnification arose before or after the Petition Date.

### 5.        Treatment of Change of Control Provisions

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of Peach County.

### 6.        Restructuring Agreement

Each of the terms of the Restructuring Agreement is hereby approved in every respect and is deemed incorporated hereby as if fully set forth herein.

### F.        Conditions Precedent to the Plan's Confirmation and Consummation

### 1.        Conditions to Confirmation

The Plan's Confirmation is subject to the satisfaction or due waiver of each of the following conditions precedent:

(i)        The proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors and The Royal Bank of Scotland plc, as agent for the Bank Group.

### 2.        Conditions to Effective Date

Effectiveness of the Plan is subject to the satisfaction or due waiver of each of the following conditions precedent:

(i)        The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors and The Royal Bank of Scotland plc, as agent for the Bank Group, confirming the Plan, as the same may have been modified.

(ii)        The Debtors shall have entered into the Converted Term Loan.

(iii)        The Debtors shall have entered into the New Senior Secured Facility, in amount, form and substance acceptable to the Debtors, to provide the Reorganized Debtors with working capital to meet ordinary and peak requirements and additional borrowings to support future projects.

### 3.        Waiver of Conditions

The conditions set forth above can be waived, in whole or in part, by the Debtors and The Royal Bank of Scotland plc, as agent for the Bank Group, at any time without an order of the Bankruptcy Court, provided, however, that in no event may any provision of the Restructuring Agreement be waived or modified without the

15

written consent of the parties thereto.  Unless waived, the failure to satisfy any condition to the Effective Date will preclude the Effective Date's occurrence, regardless of the circumstances giving rise thereto (including any action or inaction by a Debtor or Reorganized Debtor).  The waiver of any condition to Confirmation or to the Effective Date shall not constitute or be deemed a waiver of any other condition.

### G.    Modification; Withdrawal

The Debtors reserve the right to modify the Plan either before or after Confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Fed. R. Bankr. P. 3019.  The Debtors may withdraw the Plan at any time before the Effective Date.

### H.    Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

1.    Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

2.    Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

3.    Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

4.    Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

5.    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

6.    Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

7.    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

8.    To construe and enforce the Restructuring Agreement; and

9.    Enter a final decree closing the Chapter 11 Cases.

## I.    Effects of Confirmation

### 1.    Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims and Interests, and their respective successors and assigns, and all other parties-in-interest in these Chapter 11 Cases.

### 2.    Discharge Of The Debtors

All consideration distributed under the Plan shall be in exchange for, and incomplete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against, or Interests in, the Debtors or any of their assets or properties, and, except as otherwise provided herein or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of a Debtor prior to the Petition Date and that arises from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the holder of a Claim based upon such debt accepted the Plan.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, subject to the Effective Date occurring.   Notwithstanding anything in this section to the contrary, the Liens securing the Bank Group Claims shall not be discharged, but shall remain in effect to secure the Reorganized Debtors' obligations under the Converted Term Loan.

### 3.    Injunction

Except as otherwise provided in the Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, the Estate(s), Reorganized Peach County, or any of their property on account of any such Claims or Interests:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan; and provided further that nothing contained herein shall preclude the Bank Group from exercising its rights with respect to the Lien securing the Reorganized Debtors' obligations under the Converted Term Loan.

### 4.    Exculpation And Limitation Of Liability

Neither the Debtors nor any of their present or former members, officers, directors, employees, advisors, attorneys, or agents, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no

17

successors or assigns of the foregoing, shall have any right of action against the Debtors, the Estate(s), the Reorganized Debtors, or any of their respective present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

As of the confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors and each of their affiliates, agents, directors, officers, employees, investment bankers, financial advisors, attorneys and other professionals have participated in good faith and in compliance with section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Peach County Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Peach County Stock under the Plan.

### 5.      Limited Mutual Releases

Pursuant to and in accordance with the terms of the Restructuring Agreement, each of the Debtors, Volvo Holdings Sverige AB, AB Volvo, Volvo Truck and Bus Limited, Volvo Bus Corporation (collectively, the "Volvo Companies"), each member of the Bank Group and management, Mikael Bratt, Sal Mauro and Tore Backstrom ((in their capacity as former directors of the Debtors) the "Volvo Nominees") and each of the aforementioned parties' affiliates, principals, employees, agents, officers, directors, representatives, financial advisors, attorneys and other professionals, if any, hereby release and discharge one another and are deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged one another for and from any and all claims or causes of action existing as of the date hereof in any manner arising from, based on, or relating to, in whole or in part, the investment in the Debtors by Volvo Holding Sverige AB; the management and operation of the Debtors since 2004; the negotiations relating to proposals for a refinancing of the Debtors during 2005 and the reporting and consideration of such negotiations by the directors of the Debtors (including the Volvo nominees); the discussions and negotiations relating to the proposed acquisition by Volvo Holding Sverige AB of the Bank Group claims against and Stock in the Debtors owned by the Bank Group, the Henlys Group plc Pension Scheme, and Management; the recapitalization of the corporate group; and that certain Management Services Agreement between Volvo Bus Corporation and the Debtors dated October 18, 2004, which is terminated forthwith without any liability for either party, whether with regard to the past or the future. Miscellaneous Provisions

### 1.      Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### 2.      Payment of Statutory Fees

All fees payable under Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid from funds otherwise available for distribution hereunder.

### 3.      Severability of Plan Provision

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void or unenforceable, the Debtors, at their option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. The Confirmation Order shall constitute a

judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

### 4.    Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

### 5.    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until Reorganized Peach County has made all distributions contemplated by the Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Cases.

### J.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (i) the State of Delaware shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.

## VI.    CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including those items discussed in the Projections attached hereto, before deciding whether to vote to accept or to reject the Plan.

### A.    Failure to Confirm the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to Chapter 7 liquidations. In fact, the Debtors believe that absent confirmation of the Plan, the likely result will be an immediate cessation of all business operations, followed by a piecemeal liquidation of estate assets. If that were to occur, holders of Bank Group Claims would receive a fraction of the face amount of their Claims, and holders of other Claims likely would receive no recovery. *See* "Alternatives to Confirmation and Consummation of the Plan."

### B.    Potential Adverse Effects of Chapter 11

While the Debtors will seek to make their stay in Chapter 11 as brief as possible so as to minimize any potential disruption to their business operations and dealer and customer goodwill, it is possible that despite the belief and intent of the Debtors, the commencement of the Chapter 11 Cases could materially adversely affect relationships among the Debtors and their dealers, customers, employees, and suppliers. Indeed, the Debtors believe that the fact that they were unable to pursue an out-of-court restructuring may have an adverse effect on their business and enterprise value, especially in light of the fact that the Debtors temporarily suspended operations pending efforts to achieve consensus on a restructuring.

### C.    Potential Adverse Effects on Borrowing Needs

The Debtors and their advisors have estimated for the Bank Group the amount of a senior secured revolving lending facility necessary to afford them sufficient working capital during the coming months, when their annual

liquidity typically is at its lowest as bus orders are made and the Debtors' inventory acquisitions and manufacturing operations are intensified.  This estimate was based on an out-of-court scenario and assumed implementation of that scenario during the week of January 17, 2006.

### D.    Seasonal Nature of Business

The Debtors' bus business is very seasonal.  They are net cash users from October through June, and net cash generators from July through September.  Thus, the Debtors earn a disproportionate percentage of their revenue during a relatively narrow window each year.  Any adverse consequences as a result of pursuing Chapter 11 proceedings at this time, as they approach that time of year when their cash needs are highest, therefore could negatively affect financial performance.

### E.    Competition

The markets in which the Debtors compete are highly competitive.  To compete successfully, the Debtors must remain competitive in areas of quality, value, product line, ease of use, safety, comfort and customer service. The Debtors face competition in both of their operating divisions (i.e., school buses and coaches) from a number of manufacturers.  Competition in each of the Debtors' markets generally is based on product design, overall product quality, maintenance costs and price.

### F.    Risks Associated With Halted Production The Debtors typically shut down their

facilities during the last weeks of the calendar year.  This normal and scheduled halt in production is not expected to have any material effect on the Debtors' operations.  In early January, however, Blue Bird decided to shut-down its facilities after it concluded that it had inadequate capital to purchase parts necessary for the production of buses. This extended shut-down could have a negative effect on the Debtors' future financial performance. **Inherent Uncertainty of Financial Projections**

The Projections set forth in Exhibit C annexed hereto are based on numerous assumptions including the timing, confirmation, and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Debtors' operations.

Variations from assumptions in the Disclosure Statement may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to post-Effective Date indebtedness and to achieve the Projections.  Because the actual results achieved throughout the periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

### H.    Environmental Matters

The past and present business operations of the Debtors and the past and present ownership and operation of real property by the Reorganized Debtors are subject to extensive and changing federal, state and local environmental laws and regulations pertaining to the discharge of certain materials into the environment, the handling and disposal of wastes (including solid and hazardous wastes) or otherwise relating to health, safety and protection of the environment.  As such, the nature of the Debtors' operations and previous operations by others at real property currently or formerly owned or operated by the Debtors expose the Debtors to the risk of claims under

20

such environmental laws and regulations, and there can be no assurance that material costs or liabilities will not be incurred in connection with such claims. Based on their experience to date, the Debtors do not expect such claims, or the costs of compliance with environmental laws and regulations, to have a material impact on their capital expenditures, earnings or competitive position. No assurance can be given, however, that the discovery of presently unknown environmental conditions, changes in environmental laws and regulations or their interpretation, or other unanticipated events will not give rise to expenditures or liabilities that may have such an effect.

### I.    Dependence on Key Personnel

The success of the Reorganized Debtors' business is materially dependent upon the continued services of their key officers and employees. The loss of key personnel due to death, disability or termination of employment could have a material adverse effect on the results of operations or financial conditions, or both, of the Reorganized Debtors.

### J.    Absence of Public Market; Restriction on Transferability

The shares of Reorganized Peach County Holdings are securities for which there is no market. Accordingly, there can be no assurance as to the development or liquidity of any market for the shares of the stock. If a trading market does not develop or is not maintained, holders of the shares may experience difficulty in reselling such securities or may be unable to sell them at all. If a market for the shares of the stock develops, any such market may be discontinued at any time.

The shares of Reorganized Peach County Holdings stock are being offered in reliance upon an exemption from registration under the Securities Act and applicable state securities laws. Therefore, the shares may be transferred or resold only in a transaction registered under or exempt from the Securities Act and applicable state securities laws. The liquidity of, and trading market for, the shares of such stock also may be adversely affected by general declines in the market or by declines in the market for similar securities. Such declines may adversely affect such liquidity and trading markets independent of the financial performance of, and prospect for, the Reorganized Debtors.

### K.    Dividends

Reorganized Peach County Holdings does not anticipate that any dividends will be paid in the near term.

### L.    Reduction or Elimination of Tax Attributes

The transactions contemplated by the Plan will cause an ownership change with respect to the Debtors for United States federal income tax purposes. As result of this ownership change, the Debtors' substantial NOL carryovers may be significantly reduced or eliminated, and the Reorganized Debtors may be required to pay federal income tax with respect to income earned after the Effective Date.

## VII.    CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims and Interests (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtors have complied with applicable provisions of the Bankruptcy Code, (d) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all holders of Claims or Interests in each Impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before

Confirmation in accordance with sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits.

### A.    Voting Requirements

Under the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the Plan modifies the legal, equitable or contractual rights of holders of Claims or Interests in the Class (other than by curing defaults and reinstating debt).  Under section 1126(f) of the Bankruptcy Code, Classes of Claims and Interests that are unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.  Under section 1126(g) of the Bankruptcy Code, Classes of Claims and Interests whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims will have accepted the Plan if (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

As noted above, there are four classes of Claims in the Plan and one class of Interests.  The only class of Claims that is Impaired under the Plan is Class 1 Bank Group Claims.  Accordingly, holders of such Claims are the only creditors entitled to vote on the Plan.  All other classes are Unimpaired, are deemed to have accepted the Plan, and their votes therefore will not be solicited.

### B.    Feasibility of the Plan

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  This is the so-called "feasibility" test.  The Debtors believe that the Reorganized Debtors should have sufficient cash flow and borrowing availability under the new revolving facility to make the payments required under the Plan on the Effective Date and to repay and service debt obligations and to maintain operations on a going-forward basis.  This conclusion is supported by the projections attached hereto as Exhibit C that were prepared by the Debtors.  Accordingly, the Debtors believe that the Plan complies with the standard of section 1129(a)(11) of the Bankruptcy Code.

### C.    Best Interests Test

Even if the Plan is accepted by each class of holders of Claims and Interests, the Bankruptcy Code requires a Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of holders of claims or interests if a debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other

administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of a liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtors during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the Liquidation Analysis annexed hereto as Exhibit B to this Disclosure Statement, the Debtors believe that each member of each Class of Claims and Interests will receive at least as much, if not more, under the Plan as they would receive if the Debtors were liquidated in Chapter 7 Cases. More specifically, a liquidation of the Debtors would significantly impair recoveries to all stakeholders and clearly is not in the best interests of estate constituencies. The Liquidation Analysis estimates that holders of Bank Group Claims likely would receive a fraction of the face amount of their Claims, and that all other creditors and stockholders would receive nothing, in a liquidation. By contrast, under the Plan, all creditors other than the Bank Group stand to be paid in full. The Bank Group's prospects for recovery under the Plan, which they support, is significantly enhanced if the Debtors are restructured and continue their operations. Accordingly, it is clear that stakeholders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best interests test.

## D.    Confirmation Without Acceptance of All Impaired Classes -- "Cramdown"

The Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired Class of Claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no

23

holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

As explained above, the Debtors have been advised that Class 1 Bank Group Claims intend to accept the Plan. Thus, the cramdown provisions of section 1129(b) do not apply to this class. Each of the Claims and Interests in the other classes under the Plan, including Class 2 Other Secured Claims, Class 3 Other Priority Claims, Class 4 General Unsecured Claims, Class 5 Intercompany Claims, and Class 6 Interests are Unimpaired under the Plan. Thus, the cramdown provisions of section 1129(b) also do not apply to these classes. Even if Class 6 were to be considered impaired under the Plan, the cramdown provisions of section 1129(b) are satisfied with respect to this class because there is no junior class of stakeholders who stands to receive any recovery under the Plan.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

While the Debtors and members of the Bank Group (other than the lone dissenter) believe that an out-of-court restructuring of the Bank Group debt is the ideal approach to resolving the Debtors' financial and liquidity issues, the Debtors believe that the Plan affords the next best alternative for maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 cases, (b) formulation of an alternative plan or plans of reorganization, (c) a sale of the company's assets under section 363 of the Bankruptcy Code, or (d) liquidation of the Debtors under Chapter 7 or 11 of the Bankruptcy Code. The Debtors do not believe that any of these theoretical going concern alternatives is viable or realistic and that the only practical alternative to prompt confirmation of the Plan is immediate liquidation under Chapter 11 or Chapter 7.

As explained above, the Debtors do not believe that a traditional Chapter 11 process, under which a plan is developed and proposed post-petition, is viable here. The Debtors' business simply will not withstand the uncertainty and doubt engendered by such a process. Moreover, the estimated amount of post-petition financing necessary to sustain the business in a traditional Chapter 11 is prohibitively high, and several times the amount of the senior secured lending facility contemplated under the Plan. This is a consequence of the fact that in a traditional Chapter 11, trade credit would disappear as vendors restrict trade terms. Moreover, administrative expenses would be far higher in a traditional Chapter 11.

There are no viable sources of financing in the amounts necessary to sustain such a process outside the existing Bank Group, which holds liens on substantially all the Debtors' assets. The Bank Group unquestionably is undersecured, so there is no means for affording the Group adequate protection in connection with a post-petition priming facility from another source. The Debtors have been advised that the Bank Group will not consent to being primed by an outside source of financing, and it has advised the Debtors that the Bank Group is not prepared to fund a post-petition facility in the amounts necessary to sustain a traditional Chapter 11 process. Thus, the Debtors have no debtor-in-possession financing facility, and they have exceptionally limited cash resources of their own.

Moreover, there is no conceivable benefit to a traditional Chapter 11 that would outweigh its costs. Blue Bird's debt structure is very simple: it is comprised primarily of the Bank Group debt, on the one hand, and trade debt, warranty obligations, and an underfunded pension obligation, on the other hand. As a practical matter, very little of these obligations can be compromised and eliminated by Chapter 11 if the Debtors are to have any chance of maintaining a viable, go-forward business. Indeed, the great majority of the trade debt arguably is entitled to priority status under new provisions of the Bankruptcy Code, and/or is held by critical sole-source vendors who provide materials to the Debtors under the "just-in-time" delivery method.

Additionally, the Debtors clearly must honor all warranty claims in the ordinary course if they are to maintain their goodwill among customers and dealers. Furthermore, the Debtors cannot, in their business judgment, realistically attempt to terminate the pension plan in order to avoid their pension funding liabilities. In fact, the mere suggestion of the notion or attempt to do so would engender such unrest among the company's workers and so prolong the Chapter 11 process through litigation and administrative delays that, in Blue Bird's view, the business would simply collapse long before any resolution of the matter.

While a more traditional Chapter 11 is not a realistic alternative, the Debtors and their advisors did consider the possibility of a sale of their assets or other transaction under section 363 of the Bankruptcy Code and alternative structures that theoretically would allow an infusion of cash from an outside source. However, these also are not realistic alternatives given the exigencies of Blue Bird's cash situation, and hence, are not value maximizing propositions at this time. Indeed, one of Blue Bird's most likely suitors – Volvo – already considered, but determined not to proceed with, an acquisition.

There is a very small number of other players in the bus industry who theoretically could be buyers, but they have excess capacity and/or possibly would encounter regulatory delays in pursuing a transaction given the high market shares of the market participants. And given where Blue Bird currently is in its business cycle, its funding needs, its balance sheet issues, and the exigencies of time, pursuit of other potential acquirers simply is not realistic at this time or likely to afford a value greater than that contemplated by the Plan.

In light of the foregoing, the Debtors and their advisors originally concluded that there are only two alternatives for resolving Blue Bird's financial issues: an out-of-court restructuring or an immediate cessation of all operations with a resulting liquidation under Chapter 11 or Chapter 7. All members of the Bank Group (with the exception of the lone dissenter) agreed with this assessment, which is why the parties worked so vigorously to pursue an out-of-court restructuring. While pursuit of the terms of the out-of-court restructuring pursuant to this prepackaged Plan is only a second-best alternative to an entirely out-of-court process, the Debtors and the assenting Bank Group members are optimistic that it has the potential to be a business success, but only if it is confirmed in the shortest period of time possible.

Absent prompt confirmation, the Debtors believe they will liquidate. The Debtors believe that in a liquidation under Chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

Attached hereto as Exhibit B is a liquidation analysis prepared by the Debtors. In short, it demonstrates that a Chapter 11 or Chapter 7 liquidation would be an unmitigated disaster. The Bank Group would receive pennies on the dollar on account of their senior secured claims, while other creditors would receive nothing on account of their claims. Under the Plan, however, all Claims other than the Bank Group Claims will be paid in full, while holders of the Bank Group Claims stand to receive considerably enhanced value from Blue Bird's go-forward operations.

**THE DEBTORS THEREFORE BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.**

**IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS OF THE PLAN**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, CLAIMHOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX**

25

**ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY CLAIMHOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON CLAIMHOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) CLAIMHOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A summary description of certain material United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only the principal consequences of the Plan for holders of Claims who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims who are (or who hold their Claims through) pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction).  The following discussion assumes that holders of Claims hold their Claims as capital assets for United States federal income tax purposes.  Furthermore, the following discussion does not address United States federal taxes other than income taxes.

For purposes of the following discussion, a "United States person" is any of the following:

- an individual who is a citizen or resident of the United States;
- a corporation created or organized under the laws of the United States or any state or political subdivision thereof;
- an estate, the income of which is subject to  federal income taxation regardless of its source; or
- a trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

As used herein, the term "U.S. Holder" means a Claimholder that is a United States person, the term "non-U.S. person" means a person other than a United States person and the term "Non-U.S. Holder" means a Claimholder that is a non-U.S. person.

26

**Each holder of a Claim is strongly urged to consult its own tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

### A.    Certain United States Federal Income Tax Consequences to the Debtors

#### 1.    Cancellation of Indebtedness Income

Under general United States federal income tax principles, each Debtor will realize cancellation of debt ("COD") income to the extent that its obligation to a Claimholder is discharged pursuant to the Plan for an amount less than the adjusted issue price (in most cases, the amount the Debtors received upon incurring the obligation, with certain adjustments) of such holder's Claim.  For this purpose, the amount paid to a Claimholder in discharge of its Claim generally will equal the amount of Cash and the fair market value on the Effective Date of any other property paid to such Claimholder.

Because each Debtor will be a debtor in a bankruptcy case at the time it realizes COD income, the Debtors will not be required to include such COD income in their gross income, but rather will be required to reduce certain of their respective tax attributes by the amounts of COD income so excluded.  Under the general rules of IRC section 108, the required attribute reduction will be applied to reduce the net operating losses ("NOLs") and NOL carryforwards, to the extent of such NOLs and carryforwards, and certain other tax attributes of the Debtors.

Although not free from doubt, based on existing authorities, the Debtors reasonably believe and plan to take the position that any cancellation of intercompany debt will be treated as a contribution to capital.

#### 2.    Utilization of Net Operating Losses

Under IRC section 382, whenever there is a more than fifty percent ownership change of a corporation during a three-year testing period, the ability of the corporation to utilize its NOL carryovers and certain subsequently recognized built-in losses and deductions to offset future taxable income may be subject to an annual limitation.  The issuance of New Peach County Stock pursuant to the Plan will constitute an ownership change for purposes of IRC section 382.  As a result of this ownership change, the Debtors' substantial NOL carryovers may be significantly reduced or eliminated, and the Reorganized Debtors may be required to pay federal income tax with respect to income earned after the Effective Date.

#### 3.    Alternative Minimum Tax

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  It is possible that the Debtors may be liable for the alternative minimum tax.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims

The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Allowed Claims generally will be as follows.  These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things:  (1) the manner in which a holder acquired a Claim; (2) the length of time the Claim has been held; (3) the holder's method of tax accounting; (4) whether the Claimholder has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior years; and (5) (a) whether the Claim was acquired at a discount, (b) whether the Claimholder has previously included accrued but unpaid interest with respect to the Claim, (c) whether the Claim is an installment obligation for United States federal income tax purposes and (d) whether the Claim constitutes a "security" for United States federal income tax purposes.  Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

27

1.        **U.S. Holders of Allowed Bank Group Claims**

The Debtors believe and intend to take the position, and the following discussion assumes, that the Allowed Bank Group Claims do not constitute "securities" for United States federal income tax purposes.  A U.S. Holder's receipt of its *pro rata* share of (a) the Converted Term Loan and (b) shares of New Peach County Stock (collectively, the "Bank Group Consideration"), in respect of its Allowed Bank Group Claim pursuant to the Plan should be treated as a taxable transaction for United States federal income tax purposes.  As a result, a U.S. Holder should, except as described in the next sentence, generally recognize capital gain or loss for United States federal income tax purposes in an amount equal to the difference between its pro rata share of  (1) the sum of (x) the stated redemption price at maturity (the "SRPM") of the Converted Term Loan and (y) the fair market value on the Effective Date of the shares of New Peach County Stock received in respect of its Allowed Bank Group Claim and (2) such holder's adjusted tax basis in its Allowed Bank Group Claim.  A holder should, however, recognize interest income to the extent it receives its Bank Group Consideration in respect of accrued interest or accrued market discount that has not already been included in income under the holder's method of tax accounting.  A U.S. Holder that recognizes a loss as a result of the Plan could be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.  A holder's tax basis in its *pro rata* share of the Converted Term Loan should generally be equal to the SRPM of such *pro rata* share, and its tax basis in its shares of New Peach County Stock should generally be equal to the aggregate fair market value of such shares on the Effective Date.  Any gain or loss should be long-term gain or loss if the holder's holding period for its Allowed Bank Group Claim is more than one year on the Effective Date.  The holding period for the Bank Group Consideration received pursuant to the Plan would begin on the day following the Effective Date.

Additionally, a creditor that receives stock in exchange for debt is required, to the extent that gain is recognized upon a subsequent disposition of such stock, to "recapture" as ordinary income any bad debt deductions taken by the creditor with respect to such debt and any ordinary loss claimed by the creditor upon the receipt of the stock in satisfaction of such debt, reduced by any amount included in income upon the receipt of the stock.  A holder of Allowed Bank Group Claims may therefore recognize ordinary income, depending on the deductions taken by such holder.

2.        **Non-U.S. Holders of Allowed Bank Group Claims**

A Non-U.S. Holder of an Allowed Bank Group Claim will recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between its adjusted tax basis in such Claim, if any, and the "amount realized" by such Claimholder in connection with such Claim, except as described below under "Allocation Between Principal and Interest."  The amount realized by a Non-U.S. Holder of an Allowed Bank Group Claim will be equal to its pro rata share of the sum of (a) the SRPM the Converted Term Loan and (b) the fair market value of the New Peach County Stock.  A Non-U.S. Holder of an Allowed Bank Group Claim will take a basis in its Bank Group Consideration equal to the amount so taken into account as the amount realized.  A Non-U.S. Holder of an Allowed Bank Group Claim will have a holding period for its Bank Group Consideration determined by reference to the date of the above-described exchange.

If a dividend is paid with respect to the New Peach County Stock, any such dividend paid to a Non-U.S. Holder generally will be subject to withholding of United States federal income tax at a 30 percent rate (or such lower rate as may be specified by an applicable income tax treaty), unless the dividend is effectively connected with such holder's conduct of a trade or business within the United States, in which case the dividend will be taxed at ordinary United States federal income tax rates.  If such Non-U.S. Holder is a corporation, such effectively connected income may also be subject to an additional "branch profits tax."  The same treatment will apply to interest paid on the Converted Term Loan.

A Non-U.S. Holder generally will not be subject to United States federal income tax on any gain realized upon the sale or other disposition of Bank Group Consideration received in exchange for its Allowed Bank Group Claim unless such gain is effectively connected with a United States trade or business of the Non-U.S. Holder.  In addition, if Reorganized Peach County were a "United States real property holding corporation," for United States federal income tax purposes, then a Non-U.S. Holder would be subject to United States federal income taxation on

any gain realized from the sale or exchange of such stock unless an exemption is provided by an applicable treaty. The Debtors do not believe that Reorganized Peach County will be a United States real property holding corporation for United States federal income tax purposes.  However, there can be no assurance that the IRS will respect this conclusion.

**3.       Allocation of Plan Distributions Between Principal and Interest**

The Plan provides that, to the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest on such indebtedness, such distribution will, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  The Company intends to take the position that any distributions made under the Plan with respect to an Allowed Claim will be allocated first to the principal amount of the Claim, with the excess over the principal amount being allocated to accrued but unpaid interest.  However, current United States federal income tax law is unclear on this point and no assurance can be given that the IRS will not challenge the Company's position.

**C.       Information Reporting and Backup Withholding**

Certain payments, including the distributions or payments in respect of Claims pursuant to the Plan, are generally subject to information reporting by the payor (here, the Disbursing Agent) to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the IRC's backup withholding rules, a Claimholder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (2) provides a correct United States taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Claimholder's United States federal income tax liability, and such Claimholder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

**D.       Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**X.       OTHER MATTERS**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any Exhibits to such documents (at your own expense, unless otherwise specifically required by Fed. R. Bankr. P. 3017(d)), please contact the Voting Agent.

29

## XI.    RECOMMENDATION AND CONCLUSION

THE DEBTORS BELIEVE THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND THEIR CREDITORS.  FOR THESE REASONS, THE DEBTORS URGE ALL HOLDERS OF BANK GROUP CLAIMS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE VOTING AGENT ON OR BEFORE 10:00 A.M., EASTERN STANDARD TIME, ON JANUARY 26, 2006.

Dated:    Reno, Nevada
          January 24, 2006

PEACH COUNTY HOLDINGS, INC.

By:    /s/  Jeffry D. Bust
Name:    Jeffry D. Bust
Title:    Chief Executive Officer

HENLYS US INVESTMENTS, INC.

By:    /s/  Jeffry D. Bust
Name:    Jeffry D. Bust
Title:    Chief Executive Officer

HENLYS HOLDING CORP.

By:    /s/  Jeffry D. Bust
Name:    Jeffry D. Bust ·
Title:    Chief Executive Officer

BLUE BIRD CORPORATION

By:    /s/  Jeffry D. Bust ·
Name:    Jeffry D. Bust
Title:    Chief Executive Officer

BLUE BIRD BODY COMPANY

By:    /s/  Jeffry D. Bust
Name:    Jeffry D. Bust
Title:    Chief Executive Officer

BLUE BIRD INVESTMENT CORPORATION

By:   /s/  Jeffry D. Bust
Name:    Jeffry D. Bust
Title:     Chief Executive Officer


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Attorneys for Blue Bird Body Company, et al.,


By: /s/ Jay M. Goffman
Jay M. Goffman
Four Times Square
New York, NY  10036-6552

          -and-

By: /s/ Jennifer A. Smith
LIONEL SAWYER & COLLINS
1100 Bank of America Plaza
50 W. Liberty St.
Reno, Nevada  89501

31

**EXHIBIT A**

**PREPACKAGED JOINT PLAN OF REORGANIZATION OF
BLUE BIRD BODY COMPANY AND CERTAIN AFFILIATES**

EXHIBIT A

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                              :
In re                                         :
                                              :  Chapter 11
BLUE BIRD BODY COMPANY, et al.,               :  Case No. _____
                                              :  (Jointly Administered)
                          Debtors.            :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

### PREPACKAGED JOINT PLAN OF REORGANIZATION
### OF BLUE BIRD BODY COMPANY AND CERTAIN AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Van C. Durrer II
Mark A. McDermott
4 Times Square
New York, NY  10036-6552
(212) 735-3000

-and-

LIONEL SAWYER & COLLINS
Jennifer Smith
1100 Bank of America Plaza
50 W. Liberty Street
Reno, NV 89501
(773) 788-8666

Attorneys for Blue Bird Body Company, Inc., et al.

Dated:    Reno, Nevada
          January 24, 2006

**<u>TABLE OF CONTENTS</u>**

Page

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

A.    Scope of Definitions; Rules of Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
B.    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
C.    Rules of Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
D.    Computation of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE II
TREATMENT OF UNCLASSIFIED CLAIMS

A.    Administrative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
B.    Priority Tax Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE III
CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
B.    Summary of Classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
C.    Full Satisfaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
D.    Alternative Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE IV
MEANS FOR IMPLEMENTATION OF THE PLAN

A.    Continued Corporate Existence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
B.    Certificates of Incorporation and By-laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
C.    Restructuring Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
D.    Directors and Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
E.    Revesting of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
F.    Preservation of Rights of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
G.    Exemption from Certain Transfer Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
H.    Effectuating Documents; Further Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE V
PROVISIONS GOVERNING DISTRIBUTIONS

A.    Delivery of Distributions; Undeliverable or Unclaimed Distributions . . . . . . . . . . . . . . . . . . . . . 9
B.    Calculation Of Distribution Amounts Of New Common Stock . . . . . . . . . . . . . . . . . . . . . . . . . . 9
C.    Withholding and Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
D.    Setoffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2

ARTICLE VI

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumed Contracts and Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
B.    Payments Related to Assumption of Contracts and Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
C.    Compensation, Benefit, and Pension Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
D.    Indemnification Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
E.    Treatment of Change of Control Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
F.    Restructuring Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VII
ACCEPTANCE OR REJECTION OF THE PLAN

A.    Classes Entitled To Vote . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
B.    Acceptance by Impaired Classes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
C.    Cramdown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE VIII
CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION AND EFFECTIVE DATE

A.    Conditions to Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
B.    Conditions to Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
C.    Waiver of Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE IX
MODIFICATION; WITHDRAWAL

ARTICLE X
RETENTION OF JURISDICTION

ARTICLE XI
EFFECTS OF CONFIRMATION

A.    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
B.    Discharge Of The Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
C.    Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
D.    Exculpation And Limitation Of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
E.    Limited Liability Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE XII
MISCELLANEOUS PROVISIONS

A.    Allocation of Plan Distributions Between Principal and Interest
B.    Payment of Statutory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
C.    Severability of Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
D.    Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
E.    Term of Injunctions or Stays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
F.    Notices to Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
G.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3

TABLE OF EXHIBITS

| Exhibit | Name |
|---|---|
| A. | Debtor Affiliates of Blue Bird Body Company |
| B. | Converted Term Loan |
| |   - Amended and Restated Credit Agreement |
| |   - Amendment and Restatement Agreement |
| |   - Debt Subordination Agreement |
| C. | Restructuring Agreement |
| D. | Senior Secured Financing Facility |
| E. | Certificate of Incorporation and Bylaws |

4

# INTRODUCTION

Blue Bird Body Company and its affiliates identified on the annexed Exhibit A (collectively, the "Debtors") hereby propose this prepackaged joint reorganization plan (the "Plan"). The Debtors' Disclosure Statement, distributed with this Plan, contains a discussion of the Debtors' history, businesses and properties and a summary of the Plan and certain related matters relating to the Plan's confirmation. The Debtors urge all holders of Impaired Claims to review the Disclosure Statement and Plan in full.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION,
## AND COMPUTATION OF TIME

**A.    Scope of Definitions; Rules of Construction**

Except as expressly provided or unless the context otherwise requires, capitalized terms not otherwise defined in this Plan shall have the meanings ascribed to them in this Article I. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it therein. Where the context requires, any definition applies to the plural as well as the singular number.

**B.    Definitions**

1.1    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

1.2    "Allowed Claim" means a Claim or any portion thereof that is specifically allowed in this Plan.

1.3    "Bank Group" means those lenders party to the Restructuring Agreement.

1.4    "Bank Group Claims" means the Claims arising from or related to that certain restructuring agreement dated October 18, 2004 between Henlys Group plc and Peach County Holdings, Inc. and Others and Lloyds TSB Bank plc and The Royal Bank of Scotland plc, as Arrangers, including the Amended and Restated Credit Agreement dated October 18, 2004, entered into pursuant to the terms thereof, relating to a Credit Agreement dated September 14, 1999, as amended and restated by an amendment and restatement agreement dated December 9, 2003, each as amended, supplemented, or modified.

1.5    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

1.6    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Nevada or any other court with jurisdiction over the Chapter 11 Cases.

1.7    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, and the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein.

1.8    "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Fed. R. Bankr. P. 9006(a)), on which commercial banks are open for business in New York, New York.

1.9    "Cash" means legal tender of the United States.

1.10    "Chapter 11 Case(s)" means the Chapter 11 cases of the Debtors.

1.11    "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

1.12    "Class" means one of the classes of Claims or Interests listed in Article III of the Plan.

1.13    "Collateral" means any property or interest in property of a Debtor's Estate that is subject to a Lien to secure the payment or performance of a Claim.

1.14    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order.

1.15    "Confirmation Date" means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

1.16    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.17    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.18    "Converted Term Loan" means a loan secured by a Lien on substantially all of the Reorganized Debtors' assets, junior only to the Lien securing the Senior Secured Financing Facility, in a principal amount equal to $100 million, on substantially the terms contained in the draft document attached hereto as Exhibit B.

1.19    "Cure" means the payment of Cash by a Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of the Debtor that permits the Debtor to assume that contract or lease under section 365(a) of the Bankruptcy Code.

1.20    "Debtor" means each of Blue Bird Body Company, Blue Bird Corporation, Blue Bird Investment Corporation, Henlys Holding Corporation, Henlys U.S. Investments, Inc., and Peach County Holdings, Inc., as debtors and debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code, and "Debtors" means all of them collectively.

1.21    "Disclosure Statement" means the written disclosure statement that relates to the Plan, as amended, supplemented or modified from time to time and that is prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3018.

1.22    "Distribution Date" means the Effective Date.

1.23    "Effective Date" means the first Business Day (i) on which all conditions to the Plan's confirmation in Article VIII Section B of the Plan have been satisfied or waived and (ii) that is the date on which the Plan is consummated.

1.24    "Estate" means the estate of any Debtor in the Chapter 11 Cases, and "Estates" means, collectively, the estates of all of the Debtors in the Chapter 11 Cases, in each case as created under section 541 of the Bankruptcy Code.

1.25    "Final Order" means an order or judgment, entered by a court of competent jurisdiction, that has not been amended, modified, or reversed, and as to which no stay is in effect.

1.26    "General Unsecured Claim" means a Claim that is not an Administrative Claim, Bank Group Claim, Other Priority Claim, Other Secured Claim, or Priority Tax Claim.

1.27    "Impaired" refers to any Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.28    "Intercompany Claim" means any Claim by a Debtor or an affiliate against another Debtor or an affiliate.

1.29    "Interest" means the legal, equitable, contractual and other rights of any Person with respect to any shares in any of the Debtors or any other right thereto, including, but not limited to, common stock, preferred stock, stock options and warrants.

1.30    "Lien" means a security interest in Collateral.

1.31    "Limited Releases" shall have the meaning ascribed to such term in Article XI Section B of the Plan.

1.32    "New Peach County Stock " means shares of Reorganized Peach County Holdings stock to be authorized and issued under Article IV Section C of the Plan.

1.33    "New Peach County Stock Distribution " means shares of New Peach County Stock to be distributed to holders of Bank Group Claims under Article III Section B of the Plan.

1.34    "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.35    "Other Secured Claims" means all Secured Claims against the Debtors other than the Bank Group Claims.

1.36    "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.37    "Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.38    "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.39    "pro rata" means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in that Class, unless the Plan provides otherwise.

1.40    "Reinstated" or "Reinstatement" means, with respect to the treatment of a Claim under this Plan, that the Claim will not be impaired, as that term is used in section 1124 of the Bankruptcy Code.

1.41    "Released Parties" shall have the meaning ascribed to such term in Article XI Section B of the Plan.

1.42    "Reorganized Debtor" and "Reorganized Debtors" means, individually, any Debtor and, collectively, all Debtors, in each case from and after the Effective Date.

1.43    "Reorganized . . ." means the applicable Debtor from and after the Effective Date.

1.44    "Restructuring Agreement" means that certain Restructuring Agreement dated January 24, 2006 among the Debtors, the Bank Group, Volvo, and certain members of management of the Debtors, a copy of which is attached hereto as Exhibit C.

1.45    "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.46    "Senior Secured Financing Facility" means a new exit financing facility to be provided to the Reorganized Debtors, including any and all additional documents related thereto, on substantially the terms contained in the draft document attached hereto as Exhibit D.

1.47    "Subordination Agreement" means that certain debt subordination agreement among the Debtors, the lenders and agent under the Senior Secured Financing Facility and the lenders and agent under the Converted Term Loan.

1.48    "Volvo" means, collectively, AB Volvo, Volvo Holding Sverige AB, Volvo Truck and Bus Limited, Volvo Bus Corporation, and Volvo Trucks North America.

1.49    "Volvo Nominees" means, collectively, Mikael Bratt, Sal Mauro, and Tore Beckstrom.

## C.    Rules of Interpretation

(i)    General

In this Plan (a) any reference to a contract, instrument, release, or other agreement or document as being in a particular form or on particular terms and conditions means the agreement or document substantially in that form or on those terms and conditions, (b) any reference to an existing document or exhibit means that document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

(ii)    "Including"

As used in this Plan, "including" means "including without limitation."

(iii)    "On"

With reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

(iv)    "Contra Proferentum" Rule Not Applicable

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors and certain holders of Bank Group Claims. Each of the foregoing was represented by counsel who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, the general rule of contract construction known as "contra proferentum" shall not apply to the interpretation of any provision of this Plan, the Disclosure Statement, or any agreement or document generated in connection herewith.

D.    **Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

A.    **Administrative Claims**

The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.

B.    **Priority Tax Claims**

The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    **Introduction**

The Plan places all Claims and Interests, except unclassified Claims provided for in Article II, in the Classes listed below.  A Claim or Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in other Classes to the extent that any portion thereof falls within the description of other Classes.

B.    **Summary of Classes**

| <u>Description of Claims and Interests</u> | <u>Treatment Under the Plan</u> |
| --- | --- |
| Class 1 - Bank Group Claims (All Debtors) | • *Impaired* -- The Bank Group Claims are Allowed Claims.  On the Distribution Date, each holder of an Allowed Bank Group Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Group Claim, (a) its pro rata share of the Converted Term Loan and (b) its pro rata share of the New Peach County Stock Distribution. |
| | • *Estimated Recovery* -- Greater than in a liquidation. |

PLAN-5

| **Description of Claims and Interests** | **Treatment Under the Plan** |
|---|---|
| Class 2 - Other Secured Claims (All Debtors) | • *Unimpaired* -- The rights of each holder of an Other Secured Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of an Other Secured Claim shall retain its Lien on the Collateral securing such Other Secured Claim, and such Lien shall survive the Effective Date and continue in accordance with the contractual terms of any underlying agreements and applicable law until such Other Secured Claim is satisfied in full. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.<br><br>• *Estimated Recovery* -- 100% |
| Class 3 - Other Priority Claims (All Debtors) | • *Unimpaired* -- The rights of each holder of an Other Priority Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Thus, each holder of an Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtors and such holder shall have agreed upon in writing. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.<br><br>• *Estimated Recovery* -- 100% |
| Class 4 - General Unsecured Claims (All Debtors) | • *Unimpaired* -- The rights of each holder of a General Unsecured Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Thus, each holder of a General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtors and such holder shall have agreed upon in writing. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.<br><br>• *Estimated Recovery* -- 100% |
| Class 5 - Intercompany Claims | • *Unimpaired* – At the option of the Reorganized Debtors, Intercompany Claims shall either be Reinstated, in full or in part, or cancelled and discharged, in full or in part. This Class is deemed to have accepted the Plan and therefore is not entitled to vote.<br><br>• *Estimated Recovery* -- 100% |

| Description of Claims and Interests | Treatment Under the Plan |
|---|---|
| Class 6 - Interests | • *Unimpaired* --    Holders of Interests in Peach County Holdings, Inc. shall not be Impaired by the Plan.  Specifically, holders of such Interests shall receive the following treatment:  (a) the Interests of any holder who has executed or otherwise indicated that it accepts the Restructuring Agreement as of the Confirmation Date shall be cancelled in accordance with the Restructuring Agreement and (b) the Interests of any holder who has not executed or otherwise indicated that it accepts the Restructuring Agreement as of the Confirmation Date shall be cancelled, but the rights and remedies of any such holder under applicable non-bankruptcy law with respect to such Interests otherwise shall not be Impaired by, the Plan.  Interests in all subsidiary Debtors shall be Reinstated under, and shall not be Impaired by, the Plan. |
|  | • *Estimated Recovery* -- 100% |

**C.    Full Satisfaction**

Reorganized Peach County shall make, and each holder of a Claim shall receive, the distributions provided for in the foregoing provisions of this Article III in full satisfaction and discharge of all Claims against the Debtors.

**D.    Alternative Treatment**

Notwithstanding any provision herein to the contrary, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtor obligated on its Claim may agree in writing.

**ARTICLE IV**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.    Continued Corporate Existence**

The Reorganized Debtors shall continue to exist as separate corporate entities, in accordance with the applicable law in the respective jurisdictions in which they are incorporated, under their respective certificates of incorporation and by-laws in effect before the Effective Date, except as their certificates of incorporation and by-laws are amended by this Plan.

**B.    Certificates of Incorporation and By-laws**

The certificate of incorporation and by-laws of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, substantially as contemplated by Exhibit E attached hereto, and shall include, among other things, under section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities.

C.    **Restructuring Transactions**

(i)    *New Peach County Stock*

As of the Effective Date, the issuance of New Peach County Stock is hereby authorized without further act or action under applicable law, regulation, order or rule.  All such Stock to be issued will be deemed issued as of the Distribution Date regardless of the date on which it is actually distributed.  The issuance and distribution of the New Peach County Stock is exempt from the registration requirements of the Securities Act of 1933 and any state or local laws requiring registration, by reason of one or more exemptions therefrom, including section 4(2) thereof, and the issuance of such stock is exempt from the registration requirements of the Securities Act and similar state statutes pursuant to section 1145 of the Bankruptcy Code.

(ii)    *New Senior Secured Financing Facility*

The Reorganized Debtors will enter into one or more post-confirmation loan facilities, including the New Senior Secured Financing Facility, in order to (a) make payments required to be made on the Effective Date or the Distribution Date, and (b) provide the additional borrowing capacity required by the Reorganized Debtors and the non-Debtor subsidiaries following the Effective Date to maintain their operations.

(iii)    *Converted Term Loan and Subordination Agreement*

The Reorganized Debtors will enter into the Converted Term Loan secured by a  Lien on the Reorganized Debtors' assets, subordinate to the Lien securing the Senior Secured Financing Facility pursuant to the terms of the Subordination Agreement.

D.    **Directors and Officers**

On the Effective Date, the Board of Directors of Reorganized Peach County Holdings shall be comprised of persons selected by holders of the Bank Group Claims, consistent with its amended certificate of incorporation and bylaws.  Each of such persons shall be identified on or before the Confirmation Hearing.  The officers and directors of the other Reorganized Debtors shall be as determined by Reorganized Peach County Holdings.

E.    **Revesting of Assets**

The property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Debtor on the Confirmation Date.  Thereafter, each Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Confirmation Date, all property of each Debtor shall be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order.  Without limiting the generality of the foregoing, each Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Confirmation Date for professional fees and expenses.

F.    **Preservation of Rights of Action**

Except as otherwise provided in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or the Estates may hold against any Person or entity.  Each Debtor or its successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights. Notwithstanding the foregoing, the Debtors hereby release any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code.

**G.      Exemption from Certain Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers or mortgages from or by a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**H.      Effectuating Documents; Further Transactions**

The chairman of the Board of Directors, president, chief financial officer, or any other appropriate officer of the Debtors, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the appropriate Debtor shall be authorized to certify or attest to any of the foregoing actions.

**ARTICLE V**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.      Delivery of Distributions; Undeliverable or Unclaimed Distributions**

(i)      Delivery of Distributions in General

Reorganized Peach County shall make distributions to each holder of an Allowed Claim at the address reflected in the books and records of the Debtors.

(ii)      Undeliverable and Unclaimed Distributions

1.      Holding of Undeliverable and Unclaimed Distributions

If any holder's distribution is returned as undeliverable, no further distributions to that holder shall be made unless and until Reorganized Peach County receives notice of the holder's then-current address, at which time all outstanding distributions shall be made to the holder.  Undeliverable distributions made through Reorganized Peach County shall be returned to Reorganized Peach County until such distributions are claimed.  Reorganized Peach County shall establish a segregated account to serve as the unclaimed distribution reserve, and all undeliverable and unclaimed distributions shall be deposited therein, for the benefit of all similarly situated Persons until such time as a distribution becomes deliverable or is claimed.

2.      Failure to Claim Undeliverable Distributions

Any undeliverable or unclaimed distribution under this Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtors, the Estates, the Reorganized Debtors, or their property.  After the second anniversary of the Effective Date, Reorganized Peach County shall withdraw any amounts remaining in the unclaimed distribution reserve for distribution in accordance with this Plan.

**B.      Calculation Of Distribution Amounts Of New Common Stock**

No fractional shares of New Peach County Stock shall be issued or distributed under the Plan or by the Reorganized Debtors or Disbursing Agent.  Each Person entitled to receive New Peach County Stock will receive the total number of whole shares of New Peach County Stock to which such Person is entitled.

**C.      Withholding and Reporting Requirements**

In connection with this Plan and all distributions hereunder, Reorganized Peach County shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements.  Reorganized Peach County shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements.  Notwithstanding any other provision of this Plan, (i) each holder of an Allowed Claim that is to receive a distribution of its pro rata share of the Converted Term Loan and shares of New Peach County Stock shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations or has, to the Disbursing Agent's satisfaction, established an exemption therefrom.  Any distribution of a pro rata share of the Converted Term Loan or shares of New Peach County Stock to be made pursuant to this Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article V(C)(ii) hereof.

**D.      Setoffs**

Reorganized Peach County may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtors or Reorganized Debtors may have against the Claim's holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any claim that the Debtors or Reorganized Debtors may have.

**ARTICLE VI**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**A.      Assumed Contracts and Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the contract and lease assumptions as of the Effective Date.

**B.      Payments Related to Assumption of Contracts and Leases**

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure in the ordinary course of business.

**C.      Compensation, Benefit, and Pension Programs**

All employee compensation, benefit, indemnification and pension programs of the Debtors, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Article VI. A of the Plan, but only to the extent that rights under such programs are held by a Debtor or Persons who are employees of a Debtor as of the Confirmation Date, and the Debtors' obligations under such programs to persons who are employees of a Debtor on the Confirmation Date shall survive confirmation of this Plan.

**D.**     **Indemnification Obligations**

Except as otherwise specifically provided herein, any obligations or rights of any Debtor to indemnify its present and former directors, officers, or employees under its certificate of incorporation, by-laws, employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by this Plan's confirmation, and remain an obligation of the respective Reorganized Debtor, regardless of whether the right to indemnification arose before or after the Petition Date.

**E.**     **Treatment of Change of Control Provisions**

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of Peach County.

**F.**     **Restructuring Agreement**

Each of the terms of the Restructuring Agreement is hereby approved in every respect and is deemed incorporated hereby as if fully set forth herein.

**ARTICLE VII**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.**     **Classes Entitled To Vote**

Only those holders of Class 1 Bank Group Claims are entitled to vote to accept or reject the Plan. By operation of law, claims and interests in Classes 2 through 6 are unimpaired, are deemed to have accepted the Plan and, therefore, are not entitled to vote.

**B.**     **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

**C.**     **Cramdown**

In the event a determination is made that Class 6 is impaired, the Debtors will request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

**ARTICLE VIII**

**CONDITIONS PRECEDENT TO THE PLAN'S
CONFIRMATION AND EFFECTIVE DATE**

**A.**     **Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction or due waiver of each of the following conditions precedent:

(i)     The proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors and The Royal Bank of Scotland plc, as agent for the Bank Group.

**B.** **Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction or due waiver of each of the following conditions precedent:

(i)     The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors and The Royal Bank of Scotland plc, as agent for the Bank Group, confirming the Plan, as the same may have been modified.

(ii)    The Debtors shall have entered into the Converted Term Loan.

(iii)   The Debtors shall have entered into the New Senior Secured Facility, in amount, form and substance acceptable to the Debtors, to provide the Reorganized Debtors with working capital to meet ordinary and peak requirements and additional borrowings to support future projects.

**C.** **Waiver of Conditions**

The conditions set forth above can be waived, in whole or in part, jointly by the Debtors and The Royal Bank of Scotland plc, as agent for the Bank Group, at any time without an order of the Bankruptcy Court, provided, however, that in no event may any provision of the Restructuring Agreement be waived or modified without the written consent of the parties thereto. Unless waived, the failure to satisfy any condition to the Effective Date will preclude the Effective Date's occurrence, regardless of the circumstances giving rise thereto (including any action or inaction by a Debtor or Reorganized Debtor). The waiver of any condition to Confirmation or to the Effective Date shall not constitute or be deemed a waiver of any other condition.

## ARTICLE IX

## MODIFICATION; WITHDRAWAL

The Debtors reserve the right to modify the Plan either before or after Confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Fed. R. Bankr. P. 3019. The Debtors may withdraw the Plan at any time before the Effective Date.

## ARTICLE X

## RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

A.     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

B.     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

C.     Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

D.      Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

E.      Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

F.      Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

H.      Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

I.      To construe and enforce the Restructuring Agreement; and

J.      Enter a final decree closing the Chapter 11 Cases.

## ARTICLE XI

## EFFECTS OF CONFIRMATION

**A.      Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims and Interests, and their respective successors and assigns, and all other parties-in-interest in these Chapter 11 Cases.

**B.      Discharge Of The Debtors**

All consideration distributed under the Plan shall be in exchange for, and incomplete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against, or Interests in, the Debtors or any of their assets or properties, and, except as otherwise provided herein or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of a Debtor prior to the Petition Date and that arises from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the holder of a Claim based upon such debt accepted the Plan.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, subject to the Effective Date occurring.  Notwithstanding anything in this section to the contrary, the Liens securing the Bank Group Claims shall not be discharged by the Plan, but shall remain in effect to secure the Reorganized Debtors' obligations under the Converted Term Loan.

**C.      Injunction**

Except as otherwise provided in the Plan, from and after the Confirmation Date, all Persons who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, the Estate(s), Reorganized Peach County, or any of their property on account of any such Claims or Interests:  (i) commencing or continuing, in any manner or in any

place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan; and provided further that nothing contained herein shall preclude the Bank Group from exercising its rights with respect to the Lien securing the Reorganized Debtors' obligations under the Converted Term Loan.

**D.    Exculpation And Limitation Of Liability**

Neither the Debtors nor any of their present or former members, officers, directors, employees, advisors, attorneys, or agents, shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of this Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtors, the Estate(s), the Reorganized Debtors, or any of their respective present or former members, officers, directors, employees, advisors, attorneys, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence.

As of the confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors and each of the aforementioned parties' affiliates, agents, directors, officers, employees, investment bankers, financial advisors, attorneys and other professionals have participated in good faith and in compliance with section 1125(e) of the Bankruptcy Code in the offer and issuance of the New Peach County Stock under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the New Peach County Stock under the Plan.

**E.    Limited Mutual Releases**

Pursuant to and in accordance with the terms of the Restructuring Agreement, each of the Debtors, Volvo Holding Sverige AB, AB Volvo, Volvo Truck and Bus Limited, Volvo Bus Corporation (collectively the "Volvo Companies"), each member of the Bank Group and management, Mikael Bratt, Sal Mauro, and Tore Beckstrom ((in their capacity as former directors of the Debtors) the "Volvo Nominees") and each of the aforementioned parties' affiliates, principals, employees, agents, officers, directors, representatives, financial advisors, attorneys and other professionals, if any, hereby release and discharge one another and are deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged one another for and from any and all claims or causes of action existing as of the date hereof in any manner arising from, based on, or relating to, in whole or in part, the investment in the Debtors by Volvo Holding Sverige AB; the management and operation of the Debtors since 2004; the negotiations relating to proposals for a refinancing of the Debtors during 2005 and the reporting and consideration of such negotiations by the directors of the Debtors (including the Volvo nominees); the discussions and negotiations relating to the proposed acquisition by Volvo Holding Sverige AB of the Bank Group claims against and Stock in the Debtors owned by the Bank Group, the Henly Group plc Pension Scheme, and Management; the recapitalization of the corporate group; and that certain Management Services Agreement between Volvo Bus Corporation and the Debtors dated October 18, 2004, which is terminated forthwith without any liability for either party, whether with regard to the past or the future.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**A.      Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**B.      Payment of Statutory Fees**

All fees payable under Section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases shall be paid from funds otherwise available for distribution hereunder.

**C.      Severability of Plan Provisions**

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void or unenforceable, the Debtors, at their option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

**D.      Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

**E.      Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until Reorganized Peach County has made all distributions contemplated by this Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Cases.

**F.      Notices to Debtors**

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

BLUE BIRD BODY COMPANY
P.O. Box 937
402 Blue Bird Blvd.
Fort Valley, GA 31030
Att'n      Jeffry D. Bust

with a copy to:

    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Four Times Square
    New York, NY 10036-6552
    Att'n:    Jay M. Goffman, Esq.

    -and-

    LIONEL SAWYER & COLLINS
    1100 Bank of America Plaza
    50 W. Liberty St.
    Reno, NV 89501
    Att'n:    Jennifer Smith

**G.**    **Governing Law**

    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (i) the State of Delaware shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereof.

Dated:    Reno, Nevada
          January 24, 2006

BLUE BIRD BODY COMPANY

By:  /s/ Jeffry D. Bust
Name: Jeffry D. Bust
Title:  Chief Executive Officer

BLUE BIRD CORPORATION

By:  /s/ Jeffry D. Bust
Name: Jeffry D. Bust
Title:  Chief Executive Officer

BLUE BIRD INVESTMENT CORPORATION

By:  /s/Jeffry D. Bust
Name: Jeffry D. Bust
Title:  Chief Executive Officer

HENLYS HOLDING CORPORATION

By:  /s/ Jeffry D. Bust
Name: Jeffry D. Bust
Title:  Chief Executive Officer

HENLYS U.S. INVESTMENTS, INC.

By:  /s/ Jeffry D. Bust
Name: Jeffry D. Bust
Title: Chief Executive Officer

PEACH COUNTY HOLDINGS, INC.

By:  /s/ Jeffry D. Bust
Name: Jeffry D. Bust
Title: Chief Executive Officer

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Attorneys for Blue Bird Body Company,
Debtors-in-Possession

By:  /s/ Jay M. Goffman
Jay M. Goffman
Four Times Square
New York, NY  10036-6552

-and-

LIONEL SAWYER & COLLINS
Jennifer Smith
1100 Bank of America Plaza
50 W. Liberty St.
Reno, NV 89501
(775) 788-8666

**EXHIBIT A**

**DEBTOR AFFILIATES OF BLUE BIRD BODY COMPANY**

Blue Bird Corporation
Blue Bird Investment Corporation
Henlys Holding Corporation
Henlys U.S. Investments, Inc.
Peach County Holdings, Inc.

**EXHIBIT B**

**CONVERTED TERM LOAN**

DRAFT: 25/01/06

# AMENDED AND RESTATED CREDIT AGREEMENT

**relating to a credit agreement originally dated 14 September 1999, as supplemented by a supplemental agreement dated 11 June 2002, as restated by an amendment and restatement agreement dated 9 December 2003, amended and restated by a restructuring agreement dated 18 October 2004, as further amended by an amendment agreement dated 12 May 2005 and as further amended and restated by an amendment and restatement agreement dated [   ] January 2006**

**U.S.$100,000,000**

**CREDIT FACILITY**

**for**

**PEACH COUNTY HOLDINGS, INC.**

**with**

**LLOYDS TSB BANK plc**
**THE ROYAL BANK OF SCOTLAND plc**
**as Agent**

The indebtedness evidenced by this instrument is subordinate to the priory payment in full of the Senior Debt (as defined in the Subordination Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Debt Subordination Agreement dated as of January [    ], 2006 as the same may be amended, modified or restated from time to time (the **Subordination Agreement**), by, *inter alia*, the maker hereof, the holder and the Senior Agent (as such term is defined in the Subordination Agreement).

# ALLEN & OVERY

**ALLEN & OVERY LLP**

**LONDON**

# CONTENTS

**Clause**                                                                                                           **Page**

1.      Interpretation ............................................................................................................. 1
2.      The Facilities ............................................................................................................. 18
3.      Purpose ..................................................................................................................... 19
4.      Conditions Precedent ................................................................................................. 19
5.      Continuation of Letters of Credit .............................................................................. 19
6.      Letters of Credit ........................................................................................................ 20
7.      Repayment ................................................................................................................ 23
8.      Prepayment and Cancellation ................................................................................... 23
9.      Interest ...................................................................................................................... 25
10.     Terms ........................................................................................................................ 26
11.     Taxes ......................................................................................................................... 26
12.     Increased Costs ......................................................................................................... 29
13.     Mitigation ................................................................................................................. 29
14.     Payments ................................................................................................................... 30
15.     Guarantee .................................................................................................................. 32
16.     Representations and Warranties ................................................................................ 35
17.     Undertakings ............................................................................................................ 41
18.     Default ...................................................................................................................... 51
19.     Security ..................................................................................................................... 55
20.     The Administrative Parties ....................................................................................... 57
21.     Evidence and Calculations ........................................................................................ 62
22.     Fees ........................................................................................................................... 62
23.     Indemnities and Break Costs .................................................................................... 63
24.     Expenses ................................................................................................................... 64
25.     Amendments and Waivers ......................................................................................... 64
26.     Changes to the Parties ............................................................................................... 65
27.     Disclosure of Information ......................................................................................... 70
28.     Set-off ....................................................................................................................... 71
29.     Pro Rata Sharing ....................................................................................................... 71
30.     Ancillary Facilities ................................................................................................... 72
31.     Severability ............................................................................................................... 72
32.     Counterparts .............................................................................................................. 72
33.     Notices ...................................................................................................................... 72
34.     Language ................................................................................................................... 74
35.     Governing Law .......................................................................................................... 75
36.     Enforcement .............................................................................................................. 75
37.     Priority of Senior Facility ......................................................................................... 76

**Schedule**                                                                                                  **Page**

1.      Existing Parties as at Third Amendment and Restatement Date ........................................ 79

        Part 1        Existing Lenders ........................................................................................ 79

        Part 2        Existing Obligors ...................................................................................... 80

2.      Conditions Precedent Documents - to be delivered by an Additional Obligor ....................... 81

3.      Form of Transfer Certificate ................................................................................... 83

4.      Form of Accession Agreement .................................................................................. 85

5.      Form of Resignation Request ................................................................................... 86

6.      Form of Compliance Certificate ............................................................................... 87

**THIS AGREEMENT** was originally dated 14th September 1999, was most recently amended and restated on the Third Amendment and Restatement Date (defined below) and is made:

**BETWEEN**:

(1)     **PEACH COUNTY HOLDINGS, INC.** a corporation incorporated under the laws of the State of Delaware in the United States of America (the **Company**);

(2)     **BLUE BIRD BODY COMPANY** a corporation incorporated under the laws of the state of Georgia in the United States as existing borrower (in this capacity **Blue Bird Body Company**);

(3)     **THE SUBSIDIARIES OF THE COMPANY** listed in Part 2 of Schedule 1 (Existing Parties at Third Amendment and Restatement Date) as existing guarantors (in this capacity, together with the Company, the **Existing Guarantors**);

(4)     **THE ROYAL BANK OF SCOTLAND plc** and **LLOYDS TSB BANK plc** as arrangers (in this capacity the **Arrangers**);

(5)     **THE FINANCIAL INSTITUTIONS** listed in Part 1 of Schedule 1 (Existing Parties as at Third Amendment and Restatement Date) as lenders (the **Existing Lenders**);

(6)     **WACHOVIA BANK NATIONAL ASSOCIATION** as issuing bank (in this capacity the **Issuing Bank**);

(7)     **WACHOVIA BANK NATIONAL ASSOCIATION** as provider of the Ancillary Facility (in this capacity the **Ancillary Facility Provider**); and

(8)     **THE ROYAL BANK OF SCOTLAND plc** in its capacity as agent for the Lenders (in this capacity the **Agent**).

**IT IS AGREED** as follows:

**1.      INTERPRETATION**

**1.1     Definitions**

In this Agreement:

**Accession Agreement** means a letter, substantially in the form of Schedule 6 (Form of Accession Agreement), with such amendments as the Agent and the Company may agree.

**Acknowledgement and Confirmation Agreement** means the acknowledgement and confirmation agreement dated 6th January, 2003 between Blue Bird Body Company, Brannen Ford Inc., Canadian Blue Bird Coach, Ltd., Ford Motor Company and Ford Motor Credit Company.

**Additional Borrower** means a member of the Group which becomes a Borrower after the Third Amendment and Restatement Date.

**Additional Guarantor** means a member of the Group which becomes a Guarantor after the Third Amendment and Restatement Date.

**Additional Obligor** means an Additional Borrower or an Additional Guarantor.

**Administrative Party** means an Arranger, the Issuing Bank or the Agent.

**Affiliate** means a Subsidiary or a Holding Company of a person or any other Subsidiary of that Holding Company.

**Ancillary Facility** means the Wachovia Ancillary Facility or any replacement letter of credit facility or facilities (not exceeding U.S.$3,302,280 in aggregate) provided by any bank or financial institution to Blue Bird Body Company on terms approved by the Agent in accordance with Clause 26.10.

**Ancillary Facility Security Interest** means the Wachovia Security Interest or any Security Interest over an Obligor's bank accounts granted to an Ancillary Facility Provider on terms approved by the Agent.

**Bank of America RV Repurchase Agreement** means the repurchase agreement dated 28th July, 2000 between Fleetwood Credit Corp., Bank of America Speciality Finance, Inc., Bank of America N.A., Bank of America Canada Specialty Group Ltd. and Blue Bird Body Company (as amended).

**Bankruptcy Court** means the United States Bankruptcy Court for the [● District of ●].

**Barloworld Lease Agreement** means the lease agreement dated 15th October 2002 between Barloworld Fleet Leasing LLC and Blue Bird Corporation (as amended).

**BIA** means the Bankruptcy and Insolvency Act (Canada) and all regulations under it, as amended from time to time.

**Bilateral Letters of Credit** means the Wachovia Bilateral Letters of Credit or any letters of credit, bid bonds or performance bonds issued or renewed by an Ancillary Facility Provider under an Ancillary Facility from time to time.

**Blue Bird Company** means Blue Bird Investment Corporation, Blue Bird Body Company, Canadian Blue Bird Coach, Ltd., Blue Bird Corporation or Bluebird de México S.A. de C.V.

**Borrower** means an Existing Borrower or an Additional Borrower.

**Bus Trust Agreement** means the trust agreement dated 5th August 1996 between Blue Bird Body Company, as successor to Blue Bird Capital Corporation and William T. Gourley (as amended).

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in London and New York and if on that day a payment in or a purchase of a currency is to be made, the principal financial centre of the country of that currency.

**Canadian Benefit Plans** means each employee benefit plan of any nature or kind whatsoever that is not a Canadian Pension plan established, maintained or contributed to by any Obligor or any of its Subsidiaries for its employees or former employees in Canada.

**Canadian Blue Bird Coach, Ltd.** means Canadian Blue Bird Coach, Ltd., a company incorporated under the laws of Ontario, Canada.

**Canadian Pension Plans** means each plan which is considered to be a pension plan for the purposes of any applicable pension benefits standards statute and/or regulation in Canada

established, maintained or contributed to by any Obligor or any of its Subsidiaries for its employees or former employees.

**Canadian Subsidiary** means at any time, any member of the Group incorporated in Canada or any province of Canada.

**Cases** means the Chapter 11 cases of Blue Bird Body Company and certain of its Affiliates.

**Cash** means any credit balance on any deposit, savings or current account with a bank or building society in the U.K. or a bank in the United States of America or Canada (or which is readily remittable to a bank in the U.K.) and cash in hand other than:

(a)     any cash or deposit which is subject to any Security Interest (other than Security Interests of the type classified in Subclause 17.10 (Negative pledge)), or flawed asset arrangement; and

(b)     cash held by the Group as agent for any party pursuant to the Existing School Bus Agreements or the Existing RV Repurchase Agreements.

**Cash Equivalents**  means, at any time:

(a)     certificates of deposit, maturing within one year after the relevant date of calculation, issued by an acceptable bank;

(b)     any investment in marketable obligations issued or guaranteed by the government of the United States of America or by an instrumentality or agency of the government of the United States of America;

(c)     open market commercial paper:

(i)      for which a recognised trading market exists;

(ii)     issued in the United States of America;

(iii)    which matures within one year after the relevant date of calculation; and

(iv)    which has a credit rating of either A-1 by S&P or Fitch or P-1 by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term debt obligations, an equivalent rating; or

(d)     any other instrument, security or investment approved by the Majority Lenders,

in each case, to which any member of the Group is beneficially entitled at that time and which is capable of being applied against Consolidated Debt.  For this purpose an acceptable bank is a commercial bank or trust company which has a rating of A or higher by S&P or Fitch or A2 or higher by Moody's or a comparable rating from a nationally recognised credit rating agency for its long-term debt obligations or has been approved by the Majority Lenders.

**Chapter 11 Plan** means the Plan of Reorganisation of each of the Obligors under Chapter 11 of the U.S. Bankruptcy Code in the form satisfactory to the Lenders and filed with the Bankruptcy Court.

**Code** means the United States Internal Revenue Code of 1986, as amended, and any rule or regulation issued under it from time to time in effect.

**Commitment** means a Facility A Commitment or a Facility B Commitment.

**Company Certificate of Incorporation** means the Third Amended and Restated Certificate of Incorporation of the Company dated on or about the Third Amendment and Restatement Date.

**Compliance Certificate** means a certificate, substantially in the form of Schedule 6 (Form of Compliance Certificate), duly completed and signed by the Company.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Chapter 11 Plan.

**Consummation of the Plan** means the substantial consummation of the Chapter 11 Plan.

**Control** (including the terms **controlled by** and **under common control with**), with respect to the relationship between or among two or more persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a person, whether through the ownership of voting stock, as trustee or executor, by contract or otherwise, including, without limitation:

(a)     the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such person, and

(b)     the ownership, directly or indirectly, of a majority of the voting stock of such person.

**Controlled Group** means:

(a)     each Obligor and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with an Obligor, are treated as a single employer under Section 414 of the Code; or

(b)     each Canadian Subsidiary.

**Cooper Services Agreement** means the services agreement dated [        ] between Blue Bird Corporation and its Subsidiaries, Stephen F. Cooper and Kroll Zolfo Cooper LLC.

**Credit** means a Loan or a Letter of Credit.

**Default** means:

(a)     an Event of Default; or

(b)     an event which would be (with the expiry of a grace period, the giving of notice or the making of any determination under the Finance Documents or any combination of them) an Event of Default.

**Dormant Subsidiary** means at any time a member of the Group which:

(a)     is dormant within the meaning in Section 249AA(4) of the Companies Act 1985; or

(b)     not trading at that time and which has gross assets (excluding intra group balances) of less than U.S.$100,000.

**Effective Date** has the meaning given to it in the Restructuring Agreement.

**Environmental Approval** has the meaning given to it in Subclause 17.17 (Environmental matters).

**Environmental Law** has the meaning given to it in Subclause 17.17 (Environmental matters).

**ERISA** means the United States Employee Retirement Income Security Act of 1974, as amended.

**euro** means the single currency of the Participating Member States.

**Event of Default** means an event specified as such in Clause 18 (Default).

**Existing Borrower** means the Company or Blue Bird Body Company.

**Existing Guarantor** means any company listed under the heading "Existing Guarantors" in Part 2 of Schedule 1 (Existing Parties as at the Third Amendment and Restatement Date).

**Existing Obligor** means the Company, an Existing Borrower or an Existing Guarantor.

**Facility** means Facility A or Facility B.

**Facility A** means the term loan facility referred to in Subclause 2.1 (Term loan facility).

**Facility A Commitment** means:

(a)     for a Lender as at the Third Amendment and Restatement Date, the amount set opposite its name in Part 1 of Schedule 1 (Existing Parties as at Third Amendment and Restatement Date) under the heading Facility A Commitments and the amount of any other Facility A Commitment it acquires; and

(b)     for any other Lender, the amount of any other Facility A Commitment it acquires,

to the extent not cancelled, transferred or reduced under this Agreement.

**Facility A Loan** means the principal amount of each borrowing under Facility A or the principal amount outstanding of that borrowing.

**Facility B** means the credit facility referred to in Subclause 2.2 (Revolving credit facility).

**Facility B Commitment** means:

(a)     for a Lender as at the Third Amendment and Restatement Date, the amount set opposite its name in Part 1 of Schedule 1 (Existing Parties as at Third Amendment and Restatement Date) under the heading Facility B Commitment and the amount of any other Facility B Commitment it acquires; and

(b)     for any other Lender, the amount of any Facility B Commitment it acquires,

to the extent not cancelled, transferred or reduced under this Agreement.

**Facility B Loan** means the principal amount of each borrowing under Facility B or the principal amount outstanding of that borrowing.

**Facility Office** means the office(s) notified by a Lender to the Agent:

(a)      on or before the date it becomes a Lender; or

(b)      by not less than five Business Days' notice,

as the office(s) through which it will perform all or any of its obligations under this Agreement.

**Final Maturity Date** means 30th September 2008.

**Finance Document** means:

(a)      this Agreement;

(b)      the Third Amendment and Restatement Agreement

(c)      a Transfer Certificate;

(d)      an Accession Agreement;

(e)      a Security Document;

(f)      the Subordination Agreement;

(g)      documents evidencing the Ancillary Facility;

(h)      the Restructuring Agreement; or

(i)      any other document designated as such by the Agent and the Company.

**Finance Party** means a Lender, an Administrative Party or an Ancillary Facility Provider.

**Financial Indebtedness** means any indebtedness in respect of any obligation whether incurred as principal or surety for the payment or repayment of money whether present or future, actual or contingent, and shall include but not be limited to (without double counting):

(a)      moneys borrowed;

(b)      any debenture, bond, loan note, loan stock, any redeemable preference share or other security;

(c)      any acceptance or documentary credit (including any dematerialised equivalent);

(d)      receivables sold or discounted (otherwise than on a non-recourse basis);

(e)      the acquisition cost of any asset to the extent payable before or after the time of acquisition or possession by the party liable where the advance or deferred payment is arranged primarily as a method of raising finance or financing the acquisition of that asset but excluding normal trade credit outstanding for 180 days or less;

(f)      any lease entered into primarily as a method of raising finance or financing the acquisition of the asset leased;

(g)    any currency swap or interest swap, cap or collar arrangement or any other derivative instrument;

(h)    any amount raised under any other transaction having the primary rather than incidental commercial effect of a borrowing or raising of money;

(i)    any counter indemnity for any guarantee, letter of credit or similar assurance against financial loss issued on behalf of any member of the Group; or

(j)    any guarantee, indemnity or similar assurance against financial loss of any person of a type referred to in paragraphs (a) to (i) (inclusive) above.

**Ford Authorized Converter Pool Agreement** means:

(a)    the Ford authorized converter pool agreement dated 19th September 2001 between Canadian Blue Bird Coach, Ltd., Ford Motor Company of Canada, Limited and Ford Credit Canada Limited; or

(b)    the Ford authorized converter pool agreement dated 5th March 2003 between Ford Motor Company and Blue Bird Body Company.

**Ford Credit Consignment Agreement** means the consignment agreement that is dated 7th September 2001 between Ford Credit Canada Limited, as consignor, and Canadian Blue Bird Coach, Ltd., as consignee.

**Ford Inventory Agreement** means the wholesale financing and security agreement dated 6th January 2003 between Ford Motor Credit Company and Blue Bird Body Company.

**Ford Credit Lease Agreement** means the lease agreement dated 20th January, 2003 between Brant Country Ford Sales Ltd. and/or Ford Credit Canada Leasing Company and Canadian Blue Bird Coach, Ltd.

**Ford Lease Programme Agreement** means the lease program agreement dated 20th November 2001, between Blue Bird Corporation, Blue Bird Body Company and Ford Motor Credit Company.

**GAAP** means accounting principles and practices generally accepted in the United States of America.

**GE Capital RV Repurchase Agreement** means the vendor agreement that is dated 2002 between Deutsche Financial Services Corporation and Blue Bird Body Company.

**GMAC Inventory Agreement** means the inventory loan and security agreement dated 14th December 1995 between General Motors Acceptance Corporation and Blue Bird Body Company (as amended).

**GMAC Wholesale Security Agreement** means the wholesale security agreement dated 26th September 1996 between General Motors Acceptance Corporation and Blue Bird Body Company.

**Group** means the Company and its Subsidiaries.

**Guarantor** means the Company, an Existing Guarantor or an Additional Guarantor.

**Holding Company** of any other person means a company in respect of which that other person is a Subsidiary.

**Increased Cost** means:

(a)     an additional or increased cost;

(b)     a reduction in the rate of return from a Facility or on its overall capital; or

(c)     a reduction of an amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates but only to the extent attributable to that Finance Party having entered into any Finance Document or funding or performing its obligations under any Finance Document.

**ITA** means the Income Tax Act (Canada) and all regulations under it.

**LaSalle Facility Agreement** means the credit facility dated 29th March, 1996 (as amended) provided by LaSalle National Bank to Blue Bird Corporation (successor to Blue Bird Capital Corporation) and its Subsidiaries.

**Lender** means:

(a)     an Existing Lender; or

(b)     any person which becomes a Lender after the Third Amendment and Restatement Date.

**Letter of Credit** means a letter of credit issued by the Issuing Bank under this Facility.

**Loan** means, unless otherwise stated in this Agreement, the principal amount of each borrowing under this Agreement or the principal amount outstanding of that borrowing.

**Local Bank** means Branch Banking & Trust Bank, The Bank of LaFayette, Citizens Bank (Fort Valley) or The Toronto-Dominion Bank.

**Majority Lenders** means, at any time, Lenders:

(a)     whose share in the outstanding Credits and whose undrawn Commitments then aggregate $66^2/_3$ per cent. or more of the aggregate of all the outstanding Credits and the undrawn Commitments of all the Lenders;

(b)     if there is no Credit then outstanding, whose undrawn Commitments then aggregate $66^2/_3$ per cent. or more of the Total Commitments; or

(c)     if there is no Credit then outstanding and the Total Commitments have been reduced to zero, whose Commitments aggregated $66^2/_3$ per cent. or more of the Total Commitments immediately before the reduction.

**Material Adverse Effect** means a material adverse effect on:

(a)     the business or financial condition of the Company, any Borrower or any Material Subsidiary or the Group as a whole;

(b)      the ability of any Obligor to perform its payment obligations or its obligations under Subclause 17.18 (Financial covenants) under any Finance Document;

(c)      the validity or enforceability of any Finance Document; or

(d)      the rights or remedies of the Finance Parties in respect of a Finance Document which, in the opinion of the Majority Lenders, are material.

**Material Company** means:

(a)      (i)      any Subsidiary of the Company:

(A)      whose EBITDA is equal to 1 per cent. or more of Consolidated EBITDA; or

(B)      whose gross assets, excluding intra group balances, are equal to 1 per cent. or more of the Consolidated Gross Assets of the Group excluding amounts owed to it by other members of the Group as a result of a transfer of trade or business to that other member of the Group in circumstances where the creditor has no other assets and is a Dormant Subsidiary,

all as shown (in the case of any Subsidiary) in its most recent annual accounts and (in the case of the Group) in the most recent annual consolidated accounts of the Group; and

(ii)      any other Subsidiary of the Company to whom all or substantially all of the assets or business of a Material Subsidiary are transferred;

(b)      the Company; or

(c)      any Borrower.

**Material Subsidiary** means:

(a)      any Subsidiary of the Company:

(i)      whose EBITDA is equal to 5 per cent. or more of Consolidated EBITDA; or

(ii)      whose gross assets are equal to 5 per cent. or more of the Consolidated Gross Assets of the Group excluding amounts owed to it by other members of the Group as a result of a transfer of trade or business to that other member of the Group in circumstances where the creditor has no other assets and is a Dormant Subsidiary,

all as shown (in the case of any Subsidiary) in its most recent annual accounts and (in the case of the Group) in the most recent annual consolidated accounts of the Group; and

(b)      any other Subsidiary of the Company to whom all or substantially all of the assets or business of a Material Subsidiary are transferred.

**Maturity Date** means, for a Letter of Credit, the last day of its Term.

**Monthly Management Accounts** or **Monthly Management Accounts Package** means the monthly management accounts to be provided by the Company to the Agent under Subclause 17.2(c) (Financial information), in the form approved by the Agent (acting reasonably) prior to the Third Amendment and Restatement Date, but including in any event a profit and loss account for the month- and year-to-date, a balance sheet and a cash flow on a year-to-date basis.

**Multiemployer Plan** means a "multiemployer plan" within the meaning of section 3(37) or 4001(a)(3) of ERISA to which any Obligor or any member of the Controlled Group has an obligation to contribute.

**National Leasing Group Inc. Agreement** means the agreement dated 27th June 2001 between Blue Bird Body Company and National Leasing Group Inc. in connection with, among other things, commercial vehicle leasing.

**Obligor** means a Borrower or a Guarantor.

**Party** means a party to this Agreement.

**PBGC** means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

**PBA** means the Pension Benefits Act of Ontario and all regulations under it as amended from time to time, and any successor legislation.

**Permitted Transaction** means a transaction entered into, indebtedness incurred or Security Interest granted or arising under or in connection with:

(a)     the Ford Lease Programme Agreement, the Ford Credit Lease Agreement, the Tatonka Lease Programme Agreement, a Volvo Agreement, the Bus Trust Agreement or the LaSalle Facility Agreement, in each case on their terms and conditions as at 9th December, 2003 (each an **Existing School Bus Agreement**);

(b)     any other agreement or arrangement under which a Blue Bird Company disposes of a school bus or vehicle manufactured by a Blue Bird Company to a third party by first leasing the school bus or vehicle to the third party and then disposing of its leasehold interest to Ford Credit, Tatonka, Volvo, LaSalle, the trustee under the Bus Trust Agreement, ORIX Financial Services, Inc. or any other financier upon terms which may or may not entitle the financier to require any member of the Group to repurchase the lease or fulfil any obligation, make a payment or otherwise assume any liability concerning the lease (each a **recourse obligation**) if the third party defaults on any of its obligations concerning the lease provided that: (i) any recourse obligation concerning such an agreement or arrangement is not more onerous in any material respect than any recourse obligation under an Existing School Bus Agreement; and (ii) each of those agreements or arrangements is on substantially the same terms and conditions as an Existing School Bus Agreement;

(c)     the GMAC Inventory Agreement, the Ford Inventory Agreement, the Ford Authorized Converter Pool Agreement, the Ford Credit Consignment or the GMAC Wholesale Security Agreement in each case on their terms and conditions as at 9th December, 2003 in all material respects (each an **Existing Inventory Agreement**);

(d)     any other agreement or arrangement entered into with a third party who supplies chassis to a Blue Bird Company on terms by which that third party reserves title in or takes security over the chassis, the vehicle manufactured incorporating the chassis or

the receivable generated by selling the chassis provided that each of those agreements or arrangements are on substantially the same terms and conditions as an Existing Inventory Agreement;

(e) the GE Capital RV Repurchase Agreement or the Bank of America RV Repurchase Agreement, in each case on their terms and conditions as at 9th December, 2003 (each an **Existing RV Repurchase Agreement**);

(f) any other agreement or arrangement under which a Blue Bird Company may be required to repurchase, fulfil any obligation, make a payment or otherwise assume any liability concerning a recreational or other vehicle (each a **recourse obligation**) sold by it to a distributor, where the distributor has financed the purchase by entering into a finance agreement with a third party financier, if it defaults on any of its obligations concerning that finance agreement provided that: (i) any recourse obligation concerning such an agreement or arrangement is not more onerous in any material respect than any recourse obligation under an Existing RV Repurchase Agreement; and (ii) each of those agreements or arrangements is on substantially the same terms and conditions as an Existing RV Repurchase Agreement;

(g) the agreement or agreements (each an **Existing IRB Agreement**), entered into between Blue Bird Body Company and the Development Authority of Peach County, Georgia, the United States of America (the **DA**) on or about 31st December 2003 pursuant to which Blue Bird Body Company disposed of certain assets to the DA and subsequently leased those assets from the DA pursuant to the "bonds for title" arrangements between Blue Bird Body Company and the DA;

(h) any other agreement or arrangement entered into pursuant to or in succession to the Existing IRB Agreement and any similar agreement with the DA provided it is on substantially the same terms and with substantially the same parties as an Existing IRB Agreement;

(i) the Barloworld Lease Agreement;

(j) the National Leasing Group Inc. Agreement;

(k) the Acknowledgement and Confirmation Agreement; or

(l) the Senior Secured Facility.

**Plan** means an "employee benefit plan" as defined in section 3(3) of ERISA (i) maintained by any Obligor or any member of the Controlled Group currently or at any time within the last five years, or (ii) to which any Obligor or any member of the Controlled Group is required to make any payment or contribution or has made payments or contributions within the past five years, and any Canadian Pension Plan.

**Pro Rata Share** means:

(a) for the purpose of determining a Lender's share in a utilisation of a Facility, the proportion which its Commitment under that Facility bears to all the Commitments under that Facility; and

(b) for any other purpose on a particular date:

(i)     the proportion which a Lender's share of the Credits (if any) bears to all the Credits;

(ii)    if there is no such Credit outstanding on that date, the proportion which its Commitment bears to the Total Commitments on that date;

(iii)   if the Total Commitments have been cancelled, the proportion which its Commitments bore to the Total Commitments immediately before being cancelled; or

(iv)    when the term is used in relation to a Facility, the above proportions but applied only to the Credits and Commitments for that Facility.

For the purpose of subparagraph (iv) above, the Agent will determine, in the case of a dispute, whether the term in any case relates to a particular Facility.

**Qualifications** means the relevant qualifications as to matters of law contained in the legal opinions referred to in Schedule 8 (Conditions precedent) to the Restructuring Agreement or in Schedule 1 (Conditions precedent) to the Third Amendment and Restatement Agreement.

**Repeating Representations** means the representations which are deemed to be repeated under Subclause 16.22 (Times for making representations and warranties).

**Reportable Event** means:

(a)     an event specified as such in section 4043 of ERISA or any related regulation, other than an event in relation to which the requirement to give notice of that event is waived by any regulation; or

(b)     a failure to meet the minimum funding standard under section 412 of the Code or section 302 of ERISA, whether or not there has been any waiver of notice or waiver of the minimum funding standard under section 412 of the Code.

**Request** means a request made by a Borrower for a Credit, substantially in the form of Schedule 4 (Form of Request).

**Restructuring Agreement** means the restructuring agreement dated 18th October 2004 entered into in relation to this Agreement.

**Restructuring Date** means the date of the Restructuring Agreement.

**Retained Group Indemnity** means the indemnity given by the Company to Henlys Group plc and its Subsidiaries on or about the Restructuring Date in respect of certain contingent and actual liabilities.

**Security Agreement** means:

(a)     any U.S. Stock Pledge Agreement;

(b)     the security agreement between Henlys US Investments, Inc. and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time);

(c)     the security agreement between Henlys Holding Corp. and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time);

(d)     the security agreement between Blue Bird Body Company and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time);

(e)     the security agreement between Blue Bird Corporation and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time );

(f)     the security agreement between Blue Bird Investment Corporation and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time );

(g)     the security agreement between the Company and the Agent dated on or about the Restructuring Date (as amended from time to time);

(h)     the Walker County deed to secure debt and security agreement between Blue Bird Body Company and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time);

(i)     the Walker County assignment of lease and rents between Blue Bird Body Company and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time);

(j)     the Peach County deed to secure debt and security agreement between Blue Bird Body Company and the Agent dated on or about the 9th December, 2003 (as amended and restated from time to time); or

(k)     the Peach County assignment of lease and rents between Blue Bird Body Company and the Agent dated on or about 9th December, 2003 (as amended and restated from time to time).

**Security Document** means:

(a)     each Security Agreement; or

(b)     any other document evidencing or creating security over any asset of an Obligor to secure any obligation of any Obligor to a Finance Party under the Finance Documents.

**Security Interest** means any mortgage, pledge, lien, charge, assignment, hypothecation, adverse claim, restriction on assignment, transfer or pledge or security interest or any other agreement or arrangement having a similar effect.

**Senior Agent** means the agent from time to time in respect of the Senior Secured Facility.

**Senior Lenders** means the lenders from time to time under the Senior Secured Facility.

**Senior Secured Facility** means the U.S.$52,500,000 credit facility for Blue Bird Body Company dated on or about the Third Amendment and Restatement Date.

**Step 10 Agreement** means the agreement dated on or about the Restructuring Date between Henlys Group plc and the Company relating to the transfer of certain assets and liabilities from Henlys Group plc to the Company.

**Subordination Agreement** means the debt subordination agreement dated on or about the Third Amendment and Restatement Date between the Company, the Lenders, the Agent, the Senior Lenders and the Senior Agent.

**Subsidiary** means as to any person, any person (a) of which such person directly or indirectly owns securities or other equity interests representing fifty per cent. or more of the aggregate voting powers, (b) of which such person possesses fifty per cent. or more of the right to elect directors or persons holding similar positions or (c) which such person Controls directly or indirectly through one or more intermediaries.

**Tatonka Lease Programme Agreement** means the lease program agreement dated 27th February 2003 between Blue Bird Corporation, Blue Bird Body Company and Tatonka Capital Corporation.

**Tax** means any tax, levy, remittance, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

**Tax Payment** means a payment made by an Obligor to a Finance Party in any way relating to a Tax Deduction or under any indemnity given by that Obligor in respect of Tax under any Finance Document.

**Term** means each period determined under this Agreement:

(a)    by reference to which interest on a Loan or an overdue amount is calculated; or

(b)    for which the Issuing Bank may be under a liability under a Letter of Credit.

**Termination Event** means:

(a)    the whole or partial withdrawal of any Obligors or any of their Subsidiaries from a Plan during a Plan year;

(b)    the filing of a notice of intent to terminate in whole or in part a Plan or the treatment of a Plan amendment as a termination or partial termination;

(c)    the institution of proceedings by any governmental authority to terminate in whole or in part or have a trustee appointed to administer a Plan; or

(d)    any other event or condition which might reasonably be expected to constitute grounds for the termination or winding up of partial termination or winding up or the appointment of a trustee to administer any Plan.

**Third Amendment and Restatement Agreement** means the amendment and restatement agreement dated on or about [      ] January 2006, entered into in relation to this Agreement.

**Third Amendment and Restatement Date** means the Effective Date as defined in the Third Amendment and Restatement Agreement.

**Term Loan** means a Loan under Facility A.

**Total Commitments** means the aggregate of the Commitments of all the Lenders.

**Total Facility A Commitments** means the aggregate of the Facility A Commitments of all the Lenders, being, on the Third Amendment and Restatement Date, the total amount

specified as such in Part 1 of Schedule 1 (Existing Parties as at Third Amendment and Restatement Date).

**Total Facility B Commitments** means the aggregate of the Facility B Commitments of all the Lenders, being, on the Third Amendment and Restatement Date, the total amount specified as such in Part 1 of Schedule 1 (Existing Parties as at Third Amendment and Restatement Date).

**Transfer Certificate** means a certificate, substantially in the form of Schedule 3 (Form of Transfer Certificate), with such amendments as the Agent may approve or reasonably require or any other form agreed between the Agent and the Company.

**U.K.** means the United Kingdom.

**Unlawful Payment** means any unlawful payment, commission, bribe, pay-off or kickback.

**U.S.** means the United States of America.

**U.S. Bankruptcy Code** means the U.S. Bankruptcy Code of 1978, as amended.

**U.S. Dollars** or **U.S.$** means the lawful currency of the United States of America.

**U.S. Stock Pledge Agreement** means:

(a)     the pledge by Henlys US Investments Inc of its shares in Henlys Holding Corp.;

(b)     the pledge by Blue Bird Corporation of its shares in Blue Bird Body Company;

(c)     the pledge by Henlys Holding Corp. of its shares in Blue Bird Corporation; or

(d)     the pledge by Blue Bird Body Company of its shares in Blue Bird Investment Corporation,

each dated on or about 9th December, 2003 and amended and restated on or about the Restructuring Date; or

(e)     the pledge by the Company of its shares in Henlys US Investments, Inc.; or

(f)     the pledge by Blue Bird Body Company of 66% of the shares in Canadian Blue Bird Coach, Ltd.,

each dated on or about the Restructuring Date.

**Utilisation Date** means each date on which a Facility is utilised.

**Volvo** means AB Volvo or any of its Subsidiaries (including Volvo Truck and Bus Limited).

**Volvo Agreement** means:

(a)     the servicing agreement dated 25th October 2000 between Blue Bird Body Company and Volvo Commercial Finance LLC The Americas;

(b)     the receivables purchase agreement dated 25th October 2000 between Blue Bird Body Company and Volvo Commercial Finance LLC The Americas; or

(c)    the receivables purchase agreement dated 20th December 2000 between Blue Bird Body Company and Volvo Commercial Finance LLC The Americas.

**Wachovia Ancillary Facility** means the U.S.$3,302,280 letter of credit facility provided by Wachovia to Blue Bird Body Company under which the Wachovia Bilateral Letters of Credit have been issued or renewed.

**Wachovia Bilateral Letters of Credit** means the U.S.$3,302,280 letters of credit, bid bonds or performance bonds issued by Wachovia at the request of Blue Bird Body Company prior to the Third Amendment and Restatement Date or as may be renewed up to that commitment from time to time.

**Wachovia Security Interest** means any Security Interest over an Obligor's bank accounts granted to Wachovia prior to the Third Amendment and Restatement Date or any Security Interest over an Obligor's bank accounts granted to Wachovia on terms approved by the Agent.

**Wachovia** means Wachovia Bank, National Association.

## 1.2    Construction

(a)    In this Agreement, unless the contrary intention appears, a reference to:

(i)    an **amendment** includes a supplement, restatement, novation or re-enactment and **amended** is to be construed accordingly;

(ii)    **assets** includes any kind of present and future properties, or assets, whether real, personal or mixed, moveable or immovable, tangible or intangible, and revenues and rights of every description;

(iii)    an **authorisation** includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration and notarisation;

(iv)    **disposal** means a sale, transfer, grant, lease or other disposal, whether voluntary or involuntary, and **dispose** will be construed accordingly;

(v)    **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money;

(vi)    **know your customer requirements** is a reference to the identification checks that a Finance Party requests in order to meet its obligations under any applicable law or regulation to identify a person who is (or is to become) its customer;

(vii)    a **person** includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, province, agency, organisation or other entity whether or not having separate legal personality;

(viii)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(ix)    a currency is a reference to the lawful currency for the time being of the relevant country;

(x)    a Default being **outstanding** means that it has not been remedied or waived;

(xi)    a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(xii)    a Clause, a Subclause or a Schedule is a reference to a Clause or subclause of, or a Schedule to, this Agreement;

(xiii)    a Party or any other person includes its successors in title, permitted assigns and permitted transferees;

(xiv)    a Finance Document or another document is a reference to that Finance Document or other document as amended, supplemented, revised, restated or replaced from time to time; and

(xv)    a time of day is a reference to London time; and

(xvi)    a reference to **Consolidated Debt**, **Consolidated EBITDA**, **Consolidated Gross Assets**, is deemed to be a reference to those terms as agreed by the Senior Lenders in relation to financial covenants agreed in respect of the Senior Secured Facility.

(b)    Unless the contrary intention appears, a reference to a **month** or **months** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)    if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)    notwithstanding subparagraph (i) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)    Unless expressly provided to the contrary in a Finance Document, a person who is not a party to a Finance Document may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999 and, notwithstanding any term of any Finance Document, no consent of any third party is required for any variation (including any release or compromise of any liability) or termination of that Finance Document.

(d)    Unless the contrary intention appears:

(i)    a reference to a Party will not include that Party if it has ceased to be a Party under this Agreement;

(ii)    an amount in euro is payable only in the euro unit;

(iii)    a word or expression used in any other Finance Document or in any notice given in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement; and

(iv)    any obligation of an Obligor under the Finance Documents which is not a payment obligation remains in force for so long as any payment obligation of an Obligor is or may be outstanding under the Finance Documents.

(e)    The headings in this Agreement do not affect its interpretation.

## 2.    THE FACILITIES

### 2.1    Term loan facility

Subject to the terms of this Agreement, the Lenders make available to the Company a term loan facility in an aggregate amount equal to the Total Facility A Commitments (**Facility A**).

### 2.2    Credit facility

Subject to the terms of this Agreement:

(a)    the Lenders make available to Blue Bird Body Company a credit facility in an aggregate amount equal to the Total Facility B Commitments; and

(b)    the Ancillary Facility Provider makes available to Blue Bird Body Company the Ancillary Facility,

each of which comprises a letter of credit and a performance bond option and a bid bond facility (collectively, **Facility B**).

### 2.3    Maximum number

Unless the Agent agrees, a Request may not be given if, as a result, there would be more than:

(a)    two Loans outstanding under Facility A; and

(b)    15 (or such other number determined pursuant to arrangements agreed by the Company, the Issuing Bank and the Agent) Letters of Credit outstanding under Facility B.

### 2.4    Nature of a Finance Party's rights and obligations

Unless otherwise agreed by all the Finance Parties:

(a)    the obligations of a Finance Party under the Finance Documents are several;

(b)    failure by a Finance Party to perform its obligations does not affect the obligations of any other Party under the Finance Documents;

(c)    no Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents;

(d)    the rights of a Finance Party under the Finance Documents are separate and independent rights;

(e)     a Finance Party may, except as otherwise stated in the Finance Documents, separately enforce those rights; and

(f)     a debt arising under the Finance Documents to a Finance Party is a separate and independent debt.

## 3.     PURPOSE

### 3.1    Term Loan

Under the Third Amendment and Restatement Agreement, the Term Loans are loans continued by the Company and Blue Bird Body Company as at the Third Amendment and Restatement Date.

### 3.2    Letters of Credit

Each Letter of Credit may only be used for the general corporate purposes of Blue Bird Body Company.

### 3.3    Outstanding Credits

A Credit which is outstanding on the Third Amendment and Restatement Date and is continued under a particular Facility by virtue of the Third Amendment and Restatement Agreement will be deemed to be a Credit drawn under the relevant Facility with effect on and from the Third Amendment and Restatement Date.

### 3.4    No obligation to monitor

No Finance Party is bound to monitor or verify the utilisation of a Facility.

## 4.     CONDITIONS PRECEDENT

The obligations of each Lender to participate in any Credit and of the Issuing Bank to issue a Letter of Credit are subject to the conditions precedent that on both the date of the Request and the Utilisation Date for that Credit:

(a)     the Repeating Representations are correct in all material respects; and

(b)     no Default is outstanding or would result from the Credit.

## 5.     CONTINUATION OF LETTERS OF CREDIT

(a)     Letters of credit issued by the Issuing Bank under the Credit Agreement (prior to its amendment and restatement under the Third Amendment and Restatement Agreement) which are outstanding as at the Third Amendment and Restatement Date constitute Letters of Credit for the purposes of this Agreement.

(b)     The Issuing Bank is not obliged to agree any extension of an outstanding Letter of Credit.  If the Issuing Bank decides not to agree the extension of a Letter of Credit, it shall give notice (a **non-extension notice**) to the Company and the Agent as soon as practicable and in any event not less than 60 days prior to the maturity date of the Letter of Credit.

(c)     If the Issuing Bank gives a non-extension notice, it shall be deemed to also to have given a notice under Subclause 6.7(b) (Resignation of the Issuing Bank).

**6.    LETTERS OF CREDIT**

**6.1    General**

(a)    A Letter of Credit or a Bilateral Letter of Credit is **repaid** or **prepaid** if:

   (i)    a Borrower provides cash cover for that Letter of Credit or Bilateral Letter of Credit;

   (ii)    the maximum amount payable under the Letter of Credit or Bilateral Letter of Credit is reduced in accordance with its terms; or

   (iii)    the Issuing Bank or the relevant Ancillary Facility Provider (as the case may be) is satisfied (acting reasonably) and has so confirmed to the Agent in writing that it has no further liability under that Letter of Credit or Bilateral Letter of Credit.

The amount by which a Letter of Credit or Bilateral Letter of Credit is repaid or prepaid under subparagraphs (i) and (ii) above is the amount of the relevant cash cover or reduction.

(b)    If a Letter of Credit or Bilateral Letter of Credit or any amount outstanding under a Letter of Credit or Bilateral Letter of Credit is expressed to be immediately payable, the Borrower that requested the issue of that Letter of Credit or Bilateral Letter of Credit must repay or prepay that amount immediately.

(c)    **Cash cover** is provided for a Letter of Credit or Bilateral Letter of Credit if a Borrower pays an amount in the currency of the Letter of Credit or Bilateral Letter of Credit to an interest-bearing account with a Finance Party in the name of the Borrower and the following conditions are met:

   (i)    the account is with the Agent (if, subject as provided below, the cash cover is to be provided for all the Lenders) or with the relevant Ancillary Facility Provider (if the cash cover is to be provided for that Ancillary Facility Provider);

   (ii)    until no amount is or may be outstanding under that Letter of Credit or Bilateral Letter of Credit, withdrawals from the account may only be made to pay a Finance Party amounts due and payable to it under that Letter of Credit or Bilateral Letter of Credit or this Clause; and

   (iii)    the Borrower has executed a security document over that account, in form and substance satisfactory to the Agent or the relevant Ancillary Facility Provider, creating a first ranking security interest over that account.

Where cash cover is to be provided to all the Lenders, a Lender may require its portion of the cash cover to be paid into its account instead of an account with the Agent.

(d)    The outstanding or principal amount of a Letter of Credit or Bilateral Letter of Credit at any time is the maximum amount that is or may be payable by the relevant Borrower in respect of that Letter of Credit at that time.

**6.2    Assignments and transfers**

The consent of the Issuing Bank is required for any assignment or transfer of the whole or any part of any Lender's Facility B Commitment.

**6.3**    **Fees in respect of Letters of Credit**

(a)    Each Borrower must pay to the Agent for each Lender a letter of credit fee computed at the rate of 8 per cent. per annum flat on the outstanding amount of each Letter of Credit requested by it for the period from the issue of that Letter of Credit until its Maturity Date.  This fee will be distributed according to each Lender's Pro Rata Share.

(b)    Accrued letter of credit fee is payable quarterly in arrear on the Final Maturity Date or any earlier date on which the Loans are prepaid in full, the Total Commitments are cancelled in full and the Letters of Credit are prepaid or repaid in full.

**6.4**    **Claims under a Letter of Credit**

(a)    Each Borrower irrevocably and unconditionally authorises the Issuing Bank to pay any claim made or purported to be made under a Letter of Credit requested by it and which appears on its face to be in order (a **claim**).

(b)    Each Borrower must immediately on demand pay to the Agent for the Issuing Bank an amount equal to the amount of any claim.

(c)    Each Borrower acknowledges that the Issuing Bank:

(i)    is not obliged to carry out any investigation or seek any confirmation from any other person before paying a claim; and

(ii)    deals in documents only and will not be concerned with the legality of a claim or any underlying transaction or any available set-off, counterclaim or other defence of any person.

(d)    The obligations of a Borrower under this Clause will not be affected by:

(i)    the sufficiency, accuracy or genuiness of any claim or any other document; or

(ii)    any incapacity of, or limitation on the powers of, any person signing a claim or other document.

**6.5**    **Indemnities**

(a)    A Borrower must immediately on demand indemnify the Issuing Bank against any loss or liability which the Issuing Bank incurs under or in connection with any Letter of Credit requested by it, except to the extent that the loss or liability is directly caused by the gross negligence or wilful misconduct of the Issuing Bank.

(b)    Each Lender under the relevant Facility under which the Letter of Credit has been issued must immediately on demand indemnify the Issuing Bank against its share of any loss or liability which the Issuing Bank incurs under or in connection with any Letter of Credit and which has not been paid for by an Obligor, except to the extent that the loss or liability is directly caused by the gross negligence or wilful misconduct of the Issuing Bank.

(c)    A Lender's share of the liability or loss referred to in paragraph (b) above will be its Pro Rata Share on the Utilisation Date or, if later, on the Third Amendment and Restatement Date, adjusted to reflect any subsequent assignment or transfer under this Agreement.

(d)    The relevant Borrower must immediately on demand reimburse any Lender for any payment it makes to the Issuing Bank under this Subclause.

(e)    The obligations of each Lender under this Clause are continuing obligations and will extend to the ultimate balance of all sums payable by that Lender under or in connection with any Letter of Credit, regardless of any intermediate payment or discharge in whole or in part.

(f)    The obligations of any Lender under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause (whether or not known to it or any other person).  This includes:

(i)    any time or waiver granted to, or composition with, any person;

(ii)    any release of any person under the terms of any composition or arrangement;

(iii)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any person;

(iv)    any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(v)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any person;

(vi)    any amendment (however fundamental) of a Finance Document, any Letter of Credit or any other document or security;

(vii)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document, any Letter of Credit or any other document or security;

(viii)    any insolvency or similar proceedings; or

(ix)    any cancellation of the Commitments in whole or in part.

(g)    In respect of Bilateral Letters of Credit, no Lender shall be under a duty to indemnify an Ancillary Facility Provider for any loss or liability which that Ancillary Facility Provider incurs under or in connection with such a letter of credit.

**6.6    Rights of contribution**

No Borrower will be entitled to any right of contribution or indemnity from any Finance Party in respect of any payment it may make under this Clause.

**6.7    Resignation of the Issuing Bank**

(a)    The Issuing Bank may resign and appoint any of its Affiliates as successor Issuing Bank by giving notice to the Lenders and the Company.

(b)    Alternatively, the Issuing Bank may resign by giving notice to the Lenders and the Company, in which case the Majority Lenders following consultation with the Company may appoint a successor Issuing Bank.

(c)    If no successor Issuing Bank has been appointed under paragraph (b) above within 30 days after notice of resignation was given, the Issuing Bank may appoint a successor Issuing Bank.

(d)     The person(s) appointing a successor Issuing Bank must, if practicable, consult with the Company prior to the appointment.  Any successor Issuing Bank must be a bank acceptable in the relevant markets as a letter of credit issuing bank.

(e)     The resignation of the Issuing Bank and the appointment of any successor Issuing Bank will both become effective only when the successor Issuing Bank notifies all the Parties that it accepts its appointment.  On giving the notification, the successor Issuing Bank will succeed to the position of the Issuing Bank and the term **Issuing Bank** will mean the successor Issuing Bank.

(f)     The retiring Issuing Bank and the Company must liaise and assist with seeking the agreement of beneficiaries of outstanding Letters of Credit to their replacement by letters of credit to be issued by the successor Issuing Bank.  A replacement letter of credit issued by the successor Issuing Bank and having a face amount no greater than the replaced Letter of Credit shall be deemed to be a Letter of Credit issued under this Agreement.

(g)     The retiring Issuing Bank must, at its own cost, make available to the successor Issuing Bank such documents and records and provide such assistance as the successor Issuing Bank may reasonably request for the purposes of performing its functions as the Issuing Bank under the Finance Documents.

(h)     Upon its resignation becoming effective, this Clause will continue to benefit the retiring Issuing Bank in respect of any action taken or not taken by it in connection with the Finance Documents while it was the Issuing Bank, and, subject as provided in this Subclause, it will have no further obligations under any Finance Document.

## 7.      REPAYMENT

### 7.1     Repayment of Term Loans

(a)     Each Borrower must repay the Facility A Loans made to it in full on the Final Maturity Date.

(b)     No amount of any Term Loan repaid or prepaid may be re-borrowed.

### 7.2     Repayment of Letters of Credit

(a)     Each Borrower must repay each Letter of Credit issued on its behalf in full on its Maturity Date.

(b)     Subject to the other terms of this Agreement (and in the case of Facility B, the terms of the Ancillary Facility), any amounts repaid under paragraph (a) above may be re-utilised.

(c)     Any Letter of Credit outstanding under Facility B on the Final Maturity Date must be repaid on that date.

## 8.      PREPAYMENT AND CANCELLATION

### 8.1     Mandatory prepayment - illegality

(a)     A Lender must notify the Company promptly if it becomes aware that it is unlawful in any jurisdiction for that Lender to perform any of its obligations under a Finance Document or to fund or maintain its share in any Credit.

(b)     After notification under paragraph (a) above:

(i)    each Borrower must repay or prepay the share of that Lender in each Credit utilised by it on the date specified in paragraph (c) below; and

(ii)    the Commitments of that Lender will be immediately cancelled.

(c)    The date for repayment or prepayment of a Lender's share in a Credit will be:

(i)    the last day of the current Term of that Credit; or

(ii)    if earlier, the date specified by the Lender in the notification under paragraph (a) above and which must not be earlier than the last day of any applicable grace period allowed by law.

## 8.2    Mandatory prepayment - change of control

(a)    For the purposes of this Subclause:

a **Change of Control** occurs if any person or group of persons acting in concert acquires Control of the Company; and **acting in concert** means a group of persons, acting together pursuant to an agreement or understanding (whether formal or informal).

(b)    The Company must promptly notify the Agent if it becomes aware of any Change of Control.

(c)    If:

(i)    a Change of Control occurs; or

(ii)    a person other than the holders of the common stock in the Company acquires the right to appoint, directly or indirectly, a director of Blue Bird Body Company,

unless the Majority Lenders otherwise direct, the Agent must if so instructed by any Lender, by notice to the Company:

(A)    cancel that Lender's Commitments; and

(B)    declare all outstanding Credits owing to that Lender, together with accrued interest and all other amounts accrued under the Finance Documents, to be immediately due and payable.

Any such notice will take effect in accordance with its terms.

## 8.3    Automatic cancellation

The undrawn Facility A Commitment of each Lender will be automatically cancelled at close of business on the Effective Date.  The Facility B Commitment of each Lender will be automatically cancelled at the close of business on the last day of the Availability Period.

## 8.4    Involuntary prepayment and cancellation

(a)    If an Obligor is, or will be, required to pay to a Lender a Tax Payment or an Increased Cost, the Company may, while the requirement continues, give notice to the Agent requesting prepayment and cancellation in respect of that Lender.

(b)    After notification under paragraph (a) above:

(i)      each Borrower must repay or prepay that Lender's share in each Credit utilised by it on the date specified in paragraph (c) below; and

(ii)     the Commitments of that Lender will be immediately cancelled.

(c)     The date for repayment or prepayment of a Lender's share in a Credit will be the last day of the current Term for that Credit or, if earlier, the date specified by the Company in its notification.

### 8.5 Partial prepayment of Term Loans

No amount of a Term Loan prepaid under this Agreement may subsequently be re-borrowed.

### 8.6 Miscellaneous provisions

(a)     Any notice of prepayment and/or cancellation under this Agreement is irrevocable and must specify the relevant date(s) and the affected Credits and Commitments.  The Agent must notify the Lenders promptly of receipt of any such notice.

(b)     All prepayments under this Agreement must be made with accrued interest or letter of credit fee on the amount prepaid.  No premium or penalty is payable in respect of any prepayment except for Break Costs.

(c)     The Majority Lenders may agree a shorter notice period for a voluntary prepayment or a voluntary cancellation.

(d)     No prepayment or cancellation is allowed except in accordance with the express terms of this Agreement.

(e)     No amount of the Total Commitments cancelled under this Agreement may subsequently be reinstated.

(f)     References to **Lenders** and **Credits** in Subclauses 8.1, 8.2 and 8.5 include the Ancillary Facility Provider and Bilateral Letters of Credit respectively.

## 9. INTEREST

### 9.1 Calculation of interest

Interest will accrue on each Facility A Loan for each of its Terms at a rate of 8 per cent. per annum.

### 9.2 Payment of interest

Accrued interest will be paid on the Final Maturity Date or any earlier date on which the Loans are prepaid in full, the Total Commitments are cancelled in full and the Letters of Credit are prepaid or repaid in full.

### 9.3 Interest on overdue amounts

(a)     If an Obligor fails to pay any amount payable by it under the Finance Documents, it must immediately on demand by the Agent pay interest on the overdue amount from its due date up to the date of actual payment, both before, on and after judgment.

(b)     Interest on an overdue amount is payable at a rate determined by the Agent to be 1 per cent. per annum above the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount.

**9.4**     **Deferred Interest**

Interest deferred under clause 6.4 of the Third Amendment and Restatement Agreement will be paid in accordance with that clause.

**10.**     **TERMS**

**10.1**     **Selection - Term Loans**

(a)     Each Term Loan has successive Terms.

(b)     The first Term for a Term Loan outstanding on the Third Amendment and Restatement Date is specified in the Third Amendment and Restatement Agreement and each subsequent Term is three months.

**10.2**     **No overrunning the Final Maturity Date**

If a Term would otherwise overrun the Final Maturity Date, it will be shortened so that it ends on the Final Maturity Date.

**10.3**     **Other adjustments**

The Agent and the Company may enter into such other arrangements as they may agree for the adjustment of Terms and the consolidation and/or splitting of Loans.

**11.**     **TAXES**

**11.1**     **General**

In this Clause:

**Qualifying Lender** means:

(a)     a Lender which is:

     (i)     a U.S. Lender;

     (ii)     a Treaty Lender; or

     (iii)     entitled to receive payments of interest under the Finance Documents without deduction or withholding of any Tax in the United States; or

(b)     Banca Nazionale del Lavoro S.p.A., London Branch, in respect of all or any part of its Commitments as at the Third Amendment and Restatement Date.

**Tax Credit** means a credit against, deduction from, refund of or reduction of any Tax or any relief or remission for Tax (or its repayment).

**Treaty Lender** means a Lender which is resident (as defined in the appropriate double taxation agreement) in a country with which the U.S. has a double taxation agreement giving residents of that country full exemption from U.S. taxation on interest.

**U.S. Lender** means a Lender which is created or organised under the laws of the United States or any state (including the District of Columbia) thereof.

**11.2    Tax gross-up**

(a)    Each Obligor must make all payments to be made by it under the Finance Documents without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    If:

    (i)    a Lender is not, or ceases to be, a Qualifying Lender; or

    (ii)    an Obligor or a Lender is aware that an Obligor must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction),

it must promptly notify the Agent.  The Agent must then promptly notify the affected Parties.

(c)    Except as provided below, if a Tax Deduction is required by law to be made by an Obligor or the Agent, the amount of the payment due from the Obligor will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    Except as provided below, an Obligor is not required to make an increased payment under paragraph (c) above for a Tax Deduction in respect of the tax imposed by the U.S. to a Lender that is not, or has ceased to be, a Qualifying Lender in excess of the amount that the Obligor would have had to pay had the Lender been, or not ceased to be, a Qualifying Lender.

(e)    Paragraph (d) above will not apply if the Lender has ceased to be a Qualifying Lender by reason of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or double taxation agreement or any published practice or concession of any relevant taxing authority.

(f)    If an Obligor is required to make a Tax Deduction, that Obligor must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(g)    Within 30 days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Obligor making that Tax Deduction or payment must deliver to the Agent for the relevant Finance Party evidence satisfactory to that Finance Party (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

**11.3    Tax indemnity**

(a)    Except as provided below, the applicable Obligor must indemnify a Finance Party against any loss or liability which that Finance Party (in its absolute discretion) determines will be or has been suffered (directly or indirectly) by that Finance Party for or on account of Tax in relation to a payment received or receivable (or any payment deemed to be received or receivable) under a Finance Document.

(b)    Paragraph (a) above does not apply to any Tax assessed on a Finance Party under the laws of the jurisdiction in which:

(i)     that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party has a Facility Office and is treated as resident for tax purposes; or

(ii)    that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable by that Finance Party.  However, any payment deemed to be received or receivable, including any amount treated as income but not actually received by the Finance Party, such as a Tax Deduction, will not be treated as net income received or receivable for this purpose.

(c)     A Finance Party making, or intending to make, a claim under paragraph (a) above must promptly notify the applicable Obligor of the event which will give, or has given, rise to the claim.

## 11.4    Tax Credit

If an Obligor makes a Tax Payment and the relevant Finance Party (in its absolute discretion) determines that:

(a)     a Tax Credit is attributable to that Tax Payment or the Tax giving rise to it; and

(b)     it has used and retained that Tax Credit,

the Finance Party must pay an amount to the Obligor which that Finance Party determines (in its absolute discretion) will leave it (after that payment) in the same after-tax position as it would have been if the Tax Payment had not been required to be made by the Obligor.

## 11.5    Stamp taxes

The Company must pay and indemnify each Finance Party against any stamp duty, stamp duty land tax, registration or other similar Tax payable in connection with the entry into, performance or enforcement of any Finance Document, except for any such Tax payable in connection with the entry into a Transfer Certificate.

## 11.6    Value added taxes

(a)     Any amount (including costs and expenses) payable under a Finance Document by an Obligor is exclusive of any value added tax or any other Tax of a similar nature which might be chargeable in connection with that amount.  If any such Tax is chargeable, the Obligor must pay to the Finance Party (in addition to and at the same time as paying that amount) an amount equal to the amount of that Tax.

(b)     The obligation of any Obligor under paragraph (a) above will be reduced to the extent that the Finance Party determines (acting reasonably) that it is entitled to repayment or a credit in respect of the relevant Tax.

## 11.7    U.S. Tax Forms

(a)     Except as provided below, each Lender must supply to the Agent and each Obligor the U.S. Internal Revenue Service forms that are necessary to enable that Obligor to make payments to that Lender under the Finance Documents without any deduction or withholding in respect of any Tax in the United States of America.

(b)     A Lender must comply with its obligations under paragraph (a) above as soon as practicable after the date it becomes a Party or (if later) the date the Obligor becomes a Party.

(c)     A Lender is not obliged to supply any form under paragraph (a) above if it is unable to do so by reason of any change after the Third Amendment and Restatement Date in (or in the interpretation, administration or application of) any law or regulation or any published practice or concession of any relevant taxing authority.

(d)     An Obligor is not obliged to pay any Tax Payment to a Lender to the extent that the Tax Payment would not have been payable if that Lender had complied with its obligations under this Subclause.

## 12.     INCREASED COSTS

### 12.1     Increased Costs

Except as provided below in this Clause, the Company must pay to a Finance Party the amount of any Increased Cost incurred by that Finance Party or any of its Affiliates as a result of:

(a)     the introduction of, or any change in, or any change in the interpretation, administration or application of, any law or regulation; or

(b)     compliance with any law or regulation,

made after the Third Amendment and Restatement Date.

### 12.2     Exceptions

The Company need not make any payment for an Increased Cost to the extent that the Increased Cost is:

(a)     compensated for under another Clause or would have been but for an exception to that Clause;

(b)     a tax on the overall net income of a Finance Party or any of its Affiliates; or

(c)     attributable to a Finance Party or its Affiliate wilfully failing to comply with any law or regulation.

### 12.3     Claims

A Finance Party intending to make a claim for an Increased Cost must notify the Company promptly of the circumstances giving rise to, and the amount of, the claim.

## 13.     MITIGATION

### 13.1     Mitigation

(a)     Each Finance Party must, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which result or would result in:

(i)     any Tax Payment or Increased Cost being payable to that Finance Party;

(ii)      that Finance Party being able to exercise any right of prepayment and/or cancellation under this Agreement by reason of any illegality; or

(iii)    that Finance Party incurring any cost of complying with the minimum reserve requirements of the European Central Bank,

including transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office.

(b)      Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

(c)      The Company must indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of any step taken by it under this Subclause.

(d)      A Finance Party is not obliged to take any step under this Subclause if, in the opinion of that Finance Party (acting reasonably), to do so would reasonably be expected to be prejudicial to it.

### 13.2    Conduct of business by a Finance Party

No term of this Agreement will:

(a)      interfere with the right of any Finance Party to arrange its affairs (Tax or otherwise) in whatever manner it thinks fit;

(b)      oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it in respect of Tax or the extent, order and manner of any claim; or

(c)      oblige any Finance Party to disclose any information relating to its affairs (Tax or otherwise) or any computation in respect of Tax.

### 14.    PAYMENTS

### 14.1    Place

Unless a Finance Document specifies that payments under it are to be made in another manner, all payments by a Party (other than the Agent) under the Finance Documents must be made to the Agent to its account at such office or bank:

(a)      in the principal financial centre of the country of the relevant currency; or

(b)      in the case of euro, in the principal financial centre of a Participating Member State or London,

as it may notify to that Party for this purpose by not less than five Business Days' prior notice.

### 14.2    Funds

Payments under the Finance Documents to the Agent must be made for value on the due date at such times and in such funds as the Agent may specify to the Party concerned as being customary at the time for the settlement of transactions in the relevant currency in the place for payment.

**14.3    Distribution**

(a)    Each payment received by the Agent under the Finance Documents for another Party must, except as provided below, be made available by the Agent to that Party by payment (as soon as practicable after receipt) to its account with such office or bank:

    (i)    in the principal financial centre of the country of the relevant currency; or

    (ii)    in the case of euro, in the principal financial centre of a Participating Member State or London,

as it may notify to the Agent for this purpose by not less than five Business Days' prior notice.

(b)    The Agent may apply any amount received by it for an Obligor in or towards payment (as soon as practicable after receipt) of any amount due from that Obligor under the Finance Documents or in or towards the purchase of any amount of any currency to be so applied.

(c)    Where a sum is paid to the Agent under this Agreement for another Party, the Agent is not obliged to pay that sum to that Party until it has established that it has actually received it. However, the Agent may assume that the sum has been paid to it, and, in reliance on that assumption, make available to that Party a corresponding amount.  If it transpires that the sum has not been received by the Agent, that Party must immediately on demand by the Agent refund any corresponding amount made available to it together with interest on that amount from the date of payment to the date of receipt by the Agent at a rate calculated by the Agent to reflect its cost of funds.

**14.4    Currency**

(a)    Unless a Finance Document specifies that payments under it are to be made in a different manner, the currency of each amount payable under the Finance Documents is determined under this Clause.

(b)    Interest and letter of credit fee is payable in the currency in which the relevant amount in respect of which it is payable is denominated.

(c)    A repayment or prepayment of any principal amount is payable in the currency in which that principal amount is denominated on its due date.

(d)    Amounts payable in respect of costs and expenses are payable in the currency in which they are incurred.

(e)    Each other amount payable under the Finance Documents is payable in U.S. Dollars.

**14.5    No set-off or counterclaim**

All payments made by an Obligor under the Finance Documents must be made without set-off or counterclaim.

**14.6    Business Days**

(a)    If a payment under the Finance Documents is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not) or whatever day the Agent determines is market practice.

(b)    During any extension of the due date for payment of any principal under this Agreement interest is payable on that principal at the rate payable on the original due date.

**14.7    Partial payments**

(a)    If any Finance Party receives an amount, whether through repayment, enforcement proceeds or otherwise insufficient to discharge all the amounts then due and payable by the Obligors under the Finance Documents, that amount must be applied towards the obligations of the Obligors under the Finance Documents in the following order:

    (i)    **first**, in or towards payment pro rata of any unpaid fees, costs and expenses of the Administrative Parties under the Finance Documents;

    (ii)    **secondly,** in or towards payment pro rata of any accrued interest or fee that is due and payable under the Finance Documents;

    (iii)    **thirdly**, in or towards payment pro rata of any principal amount due and payable under this Agreement and the Ancillary Facility; and

    (iv)    **fourthly**, in or towards payment pro rata of any other sum due and payable under the Finance Documents.

(b)    The Agent must, if so directed by all the Lenders, vary the order set out in subparagraphs (a)(ii) to (iv) above.

(c)    This Subclause will override any appropriation made by an Obligor.

**14.8    Timing of payments**

If a Finance Document does not provide for when a particular payment is due, that payment will be due within three Business Days of demand by the relevant Finance Party.

**15.    GUARANTEE**

**15.1    Guarantee**

Each Guarantor irrevocably, unconditionally, jointly and severally (and notwithstanding the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditors of any member of the Group):

(a)    as principal obligor, guarantees to each Finance Party prompt performance by each other Obligor of all its payment obligations under the Finance Documents;

(b)    undertakes with each Finance Party that whenever an Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall forthwith on demand by the Agent pay that amount as if that Guarantor instead of that Obligor were expressed to be the principal obligor; and

(c)    indemnifies each Finance Party on demand against any loss or liability suffered by it if any obligation guaranteed by that Guarantor is or becomes unenforceable, invalid or illegal.

## 15.2 Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by each other Obligor under, among other things, the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

## 15.3 Reinstatement

(a) Where any discharge (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made in whole or in part or any arrangement is made on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of each Guarantor under this Clause shall continue as if the discharge or arrangement had not occurred.

(b) Each Finance Party may concede or compromise any claim that any payment, security or other disposition is liable to avoidance or restoration.

## 15.4 Waiver of defences

The obligations of each Guarantor under this Clause will not be affected by any act, omission, matter or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause or prejudice or diminish those obligations in whole or in part, including (whether or not known to it or any Finance Party):

(a) any time or waiver granted to, or composition with, any Obligor or other person;

(b) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(c) any incapacity or lack of powers, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(d) any variation (however fundamental) or replacement of a Finance Document or any other document or security so that references to that Finance Document in this Clause shall include each variation or replacement;

(e) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security, to the intent that each Guarantor's obligations under this Clause shall remain in full force and its guarantee be construed accordingly, as if there were no unenforceability, illegality or invalidity;

(f) the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditors of any member of the Group; or

(g) any postponement, discharge, reduction, non-provability or other similar circumstance affecting any obligation of any Obligor under a Finance Document resulting from any insolvency, liquidation or dissolution proceedings or from any law, regulation or order so that each such obligation shall for the purposes of the Guarantor's obligations under this Clause shall be construed as if there were no such circumstance.

### 15.5 Immediate recourse

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause.

### 15.6 Appropriations

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a) refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b) hold in a suspense account bearing interest at a commercial rate any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause.

### 15.7 Non-competition

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, no Guarantor shall, after a claim has been made or by virtue of any payment or performance by it under this Clause.

(a) be subrogated to any rights, security or moneys held, received or receivable by any Finance Party (or any trustee or agent on its behalf) or be entitled to any right of contribution or indemnity in respect of any payment made or moneys received on account of that Guarantor's liability under this Clause.

(b) claim, rank, prove or vote as a creditor of any Obligor or its estate in competition with any Finance Party (or any trustee or agent on its behalf); or

(c) receive, claim or have the benefit of any payment, distribution or security from or on account of any Obligor, or exercise any right of set-off as against any Obligor,

unless the Agent otherwise directs. Each Guarantor shall hold in trust for and forthwith pay or transfer to the Agent for the Finance Parties any payment or distribution or benefit of security received by it contrary to this Clause or as directed by the Agent.

### 15.8 Release of Guarantors' right of contribution

If any Guarantor ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purposes of any sale or other disposal of that Guarantor:

(a) that Guarantor will be released by each other Guarantor from any liability whatsoever to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b) each other Guarantor will waive any right it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any right of any Finance Party

under any Finance Document or of any other security taken under, or in connection with, any Finance Document by any Finance Party.

**15.9    Additional security**

This guarantee is in addition to and is not in any way prejudiced by any other security now or hereafter held by any Finance Party.

**15.10    Consideration and enforceability**

(a)    Each Guarantor represents, warrants and agrees that:

    (i)    it will receive valuable direct and indirect benefits as a result of the transactions financed by the Loans; and

    (ii)    these benefits will constitute **reasonably equivalent value** and **fair consideration** as those terms are used in the fraudulent transfer laws.

(b)    Each Guarantor acknowledges and agrees that each of the Finance Parties has acted in good faith in connection with the guarantee granted under this Clause and the transactions contemplated by this Agreement.

(c)    This Clause shall be enforceable against each Guarantor to the maximum extent permitted by the fraudulent transfer laws.

(d)    Each Guarantor's liability under this Clause shall be limited to the extent necessary (but only to such extent) to procure that no obligation of, or transfer by, the Guarantor under this Clause is subject to avoidance and turnover under the fraudulent transfer laws.

(e)    For purposes of this Clause, **fraudulent transfer laws** means applicable United States bankruptcy and State fraudulent transfer and conveyance statutes and the related case law.

(f)    Each representation and warranty in this Subclause:

    (i)    is made by each Guarantor on the Third Amendment and Restatement Date;

    (ii)    is deemed to be repeated by:

        (A)    each Additional Guarantor on the date that Additional Guarantor becomes a Guarantor; and

        (B)    each Guarantor on the first day of each Term; and

is, when repeated, applied to the circumstances existing at the time of repetition.

## 16.    REPRESENTATIONS AND WARRANTIES

**16.1    Representations and warranties**

Each Obligor makes the representations and warranties set out in this Clause to each Finance Party.

**16.2    Status**

(a)    It is a limited liability company or corporation, duly incorporated or amalgamated, validly existing and, where applicable, in good standing under the laws of the jurisdiction of its incorporation; and

(b)    it and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

**16.3    Powers and authority**

Upon the entry of the Confirmation Order, it has the power to enter into and perform, and has taken all necessary action to authorise the entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

**16.4    Legal validity**

Each Finance Document to which it is or will be a party constitutes, or when executed in accordance with its terms will constitute, its legal, valid and binding obligation enforceable subject to relevant Qualifications in accordance with its terms.

**16.5    Non-conflict**

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not conflict with:

(a)    any law or regulation or judicial or official order; or

(b)    its constitutional documents; or

(c)    any material document which is binding upon it or any of its Subsidiaries or its assets or any of its Subsidiaries' assets.

**16.6    No default**

(a)    No Default is outstanding or will result from the execution of or the performance of any transactions contemplated by any Finance Document; and

(b)    No other event is outstanding which constitutes (or with the giving of notice or lapse of time could reasonably be expected to constitute) a default under any document which is binding on it or any of its Subsidiaries or any asset of it or any of its Subsidiaries to an extent or in a manner which could reasonably be expected to have a Material Adverse Effect.

**16.7    Authorisations**

Except for registration of each Security Document and after giving effect to the Confirmation Order, all authorisations, licences and approvals required in connection with the entry into, performance, validity and enforceability of, and the transactions contemplated by, the Finance Documents have been obtained or effected (as appropriate) and are in full force and effect.

**16.8    Accounts**

(a)    In the case of the Company, when delivered, the audited consolidated accounts of the Group most recently delivered to the Agent after the Third Amendment and Restatement Date:

(i)     have been prepared in accordance with GAAP consistently applied; and

(ii)    fairly represent the consolidated financial condition of the Group as at the date to which they were drawn up.

(b)     In the case of each Guarantor, its audited accounts most recently delivered to the Agent after the Third Amendment and Restatement Date,:

(i)     have been prepared in accordance with accounting principles and practices generally accepted in the jurisdiction of its incorporation consistently applied; and

(ii)    fairly represent its financial condition as at the date to which they were drawn up.

(c)     In the case of the Company, each set of the interim accounts, quarterly accounts and monthly accounts will, when delivered, have been prepared with due care and skill and on a basis consistent with the audited consolidated accounts of the Group but for year-end adjustments.

**16.9    Litigation**

No litigation, arbitration or administrative proceedings, actions, suits or investigations are current, pending or, to its knowledge, pending or threatened against it or any of its Subsidiaries, which (i) is reasonably likely to be determined against such member and, if so adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) except for the Cases, involves any of the transactions or commitments contemplated by this Agreement.

**16.10   Environmental Matters**

(a)     It and each of its Subsidiaries is in compliance  with all laws and regulations applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)     Neither it nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any Environmental Approval, (ii) is subject to or has received notice of any Environmental Claim against or affecting any of them or (iii) knows of any circumstances that could reasonably form the basis of an Environmental Claim against or affecting any of them, except for any such matters which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**16.11   ERISA**

(a)     Each member of the Controlled Group has fulfilled its obligations under the minimum funding standards of ERISA, the Code or the applicable laws of any other jurisdiction including the PBA with respect to each Plan to which such minimum funding standards apply.

(b)     Each member of the Controlled Group is in compliance in all material respects with the presently applicable provisions of ERISA, the Code or the applicable laws of any other jurisdiction (including the PBA) with respect to each Plan.

(c)     Each Plan complies in all material respects with all applicable requirements of law and regulations.  No Reportable Event (other than Reportable Events arising in connection with a reduction in workforce from 2003-2004 and the freezing of the Group Pension Plan) or Termination Event has occurred with respect to any Plan, and no steps have been taken to

reorganise or terminate any Plan or by the Obligors or any member of the Controlled Group to effect a complete or partial withdrawal from any Multiemployer Plan.

(d)      No member of the Controlled Group has:

    (i)      sought a waiver of the minimum funding standard under Section 412 of the Code or otherwise in respect of any Plan;

    (ii)      failed to make any contribution or payment to any Plan, or made any amendment to any Plan, and no other event, transaction or condition has occurred which has resulted or could result in the imposition or creation of a lien (choate or inchoate) in respect of any Obligor or any member of the Controlled Group or its or their property, or the posting of a bond or other security under ERISA or the Code except for such failures, amendments, impositions or postings that would not have a Material Adverse Effect or for contribution amounts that are not yet due; or

    (iii)      incurred any material liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA.

**16.12    Labour matters**

There are no collective bargaining agreements or Multiemployer Plans covering any employees of any Obligor, any Canadian Subsidiary or any member of the Controlled Group, and no Obligor has experienced any strike, walkout, work stoppage or other labour action or disturbance during the past three years.

**16.13    No Unlawful Payments**

No Obligor has in any way violated the United States Foreign Corrupt Practices Act of 1977, as amended, or similar laws of any other applicable jurisdiction in any way that has resulted in or is reasonably likely to result in imposition of criminal liability or otherwise have a Material Adverse Effect.

**16.14    Investment Company Act**

No Obligor is an **investment company** or a company **controlled** by an **investment company** within the meaning of the United States Investment Company Act 1940, as amended.

**16.15    Public Utility Holding Company Act**

No Obligor is a **holding company** or an **affiliate** of a **holding company** or a **subsidiary company** of a **holding company**, within the meaning of, or otherwise subject to regulation under, the United States Public Utility Holding Company Act of 1935, as amended.

**16.16    Margin stock**

(a)      **Margin Regulations** means Regulations U and X of the Board of Governors of the United States Federal Reserve System.

(b)      No Obligor is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of the Margin Regulations), and no portion of any Loan has been or will be used, directly or indirectly, to purchase or carry margin stock or for any other purpose in violation of the Margin Regulations.

**16.17    Anti-Terrorism**

(a)     In this Subclause:

      **Anti-Terrorism Law** means each of:

      (i)     Executive Order No. 13224 of September 23, 2001 - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the **Executive Order**);

      (ii)     the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act);

      (iii)     the Money Laundering Control Act of 1986, Public Law 99-570; and

      (iv)     any similar law enacted in the United States of America subsequent to the Third Amendment and Restatement Date.

      **Restricted Party** means any person listed:

      (i)     in the Annex to the Executive Order;

      (ii)     on the "Specially Designated Nationals and Blocked Persons" list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or

      (iii)     in any successor list to either of the foregoing.

(b)     To the best of its knowledge, neither it nor any of its Affiliates:

      (i)     is, or is controlled by, a Restricted Party;

      (ii)     has received funds or other property from a Restricted Party; or

      (iii)     is in breach of or is the subject of any action or investigation under any Anti-Terrorism Law.

(c)     It and each of its Affiliates have taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

**16.18    No Limitation on incurring Financial Indebtedness**

      It is not subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee Financial Indebtedness.

**16.19    Immunity**

(a)     The execution by it of each Finance Document constitutes, and the exercise by it of its rights and performance of its obligations under each Finance Document will constitute, private and commercial acts performed for private and commercial purposes; and

(b)     it will not be entitled to claim immunity from suit, execution, attachment or other legal process in any proceedings taken in its jurisdiction of incorporation in relation to any Finance Document.

**16.20    No adverse consequences**

(a)    Subject to matters expressly set out in the Qualifications, it is not necessary under the laws of its jurisdiction of incorporation:

    (i)    in order to enable any Finance Party to enforce its rights under any Finance Document; or

    (ii)    by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in its jurisdiction of incorporation; and

(b)    no Finance Party is or will be deemed to be resident, domiciled or carrying on business in its jurisdiction of incorporation by reason only of the execution, performance and/or enforcement of any Finance Document.

**16.21    Jurisdiction/governing law**

(a)    Subject to matters expressly set out in the Qualifications, its:

    (i)    irrevocable submission under this Agreement to the jurisdiction of the courts of England and New York;

    (ii)    agreement that this Agreement is governed by English law; and

    (iii)    agreement not to claim any immunity to which it or its assets may be entitled,

are legal, valid and binding under the laws of its jurisdiction of incorporation; and

(b)    any judgment obtained in England or in New York will be recognised and be enforceable by the courts of its jurisdiction of incorporation.

**16.22    Times for making representations and warranties**

The representations and warranties set out in this Clause:

(a)    (i)    are made by each Obligor on the Third Amendment and Restatement  Date; and

    (ii)    in the case of an Obligor which becomes a Party after the Third Amendment and Restatement Date (with the exception of Subclause 16.5(c) (Non-conflict) will be deemed to be made by that Obligor on the date it executes an Accession Agreement; and

(b)    (with the exception of Subclause 16.5(c) (Non-conflict)), are deemed to be repeated by each Obligor on the first day of each Term with reference to the facts and circumstances then existing.

## 17.    UNDERTAKINGS

### 17.1    Duration

The undertakings in this Clause remain in force from the Effective Date for so long as any amount is or may be outstanding under this Agreement or any Commitment is in force.

### 17.2    Financial information

The Company shall supply to the Agent (in sufficient copies for all the Lenders and Issuing Bank):

(a)    as soon as the same are available (and in any event within 120 days of the end of each of its financial years) (210 days in the case of the 2005 financial year):

   (i)    its audited consolidated accounts for that financial year; and

   (ii)    the audited accounts of each Obligor (other than Blue Bird Body Company) for that financial year (if, in the case of an Obligor, such audited accounts are produced);

(b)    as soon as the same are available, and in any event within:

   (i)    210 days of the end of its financial year ending on 30th September 2005; and

   (ii)    90 days of the end of each of its financial years thereafter,

   the unaudited consolidated financial statements of Blue Bird Corporation for that financial year;

(c)    as soon as they are available (and in any event within 30 days of the end of each month its consolidated Monthly Management Accounts and Blue Bird Body Company's Monthly Management Accounts; Monthly Management Accounts covering a month expiring at a quarter end or at half-year will include cumulative accounts for the relevant quarter or half-year (as applicable);

(d)    together with the accounts specified in paragraph (c) above:

   (i)    in respect of each quarter, details of non school bus vehicles held on floor plans by distributors (including details of any sales subsidy mechanisms); and

   (ii)    in respect of each month details of Blue Bird Body Company's order book (together with deviations from the year-on-year orders) the key performance indicators of Blue Bird Body Company, all in respect of the relevant month, and a rolling 13-week cash flow forecast (all in the form agreed prior to the Third Amendment and Restatement Date); and

(e)    as soon as the same is available (and in any case within 30 days of the commencement of each financial year) the Group's annual business plan and budget for that financial year.

**17.3     Information - miscellaneous**

Each Obligor shall supply to the Agent:

(a)     all documents despatched by it to all of its shareholders (or any class of them) or all of its creditors (or any class of them) at the same time as they are despatched;

(b)     promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending, and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)     (i)     promptly, such further information in the possession or control of any member of the Group regarding its financial condition and operations as any Finance Party may reasonably request, other than information which the Company is precluded by law or regulation from disclosing (providing that the Company shall use all reasonable endeavours to obtain all necessary consents, authorisations or waivers for the disclosure thereof to the Agent);

          (ii)    if the Company considers a Finance Party's request under subparagraph (i) to be unreasonable in all the circumstances and the relevant request was not made by the Majority Lenders, it may request the Majority Lenders through the Agent to determine whether or not the request is reasonable; the Majority Lenders' determination (if any) shall be conclusive and binding on the Parties; and

(d)     if any member of the Controlled Group:

          (i)     gives or is required to give notice to the PBGC of any Reportable Event with respect to any Plan which might constitute grounds for a termination of that Plan under Title IV of ERISA, or knows that the plan administrator of any Plan has given notice of that Reportable Event, a copy of the notice of that Reportable Event given or required to be given to the PBGC;

          (ii)    receives notice of complete or partial withdrawal liability under Title IV of ERISA or notice that any Multiemployer Plan is in reorganization, is insolvent or has been terminated, a copy of that notice;

          (iii)   receives notice from the PBGC under Title IV of ERISA of an intent to terminate, impose liability (other than for premiums under Section 4007 of ERISA) or the Financial Services Commission of Ontario in respect of, or appoint a trustee to administer, any Plan, a copy of that notice;

          (iv)    applies for a waiver of the minimum funding standard under Section 412 of the Code or otherwise, a copy of that application;

          (v)     gives notice of intent to terminate any Plan under Section 4041(c) of ERISA or otherwise, a copy of that notice and any other information filed with the PBGC or the Financial Services Commission of Ontario;

          (vi)    gives notice of withdrawal from any Plan pursuant to Section 4063 of ERISA, a copy of that notice or otherwise;

(vii)    if so requested by the Agent (acting reasonably), promptly after filing an actuarial report and/or information return with respect to any Canadian Pension Plan, a copy of such report and/or return; or

(viii)    fails to make any payment or contribution to any Plan or makes any amendment to any Plan which has resulted or could result in the imposition of a Security Interest (choate or inchoate) or the posting of a bond or other security, a certificate of the chief financial officer or the chief accounting officer of the applicable Obligor setting forth details of that occurrence and action, if any, which the applicable Obligor or applicable member of the Controlled Group is required or proposes to take, in sufficient copies for all of the Lenders, if the Agent so requests.

## 17.4    Notification of Default

Each Obligor shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

## 17.5    Year end

No Obligor may change its financial year end unless Clause 17.18 (Financial Covenants) has been amended to reflect that change to the satisfaction of the Majority Banks.

## 17.6    Know your customer requirements

(a)    Each Obligor must promptly on the request of any Finance Party supply to that Finance Party any documentation or other evidence which is reasonable requested by that Finance Party (whether for itself, on behalf of any Finance Party or any prospective new Lender) to enable a Finance Party or prospective New Lender to carry out and be satisfied with the results of all applicable know your customer requirements.

(b)    Each Lender must promptly on the request of the Agent supply to the Agent any documentation or other evidence which is reasonably required by the Agent to carry out and be satisfied with the results of all applicable know your customer requirements.

## 17.7    Compliance Certificates

(a)    The Company shall supply to the Agent:

(i)    together with the accounts specified in Subclauses [17.2(a)(i) and (b)] (Financial information); and

(ii)    promptly at any other time, if the Agent so requests,

a certificate signed by the Chief Financial Officer on its behalf and the Group certifying that no Default is outstanding or, if a Default is outstanding, specifying the Default and the steps, if any, being taken to remedy it.

(b)    The Company shall supply to the Agent:

(i)    together with the accounts specified in Subclauses 17.2(a)(i) (Financial information) above and if the auditors are willing to provide the same and the Majority Lenders, having been provided with a copy of the auditor's fee quotation for the engagement, so require, a Compliance Certificate signed by its auditors setting out in reasonable

detail computations establishing whether or not the Company is in compliance with Subclause 17.18 (Financial covenants) as at the date to which their accounts were drawn up; and

(ii)     together with the accounts specified in Subclause 17.2(c) (Financial information) above, a Compliance Certificate signed by the Chief Financial Officer on behalf of the Group and of Blue Bird Body Company setting out in reasonable detail computations establishing whether or not the Company is in compliance with Subclause 17.18 (Financial covenants) as at the date those accounts were drawn up.

(c)     The Company must provide the Agent for the Lenders in good time with the auditors' fee quotation referred to in paragraph (b)(i) above or with evidence that the auditors' have declined to accept an engagement to sign the Compliance Certificate.

## 17.8    Authorisations

Each Obligor shall promptly:

(a)     obtain, maintain and comply with the terms of; and

(b)     upon request, supply certified copies to the Agent of,

any authorisation required under any law or regulation to enable it to perform its material obligations under, or for the validity or enforceability of, any Finance Document.

## 17.9    Pari passu ranking

Subject to the terms of the Subordination Agreement, each Obligor shall procure that its obligations under the Finance Documents do and will rank at least *pari passu* with all its other present and future unsecured obligations, except for obligations mandatorily preferred by law applying to companies generally.

## 17.10    Negative pledge

(a)     No Obligor shall, and each Borrower shall procure that no other member of the Group will, create or permit to subsist any Security Interest on any of its assets.

(b)     Paragraph (a) does not apply to:

(i)     a Security Document;

(ii)     any lien (including a banker's lien and right to combine accounts) arising by operation of law in the ordinary course of business and securing amounts not more than 30 days overdue;

(iii)     any Security Interest over goods acquired by any member of the Group in the ordinary course of business arising out of title retention provisions in a supplier's standard conditions of supply entered into by that member of the Group in the ordinary course of its business;

(iv)     any Security Interest which constitutes a contractual right of any bank or financial institution to apply any credit balance maintained by any member of the Group with that bank or financial institution against any other amount payable to such bank or financial institution by that or any other member of the Group pursuant to a cash

management or cash pooling scheme entered into by members of the Group with that bank in connection with the relevant Group members' ordinary banking arrangements;

(v)     any Security Interest created on any asset (other than an asset acquired from another member of the Group) acquired by it after the Effective Date for the sole purpose of securing indebtedness incurred only to finance or refinance that acquisition;

(vi)    any Security Interest created by any member of the Group existing at and disclosed in writing to and accepted by the Finance Parties prior to the Effective Date provided that the amount secured by such Security Interest shall not be increased after the date of such disclosure;

(vii)   any Security Interest created with the approval of the Majority Lenders;

(viii)  any Permitted Transaction;

(ix)    any Ancillary Facility Security Interest;

(x)     any cash cover of up to U.S.$2,000,000 in aggregate provided for workers' compensation related letters of credit; and

(xi)    any other Security Interests so long as the aggregate amount of Financial Indebtedness secured by these Security Interests does not exceed (together with the amount of outstanding indebtedness permitted under Subclause 17.11 (Transactions similar to security), U.S.$2,000,000 (or its equivalent in any other currency or currencies) at any time.

## 17.11   Transactions similar to security

(a)     No Obligor shall, and each Borrower shall procure that no other member of the Group will:

(i)     sell, transfer or otherwise dispose of any of its assets on terms whereby it is or may be leased to or re-acquired or acquired by a member of the Group or any of its related entities; or

(ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms, except for the discounting of bills or notes in the ordinary course of trading.

(b)     Paragraph (a) does not apply to nor limit any Permitted Transaction or to any transaction referred to in that paragraph where the aggregate of:

(i)     the aggregate capital amount outstanding under finance leases entered into in respect of assets disposed of pursuant to a transaction referred to in subparagraph (a)(i) above; and

(ii)    the aggregate at the relevant time of all recourse referred to in subparagraph (a)(ii) above; and

(iii)   the aggregate of all Financial Indebtedness secured by Security Interests permitted under Subclause 17.10 (Negative pledge),

does not exceed U.S.$2,000,000 (or its equivalent in any other currency or currencies) at any time.

**17.12    Disposals**

(a)    No Obligor shall, and the Company shall procure that no other member of the Group will, either in a single transaction or in a series of transactions, whether related or not and whether voluntarily or involuntarily, sell, transfer, grant or lease or otherwise dispose of all or any part of its assets.

(b)    Paragraph (a) does not apply to:

    (i)    Permitted Transactions;

    (ii)    disposals made in the ordinary course of trading of the disposing entity;

    (iii)    disposals of cash for any purpose permitted by this Agreement;

    (iv)    disposals between Obligors;

    (v)    disposals of assets in exchange for other assets comparable or superior as to type, value and quality;

    (vi)    disposals from a member of the Group to another member of the Group provided that, where such other member of the Group is not an Obligor and the person making the disposal is an Obligor:

        (A)    such disposal must be on arm's length terms for fair market value; and

        (B)    the annual aggregate consideration payable for all such disposals shall not exceed U.S.$5,000,000;

    (vii)    disposals on arm's length terms of assets not required for the efficient operation of the business of the Group;

    (viii)    disposals of assets not exceeding U.S.$5,000,000 (or its equivalent in other currencies) in aggregate in any one financial year of the Group;

    (ix)    disposal of the fabrication facility in Branford, Canada and disposal of the capital stock of School Bus Sales of Alabama Inc.;

    (x)    any other disposal approved by the Majority Lenders.

(c)    Paragraph (b) does not permit the disposal of any asset that is subject to a fixed Security, Interest except in accordance with Subclause 19.7 (Release of security).

**17.13    Mergers, acquisitions and joint ventures**

(a)    No Obligor shall enter into any amalgamation, demerger, merger or reconstruction (other than on terms approved by the Majority Lenders (acting reasonably)).

(b)    No Obligor shall, and each Borrower shall procure that no other member of the Group will, acquire any assets or business or make any investment or enter into or acquire any interest in any joint venture, partnership or similar arrangement, other than:

    (i)    in the ordinary course of trading;

    (ii)    otherwise up to an aggregate annual amount of U.S.$2,000,000 provided that no Default is outstanding;

    (iii)    otherwise as approved by the Majority Lenders; or

    (iv)    pursuant to a Permitted Transaction.

(c)    Any investment made by an Obligor pursuant to paragraph (b) may only be in Cash or Cash Equivalents.

### 17.14 Restrictions on additional indebtedness

The Company shall ensure that no member of the Group incurs any Financial Indebtedness except for:

(a)    Financial Indebtedness incurred with the prior consent of the Majority Lenders;

(b)    Financial Indebtedness of a member of the Group to or in favour of any other member of the Group;

(c)    foreign exchange, interest rate or similar hedging arrangements entered into only for the purposes of managing the interest rate and foreign exchange rates of the Group and not for any speculative purpose or pursuant to any financial trading;

(d)    Financial Indebtedness of any member of the Group acquired after the Effective Date if:

    (i)    the Financial Indebtedness was incurred prior to the acquisition of the relevant company and otherwise than in contemplation of the acquisition; and

    (ii)    the amount of the Financial Indebtedness immediately prior to the acquisition is not thereafter exceeded; and

    (iii)    such Financial Indebtedness is repaid or discharged in full within 12 months of the date of the acquisition;

(e)    Financial Indebtedness incurred in respect of performance, completion or similar bonds up to an aggregate principal amount outstanding at any time of U.S.$5,000,000 (or its equivalent in other currencies);

(f)    Financial Indebtedness incurred under a Permitted Transaction;

(g)    guarantees given by an Obligor to a third party in respect of the Financial Indebtedness of another Obligor;

(h)    Financial Indebtedness under the Finance Documents;

(i)    Financial Indebtedness under the Senior Secured Facility and related documents; and

(j)    any other Financial Indebtedness up to an aggregate principal amount outstanding at any one time of U.S.$5,000,000 (or its equivalent in other currencies).

**17.15    Compliance with laws**

Each member of the Group must comply in all respects with all laws and regulations to which it or its property is subject, except where failure to do so is not reasonably likely to have a Material Adverse Effect.

**17.16    Change of business**

The Company must ensure that no substantial change is made to the general nature of the business of the Company or the Group from that carried on at the Effective Date.

**17.17    Environmental matters**

(a)    In this Subclause:

**Environmental Approval** means any license, permit, approval, registration or authorisation required by an Environmental Law.

**Environmental Claim** means any claim, action, proceeding, demand or investigation by any person in connection with:

(i)    a breach, or alleged breach, of any Environmental Law or Environmental Approval;

(ii)    any accident, fire, explosion or other event of any type involving an emission or substance which is capable of causing harm to any living organism or the environment; or

(iii)    any other presence, release or migration or any emission or substance which is capable of causing harm to any living organism or the environment including but not limited to asbestos or asbestos-containing materials in any product or at any location, or any other liability or alleged liability relating to any Environmental Law or Environmental Approval.

**Environmental Law** means any law or regulation concerning:

(i)    the protection of health and safety;

(ii)    the environment; or

(iii)    any emission or substance which is capable of causing harm to any living organism or the environment.

(b)    Each Obligor must ensure that it is, and has been, in compliance with all Environmental Laws and Environmental Approvals applicable to it or the property over which it has charge, control or management, except where failure to do so is not reasonably likely to have a Material Adverse Effect or result in any liability for a Finance Party.

(c)    Each Obligor must promptly upon becoming aware notify the Agent of:

(i)    any Environmental Claim current, or to its knowledge, pending or threatened; or

(ii)    any circumstances reasonably likely to result in an Environmental Claim,

which, if substantiated, is reasonably likely to either have a Material Adverse Effect or result in any liability for a Finance Party.

**17.18    Financial covenants**

The Obligors shall comply with the financial covenants which are agreed by the Senior Lenders in respect of the Senior Secured Facility which will be deemed to be incorporated in this Agreement mutatis mutandis on being incorporated in the Senior Secured Facility.

**17.19    ERISA**

(a)    Each Obligor must promptly upon becoming aware of it notify the Agent of:

   (i)    any Reportable Event;

   (ii)    the termination of or withdrawal from, or any circumstances reasonably likely to result in the termination of or withdrawal from, any Plan subject to Title IV of ERISA or a complete or partial withdrawal from any Multiemployer Plan or any action that might result in complete or partial withdrawal; and

   (iii)    a claim or other communication alleging material non-compliance with any law or regulation relating to any Plan.

(b)    Each Obligor and each member of the Controlled Group must be, and remain, in compliance in all respects with all laws and regulations relating to each of its Plans, where failure to do so is reasonably likely to have a Material Adverse Effect.

(c)    Each Obligor and member of the Controlled Group must ensure that no event or condition exists at any time in relation to a Plan which is reasonably likely to result in the imposition of a Security Interest on any of its assets or which is reasonably likely to have a Material Adverse Effect.

**17.20    Canadian plans**

(a)    For each existing Canadian Pension Plan, each Obligor and its Subsidiaries shall ensure that each plan retains its registered status under and is administered in a timely manner in all respects in accordance with applicable pension plan text and funding agreement, the ITA and all other applicable laws.

(b)    For each Canadian Pension Plan adopted by an Obligor or any of its Subsidiaries after 9th December, 2003 which is required to be registered under the ITA or any other applicable laws, that Obligor or Subsidiary shall use its best efforts to seek and receive confirmation in writing from the applicable governmental authority to the effect that the plan is unconditionally registered under the ITA and any other applicable laws.

(c)    For each existing or adopted Canadian Pension Plan and Canadian Benefit Plan, each Obligor and its Subsidiaries shall in a timely fashion perform in all material respects all obligations (including fiduciary, funding, investment and administration obligations) required to be performed in connection with that plan and its funding media where failure to do so could reasonably be likely to have a Material Adverse Effect.

**17.21    Insurance**

Each Obligor shall, and the Company shall procure that each member of the Group will, maintain insurance with financially sound and reputable insurers with respect to its assets of an insurable nature against such risks and in such amounts as are normally maintained by persons who carry on a similar class of business.

**17.22    Intercompany debt**

No member of the Group which is the creditor in respect of any Financial Indebtedness to any other member of the Group may take any action to cause that Financial Indebtedness to become due or to be paid unless the other member of the Group has sufficient readily available cash to pay the sum which is due or demanded.

**17.23    Bank accounts**

No member of the Group may open or maintain an account with a bank or financial institution (other than Wachovia) that is a Local Bank, a Finance Party or an Affiliate of a Finance Party unless such Local Bank, Finance Party or Affiliate of a Finance Party has executed a deposit account control agreement or other applicable security perfecting documentation (subject, in the case of any Ancillary Facility Provider, to the relevant Ancillary Facility Security Interest) to the satisfaction of the Agent promptly (but in any event within 30 days of the Effective Date (or such later date as the Agent, in its sole discretion, may agree)).

**17.24    Additional security/further assurance**

(a)    Each Obligor shall take whatever action the Agent may require for creating or perfecting security, in a form and substance satisfactory to the Agent, over all or substantially (as the Agent may require) all of the undertaking and assets of any Additional Obligor, this includes:

   (i)    the execution of any transfer, conveyance, assignment by way of security or assurance of any property, whether to the Agent or to its nominee; or

   (ii)    the giving of any notice, order or direction and the making of any registration,

which, in any such case, the Agent may think expedient, in each case, provided that the extent and terms of such security will be consistent with the security provided by other Obligors in the same jurisdiction (if any) or, if there are none, in accordance with prudent secured lending practice in the relevant jurisdiction and will not in any event be granted if it would give rise to a material risk to the directors of the relevant Obligor incurring personal liability.

(b)    Each Obligor shall take whatever action, including without limitation re-execution, ratification and/or reregistration of any Security Document, the Agent requires (acting reasonably) to ensure the Security Interests constituted by that Security Document continue for the benefit of the Finance Parties (including an Incoming Lender, as defined in Subclause 26.2 (Assignments and transfers by Lenders) following a transfer by a Finance Party under this Agreement.

**17.25    U.S. Securities Laws**

No Obligor may use any part of any Loan to acquire any security in a transaction that is subject to the reporting requirements of section 13 and 14 of the United States Securities Exchange Act of 1934.

**17.26    Canadian Blue Bird Coach, Ltd.**

No member of the Group (other than Canadian Bluebird Coach, Ltd.) may transfer any asset (other than payments for services rendered by Canadian Blue Bird Coach, Ltd. to such a member in the ordinary course of trade) to, nor incur any Financial Indebtedness in respect of, Canadian Blue Bird Coach, Ltd. with a value in excess of an aggregate amount of U.S.$1,000,000, without the prior consent of the Majority Lenders.

**17.27    Amendment of other documentation**

No Obligor shall agree an amendment of the terms of, or consent to waive any of its rights under:

(a)        its Certificate of Incorporation or Bylaws;

(b)        the Cooper Services Agreement;

(c)        the Step 10 Agreement; and

(d)        the Retained Group Indemnity,

except with the prior consent of the Majority Lenders.

**17.28    Transactions with Henlys Group plc**

(a)    No member of the Group may transfer any asset nor pay any money to, nor incur any Financial Indebtedness to or for the account of, nor guarantee or assume any obligation of, or otherwise have any dealings, whether or not for consideration, of any kind, with Henlys Group plc or any of its Affiliates.

(b)    Paragraph (a) does not apply to transactions or obligations under the Step 10 Agreement or the Retained Group Indemnity.

**18.    DEFAULT**

**18.1    Events of Default**

Each of the events set out in this Clause is an Event of Default (whether or not caused by any reason whatsoever outside the control of any Obligor or any other person).

**18.2    Non-payment**

An Obligor does not pay on the due date any amount payable by it under the Finance Documents at the place and in the currency in which it is expressed to be payable unless such non-payment is due solely to technical and/or administrative delays in the transmission of funds and such amount is paid within three Business Days of its due date.

**18.3    Breach of other obligations**

(a)    The Company does not comply with any provision of Subclause 17.18 (Financial covenants).

(b)    An Obligor does not comply with any provision of the Finance Documents (other than those referred to in paragraph (a) above or Subclause 18.2 (Non-payment)) and, if capable of remedy, such default is not remedied within 14 days after the earlier of the relevant Obligor becoming aware of the default and notice of the default being given by the Agent to the Company.

**18.4    Misrepresentation**

A representation, warranty or statement made or repeated in or in connection with any Finance Document or in any document delivered by or on behalf of any Obligor under or in connection with any Finance Document is incorrect in any material respect when made or deemed to be made or repeated and, if the events or circumstances giving rise to the

incorrectness are capable of remedy, they are not remedied within 14 days after the date when the representation, warranty or statement was made or repeated.

**18.5    Cross-default**

Any of the following occurs:

(a)    Any Financial Indebtedness of any member of the Group is not paid when due or within:

(i)    any applicable grace period; or

(ii)    in the case of an on-demand overdraft facility only, three Business Days of demand;

(b)    an event of default howsoever described occurs under any document relating to Financial Indebtedness of a member of the Group and is continuing unremedied and unwaived;

(c)    any Financial Indebtedness of a member of the Group becomes prematurely due and payable or is placed on demand as a result of an event of default (howsoever described) under the document relating to that Financial Indebtedness;

(d)    any Security Interest securing Financial Indebtedness over any asset of a member of the Group becomes enforceable; or

(e)    any commitment for, or underwriting of, any Financial Indebtedness of a member of the Group is cancelled or suspended as a result of an event of default (howsoever described) under the document relating to that Financial Indebtedness,

unless the aggregate of the Financial Indebtedness referred to in paragraphs (i) to (v) (inclusive) above is less than an aggregate amount of U.S.$2,000,000  (or its equivalent in any other currency).

**18.6    Insolvency**

(a)    Any Material Company is, or is deemed for the purposes of any law to be, unable to pay its debts as they fall due or insolvent, or admits its inability to pay its debts as they become due;

(b)    Any Material Company suspends making payments on all or any class of its debts or announces an intention to do so, or a moratorium is declared in respect of any of its indebtedness;

(c)    Any Material Company by reason of actual or anticipated financial difficulties, begins negotiations with one or more of its creditors with a view to the readjustment or rescheduling of any of its indebtedness; or

(d)    If a moratorium occurs in respect of any Material Company, the ending of the moratorium will not remedy any Event of Default caused by the moratorium.

**18.7    Insolvency proceedings**

(a)    Except as provided below, any of the following occurs in respect of any Material Company:

(i)    it makes a general assignment for the benefit of creditors;

(ii)     it commences a voluntary case or proceeding under any U.S. Bankruptcy Code;

(iii)    an involuntary case or proceeding under any U.S. Bankruptcy Code is commenced against it and is not controverted within 30 days or is not dismissed or stayed within 90 days after commencement of the case;

(iv)     any step (not including the taking of advice or engaging in preliminary discussions or analysis) whether by a third party or by any Material Company is taken with a view to a moratorium or a composition, assignment or similar arrangement with any of its creditors;

(v)      a meeting of its shareholders, directors or other officers is convened for the purpose of considering for approval any resolution for, to petition for or to file documents with a court or any registrar for, its liquidation, winding-up, administration or dissolution or any such resolution is passed;

(vi)     any person presents a petition or proposal, or files documents with a court or any registrar (other than a petition or documents relating to a case or proceeding described in paragraph (ii) or (iii) above), for its liquidation, winding-up, administration or dissolution and this petition is not contested in good faith and with due diligence and discharged or struck out within seven days;

(vii)    an order for its liquidation, winding-up, administration or dissolution is made;

(viii)   any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer is appointed in respect of it or any of its assets;

(ix)     its shareholders, directors or other officers request the appointment of, or give notice of their intention to appoint, a liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer; or

(x)      any other analogous step or procedure is taken in any jurisdiction.

(b)      Paragraph (a) does not apply to:

(i)      any step or procedure in connection with a solvent reconstruction of any Material Company on terms approved by the Majority Lenders; or

(ii)     any such event occurring in relation to a Dormant Subsidiary.

**18.8    Enforcement of Security Interests**

Any steps are taken to enforce any Security Interest over any part of the assets of any Material Company with a value in excess of U.S.$50,000.

**18.9    Creditors' process**

Any attachment, sequestration, distress or execution affects any material asset of any Material Company and is not discharged within 14 days.

**18.10    Analogous proceedings**

Subject to Subclause 18.16 (Canadian Bankruptcy Laws) in the case of any Material Company incorporated in Canada, there occurs, in relation to any Material Company, any event anywhere which corresponds with any of those mentioned in Subclauses 18.6 (Insolvency) to 18.9 (Creditors' process) (inclusive).

**18.11    Cessation of business**

The Company or any Material Subsidiary ceases, or threatens to cease, to carry on all or a substantial part of its business (other than as a result of or in connection with a disposal of its business or assets permitted by Subclause 17.12 (Disposals)), to an extent or in a manner which could reasonably be expected to have a Material Adverse Effect.

**18.12    Unlawfulness**

It is or becomes unlawful for any Obligor to perform any of its obligations under the Finance Documents.

**18.13    Guarantees**

The guarantee of any Guarantor is not effective or is alleged by an Obligor to be ineffective for any reason.

**18.14    Ownership of the Guarantors**

Any Obligor (other than the Company) is not or ceases to be a Subsidiary of the Company otherwise than pursuant to a transaction including a release of that Obligor in accordance with Subclause 26.8 (Resignation of an Obligor (other than the Company)).

**18.15    Material adverse change**

Any event or series of events occurs which could reasonably be expected to have a Material Adverse Effect.

**18.16    Canadian Bankruptcy Laws**

(a)    Any Material Company commences a voluntary case or proceeding under the BIA or the Companies' Creditors Arrangement Act (Canada) or other similar law (collectively **Canadian Bankruptcy Laws**); or

(b)    an involuntary case under any Canadian Bankruptcy Law is commenced against any Material Company and (i) the petition is not controverted within 30 days or (ii) is not dismissed or stayed within 90 days after commencement of the case; or

(c)    a custodian, conservator, receiver, monitor, interim receiver, liquidator, assignee, trustee, sequestrator or other similar official is appointed under any Canadian Bankruptcy Law or for all or substantial part of the property of any Material Company.

**18.17    ERISA**

(a)    Any event or condition that could reasonably be expected to result in any member of the Controlled Group incurring a material liability under ERISA to the United States Internal

Revenue Service or to the PBGC or other applicable laws of any other jurisdiction, including the PBA; or

(b)    an **accumulated funding deficiency** (as that term is defined in section 412 of the United States Internal Revenue Code of 1986, as amended, or section 302 of ERISA), whether or not waived, by reason of the failure of member of the Controlled Group to make a contribution to a Plan.

## 18.18   Acceleration

(a)    If an Event of Default described in Subclause 18.7 (Insolvency proceedings) or Subclause 18.16 (Canadian Bankruptcy Laws) occurs, the Total Commitments will, if not already cancelled under this Agreement, be immediately and automatically cancelled and all amounts outstanding under the Finance Documents will be immediately and automatically due and payable.

(b)    On and at any time after the occurrence of an Event of Default the Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

    (i)    cancel the Total Commitments; and/or

    (ii)    declare that all or part of any amounts outstanding under the Finance Documents are:

        (A)    immediately due and payable; and/or

        (B)    payable on demand by the Agent acting on the instructions of the Majority Lenders; and/or

    (iii)    declare that full cash cover in respect of each Letter of Credit is immediately due and payable.

A notice under subparagraph (ii) or (iii) in respect of part only of the Credits may not relate to different proportions of Facilities A or B unless all the Lenders under the relevant Facilities have so agreed. Any notice given under this Subclause will take effect in accordance with its terms.

## 19.   SECURITY

## 19.1   Agent as trustee

Unless expressly provided to the contrary, the Agent holds any security created by a Security Document on trust for the Finance Parties.

## 19.2   Responsibility

The Agent is not liable or responsible to any other Finance Party for:

(a)    any failure in perfecting or protecting the security created by any Security Document; or

(b)    any other action taken or not taken by it in connection with any Security Document,

unless directly caused by its gross negligence or wilful misconduct.

**19.3    Title**

The Agent may accept, without enquiry, the title (if any) an Obligor may have to any asset over which security is intended to be created by any Security Document.

**19.4    Possession of documents**

The Agent is not obliged to hold in its own possession any Security Document, title deed or other document in connection with any asset over which security is intended to be created by a Security Document.

**19.5    Investments**

Except as otherwise provided in any Security Document, all moneys received by the Agent under a Security Document may be invested in the name of, or under the control of, the Agent in any investments selected by the Agent. Additionally, those moneys may be placed on deposit in the name of, or under the control of, the Agent at any bank or institution (including itself) and upon such terms as it may think fit.

**19.6    Approval**

Each Finance Party confirms its approval of each Security Document.

**19.7    Release of security**

(a)    If:

(i)    a Guarantor ceases to be a member of the Group; or

(ii)    a Guarantor is released from all its obligations under the Finance Documents,

in a manner allowed by this Agreement, any security created by that Guarantor over its assets under the Security Documents will be released.

(b)    If a disposal of any asset subject to security created by a Security Document is made to a person (which is and will remain) outside the Group in the following circumstances:

(i)    the Majority Lenders agree to the disposal;

(ii)    the disposal is allowed by the terms of the Finance Documents and will not result or could not reasonably be expected to result in any breach of any term of any Finance Document;

(iii)    the disposal is being made at the request of the Agent in circumstances where any security created by the Security Documents has become enforceable; or

(iv)    the disposal is being effected by enforcement of a Security Document,

the asset being disposed of will be released from any security over it created by a Security Document. However, the proceeds of any disposal (or an amount corresponding to them) must be applied in accordance with the requirements of the Finance Documents (if any).

(c)    If the Agent (acting reasonably) is satisfied that a release is allowed under this Subclause, the Agent must execute and instruct any co-security agent or delegated security agent to execute and deliver (at the request and expense of the relevant Obligor) any document which is

reasonably required to achieve that release. Each other Finance Party irrevocably authorises the Agent (and any co-security agent or delegated security agent) to execute and deliver any such document.

### 19.8 Co-security Agent

(a) The Agent may appoint a separate security agent or a co-security agent in any jurisdiction outside England and Wales:

    (i) if the Agent (acting reasonably) considers that without the appointment the interests of the Lenders under the Finance Documents might be materially and adversely affected;

    (ii) for the purpose of complying with any law, regulation or other condition in any jurisdiction; or

    (iii) for the purpose of obtaining or enforcing a judgment or enforcing any Finance Document in any jurisdiction.

(b) Any appointment under this Subclause will only be effective if the security agent or co-security agent confirms to the Agent and the Company in form and substance satisfactory to the Agent that it is bound by the terms of this Agreement as if it were the Agent.

(c) The Agent may remove any security agent or co-security agent appointed by it and may appoint a new security agent or co-security agent in its place.

(d) The Company must pay to the Agent any reasonable remuneration paid by the Agent to any security agent or co-security agent appointed by it, together with any related costs and expenses properly incurred by the security agent or co-security agent.

### 20. THE ADMINISTRATIVE PARTIES

### 20.1 Appointment and duties of the Agent

(a) Each Finance Party (other than the Agent) irrevocably appoints the Agent to act as its agent under the Finance Documents.

(b) Each Finance Party irrevocably authorises the Agent to:

    (i) perform the duties and to exercise the rights, powers and discretions that are specifically given to it under the Finance Documents, together with any other incidental rights, powers and discretions; and

    (ii) execute each Finance Document expressed to be executed by the Agent.

(c) The Agent has only those duties which are expressly specified in the Finance Documents. Those duties are solely of a mechanical and administrative nature.

### 20.2 Role of the Arrangers

Except as specifically provided in the Finance Documents, no Arranger has any obligations of any kind to any other Party in connection with any Finance Document.

### 20.3    No fiduciary duties

Except as specifically provided in a Finance Document, nothing in the Finance Documents makes an Administrative Party a trustee or fiduciary for any other Party or any other person. No Administrative Party need hold in trust any moneys paid to it for a Party or be liable to account for interest on those moneys.

### 20.4    Individual position of an Administrative Party

(a)    If it is also a Lender, each Administrative Party has the same rights and powers under the Finance Documents as any other Lender and may exercise those rights and powers as though it were not an Administrative Party.

(b)    Each Administrative Party may:

    (i)    carry on any business with any Obligor or its related entities (including acting as an agent or a trustee for any other financing); and

    (ii)    retain any profits or remuneration it receives under the Finance Documents or in relation to any other business it carries on with any Obligor or its related entities.

### 20.5    Reliance

An Administrative Party may:

(a)    rely on any notice or document believed by it to be genuine and correct and to have been signed by, or with the authority of, the proper person;

(b)    rely on any statement made by any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify;

(c)    engage, pay for and rely on professional advisers selected by it (including those representing a Party other than the Agent); and

(d)    act under the Finance Documents through its personnel and agents.

### 20.6    Majority Lenders' instructions

(a)    The Agent is fully protected if it acts on the instructions of the Majority Lenders (or the specified majorities) in the exercise of any right, power or discretion or any matter not expressly provided for in the Finance Documents.  Any such instructions given by the Majority Lenders (or other majority) will be binding on all the Lenders.  In the absence of instructions, the Agent may act as it considers to be in the best interests of all the Lenders (or all relevant Lenders, as applicable).

(b)    The Agent may assume that unless it has received notice to the contrary, any right, power, authority or discretion vested in any Party or the Majority Lenders (or other majority) has not been exercised.

(c)    The Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings in connection with any Finance Document.

(d)     The Agent may require the receipt of security satisfactory to it, whether by way of payment in advance or otherwise, against any liability or loss which it may incur in complying with the instructions of the Majority Lender (or other majority).

## 20.7    Responsibility

(a)     No Administrative Party is responsible to any other Finance Party for the adequacy, accuracy or completeness of:

      (i)     any Finance Document or any other document; or

      (ii)     any statement or information (whether written or oral) made in or supplied in connection with any Finance Document.

(b)     Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender confirms that it:

      (i)     has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of each Obligor and its related entities and the nature and extent of any recourse against any Party or its assets); and

      (ii)     has not relied exclusively on any information provided to it by any Administrative Party in connection with any Finance Document.

## 20.8    Exclusion of liability

(a)     No Administrative Party is liable or responsible to any other Finance Party for any action taken or not taken by it in connection with any Finance Document, unless directly caused by its gross negligence or wilful misconduct.

(b)     No Party (other than the relevant Administrative Party) may take any proceedings against any officer, employee or agent of an Administrative Party in respect of any claim it might have against that Administrative Party or in respect of any act or omission of any kind by that officer, employee or agent in connection with any Finance Document.  Any officer, employee or agent of that Administrative Party may rely on this Subclause and enforce its terms under the Contracts (Rights of Third Parties) Act 1999.

(c)     Nothing in this Agreement will oblige any Administrative Party to satisfy any "know your customer" requirement in relation to the identity of any person on behalf of any Finance Party.

(d)     Each Finance Party confirms to each Administrative Party that it is solely responsible for any "know your customer" requirements it is required to carry out and that it may not rely on any statement in relation to those requirements made by any other person.

## 20.9    Default

(a)     The Agent is not obliged to monitor or enquire whether a Default has occurred.  The Agent is not deemed to have knowledge of the occurrence of a Default.

(b)     If the Agent:

    (i)     receives notice from a Party referring to this Agreement, describing a Default and stating that the event is a Default; or

    (ii)    is aware of the non-payment of any principal or interest or any fee payable to a Lender under this Agreement,

it must promptly notify the Lenders.

**20.10   Information**

(a)     The Agent must promptly forward to the person concerned the original or a copy of any document which is delivered to the Agent by a Party for that person.

(b)     Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(c)     Except as provided above, the Agent has no duty:

    (i)     either initially or on a continuing basis to provide any Lender with any credit or other information concerning the risks arising under or in connection with the Finance Documents (including any information relating to the financial condition or affairs of any Obligor or its related entities or the nature or extent of recourse against any Party or its assets) whether coming into its possession before, on or after the date of this Agreement; or

    (ii)    unless specifically requested to do so by a Lender in accordance with a Finance Document, to request any certificate or other document from any Obligor.

(d)     In acting as the Agent, the agency division of the Agent is treated as a separate entity from its other divisions and departments.  Any information acquired by the Agent which, in its opinion, is acquired by it otherwise than in its capacity as the Agent may be treated as confidential by the Agent and will not be treated as information possessed by the Agent in its capacity as such.

(e)     The Agent is not obliged to disclose to any person any confidential information supplied to it by or on behalf of a member of the Group solely for the purpose of evaluating whether any waiver or amendment is required in respect of any term of the Finance Documents.

(f)     Each Obligor irrevocably authorises the Agent to disclose to the other Finance Parties any information which, in its opinion, is received by it in its capacity as the Agent.

**20.11   Indemnities**

(a)     Without limiting the liability of any Obligor under the Finance Documents, each Lender must indemnify the Agent for that Lender's Pro Rata Share of any loss or liability incurred by the Agent in acting as the Agent, except to the extent that the loss or liability is caused by the Agent's gross negligence or wilful misconduct.

(b)     The Agent may deduct from any amount received by it for a Lender any amount due to the Agent  from that Lender under a Finance Document but unpaid.

**20.12    Compliance**

Each Administrative Party may refrain from doing anything (including disclosing any information) which might, in its opinion, constitute a breach of any law or regulation or be otherwise actionable at the suit of any person, and may do anything which, in its opinion, is necessary or desirable to comply with any law or regulation.

**20.13    Resignation of an Administrative Party**

(a)    The Agent may resign and appoint any of its Affiliates as successor Agent by giving notice to the Lenders and the Company.

(b)    Alternatively, the Agent may resign by giving notice to the Lenders and the Company, in which case the Majority Lenders following consultation with the Company may appoint a successor Agent.

(c)    If no successor Agent has been appointed under paragraph (b) above within 30 days after notice of resignation was given, the Agent may appoint a successor Agent.

(d)    The person(s) appointing a successor Agent must, if practicable, consult with the Company prior to the appointment.  Any successor Agent must have an office in the U.K.

(e)    The resignation of the Agent and the appointment of any successor Agent will both become effective only when the successor Agent notifies all the Parties that it accepts its appointment. On giving the notification, the successor Agent will succeed to the position of the Agent and the term **Agent** will mean the successor Agent.

(f)    The retiring Agent must, at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as the Agent under the Finance Documents.

(g)    Upon its resignation becoming effective, this Clause will continue to benefit the retiring Agent in respect of any action taken or not taken by it in connection with the Finance Documents while it was the Agent, and, subject to paragraph (f) above, it will have no further obligations under any Finance Document.

(h)    The Majority Lenders may, by notice to the Agent, require it to resign under paragraph (b) above.

**20.14    Relationship with Lenders**

(a)    The Agent may treat each Lender as a Lender, entitled to payments under this Agreement and as acting through its Facility Office(s) until it has received not less than five Business Days' prior notice from that Lender to the contrary.

(b)    The Agent may at any time, and must if requested to do so by the Majority Lenders, convene a meeting of the Lenders.

(c)    The Agent must keep a register of all the Parties and supply any other Party with a copy of the register on request.  The register will include each Lender's Facility Office(s) and contact details for the purposes of this Agreement.

**20.15    Agent's management time**

If the Agent requires, any amount payable to the Agent by any Party under any indemnity or in respect of any costs or expenses incurred by the Agent under the Finance Documents after the date of this Agreement may include the cost of using its management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Agent may notify to the relevant Party.  This is in addition to any amount in respect of fees or expenses paid or payable to the Agent under any other term of the Finance Documents.

**20.16    Notice period**

Where this Agreement specifies a minimum period of notice to be given to the Agent, the Agent may, at its discretion, accept a shorter notice period.

**21.    EVIDENCE AND CALCULATIONS**

**21.1    Accounts**

Accounts maintained by a Finance Party in connection with this Agreement are *prima facie* evidence of the matters to which they relate for the purpose of any litigation or arbitration proceedings.

**21.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under the Finance Documents will be, in the absence of manifest error: (i) in relation to matters not concerning Letters of Credit, *prima facie* evidence of the matters to which it relates; and (ii) in relation to matters concerning Letters of Credit, conclusive evidence of the matters to which it relates.

**21.3    Calculations**

Any interest or fee accruing under this Agreement accrues from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 or 365 days or otherwise, depending on what the Agent determines is market practice.

**22.    FEES**

**22.1    Agent's fee**

The Company must pay to the Agent for its own account an agency fee in the manner agreed in the Fee Letter between the Agent and the Company.

**22.2    Deferred Facility Fee**

A Deferred Facility Fee of U.S.$6,516,380 shall be paid by the Company to the Lenders pro rata to Commitments at the time of payment (or if the Total Commitments have been reduced to zero, pro rata to Commitments immediately before the reduction) on the Final Maturity Date (or the date on which the Facilities become due and payable in full (whether by acceleration or prepayment)).

**22.3    Issuing Bank's fee**

The Company must pay to the Issuing Bank for its own account an Issuing Bank fee and all other fees, costs and expenses in the manner agreed in the Fee Letter between the Issuing Bank and the Company.

**23.    INDEMNITIES AND BREAK COSTS**

**23.1    Currency indemnity**

(a)    The Company must, as an independent obligation, indemnify each Finance Party against any loss or liability which that Finance Party incurs as a consequence of:

(i)    that Finance Party receiving an amount in respect of an Obligor's liability under the Finance Documents; or

(ii)    that liability being converted into a claim, proof, judgment or order,

in a currency other than the currency in which the amount is expressed to be payable under the relevant Finance Document.

(b)    Unless otherwise required by law, each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency other than that in which it is expressed to be payable.

**23.2    Other indemnities**

(a)    The Company must indemnify each Finance Party against any loss or liability which that Finance Party incurs as a consequence of:

(i)    the occurrence of any Event of Default;

(ii)    any failure by an Obligor to pay any amount due under a Finance Document on its due date, including any resulting from any distribution or redistribution of any amount among the Lenders under this Agreement;

(iii)    (other than by reason of negligence or default by that Finance Party) a Credit not being made after a Request has been delivered for that Credit;

(iv)    a Credit (or part of a Credit) not being prepaid in accordance with a notice of prepayment; or

(v)    any other loss or liability any Finance Party incurs in connection with the transactions contemplated by this Agreement, including but not limited to any actual or prospective Environmental Claim against or affecting any Finance Party which involves or relates in any way to the current or former properties, activities or operations of the Company or any of its Subsidiaries or any of their respective predecessors.

The Company's liability in each case includes any loss or expense on account of funds borrowed, contracted for or utilised to fund any amount payable under any Finance Document, any amount repaid or prepaid or any Credit.

(b)    The Company must indemnify the Agent against any loss or liability incurred by the Agent as a result of:

    (i)    investigating any event which the Agent reasonably believes to be a Default; or

    (ii)    acting or relying on any notice which the Agent reasonably believes to be genuine, correct and appropriately authorised.

## 24.    EXPENSES

### 24.1    Initial costs

The Company must pay to Agent the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with the negotiation, preparation, printing and execution of the Finance Documents.

### 24.2    Subsequent costs

The Company must pay to the Agent the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with:

(a)    the negotiation, preparation, printing and execution of any Finance Document (other than a Transfer Certificate) executed after the date of this Agreement; and

(b)    any amendment, waiver or consent requested by or on behalf of an Obligor or specifically allowed by this Agreement.

### 24.3    Enforcement costs

The Company must pay to each Finance Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, any Finance Document.

## 25.    AMENDMENTS AND WAIVERS

### 25.1    Procedure

(a)    Except as provided in this Clause, any term of the Finance Documents may be amended or waived with the agreement of the Company and the Majority Lenders. The Agent may effect, on behalf of any Finance Party, an amendment or waiver allowed under this Clause.

(b)    The Agent must promptly notify the other Parties of any amendment or waiver effected by it under paragraph (a) above. Any such amendment or waiver is binding on all the Parties.

### 25.2    Exceptions

(a)    An amendment or waiver which relates to:

    (i)    the definition of Majority Lenders in Clause 1.1 (Definitions);

    (ii)    an extension of the date of payment of any amount to a Lender under the Finance Documents;

(iii)    a reduction in the interest rate or a reduction in the amount of any payment of principal, interest, fee or other amount payable to a Lender under the Finance Documents;

(iv)    an increase in, or an extension of, a Commitment or the Total Commitments;

(v)    a release of an Obligor (other than as expressly provided otherwise under this Agreement);

(vi)    release of any Security Document other than in accordance with the terms of the Finance Documents;

(vii)    a term of a Finance Document which expressly requires the consent of each Lender;

(viii)    the right of a Lender to assign or transfer its rights or obligations under the Finance Documents; or

(ix)    this Clause,

may only be made with the consent of all the Lenders.

(b)    An amendment or waiver which relates to the rights or obligations of an Administrative Party or an Ancillary Facility Provider may only be made with the consent of that Administrative Party or Ancillary Facility Provider (as applicable).

### 25.3 Change of currency

If a change in any currency of a country occurs (including where there is more than one currency or currency unit recognised at the same time as the lawful currency of a country), the Finance Documents will be amended to the extent the Agent (acting reasonably and after consultation with the Company) determines is necessary to reflect the change.

### 25.4 Waivers and remedies cumulative

The rights of each Finance Party under the Finance Documents:

(a)    may be exercised as often as necessary;

(b)    are cumulative and not exclusive of its rights under the general law; and

(c)    may be waived only in writing and specifically.

Delay in exercising or non-exercise of any right is not a waiver of that right.

## 26. CHANGES TO THE PARTIES

### 26.1 Assignments and transfers by Obligors

No Obligor may assign or transfer any of its rights and obligations under the Finance Documents without the prior consent of all the Lenders.

### 26.2 Assignments and transfers by Lenders

(a)    A Lender (the **Transferring Lender**) may at any time, with the consent of the Issuing Bank pursuant to Clause 6.2, assign or transfer (including by way of novation) any of its rights and

obligations under this Agreement to any other bank or financial institution or to a trust fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **Incoming Lender**).

(b) Unless the Company and the Agent otherwise agree, a transfer of part of a Commitment or the rights and obligations under this Agreement by the Transferring Lender must be in a minimum amount of U.S.$5,000,000.

(c) The consent of the Company is required for any assignment or transfer unless the Incoming Lender is another Lender or an Affiliate of a Lender. The consent of the Company must not be unreasonably withheld or delayed. The Company will be deemed to have given its consent five Business Days after the Company is given notice of the request unless it is expressly refused by the Company within that time.

(d) A transfer of obligations will be effective only if either:

(i) the obligations are novated in accordance with the following provisions of this Clause; or

(ii) the Incoming Lender confirms to the Agent and the Company in form and substance satisfactory to the Agent that it is bound by the terms of this Agreement as a Lender. On the transfer becoming effective in this manner the Transferring Lender will be released from its obligations under this Agreement to the extent that they are transferred to the Incoming Lender.

(e) Unless the Agent otherwise agrees, the Incoming Lender must pay to the Agent for its own account, on or before the date any assignment or transfer occurs, a fee of U.S.$1,500.

(f) Any reference in this Agreement to a Lender includes an Incoming Lender but excludes a Lender if no amount is or may be owed to or by it under this Agreement.

(g) Nothing in this Agreement prohibits a Lender from assigning without notice or cost all or any part of its rights and benefits under this Agreement to a United States Federal Reserve Bank as security for borrowing from that United States Federal Reserve Bank provided that no such assignments release a Lender from any of its obligations under this Agreement.

**26.3    Register**

The Agent, as agent for the Company solely for the purposes of this paragraph, shall maintain a book-entry registration transfer system (the **Register**) for the purpose of all transfers made pursuant to Clause 26.2 or Clause 26.4. Notwithstanding any other provision of this Agreement, the transfer of all or any part of the rights and/or obligations under the Finance Document shall not be effective until such transfer is recorded on the Register and prior to such recordation all amounts owing to the Transferring Lender with respect to such rights and/or obligations shall remain owing to the Transferring Lender. The registration of the assignment, novation or transfer of all or any part of rights and/or obligations under the Finance Documents shall be recorded by the Agent on the Register only upon the acceptance by the Agent of a properly executed and delivered Transfer Certificate pursuant to Clause 26.4 and the satisfaction of the requirements of Clause 26.2 (at which time the Agent shall be required to register the relevant transfer on the Register).

**26.4    Procedure for transfer by way of novations**

(a)    In this Subclause:

        **Transfer Date** means, for a Transfer Certificate, the later of:

        (i)    the proposed Transfer Date specified in that Transfer Certificate; and

        (ii)    the date on which the Agent executes that Transfer Certificate.

(b)    A novation is effected if:

        (i)    the Transferring Lender and the Incoming Lender deliver to the Agent a duly completed Transfer Certificate; and

        (ii)    the Agent executes it.

        The Agent must execute as soon as reasonably practicable a Transfer Certificate delivered to it and which appears on its face to be in order.

(c)    Each Party (other than the Transferring Lender and the Incoming Lender) irrevocably authorises the Agent to execute any duly completed Transfer Certificate on its behalf.

(d)    On the Transfer Date:

        (i)    the Incoming Lender will assume the rights and obligations of the Transferring Lender expressed to be the subject of the novation in the Transfer Certificate in substitution for the Transferring Lender; and

        (ii)    the Transferring Lender will be released from those obligations and cease to have those rights.

**26.5    Limitation of responsibility of Transferring Lender**

(a)    Unless expressly agreed to the contrary, a Transferring Lender is not responsible to an Incoming Lender for the legality, validity, adequacy, accuracy, completeness or performance of:

        (i)    any Finance Document or any other document; or

        (ii)    any statement or information (whether written or oral) made in or supplied in connection with any Finance Document,

        and any representations or warranties implied by law are excluded.

(b)    Each Incoming Lender confirms to the Transferring Lender and the other Finance Parties that it:

        (i)    has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of each Obligor and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in this Agreement; and

(ii)    has not relied exclusively on any information supplied to it by the Transferring Lender in connection with any Finance Document.

(c)    Nothing in any Finance Document requires a Transferring Lender to:

(i)    accept a re-transfer from an Incoming Lender of any of the rights and obligations assigned or transferred under this Clause; or

(ii)    support any losses incurred by the Incoming Lender by reason of the non-performance by any Obligor of its obligations under any Finance Document or otherwise.

**26.6    Costs resulting from change of Lender or Facility Office**

If:

(a)    a Lender assigns or transfers any of its rights and obligations under the Finance Documents or changes its Facility Office; and

(b)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to pay a Tax Payment or an Increased Cost,

then, unless the assignment, transfer or change is made by a Lender to mitigate any circumstances giving rise to the Tax Payment, Increased Cost or a right to be prepaid and/or cancelled by reason of illegality, the Obligor need only pay that Tax Payment or Increased Cost to the same extent that it would have been obliged to if no assignment, transfer or change had occurred.

**26.7    Additional Obligors**

(a)    If one of the wholly-owned Subsidiaries of the Company is to become an Additional Obligor, then the Company must (following consultation with the Agent) deliver to the Agent the relevant documents and evidence listed in Schedule 2 (Conditions Precedent Documents – to be delivered by an Additional Obligor).

(b)    The prior consent of the Majority Lenders is required if the Additional Obligor is an Additional Borrower and is incorporated in a jurisdiction outside the U.S..

(c)    The relevant Subsidiary will become an Additional Obligor when the Agent notifies the other Finance Parties and the Company that it has received all of the documents and evidence referred to in paragraph (a) above in form and substance satisfactory to it.  The Agent must give this notification as soon as reasonably practicable.

(d)    Delivery of an Accession Agreement, executed by the relevant Subsidiary and the Company, to the Agent constitutes confirmation by that Subsidiary and the Company that the Repeating Representations are then correct.

**26.8    Resignation of an Obligor (other than the Company)**

(a)    In this Subclause, **Resignation Request** means a letter in the form of Schedule 7 (Form of Resignation Request), with such amendments as the Agent may approve or reasonably require.

(b)     The Company may request that an Obligor (other than the Company) ceases to be an Obligor by giving to the Agent a duly completed Resignation Request.

(c)     The Agent must accept a Resignation Request and notify the Company and the Lenders of its acceptance if either:

     (A)     (i)     in the case of a Guarantor, the Majority Lenders have consented to the Resignation Request;

          (ii)     it is not aware that a Default is outstanding or would result from the acceptance of the Resignation Request; and

          (iii)     no amount owed by that Obligor under this Agreement is still outstanding; or

     (B)     in the case of a Guarantor, all of the capital stock of such Guarantor is disposed of in a transaction permitted by the terms of the Finance Documents; or

     (C)     in the case of School Bus Sales of Alabama, Inc., all of its capital stock or all or substantially all of its assets are disposed of in a transaction allowed by the terms of a Finance Document.

(d)     The Obligor will cease to be a Borrower and/or a Guarantor, as appropriate, when the Agent gives the notification referred to in paragraph (c) above.

(e)     An Obligor (other than the Company) may also cease to be an Obligor in any other manner approved by the Majority Lenders.

**26.9     Affiliates of Lenders**

(a)     Each Lender may fulfil its obligations in respect of any Credit through an Affiliate if:

     (i)     the relevant Affiliate is specified in this Agreement as a Lender or becomes a Lender by means of a Transfer Certificate in accordance with this Agreement; and

     (ii)     the Credits in which that Affiliate will participate are specified in this Agreement or in a notice given by that Lender to the Agent and the Company.

In this event, the Lender and the Affiliate will participate in Credits in the manner provided for in subparagraph (ii) above.

(b)     If paragraph (a) above applies, the Lender and its Affiliate will be treated as having a single Commitment and a single vote, but, for all other purposes, will be treated as separate Lenders.

**26.10     Replacement of Ancillary Facility Provider**

(a)     The Ancillary Facility will be replaced by another letter of credit facility (or facilities) (the **New Ancillary Facility**) and the existing Ancillary Facility Provider will cease to be the Ancillary Facility Provider with effect from the latest date (the **Ancillary Transfer Date**) on which:

     (i)     the terms of the New Ancillary Facility are approved by the Agent;

     (ii)     each provider of the new Ancillary Facility (the **New Ancillary Facility Provider**) has confirmed to the Agent and the Company in form and substance satisfactory to

the Agent that it is bound by the terms of this Agreement as Ancillary Facility Provider; and

(iii)    any Bilateral Letters of Credit outstanding under the Ancillary Facility are replaced by letters of credit issued under the New Ancillary Facility.

(b)    On the Ancillary Transfer Date:

(i)    the New Ancillary Facility Provider will assume all of the rights and obligations of the Ancillary Facility Provider under the Finance Documents (other than the Ancillary Facility); and

(ii)    the existing Ancillary Facility Provider will be released from those obligations and cease to have those rights.

## 27.    DISCLOSURE OF INFORMATION

27.1    Each Finance Party must keep confidential any information supplied to it by or on behalf of any Obligor in connection with the Finance Documents.  However, a Finance Party is entitled to disclose information:

(a)    which is publicly available, other than as a result of a breach by that Finance Party of this Clause;

(b)    in connection with any legal or arbitration proceedings;

(c)    if required to do so under any law or regulation;

(d)    to a governmental, banking, taxation or other regulatory authority;

(e)    to its professional advisers;

(f)    to the extent allowed under paragraph (b) below;

(g)    to another Obligor; or

(h)    with the agreement of the relevant Obligor.

27.2    A Finance Party may disclose to an Affiliate or any person with whom it may enter, or has entered into, any kind of transfer, participation or other agreement in relation to this Agreement (a **participant**):

(a)    a copy of any Finance Document; and

(b)    any information which that Finance Party has acquired under or in connection with any Finance Document.

27.3    However, before a participant may receive any confidential information, the Finance Party must notify the Company and the participant must agree with the relevant Finance Party to keep that information confidential on the terms of paragraph (a) above.

27.4    This Clause supersedes any previous confidentiality undertaking given by a Finance Party in connection with this Agreement prior to it becoming a Party.

**28.    SET-OFF**

A Finance Party may set off any matured obligation owed to it by an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any obligation (whether or not matured) owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

**29.    PRO RATA SHARING**

**29.1    Redistribution**

If any amount owing by an Obligor under this Agreement to a Lender (the **recovering Lender**) is discharged by payment, set-off or any other manner other than through the Agent under this Agreement (a **recovery**), then:

(a)    the recovering Lender must, within three Business Days, supply details of the recovery to the Agent;

(b)    the Agent must calculate whether the recovery is in excess of the amount which the recovering Lender would have received if the recovery had been received by the Agent under this Agreement; and

(c)    the recovering Lender must pay to the Agent an amount equal to the excess (the **redistribution**).

**29.2    Effect of redistribution**

(a)    The Agent must treat a redistribution as if it were a payment by the relevant Obligor under this Agreement and distribute it among the Lenders, other than the recovering Lender, accordingly.

(b)    When the Agent makes a distribution under paragraph (a) above, the recovering Lender will be subrogated to the rights of the Finance Parties which have shared in that redistribution.

(c)    If and to the extent that the recovering Lender is not able to rely on any rights of subrogation under paragraph (b) above, the relevant Obligor will owe the recovering Lender a debt which is equal to the redistribution, immediately payable and of the type originally discharged.

(d)    If:

(i)    a recovering Lender must subsequently return a recovery, or an amount measured by reference to a recovery, to an Obligor; and

(ii)    the recovering Lender has paid a redistribution in relation to that recovery,

each Finance Party must reimburse the recovering Lender all or the appropriate portion of the redistribution paid to that Finance Party, together with interest for the period while it held the re-distribution.  In this event, the subrogation in paragraph (b) above will operate in reverse to the extent of the reimbursement.

### 29.3    Exceptions

Notwithstanding any other term of this Clause, a recovering Lender need not pay a redistribution to the extent that:

(a)    it would not, after the payment, have a valid claim against the relevant Obligor in the amount of the redistribution; or

(b)    it would be sharing with another Finance Party any amount which the recovering Lender has received or recovered as a result of legal or arbitration proceedings, where:

(i)    the recovering Lender notified the Agent of those proceedings; and

(ii)    the other Finance Party had an opportunity to participate in those proceedings but did not do so or did not take separate legal or arbitration proceedings as soon as reasonably practicable after receiving notice of them.

### 30.    ANCILLARY FACILITIES

Prior to the Final Maturity Date, no Ancillary Facility Provider may, without the prior consent of the Agent (acting on the instructions of the Majority Lenders), demand payment or repayment of or exercise any right of set-off, in cash or in kind, against an Obligor, except for: (i) the purposes of operating cash pooling or cash management arrangements for members of the Group in the ordinary course of management of their accounts; or  (ii) obtaining cash cover in relation to a Bilateral Letter of Credit issued pursuant to the Ancillary Facility or using that cash cover to pay a claim made or purported to be made under a Bilateral Letter of Credit which appears on its face to be in order.

### 31.    SEVERABILITY

If a term of a Finance Document is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other term of the Finance Documents; or

(b)    the legality, validity or enforceability in other jurisdictions of that or any other term of the Finance Documents.

### 32.    COUNTERPARTS

Each Finance Document may be executed in any number of counterparts.  This has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

### 33.    NOTICES

### 33.1    In writing

(a)    Any communication in connection with a Finance Document must be in writing and, unless otherwise stated, may be given:

(i)    in person, by post, fax or any other electronic communication approved by the Agent; or

(ii)    if between the Agent and a Lender and the Agent and the Lender agree, by e-mail or other electronic communication.

(b)    For the purpose of the Finance Documents, an electronic communication will be treated as being in writing.

(c)    Unless it is agreed to the contrary, any consent or agreement required under a Finance Document must be given in writing.

**33.2    Contact details**

(a)    Except as provided below, the contact details of each Party for all communications in connection with the Finance Documents are those notified by that Party for this purpose to the Agent on or before the date it becomes a Party.

(b)    The contact details of the Company and each other Obligor for this purpose are:

| | |
|---|---|
| Address: | Peach County Holdings, Inc. |
| | 402 Blue Bird Boulevard, |
| | Fort Valley, CA 31030, |
| | USA |
| Fax number: | 478 822 2456 |
| Attention: | Chief Financial Officer |

(c)    The contact details of the Agent for this purpose are:

*In respect of operational and mechanical matters:*

| | |
|---|---|
| Address: | The Royal Bank of Scotland plc |
| | Loans Administration Unit |
| | 2 ½ Devonshire Square |
| | London EC2M 4BB |
| Fax number: | 020 7615 7673 |
| Attention: | Neil Burrough |

*In respect of non-operational matters (waivers/covenant compliance):*

| | |
|---|---|
| Address: | The Royal Bank of Scotland plc |
| | Syndicated Loans Agency |
| | Level 7 |
| | 135 Bishopsgate |
| | London EC2M 3UR |
| Fax Number: | 020 7085 4564 |
| Attention: | Tony Bennett |

(d)    Any Party may change its contact details by giving five Business Days' notice to the Agent or (in the case of the Agent) to the other Parties.

(e)     Where a Party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

**33.3    Effectiveness**

(a)     Except as provided below, any communication in connection with a Finance Document will be deemed to be given as follows:

      (i)     if delivered in person, at the time of delivery;

      (ii)    if posted, five days after being deposited in the post, postage prepaid, in a correctly addressed envelope; and

      (iii)   if by fax, when received in legible form.

(b)     A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

(c)     A communication to the Agent will only be effective on actual receipt by it.

**33.4    Obligors**

(a)     All communications under the Finance Documents to or from an Obligor must be sent through the Agent.

(b)     All communications under the Finance Documents to or from an Obligor (other than the Company) must be sent through the Company.

(c)     Each Obligor (other than the Company) irrevocably appoints the Company to act as its agent:

      (i)     to give and receive all communications under the Finance Documents;

      (ii)    to supply all information concerning itself to any Finance Party; and

      (iii)   to sign all documents under or in connection with the Finance Documents.

(d)     Any communication given to the Company in connection with a Finance Document will be deemed to have been given also to the other Obligors.

(e)     The Agent may assume that any communication made by the Company is made with the consent of each other Obligor.

**34.    LANGUAGE**

34.1    Any notice given in connection with a Finance Document must be in English.

34.2    Any other document provided in connection with a Finance Document must be:

      (a)     in English; or

      (b)     (unless the Agent otherwise agrees) accompanied by a certified English translation. In this case, the English translation prevails unless the document is a statutory or other official document.

35.    **GOVERNING LAW**

This Agreement is governed by English law.

36.    **ENFORCEMENT**

36.1    **Jurisdiction**

(a)    The English courts have exclusive jurisdiction to settle any dispute in connection with any Finance Document.

(b)    Notwithstanding paragraph (a) above, any New York State court or Federal court sitting in the City and County of New York also has jurisdiction to settle any dispute in connection with any Finance Document and, for the benefits of the Finance Parties, each Obligor submits to the jurisdiction of those courts.

(c)    The English and New York courts are the most appropriate and convenient courts to settle any such dispute and each Obligor waives objection to those courts on the grounds of inconvenient forum or otherwise in relation to proceedings in connection with any Finance Document.

(d)    This Clause is for the benefit of the Finance Parties only.  To the extent allowed by law, a Finance Party may take:

(i)    proceedings in any other court; and

(ii)    concurrent proceedings in any number of jurisdictions.

36.2    **Service of process**

(a)    Each Obligor not incorporated in England and Wales irrevocably appoints Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX as its agent under the Finance Documents for service of process in any proceedings before the English courts.

(b)    Each Obligor not incorporated in New York State irrevocably appoints Corporation Service Company, 1133 Avenue of the Americas, Suite 310, New York, NY10036 as its agent for service of process in any proceedings before any court located in the State of New York.

(c)    If any person appointed as process agent is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately appoint another agent on terms acceptable to the Agent.  Failing this, the Agent may appoint another agent for this purpose.

(d)    Each Obligor agrees that failure by a process agent to notify it of any process will not invalidate the relevant proceedings.

(e)    This Clause does not affect any other method of service allowed by law.

**36.3   Waiver of immunity**

Each Obligor irrevocably and unconditionally:

(a)   agrees not to claim any immunity from proceedings brought by a Finance Party against it in relation to a Finance Document and to ensure that no such claim is made on its behalf;

(b)   consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)   waives all rights of immunity in respect of it or its assets.

**36.4   Waiver of trial by jury**

EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH ANY FINANCE DOCUMENT OR ANY TRANSACTION CONTEMPLATED BY ANY FINANCE DOCUMENT.  THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO TRIAL BY COURT.

**37.   PRIORITY OF SENIOR SECURED FACILITY**

**37.1   General**

(a)   This Agreement is subject to the Subordination Agreement and this Clause. In the event of any inconsistency between this Clause and the Subordination Agreement the Subordination Agreement shall prevail.

(b)   In this Clause:

**Debt** means any or all of the Senior Debt and the Subordinated Debt, as the context requires.

**Liability** means in relation to any Facility or the Senior Secured Facility, any present or future liability (actual or contingent) payable or owing under or in connection with that facility whether or not matured and whether or not liquidated, together with:

(a)   all related interest, fees and costs and any further advances;

(b)   any claim flowing from any recovery of a payment or discharge in respect of that liability on the grounds of preference or otherwise; and

(c)   any amount (such as post-insolvency interest) which would be included in any of the above but for its discharge, non-provability, unenforceability or non-allowability in any insolvency or other proceedings.

**Subordinated Debt** means all Liabilities of any Obligor to any Finance Party under or in connection with the Finance Documents.

**Senior Debt** means all Liabilities of any Obligor to any Senior Lender or other Finance Party under or in connection with the Senior Secured Facility.

**Senior Finance Documents** means the Finance Documents as defined in the Senior Secured Facility.

**Senior Debt Discharge Date** means the date on which the Agent has received notice from the Senior Agent that the Senior Agent is satisfied that all of the Priority Debt has been irrevocably paid and discharged and that the commitments under the Senior Secured Facility have been cancelled in full and will not be extended or reinstated.

**37.2    Ranking**

(a)    Unless expressly provided to the contrary in this Agreement or the Subordination Agreement:

 (i)    the Debt shall rank in right and priority of payment; and

 (ii)    the security constituted by the Security Documents and the security document executed in connection with the Senior Secured Facility shall rank and secure the Debt,

in each case in the following order:

**First** the Senior Debt; and

**Second** the Subordinated Debt.

(b)    The ranking and priority in paragraph (a) above applies regardless of:

 (i)    the order of registration, filing, notice or execution of any document;

 (ii)    the date upon which the Debt was incurred or arose;

 (iii)    whether a person is obliged to advance any such Debt; and

 (iv)    any fluctuations in the outstanding amount, or any intermediate discharge in whole or in part of any Debt.

**37.3    Payment Priority**

Prior to the Senior Debt Discharge Date no Obligor may pay, and no Finance Party may receive or retain payment, whether in cash or kind, of any amount of Subordinated Debt, except in accordance with the Subordination Agreement.

**37.4    Subordination on Insolvency**

(a)    If any Event of Default specified in Subclauses 18.6 (Insolvency) to 18.10 (Analogous proceedings) (inclusive) occurs in respect of any Obligor (an **Insolvent Obligor**), then the Subordinated Debt owed by the Insolvent Obligor will be subordinate in right of payment to the Senior Debt owed by that Insolvent Obligor.

(b)    Until the Priority Debt Discharge Date each Finance Party will:

 (i)    hold all payments of or in respect of any Subordinated Debt in cash or in kind received by or on behalf of it from any Insolvent Obligor (or any liquidator, administrator, receiver or similar official of that Insolvent Obligor or its assets) on trust for the Senior Lenders;

 (ii)    upon demand by the Agent or the Senior Agent, pay an amount equal to the amount of all those payments to the Agent for application in accordance with [the Subordination Agreement]; and

(iii)    direct the trustee in bankruptcy, liquidator, administrator, receiver or other person distributing the assets of an Insolvent Obligor or their proceeds to make payments on the Subordinated Debt, direct to the Agent until the Senior Debt has been paid in full.

(c)    Any payment to or receipt by a Finance Party to which paragraph (b) applies shall not be treated as a payment to it under the Finance Documents and the liability of the relevant Obligor under the Finance Documents shall be reinstated to the extent of the relevant payment.

**37.5    No registrable security**

Nothing in this Clause creates or is intended to create a registrable Security Interest.

**37.6    Enforceability by third parties**

Notwithstanding anything to the contrary in this Agreement, this Clause 37.6 may be enforced by the Senior Lenders under the Contracts (Rights of third Parties) Act 1999.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

SCHEDULE 1

EXISTING PARTIES AS AT THIRD AMENDMENT AND RESTATEMENT DATE

PART 1

EXISTING LENDERS

| Existing Lender | Commitment  (U.S. Dollars) | |
| --- | --- | --- |
| | Facility A | Facility B |
| Banc of America Securities Limited | [446,511.63] | [18,604.65] |
| Banca Nazionale del Lavoro S.p.A., London Branch | [3,809,554.65] | [158,731.44] |
| Bank of Scotland | [3,809,554.65] | [158,731.44] |
| Barclays Bank PLC | [15,685,132.56] | [653,547.19] |
| Bayerische Hypo und Vereinsbank AG, London Branch | [3,809,554.65] | [158,731.44] |
| Bear Stearns Bank plc | [1,016,827.38] | [42,367.81] |
| HVB Banque Luxembourg Societe Anonyme | [3,809,554.65] | [158,731.44] |
| JP Morgan Chase Bank, N.A. | [6,530,665.12] | [272,111.05] |
| Lloyds TSB Bank plc | [26,775,338.34] | [1,115,639.10] |
| Newstart Factors Inc. | [6,843,835.06] | [285,159.79] |
| Quadrangle Master Funding Ltd | [8,116,796.89] | [338,199.87] |
| The Royal Bank of Scotland plc | [15,346,674.40] | [639,444.77] |
| **Total Commitments** | **[96,000,000.00]** | **[4,000,000.00]** |

**Total Facility A Commitments**:          U.S.$96,000,000.00

**Total Facility B Commitments**:          U.S.$4,000,000.00

**Total Commitments**:          U.S.$100,000,000.00

**PART 2**

**EXISTING OBLIGORS**

**Existing Borrowers**

Peach County Holdings, Inc.

Blue Bird Body Company


**Existing Guarantors**

Peach County Holdings, Inc.

Blue Bird Body Company

Blue Bird Corporation

Henlys US Investments Inc.

Henlys Holding Corp.

Blue Bird Investment Corporation

**SCHEDULE 2**

**CONDITIONS PRECEDENT DOCUMENTS - TO BE DELIVERED BY AN ADDITIONAL OBLIGOR**

1.      An Accession Agreement, duly executed by the Company and the Additional Obligor.

2.      A certified copy of the constitutional documents of the Additional Obligor.

3.      A certified copy of a resolution of the board of directors of the Additional Obligor approving the terms of, and the transactions contemplated by, the Accession Agreement.

4.      A certified copy of a resolution of the board of directors of the Additional Obligor:

   (a)      approving the terms of, and the transactions contemplated by, the Agreement and resolving that it execute the Accession Agreement;

   (b)      authorising a specified person or persons to execute the Accession Agreement on its behalf; and

   (c)      authorising a specified person or persons, on its behalf, to sign and endorse Bills and to sign and/or despatch all other documents and notices to be signed and/or despatched by it under or in connection with the Finance Documents.

5.      A certificate of a director of the Additional Obligor confirming that the borrowing of the Total Commitments in full would not cause any borrowing limit binding on it to be exceeded.

6.      A copy of any other authorisation or other document, opinion or assurance which the Agent reasonably considers to be necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, the Accession Agreement or for the validity and enforceability of any Finance Document.

7.      A specimen of the signature of each person authorised by the resolution referred to in paragraph 4 above.

8.      If available, the latest audited accounts of the Additional Obligor.

9.      A certificate of an authorised signatory of the Additional Obligor certifying that each copy document specified in this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Agreement.

10.     Evidence that the process agent referred to in Subclause 36.2 (Service of process) (or a substitute agent acceptable to the Agent) has accepted their appointment.

11.     An accession document duly executed effecting the Additional Obligor's accession to the Subordination Agreement.

**Legal opinions**

1.      A legal opinion of Allen & Overy LLP, legal advisers to the Arranger and the Agent, addressed to the Finance Parties.

2.      If the Additional Obligor is incorporated in a jurisdiction outside England, a legal opinion of legal advisers reasonably acceptable to the Agent in the jurisdiction of incorporation of the Additional Obligor, addressed to the Finance Parties.

**Security Document(s)**

1.      Security Document(s) over one or more of its assets, duly executed by the Additional Obligor.

2.      A copy of any notices required to be sent under the Security Document(s).

3.      If, and to the extent relevant:

(a)      Share certificates in the name of the Agent, duly executed and stamped stock transfer forms in blank and the updated register of members of the relevant company whose shares are being charged.

(b)      Title deeds/searches.

(c)      Evidence that the procedure contemplated by sections 155-158 of the Companies Act 1985 has been completed in relation to any relevant Finance Document.

(d)      Evidence of insurance cover in compliance with this Agreement and/or the Security Document(s).

(e)      Consents from holders of negative pledges.

**Other documents and evidence**

1.      Evidence that all expenses due and payable from the Company under this Agreement in respect of the Accession Agreement have been paid.

2.      A copy of any other authorisation or other document, opinion or assurance which the Agent has notified the Company is necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, the Accession Agreement or for the validity and enforceability of any Finance Document.

## SCHEDULE 3

## FORM OF TRANSFER CERTIFICATE

To:        [The Royal Bank of Scotland plc] as Agent

From:   [THE TRANSFERRING LENDER] (the **Transferring Lender**) and [THE INCOMING LENDER] (the **Incoming Lender**)

Date:    [                        ]

**Peach County Holdings, Inc.– U.S.$100,000,000 Credit Agreement as amended and restated by an Amendment and Restatement Agreement dated [            ], 2006 (the Agreement)**

We refer to the Agreement.  This is a Transfer Certificate.

1.        The Transferring Lender transfers by novation to the Incoming Lender the Transferring Lender's rights and obligations referred to in the Schedule below in accordance with the terms of the Agreement.

2.        The proposed Transfer Date is [     ].

3.        The administrative details of the Incoming Lender for the purposes of the Agreement are set out in the Schedule.

4.        The Incoming Lender confirms that it has entered (or will on the respective transfer date enter) into an accession agreement in respect of the Subordination Agreement as provided in such agreement.

5.        This Transfer Certificate is governed by English law.

## THE SCHEDULE

**Rights and obligations to be transferred by novation**
[insert relevant details, including applicable Commitment (or part)]

**Administrative details of the Incoming Lender**
[insert details of Facility Office, address for notices and payment details etc.]

[**TRANSFERRING LENDER**]                    [**INCOMING LENDER**]

By:                                          By:

The Transfer Date is confirmed by the Agent as [              ].

[The Royal Bank of Scotland plc] as Agent

By:

**SCHEDULE 4**

**FORM OF ACCESSION AGREEMENT**

To:      [The Royal Bank of Scotland plc] as Agent

From:    Peach County Holdings, Inc. and [Proposed Borrower/Proposed Guarantor]

Date:     [            ]

**Peach County Holdings, Inc.– U.S.$100,000,000 Credit Agreement as amended and restated by an Amendment and Restatement Agreement dated [     ], 2006 (the Agreement)**

We refer to the Agreement.  This is an Accession Agreement.

[Name of company] of [address/registered office] agrees to become an Additional Borrower/Guarantor and to be bound by the terms of the Agreement as an Additional Borrower/Guarantor.

This Accession Agreement is governed by English law.

Peach County Holdings, Inc.

**SCHEDULE 5**

**FORM OF RESIGNATION REQUEST**

To:     [The Royal Bank of Scotland plc] as Agent

From:   Peach County Holdings, Inc. and [relevant Obligor]

Date:   [           ]

**Peach County Holdings, Inc.– U.S.$100,000,000 Credit Agreement as amended and restated by an Amendment and Restatement Agreement dated [    ], 2006 (the Agreement)**

1.      We refer to the Agreement.  This is a Resignation Request.

2.      We request that [resigning Obligor] be released from its obligations as [a/an] [Obligor/Borrower/Guarantor] under the Agreement.

3.      We confirm that no Default is outstanding or would result from the acceptance of this Resignation Request.

4.      We confirm that as at the date of this Resignation Request no amount owed by [resigning Obligor] under the Agreement is outstanding.

5.      This Resignation Request is governed by English law.

Peach County Holdings, Inc.              [Relevant Obligor]

By:                                  By:

The Agent confirms that this resignation takes effect on [      ].

[The Royal Bank of Scotland plc] as Agent

By:

**SCHEDULE 6**

**FORM OF COMPLIANCE CERTIFICATE**

To:      [The Royal Bank of Scotland plc] as Agent

From:   Peach County Holdings, Inc.

Date:    [     ]

> **Peach County Holdings, Inc.– U.S.$100,000,000 Credit Agreement as amended and restated by an Amendment and Restatement Agreement dated [    ], 2006 (the Agreement)**

1.      This is a Compliance Certificate (as defined in the Agreement).

2.      We confirm that:

[To be agreed based on financial covenant provisions by the Senior Lenders in relation to the Senior Facility].

(a)

3.      We set out below calculations establishing the figures in paragraph 2 above:

[          ]

4.      We confirm that no Default is outstanding at the relevant date.[1]

By:

Peach County Holdings, Inc.

[We confirm the accuracy of the figures in paragraph 2 above, and the calculations set out in paragraph 3 above.

By:

[Auditors to the Company]][2]

---

[1]     If this statement cannot be made, the certificate should identify any Default that is outstanding and the steps, if any, being taken to remedy it.

[2]     Only include in certificate provided with accounts specified in Subclauses 17.2 and 17.2.

**DRAFT: 24.01.06**

# AMENDMENT AND RESTATEMENT AGREEMENT

### DATED [     ] January 2006

### BETWEEN

### PEACH COUNTY HOLDINGS, INC.

### and

### OTHERS

**as Obligors**

### and

### THE LENDERS

### and

### THE ROYAL BANK OF SCOTLAND plc

**as Agent**

**relating to a Credit Agreement dated 14 September 1999 as supplemented by a supplemental agreement dated 11 June 2002, as amended and restated by an amendment and restatement agreement dated 9 December 2003, as amended and restated by a restructuring agreement dated 18 October 2004 and as further amended by amendment agreements dated 12 May 2005.**

## ALLEN & OVERY

**ALLEN & OVERY LLP**
**LONDON**

# CONTENTS

**Clause**                                                                                    **Page**

1.      Interpretation............................................................................................................ 1
2.      Amendment and Restatement .................................................................................... 2
3.      Waiver ....................................................................................................................... 2
4.      Conditions Precedent................................................................................................ 3
5.      Representations ......................................................................................................... 3
6.      Fees and Expenses .................................................................................................... 4
7.      Confirmations and Miscellaneous............................................................................ 4
8.      Counterparts.............................................................................................................. 6
9.      Governing Law ......................................................................................................... 6
10.     Execution .................................................................................................................. 6

**Schedule**

1.      Conditions Precedent................................................................................................ 7
        Part 1       Documents .................................................................................................. 7
        Part 2       Fees and Expenses Payable....................................................................... 10
2.      Form of Amended and Restated Credit Agreement ................................................. 11
3.      Lenders' New Participations and Commitments ...................................................... 12
4.      Defaults .................................................................................................................... 13

**Signatories**.......................................................................................................................... 14

**THIS AMENDMENT AND RESTATEMENT AGREEMENT** is dated [    ] January 2006

**BETWEEN**:

(1)     **PEACH COUNTY HOLDINGS, INC.** (a corporation incorporated under the laws of the State of Delaware in the United States) (the **Company**);

(2)     **BLUE BIRD BODY COMPANY** (a company incorporated under the laws of the state of Georgia in the United States) in its capacity as a borrower (**Blue Bird Body Company**);

(3)     **THE SUBSIDIARIES OF THE COMPANY** specified as such on the signature pages hereto as guarantors (the **Guarantors**);

(4)     **THE FINANCIAL INSTITUTIONS** specified as such on the signature pages hereto as lenders (the **Lenders**); and

(5)     **THE ROYAL BANK OF SCOTLAND plc** as agent (in this capacity the **Agent**).

**BACKGROUND**:

(A)     This Amendment and Restatement Agreement is supplemental to, and amends and restates, a credit agreement originally dated 14 September 1999 as supplemented on 11 June 2002, restated on 9 December 2003, amended and restated on 18 October 2004 and further amended on 12 May 2005 (the **Credit Agreement**).

(B)     The Plan (as defined below), contemplates the Lender's claims against the Obligors under the Credit Agreement being exchanged for:

(a)     reduced debt obligations of the Obligors (implemented by amending the Credit Agreement as set out in this Amendment and Restatement Agreement (the Credit Agreement as so to be amended and restated, the **Amended and Restated Credit Agreement**)); and

(b)     common stock of the Company being issued to the Lenders (or their nominees) in respect of the cancelled balance of such claims.

**IT IS AGREED** as follows:

1.     **INTERPRETATION**

1.1     **Definitions**

(a)     Capitalised terms used in this Amendment and Restatement Agreement which are not defined herein have the same meaning given to them in the Credit Agreement.

(b)     In this Amendment and Restatement Agreement:

**Effective Date** means the date on which the Agent gives the notification in Subclause 4.2 (Notification).

**Existing Facility A Loans** means the Loans provided by the Lenders under Facility A as at the Effective Date.

**Existing Facility B Loans** means the Loans provided by the Lenders under Facility B as at the Effective Date.

**Equitised Debt** means the amount of the debt owed to the Lenders under the Credit Agreement which will be converted into stock of the Company in accordance with the Plan.

**Plan** means the Plan of Reorganisation of each of the Obligors under Chapter 11 of the U.S. Bankruptcy Code and filed with the Bankruptcy Court for [        ] on [        ].

**Senior Secured Facility** means the U.S.$52,500,000 credit facility for Blue Bird Body Company dated on or about the date of this Agreement.

## 1.2    Construction

The provisions of Subclause 1.2 (Construction), Clause 36 (Notices) and Clause 38 (Governing Law) of the Credit Agreement apply to this Amendment and Restatement Agreement as though they were set out in full in this Amendment and Restatement Agreement but as if references to the Credit Agreement were references to this Amendment and Restatement Agreement.

## 2.    AMENDMENT AND RESTATEMENT

### 2.1    Amendment and restatement

Subject to Clause 4 (Conditions Precedent), the Credit Agreement will be amended and restated on and from the Effective Date as set out in Schedule 2 (Form of Amended and Restated Credit Agreement) to this Amendment and Restatement Agreement so that the rights and obligations of the parties to the Credit Agreement (as those parties may have been changed, or their rights and obligations novated, cancelled or released, under this Amendment and Restatement Agreement) shall, on and from that date, be governed by and construed in accordance with the provisions of the Amended and Restated Credit Agreement.

### 2.2    Facility A and Facility B

(a)    With effect from the Effective Date, each Lender's participation in the Facility A Loans and its Facility B Commitment will be as set out opposite that Lender's name in Schedule 3 (Lenders' New Participations and Commitments).

(b)    There shall be two Facility A Loans, the first is the amount of U.S.$56,705,818.50 borrowed by the Company and the second is the amount of U.S$39,294,181.50 borrowed by Blue Bird Body Company.

(c)    The first Term of the Loan referred to in paragraph (a) and (b) shall be the period from the Effective Date to the date falling 3 months after the Effective Date.

## 3.    WAIVER

### 3.1    Waiver of defaults

The Agent with the authority of the Majority Lenders permanently waives each of the Defaults and Events of Default which occurred prior to the Effective Date and are outstanding on the date of this Agreement.

**3.2    Preservation**

The waiver in Subclause 3.1 is limited to the factual circumstances existing on the date of this Agreement.  Nothing in this Agreement constitutes a waiver of any act, event, matter, fact or thing or any Default, existing or occurring after the date of this Agreement or as a result of this Agreement taking effect.  The rights and remedies of the Finance Parties in respect of any such act, event, matter, fact or thing are hereby expressly reserved.

**4.    CONDITIONS PRECEDENT**

**4.1    Receipt of Conditions Precedent**

The amendment and restatement of the Credit Agreement provided for in Clause 2 (Amendment and Restatement) and the obligations of the Finance Parties under the Amended and Restated Credit Agreement and of the Company, Blue Bird Body Company and the Guarantors under this Agreement are conditional on the Agent having received on or before [31 January] 2006.

(a)    all of the documents set out in Part 1 of Schedule 1 (Conditions Precedent - Documents), in form and substance satisfactory to the Agent; and

(b)    payment of the costs and expenses referred to in Part 2 of Schedule 1 (Conditions Precedent - Fees and Expenses Payable).

**4.2    Notification**

The Agent shall notify the Company and the Lenders promptly on being satisfied as to the matters in Subclause 4.1(a) and (b).

**4.3    Non-effectiveness**

Except as the Agent and the Company otherwise agree, if the Agent has not received the documents and payments referred to in Subclause 4.1 by the date therein specified, the Credit Agreement will not be amended and restated by this Amendment and Restatement Agreement.

**4.4    Waiver**

The Agent may waive or agree to any variation of any condition precedent referred to in this Clause 3 with the consent of the Majority Lenders.

**5.    REPRESENTATIONS**

**5.1    Representations**

The representations set out in Subclauses 5.2 (Powers and authority) to 5.6 (No Chapter 7 insolvency proceedings) are made by each Obligor on the date of this Amendment and Restatement Agreement and on the Effective Date to each Finance Party.

**5.2    Powers and authority**

It has the power to enter into and perform, and has taken all necessary action to authorise the entry into and performance of this Amendment and Restatement Agreement and the transactions contemplated by this Amendment and Restatement Agreement.

### 5.3    Legal validity

Subject to any general principles of law limiting its obligations, the obligations expressed to be assumed by it under this Amendment and Restatement Agreement are legal, binding, valid and enforceable obligations.

### 5.4    Non-conflict

The entry into and performance by it of, and the transactions contemplated by, this Amendment and Restatement Agreement do not and will not conflict with:

(a)    any agreement, mortgage, bond or other instrument or treaty to which it is a party or which is binding upon it or any of its assets which would constitute a material adverse effect;

(b)    its constitutive documents and rules and regulations; or

(c)    any applicable law, regulation or official or judicial order.

### 5.5    Validity and admissibility in evidence

All acts, conditions and things required to be done, fulfilled and performed in order:

(a)    to enable it lawfully to enter into, exercise its rights under and perform and comply with the obligations expressed to be assumed by it in this Amendment and Restatement Agreement;

(b)    to ensure that the obligations expressed to be assumed by it in this Amendment and Restatement Agreement are legal, valid and binding; and

(c)    to make this Amendment and Restatement Agreement admissible in evidence in its jurisdiction of incorporation,

have been done, fulfilled and performed and are in full force and effect.

### 5.6    No Chapter 7 insolvency proceedings

It has not filed a petition commencing a case under Chapter 7 of the U.S. Bankruptcy Code, and to the knowledge of its directors and officers, no involuntary petition has been filed against it commencing an involuntary case under Chapter 7 of the U.S. Bankruptcy Code.

### 6.    FEES AND EXPENSES

The Company shall pay, or shall cause to be paid, to the Agent the amount of all costs and expenses (including legal fees and expenses and any VAT) reasonably incurred by it in connection with the negotiation, preparation, printing and execution of this Amendment and Restatement Agreement and any other documents contemplated herein.

### 7.    CONFIRMATIONS AND MISCELLANEOUS

### 7.1    Finance Documents

(a)    This Amendment and Restatement Agreement is a Finance Document.

(b)     Except as amended or waived by this Amendment and Restatement Agreement, each Finance Document will after the Effective Date remain in full force and effect.

(c)     Each Obligor confirms its agreement to the amendments contemplated by this Amendment and Restatement Agreement and agrees that its obligations under the Finance Documents shall not be affected by any matter, fact, circumstance or thing which might now or at any time in the future affect such agreements or its obligations thereunder, including, without limitation, and whether or not known to such (or any other) Obligor or any Finance Party, and whether the case now or becoming so at any time in the future:

(i)     the invalidity or potential invalidity of the execution of this Amendment and Restatement Agreement or any other Finance Document by any other Obligor or any other party, howsoever caused or occasioned, including, without limitation, by reason of incapacity, lack of due authorisation or illegality; or

(ii)    the release of any other Obligor from all or any of its obligations or whatsoever terms made; or

(iii)   any increase in its obligations howsoever arising; or

(iv)    any Obligor ceasing to exist or being wound up or dissolved or being or becoming insolvent under any applicable law,

and all such Obligor's obligations under the Finance Documents to which it is or is expressed to be a party and the full effectiveness thereof shall continue notwithstanding any such matter, fact, circumstance or thing.

## 7.2     Guarantees

Each Obligor agrees that its obligations and assurances under clause 18 (Guarantee) of the Credit Agreement remain and will remain in full force and effect and will from the Effective Date extend to the Obligors' obligations under the Credit Agreement as to be amended by this Amendment and Restatement Agreement and under the other Finance Documents.

## 7.3     Security

Each Obligor that is a party to a Security Document:

(a)     confirms that its obligations under the Security Documents to which it is a party and the security constituted thereby, remain and will remain in full force and effect and will from the Effective Date extend to the relevant obligations under the Credit Agreement as to be amended by this Amendment and Restatement Agreement and under all the other Finance Documents; and

(b)     consents to the execution and performance of the Finance Documents by the other Obligors.

## 7.4     Existing Facility A Loans and Existing Facility B Loans - Terms and interest deferral

(a)     Until the Effective Date, each new Term for each of the Existing Facility A Loans and Existing Facility B Loans shall be one day.

(b)     As at [24 January 2006] interest accrued on Facility A Loans and Facility B Loans which is unpaid totals U.S.$[10,852,144.98].

(c) Interest accruing on Facility A Loans and Facility B Loans (during the Terms referred to in Subclause (a)) is payable on the Final Maturity Date (or the date on which the Facilities become due and payable in full (whether by acceleration or prepayment)).

(d) Notwithstanding Subclause 11.3 (Payment of interest) of the Credit Agreement, no interest will be payable on interest accrued prior to the Effective Date on Existing Facility A Loans and Existing Facility B Loans under the Credit Agreement.

**7.5    Miscellaneous**

Notwithstanding anything to the contrary in this Amendment and Restatement Agreement, none of the amendments to be made to the Credit Agreement by this Amendment and Restatement Agreement will affect the rights or obligations of any Ancillary Facility Provider.

**8.    COUNTERPARTS**

This Amendment and Restatement Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were in a single copy of this Amendment and Restatement Agreement.

**9.    GOVERNING LAW**

This Amendment and Restatement Agreement is governed by English law.

**10.    EXECUTION**

This Amendment and Restatement Agreement takes effect in accordance with its terms notwithstanding that certain Lenders may not have executed it, if the matters contemplated by this Amendment and Restatement Agreement have been approved by the Plan.

This Amendment and Restatement Agreement has been entered into on the date stated at the beginning of this Amendment and Restatement Agreement.

**SCHEDULE 1**

**CONDITIONS PRECEDENT**

**PART 1**

**DOCUMENTS**

1.    **Obligors**

(a)    A copy of a resolution of the board of directors of each Obligor:

   (i)    approving the terms of, and the transactions contemplated by, this Amendment and Restatement Agreement;

   (ii)    approving the Plan and filing for protection under Chapter 11 of the U.S. Bankruptcy Code with the Bankruptcy Court for [          ];

   (iii)    authorising a specified person or persons to execute this Amendment and Restatement Agreement on its behalf.

(b)    A certificate from the secretary or other authorised officer of each Obligor:

   (i)    certifying no change to the certificate of incorporation and by-laws of such Obligor previously delivered to the Agent or attaching the amended version;

   (ii)    attaching a copy of the resolution referred to in paragraph (a), certifying that such resolution was duly adopted and has not been altered, amended, rescinded or revoked, and certifying that no conflicting resolutions have been adopted;

   (iii)    certifying that each person who has signed this Amendment and Restatement Agreement is a duly elected, qualified and acting officer of such Obligor and has been duly authorised to execute and deliver this Amendment and Restatement Agreement on behalf of such Obligor;

   (iv)    providing a specimen of the signature of each person authorised by the resolution referred to in paragraph (a) above to sign this Amendment and Restatement Agreement;

   (v)    certifying that each copy document provided by such Obligor is correct, complete, and in full force and effect as at a date no earlier than the date of this Amendment and Restatement Agreement;

   (vi)    certifying that such Obligor is in good standing under the laws of the state in which it is incorporated/organised; and

   (vii)    certifying that such Obligor has not filed a petition commencing a case under Chapter 7 of the U.S. Bankruptcy Code, and to the knowledge of the secretary, no involuntary petition has been filed against such Obligor commencing an involuntary case under Chapter 7 of the U.S. Bankruptcy Code.

(c)     A certificate from the secretary of Blue Bird Body Company certifying that the borrowing of the full amount available to it under the Amended Credit Agreement would not cause any borrowing limit binding on it to be exceeded.

(d)     A certificate from the secretary of state of the state of incorporation/organisation of each Obligor certifying that such Obligor is in good standing as at a date no earlier than [9 January] 2006.

## 2.     Security Documents

(a)     Evidence of execution of, and recording in the relevant court record book of:

(i)     the First Amendment to First Amended and Restated Deed to Secure Debt and Security Agreement and First Amended and Restated Assignment of Leases and Rents in relation to the Borrower's property in Peach County, Georgia, USA; and

(ii)     the First Amendment to First Amended and Restated Deed to secure Debt and Security Agreement and First Amended and Restated Assignment of Leases and Rents in relation to the Borrower's property in Walker County, Georgia, USA.

## 3.     Legal opinions

(a)     A legal opinion of Skadden, Arps, Slate, Meagher & Flom LLP, legal advisers to the Obligors, addressed to the Lenders.

(b)     A legal opinion of Kilpatrick Stockton LLP, Georgia, legal advisers as to Georgia law to the Obligors, addressed to the Lenders.

(c)     A legal opinion of Jones Vargas, Nevada, legal advisers as to Nevada law to the Obligors, addressed to the Lenders.

(d)     A legal opinion of Allen & Overy, LLP, legal advisors to the Lenders, as to English law.

## 4.     Other documents and evidence

(a)     A copy of any other authorisation or other document, opinion or assurance which the Agent has notified the Company is necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, any Finance Document or for the validity and enforceability of any Finance Document.

(b)     The entry by the Bankruptcy Court for the [  ] District of [  ] (the **Bankruptcy Court**) of an order or orders (collectively, the **Order**):

(i)     confirming the Plan of each of the Obligors (collectively, the **Confirmation Order**);

(ii)     approving the disclosure statement with respect to the Plan;

(iii)     approving the [commitment letters] and draft of this Amendment and Restatement Agreement and the Senior Secured Facility (the **Facilities**) and approving all aspects of the Facilities and documents evidencing the Facilities and the transactions contemplated thereby, including without limitation the payment of all fees thereunder; and

(iv)     being in full force and effect and not subject to stay.

(c)     All conditions precedent to the effectiveness of the Plan having been satisfied (or, with the prior written consent of the [Agent for each of the Facilities], which shall not be unreasonably withheld, waived in accordance with the terms of the Plan) in the reasonable judgment of the [Agents for the Facilities],  and the substantial consummation (as defined in Section 1101 of the Code) of the Plan shall have occurred simultaneously with the closing of the Facilities.

(d)     The issuance of common stock of the Company to the Lenders (or their nominees) on cancellation of the Equitised Debt in accordance with the Plan.

(e)     A duly executed copy of the restructuring agreement dated on or about the date of this Agreement between [          ] and [            ].

(f)     The conditions precedent to the Senior Secured Facility (except for the condition corresponding to this paragraph (f)) having been satisfied or waived.

**PART 2**

**FEES AND EXPENSES PAYABLE**

1.      All costs and expenses payable to the Agent under Subclause 5.1 (Expenses) and advised or invoiced prior to the Effective Date.

2.      All costs and expenses (including legal fees and expenses and any VAT) incurred by the Agent in connection with the Credit Agreement or on behalf of the Lenders, and advised or invoiced prior to the Effective Date

**SCHEDULE 2**

**FORM OF AMENDED AND RESTATED CREDIT AGREEMENT**

# SCHEDULE 3

## LENDERS' NEW PARTICIPATIONS AND COMMITMENTS

| LENDER | PARTICIPATION IN FACILITY A LOAN TO THE COMPANY(US$) | PARTICIPATION IN FACILITY A LOAN TO BLUE BIRD BODY COMPANY(US$) | FACILITY B COMMITMENT (US$) | EQUITISED DEBT (US$) |
|---|---|---|---|---|
| Banc of America Securities Limited | [263,754.42] | [182,757.21] | [18,604.65] | [534,883.72] |
| Banca Nazionale del Lavoro S.p.A., London Branch | [2,250,303.93] | [1,559,250.72] | [158,731.44] | [4,563,529.01] |
| Bank of Scotland | [2,250,303.93] | [1,559,250.72] | [158,731.44] | [4,563,529.01] |
| Barclays Bank PLC | [9,265,207.80] | [6,419,924.76] | [653,547.19] | [18,789,481.71] |
| Bayerische Hypo und Vereinsbank AG, London Branch | [2,250,303.93] | [1,559,250.72] | [158,731.44] | [4,563,529.01] |
| Bear Stearns Bank plc | [600,639.94] | [416,187.45] | [42,367.81] | [1,218,074.47] |
| HVB Banque Luxembourg Societe Anonyme | [2,250,303.93] | [1,559,250.72] | [158,731.44] | [4,563,529.01] |
| JP Morgan Chase Bank, N.A. | [3,857,663.89] | [2,673,001.23] | [272,111.05] | [7,823,192.59] |
| Lloyds TSB Bank plc | [15,816,192.36] | [10,959,145.98] | [1,115,639.10] | [32,074,624.06] |
| Newstart Factors Inc. | [4,042,653.37] | [2,801,181.69] | [285,159.79] | [8,198,344.08] |
| Quadrangle Master Funding Ltd | [4,794,591.92] | [3,322,204.97] | [338,199.87] | [9,723,246.27] |
| The Royal Bank of Scotland plc | [9,065,280.57] | [6,281,393.83] | [639,444.77] | [18,384,037.04] |
| **Total:** | **[56,707,200.00]** | **39,292,800.00]** | **4,000,000.00]** | **115,000,000.00]** |

**SCHEDULE 4**

**DEFAULTS**

**SIGNATORIES**

**Borrowers**

**PEACH COUNTY HOLDINGS, INC.**

By:

**BLUE BIRD BODY COMPANY**

By:

**Guarantors**

**PEACH COUNTY HOLDINGS, INC.**

By:

**BLUE BIRD BODY COMPANY**

By:

**BLUE BIRD CORPORATION**

By:

**BLUE BIRD INVESTMENT CORPORATION**

By:

**HENLYS HOLDING CORP**

By:

**HENLYS US INVESTMENTS INC.**

By:

**The Lenders**

**LLOYDS TSB BANK plc**

By:


**THE ROYAL BANK OF SCOTLAND plc**

By:


**JPMORGAN CHASE BANK, N.A.**

By:


**JPMORGAN CHASE BANK, N.A.**

By:


**BANCA NAZIONALE DEL LAVORO S.p.A, LONDON BRANCH**

By:


**BAYERISCHE HYPO- UND VEREINSBANK AG, LONDON BRANCH**

By:


**HVB BANQUE LUXEMBOURG SOCIÉTÉ ANONYME**

By:


**THE GOVERNOR AND COMPANY OF THE BANK OF SCOTLAND**

By:


**BARCLAYS BANK PLC**

By:

**BEAR STEARNS BANK PLC**

By:


**NEWSTART FACTORS, INC.**

By:


**QUADRANGLE MASTER FUNDING LTD (By its advisor QUADRANGLE DEBT RECOVERY ADVISORS LLC)**

By:


**BANC OF AMERICA SECURITIES LIMITED**

By:


**Agent**

**THE ROYAL BANK OF SCOTLAND plc**

By:

DRAFT: 24.1.06

**DEBT SUBORDINATION AGREEMENT**

**DEBT SUBORDINATION AGREEMENT** (as amended from time to time, this **Agreement**), dated as of January [●], 2006, by and among Peach County Holdings, Inc. (the **Company**), the subsidiaries of the Company whose names appear on the signature pages of this Agreement (the **Other Obligors**), the financial institutions identified in Schedule 1 in their capacity as lenders under the Senior Facility Agreement (together with their successors and assigns, the **Senior Lenders**, and each a **Senior Lender**), the financial institutions listed in Schedule 2 in their capacity as lenders under the Subordinated Facility Agreement (together with their successors and assigns, the **Subordinated Lenders**, and each a **Subordinated Lender**), The Royal Bank of Scotland plc as agent and security agent to the Senior Lenders (in such capacity, together with its successors in such capacity, the **Senior Agent**) and The Royal Bank of Scotland plc as agent and security agent to the Subordinated Lenders (in such capacity, together with its successors in such capacity, the **Subordinated Agent**) for the benefit of the Senior Lenders.

**WHEREAS**, the Senior Lenders and the Subordinated Lenders are entering into this Agreement in accordance with Clause 40 (Priority of Senior Facility) of the Subordinated Facility Agreement;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual agreements herein contained and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    <u>Definitions</u>.    Terms not otherwise defined herein have the same respective meanings given to them in the Senior Facility Agreement.  In addition, the following terms shall have the following meanings:

**Senior Collateral** means any and all property and assets, real or personal, over which liens have been granted in favor of the Senior Agent under the Security Documents.

**Senior Debt** means any and all present and future obligations and liabilities of the Company of every type and description arising under or in connection with the Senior Facility Agreement due or to become due to (a) the Senior Parties or (b) any affiliate of any Senior Party or any director, officer, agent or employee of any Senior Party or such affiliate entitled to indemnification under the  Senior Finance Documents, or any of their respective successors, transferees or assigns, whether for principal, premium, interest, fees, reimbursement obligations, expenses, indemnities or other amounts (including attorneys' fees and expenses) and whether due or not due, direct or indirect, joint and/or several, absolute or contingent, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, and whether now or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and

later increased, created or incurred, whether or not arising after the commencement of a proceeding under any Bankruptcy Law (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding, and whether or not recovery of any such obligations or liability may be barred by a statute of limitations or such obligation or liability may otherwise be unenforceable. Senior Debt shall expressly include, without limitation, any and all interest at the rate determined in the Senior Facility Agreement, fees, out of pocket costs and expenses due and accruing or incurred under any Senior Finance Document on and after the date of any filing by or against any Finance Party of any petition under any Bankruptcy Laws regardless of whether the Senior Agent's or any other Senior Party's claim therefor is allowed or allowable in the case or proceeding relating thereto.

**Senior Facility Agreement** means that certain credit agreement dated as of January [●], 2006, by and between, among others, the Company, the Other Obligors, the Senior Lenders and the Senior Agent (as amended, supplemented, replaced, renewed or otherwise modified from time to time).

**Senior Finance Documents** means this Agreement and each of the Finance Documents.

**Senior Parties** means the Senior Lenders and the Senior Agent.

**Subordinated Debt** means any and all present and future obligations and liabilities of the Company of every type and description owing to any of the Subordinated Lenders under or in connection with the Subordinated Documents, whether for principal, premium, interest, fees, reimbursement obligations, expenses, indemnities or other amounts (including attorney's fees and expenses) and whether direct or indirect, joint and/or several, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, absolute or contingent, due or not due, now existing or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether or not arising after the commencement of a proceeding under any Bankruptcy Law (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding, and whether or not recovery of any such obligations or liability may be barred by a statute of limitations or such obligation or liability may otherwise be unenforceable, including, without limitation, that which is evidenced by the Subordinated Documents.

**Subordinated Documents** means, collectively, the Subordinated Facility Agreement and any and all other documents, notes or instruments evidencing or further guaranteeing or securing directly or indirectly any of the Subordinated Debt, whether now existing or hereafter created.

**Subordinated Facility Agreement** means that certain amended and restated credit agreement dated as of January [●], 2006, by and between, among others, the Company, the Other Obligors the Subordinated Lenders and the Subordinated Agent (as amended, supplemented, replaced, renewed or otherwise modified from time to time).

2

2.    <u>General</u>.  The Subordinated Debt and any and all Subordinated Documents shall be and hereby are subordinated to the prior indefeasible payment in full in cash of the Senior Debt.  Unless consented to in writing by the Senior Lenders, no payment, prepayment or redemption (including any payment that may be payable by reason of any other indebtedness of the Company being subordinated to payment of the Subordinated Debt) shall be made by or on behalf of the Company or any of the Other Obligors for or on account of any Subordinated Debt, and the Subordinated Lenders shall not take or receive from the Company or any Other Obligor, directly or indirectly, in cash, other property, or any rights or by set-off or in any other manner, including, without limitation, from or by way of collateral, payment of all or any of the Subordinated Debt, unless and until the Senior Debt shall have been indefeasibly paid in full in cash.

The Subordinated Lenders agree that notwithstanding the method of timing of the granting, filing, or perfection thereof, any and all liens, rights to payment and any other rights granted by the Company and/or any Other Obligor under the Subordinated Facility Agreement for the benefit of the Subordinated Lenders shall be junior and subordinate in all respects to the liens, rights to payment and any other rights granted to the Senior Agent for the benefit of the Senior Lenders until such time as the obligations under the Senior Facility Agreement are indefeasibly paid in full in cash.

3.    <u>Enforcement</u>.  No Subordinated Lender will take or omit to take any action or assert any claim with respect to the Subordinated Debt or which is otherwise inconsistent with the provisions of this Agreement.  Without limiting the foregoing, no Subordinated Lender will commence, join with any creditor other than the Senior Parties in commencing, or directly or indirectly cause the Company and/or the Other Obligors to commence or assist the Company and/or the Other Obligors in commencing, any proceeding referred to in Clause 4(a), and no Subordinated Lender shall accelerate, demand, sue for, assert, collect or enforce any claim for or set-off with respect to principal, premium, interest or any other amount constituting or payable with respect to, or otherwise exercise any remedy under the Subordinated Debt or the Subordinated Documents or any part thereof or take any action to foreclose or realize upon the Subordinated Debt or any part thereof or enforce any of the Subordinated Documents. Until the Senior Debt has been finally paid in full in cash, no Subordinated Lender shall enforce or exercise any right of subrogation, reimbursement, restitution, contribution or indemnity whatsoever from any assets of the Company and/or the Other Obligors, or any guarantor of or provider of collateral security for the Senior Debt.  Each Subordinated Lender further waives any and all rights with respect to marshalling.

If any amount of Senior Debt is outstanding, the Subordinated Agent shall not, and the Subordinated Lenders shall not direct the Subordinated Agent to, accelerate the Subordinated Debt prior to the Senior Debt being accelerated.  If (a) an Event of Default as defined under the Senior Facility Agreement and an Event of Default as defined under the Subordinated Facility Agreement has occurred and is continuing for more than one hundred and fifty (150) days during which period the Senior Lenders or the Senior Agent were not stayed or otherwise prevented by operation of law or otherwise from exercising remedies against the Company and/or the Other Obligors, and the Senior Agent shall not have accelerated Senior Debt under the Senior Facility Agreement, (b) the Subordinated

Agent shall have given at least ten (10) Business Days' prior notice to the Senior Agent and (c) the circumstances referred to in clause (a) remain in effect, then the Subordinated Agent shall have the right to (x) accelerate the Subordinated Debt under the Subordinated Facility Agreement and (y) if the Senior Agent has not diligently commenced the exercise of remedies against the Company and/or the Other Obligors, commence (with notice to, but without the need for, prior written consent of, the Senior Agent) the exercise of such remedies as are permitted by law.

4.    <u>Payments Held on Deposit</u>.  In furtherance of subordination, each Subordinated Lender agrees as follows:

(a)    In the event of any dissolution, winding up, liquidation, reorganization, adjustment, protection, relief or composition of the Company and/or any other Obligor or its debts, whether voluntary or involuntary, in any bankruptcy, insolvency, reorganization, receivership, relief or other similar case or proceeding under any bankruptcy or similar law, including any such similar laws which may become effective after the date hereof, or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of the Company and/or any Other Obligor or in the event any case, proceeding, assignment or marshalling as described above is otherwise commenced by or against the Company and/or any Other Obligor:

(i)    the Senior Agent is hereby irrevocably authorized and empowered (in its own name or in the name of the Subordinated Lenders or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution of any kind (whether in cash, property or securities) that otherwise would be payable or deliverable upon or with respect to the Subordinated Debt in any such case, proceeding, assignment, marshalling or otherwise (including any payment that may be payable by reason of any other indebtedness of the Company and/or any Other Obligor being subordinated to payment of the Subordinated Debt), and give acquittance therefor and to file claims and proofs of claim and take such other action (including, without limitation, voting the Subordinated Debt or enforcing any security interest or other lien securing payment of the Subordinated Debt) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Senior Parties hereunder; and

(ii)    the Subordinated Lenders shall duly and promptly take such action as any Senior Party may request (A) to collect the Subordinated Debt for the account of the Senior Parties and to file appropriate claims or proofs of claim in respect of the Subordinated Debt, (B) to execute and deliver to the Senior Agent such powers of attorney, assignments, or other instruments as the Senior Agent may request in order to enable the Senior Agent to enforce any and all claims

with respect to, any security interests and other liens securing payment of, the Subordinated Debt, and (C) to collect and receive any and all payments or distributions which may be payable or deliverable upon or with respect to the Subordinated Debt.

(b)    All payments or distributions upon or with respect to any of the Subordinated Debt which are received by any of the Subordinated Lenders prior to the indefeasible payment in full of all Senior Debt shall be received for the benefit of the Senior Parties, shall be segregated from other funds and property held by such Subordinated Lenders and shall be forthwith paid over to the Senior Agent for the account of the Senior Parties in the same form as so received (with any necessary indorsement) to be applied to, or held as collateral for, the payment or prepayment of the Senior Debt in accordance with the terms of the Senior Facility Agreement.

(c)    The Senior Agent is hereby authorized to demand specific performance of this Agreement, whether or not the Company or any Other Obligor shall have complied with any of the provisions hereof applicable to it, at any time when any of the Subordinated Lenders shall have failed to comply with any of the provisions of this Agreement applicable to them.  The Subordinated Lenders hereby irrevocably waive any defense based on the adequacy of a remedy at law, any defense based on any action or inaction by any of the Senior Parties, or any other defense, in each case, which might be asserted as a bar to such remedy of specific performance.

For the avoidance of doubt, nothing in this Agreement should be interpreted as a guarantee of the repayment of the Senior Debt by the Subordinated Lenders and no Subordinated Lender shall be obligated to pay to the Senior Lenders any amount in excess of the aggregate amount received by such Subordinated Lender with respect to or on account of the Subordinated Debt.

5.    <u>Defense to Enforcement</u>.  If any Subordinated Lender, in contravention of the terms of this Agreement, shall commence, prosecute or participate in any suit, action or proceeding against the Company or any Other Obligor, then the Company or Other Obligor may interpose as a defense or plea the making of this Agreement, and the Senior Agent may intervene and interpose such defense or plea in its name or in the name of the Company.  If any Subordinated Lender, in contravention of the terms of this Agreement, shall attempt to collect any of the Subordinated Debt or enforce any of the Subordinated Documents, then the Senior Agent or the Company and/or any Other Obligor may, by virtue of this Agreement, restrain the enforcement thereof in the name of the Senior Agent or in the name of the Company and/or any Other Obligor.

6.    <u>Rights Acquired by Virtue of Subrogation, Etc</u>.  Each Subordinated Lender agrees that no payment or distribution to any Senior Party pursuant to the provisions of this Agreement or any other Senior Finance Document shall entitle the Subordinated Lenders to exercise any rights acquired directly or indirectly by virtue of assignment, subrogation

or otherwise in respect of the Subordinated Debt until the Senior Debt shall have been paid in full in cash.

7.    <u>Subordination Legend; Further Assurance</u>.  The Subordinated Lenders and the Company will cause each instrument evidencing Subordinated Debt to be endorsed with the following legend:

> "The indebtedness evidenced by this instrument is subordinated to the prior payment in full of the Senior Debt (as defined in the Subordination Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Debt Subordination Agreement dated as of January [●], 2006, as the same may be amended, modified or restated from time to time (the **Subordination Agreement**), by, *inter alia*, the maker hereof, the holder and the Senior Agent (as such term is defined in the Subordination Agreement)."

The Subordinated Lenders and the Company and each Other Obligor each will further mark its books of account in such a manner as shall be effective to give proper notice of the effect of this Agreement and will, in the case of any Subordinated Debt which is not evidenced by any instrument, upon the Senior Agent's request cause such Subordinated Debt to be evidenced by an appropriate instrument or instruments endorsed with the above legend.  The Subordinated Lenders and the Company and each Other Obligor will, each at its own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may reasonably be deemed necessary or desirable in the judgment of the Senior Agent, acting in accordance with the Senior Facility Agreement and this Agreement, in order to protect any right or interest granted or purported to be granted hereby to the Senior Parties or to enable the Senior Agent to exercise and enforce the rights and remedies of the Senior Parties hereunder.

8.    <u>Agreement by the Company and Other Obligors</u>.  The Company and each Other Obligor agrees that it will not make any payment of any of the Subordinated Debt, or take any other action, in contravention of the provisions of this Agreement.

9.    <u>Further Assurances</u>.  Each Subordinated Lender hereby agrees, upon request of the Senior Agent at any time and from time to time, to execute such other documents or instruments as may be reasonably requested by the Senior Agent, acting in accordance with the Senior Facility Agreement and this Agreement, further to evidence on the public record or otherwise the senior priority of the Senior Debt as contemplated hereby.

10.    <u>Books and Records</u>.  Each Subordinated Lender further agrees to maintain on its books and records such notations as the Senior Agent may reasonably request to reflect the subordination contemplated hereby.

11.    <u>Senior Parties' Freedom of Dealing</u>.  Each Subordinated Lender agrees, with respect to the Senior Debt and any and all collateral therefor or guarantee thereof, that any obligor with respect to the Senior Debt and the Senior Parties may agree to modify

the terms of any of the Senior Debt, and the Senior Parties may grant extensions of the time of payment or performance with respect thereto and make compromises, including releases of collateral or guaranties, and settlements with the Company, the Other Obligors or other persons, in each case without the consent of any Subordinated Lender or the Company and without affecting the agreements of any Subordinated Lender or the Company contained in this Agreement; provided, however, that nothing contained in this Clause 11 shall (a) except with the consent of Subordinated Lenders whose participations equal or exceed 75 per cent of the principal of the Loans under the Subordinated Facility Agreement, permit the principal amount of the Senior Debt to be increased to more than $52,500,000 (except that such amount may not be increased to more than $65,000,000 without the consent of all the Subordinated Lenders), (b) permit the pricing (including fees) to be increased, or (c) constitute a waiver by the Company or any Other Obligor of its right to agree or consent to a settlement or compromise of a claim which the Senior Agent or any other Senior Party may have against the Company or any Other Obligor, as applicable.

12.    <u>Agreements in Respect of the Subordinated Debt</u>.

(a)    The Subordinated Lenders will not, except with the prior written consent of the Senior Agent, sell, assign, pledge, encumber or otherwise dispose of any of the Subordinated Debt to a Person other than a Subordinated Lender unless such sale, assignment, pledge, encumbrance or disposition (i) is to a person or entity other than the Company and the Other Obligors, (ii) is made expressly subject to this Agreement and (iii) is made in accordance with clause 26.4 (Procedure for transfers by way of novations) of the Subordinated Facility Agreement.

(b)    The Subordinated Lenders shall promptly notify the Senior Agent of the occurrence of any default under the Subordinated Debt or Subordinated Documents.  The Subordinated Lenders shall give the Senior Parties fifteen (15) days prior written notice of any contemplated (i) change in any of the terms of any of the Subordinated Debt and (ii) sale, assignment, pledge, encumbrance or other disposition of any Subordinated Debt to any party.

13.    <u>Obligations Absolute</u>.  Nothing contained in this Agreement shall impair, as between the Company, the Other Obligors and any Subordinated Lender, the obligation of the Company and the Other Obligors to pay to the Subordinated Lender all amounts payable in respect of the Subordinated Debt as and when the same shall become due and payable in accordance with the terms thereof, or prevent such Subordinated Lender (except as expressly otherwise provided in this Agreement) from exercising all rights, powers and remedies otherwise permitted by any Subordinated Document to which it is a party and by applicable law upon a default in the payment of the Subordinated Debt or a default under any Subordinated Document, all, however, subject to the rights of the Senior Agent and the Senior Parties as set forth in this Agreement.

14.    <u>Senior Obligations Hereunder Not Affected</u>.  All rights and interests of the Senior Parties hereunder, and all agreements and obligations of the Subordinated Lenders, the Company and the Other Obligors under this Agreement, shall remain in full force and effect irrespective of:

        (a)    any lack of validity or enforceability of any Senior Finance Document;

        (b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Senior Debt, or any other amendment or waiver of or consent to any departure from any Senior Finance Document, including, without limitation, any increase in the Senior Debt resulting from the extension of additional credit to the Company or any of its subsidiaries or otherwise;

        (c)    any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Senior Debt;

        (d)    any manner of application of Senior Collateral, or proceeds thereof, to all or any of the Senior Debt, or any manner of sale or other disposition of any Senior Collateral for all or any of the Senior Debt or any other assets of the Company or any of its subsidiaries;

        (e)    any change, restructuring or termination of the corporate structure or existence of the Company or any of its subsidiaries; or

        (f)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Company or a Subordinated Lender.

This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any Senior Party upon the insolvency, bankruptcy or reorganization of the Company or otherwise, all as though such payment had not been made.

15.    <u>Waiver</u>.  The Subordinated Lenders, the Company and the Other Obligors each hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Senior Debt and this Agreement and any requirement that any Senior Party protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against the Company or the Other Obligors, or any other person or entity or any collateral.

16.    <u>Representations and Warranties</u>.  Each Subordinated Lender (or in the case of Clause (e) the Company and each Other Obligor and not the Subordinated Lenders) represents and warrants as follows:

        (a)    Each Subordinated Lender (i) is duly organized, validly existing and, where relevant, in good standing under the laws of the jurisdiction of its incorporation or formation and (ii) has all requisite corporate power and

8

authority (including, without limitation, all governmental licenses, permits and other approvals) to enter into and perform this Agreement.

(b)     The execution, delivery and performance by each Subordinated Lender of this Agreement and the other transactions contemplated hereby have been duly authorized by all necessary corporate action, and do not (i) contravene such Subordinated Lender's charter or bylaws or other constituent agreements, (ii) violate any law, order, writ, judgment, injunction, decree, determination or award to which such Subordinated Lender is subject, or (iii) conflict with or result in the breach of, or constitute a default under, any material contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting such Subordinated Lender or any of its subsidiaries.

(c)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery or performance by any Subordinated Lender of this Agreement, excepting those that have been obtained and are in full force and effect.

(d)     This Agreement has been duly executed and delivered by each Subordinated Lender. This Agreement is the legal, valid and binding obligation of each Subordinated Lender, enforceable against such Subordinated Lender in accordance with its terms, except as the same may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally or by general principles of equity.

(e)     The Subordinated Debt now outstanding has been duly authorized by the Company and each Other Obligor, and constitutes the legal, valid and binding obligation of the Company and each Other Obligor enforceable against the Company and each Other Obligor in accordance with its terms, except as the same may be limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally or by general principles of equity. There exists no default in respect of any Subordinated Debt or Subordinated Documents as of the date hereof.  The Company has delivered to the Senior Agent true and complete copies of all instruments that evidence the Subordinated Debt, and such instruments have been duly authorized, issued and delivered by the Company and each Other Obligor and, as of the date hereof, have not been amended or modified from the copies delivered to the Senior Agent.

(f)     The Subordinated Lenders are the legal and beneficial owners of the Subordinated Debt now outstanding free and clear of any lien, security interest, option or other charge or encumbrance (other than liens or security interests in favor of the Senior Parties).

9

(g)     Each Subordinated Lender has, independently and without reliance upon any Senior Party and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.

(h)     Each Subordinated Lender derives substantial direct and indirect benefit in consideration for the execution of this Agreement.

17.     <u>Termination of Subordination</u>.  This Agreement shall continue in full force and effect, and the obligations and agreements of the Subordinated Lenders, the Company and the Other Obligors hereunder shall continue to be fully operative, until all of the Senior Debt shall have been indefeasibly paid and satisfied in full in cash.  To the extent that the Company, any Other Obligor or any guarantor of or provider of collateral for the Senior Debt makes any payment on the Senior Debt that is subsequently invalidated, declared to be fraudulent or preferential or set aside or is required to be repaid to a trustee, receiver or any other party under any bankruptcy, insolvency or reorganization act, state or federal law, common law or equitable cause (such payment being hereinafter referred to as a **Voided Payment**), then to the extent of such Voided Payment, that portion of the Senior Debt that had been previously satisfied by such Voided Payment shall be revived and continue in full force and effect as if such Voided Payment had never been made.  In the event that a Voided Payment is recovered from the Senior Agent or any other Senior Party, an Event of Default shall be deemed to have existed and to be continuing under the Senior Facility Agreement from the date of the initial receipt of such Voided Payment until the full amount of such Voided Payment is restored to the Senior Agent or such other Senior Party. During any continuance of any such Event of Default, this Agreement shall be in full force and effect with respect to the Subordinated Debt.  To the extent that a Subordinated Lender has received any payments with respect to the Subordinated Debt subsequent to the date of the Senior Agent's or any other Senior Party's initial receipt of such Voided Payment and such payments have not been invalidated, declared to be fraudulent or preferential or set aside and are not required to be repaid to a trustee, receiver, or any other party under any bankruptcy act, state or federal law, common law or equitable cause, such Subordinated Lender shall be obligated and hereby agrees that any such payment so made or received shall be deemed to have been received in trust for the benefit of the Senior Agent or such other Senior Party, and such Subordinated Lender hereby agrees to pay to the Senior Agent for the benefit of the Senior Agent or (as the case may be) such other Senior Party, upon demand, the full amount so received by such Subordinated Lender during such period of time to the extent necessary fully to restore to the Senior Agent or such other Senior Party the amount of such Voided Payment.  Upon the payment and satisfaction in full in cash of all of the Senior Debt, which payment shall be final and not avoidable, this Agreement will automatically terminate without any additional action by any party hereto.

18.     <u>Notices</u>.  All notices, requests and demands under this Agreement to be effective shall be in writing (or by fax confirmed in writing) and shall be deemed to have been duly given or made (a) when delivered by hand or (b) in the case of an internationally recognized overnight courier service, two (2) Business Days after delivery to such courier service, or (c) if by fax, when sent and receipt has been confirmed, addressed to the

10

sender at its address or fax number (as applicable) as set forth in Schedule 3 hereto or such other address or fax number as any party hereto shall have designated by written notice to the other parties hereto in accordance with this Clause 18.

19.    <u>Amendments, Etc</u>.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Subordinated Lenders, the Company or any Other Obligor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Senior Agent, the Company and the Subordinated Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

20.    <u>Expenses</u>.  The Company and the Other Obligors jointly and severally (and also, in the case of (b) and (c) only the relevant defaulting Subordinated Lender) agree upon demand to pay to the Senior Agent the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts or agents, which any Senior Party may incur in connection with (a) the administration of this Agreement, (b) the exercise or enforcement of any of the rights of any Senior Party hereunder or (c) the failure by the Subordinated Lenders or the Company or any Other Obligor to perform or observe any of the provisions hereof.

21.    <u>Consent to Jurisdiction, Etc</u>.  (a) Each of the parties hereto agrees that any New York State court or Federal Court sitting in the City and County of New York has jurisdiction to settle any disputes in connection with this Agreement and accordingly submits to the jurisdiction of those courts.  Each of the parties hereto agrees further that the courts of England have jurisdiction to settle any disputes in connection with this Agreement and accordingly submits to the jurisdiction of the English courts.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions in which such party or its assets may be located by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(b)  Each of the Company, the Other Obligors and the Subordinated Lenders hereby irrevocably appoints [      ] (the **New York Process Agent**), with an office on the date hereof at [      ] or, if acceptable to the Senior Agent, any other person as its agent for service of process before any courts located in the City and County of New York in connection with this Agreement.  Each of the Company, the Other Obligors and the Subordinated Lenders hereby irrevocably appoints [      ] (the **English Process Agent**) with an office on the date hereof at [      ] or, if acceptable to the Senior Agent, any other person as its agent for service of process in relation to proceedings before any courts located in England in connection with this Agreement.  Such service may be made by mailing (by a method requiring evidence of receipt) or delivering a copy of such process to the relevant party in care of the New York Process Agent or the English Process Agent, as the case may be, at its above address, and such party hereby irrevocably authorizes and directs the New York Process Agent and the English Process Agent to accept such service on its behalf.  As an alternative method of service, the Company, each Other Obligor and each Subordinated Lender also irrevocably consents to the

service of any and all process in any such action or proceeding by sending copies of such process by mail (by a method requiring evidence of receipt) with a second copy to be sent by courier to the Company or such Other Obligor or Subordinated Lender being served at its address specified in Clause 18.

(c)   Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court sitting in the City and County of New York and any English court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)   To the extent that any party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, such party hereby irrevocably waives such immunity in respect of its obligations under this Agreement and, without limiting the generality of the foregoing, agrees that the waivers set forth in this Subclause (d) shall have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

22.    Governing Law. **THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW)**.

23.    Waiver of Jury Trial.   **EACH OF THE SENIOR PARTIES, THE SUBORDINATED AGENT, THE SUBORDINATED LENDERS, THE OTHER OBLIGORS AND THE COMPANY HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY DISPUTE WITH RESPECT TO THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.** Except as prohibited by law, each of the Subordinated Agent, Subordinated Lenders, the Other Obligors and the Company hereby waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. Each of the Subordinated Agent, the Subordinated Lenders, the Other Obligors and the Company (a) certifies that no representative, agent or attorney of the Subordinated Agent, any Subordinated Lender, the Other Obligors or the Company, as applicable, has represented, expressly or otherwise, that the Subordinated Agent, any Subordinated Lender, the Other Obligors or the Company, as applicable, would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that the Subordinated Agent has been induced to enter into this Agreement by, among other things, the waivers and certifications contained herein.

12

24.    <u>Miscellaneous</u>.  This Agreement may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, and all of which together shall constitute one instrument.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.  In the event and to the extent that any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of any other provisions of this Agreement, all of which shall remain fully enforceable as set forth herein.  The Senior Agent, acting upon the instructions of the requisite Senior Parties, may, in its sole and absolute discretion, waive any provisions of this Agreement benefiting the Senior Agent and the other Senior Parties; <u>provided</u>, <u>however</u>, that such waiver shall be effective only if in writing and signed by the Senior Agent and shall be limited to the specific provision or provisions expressly so waived.  No failure on the part of any Senior Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  This Agreement is a continuing agreement of subordination and shall (a) remain in full force and effect until the indefeasible payment in full in cash of the Senior Debt, (b) be binding upon the Subordinated Lenders, the Company and their respective successors and assigns and (c) inure to the benefit of, and be enforceable by, the Senior Agent and the other Senior Parties, the Senior Agent's and the other Senior Parties' respective successors and permitted assigns, but shall not otherwise create any rights or benefits for any third party.  Without limiting the generality of the foregoing clause (c), any Senior Party may assign or otherwise transfer all or any portion of its rights and obligations under any Senior Finance Document to which it is a party (including, without limitation, all or any portion of any Senior Debt held by it) to any other person or entity in accordance with the terms of such Senior Finance Document, and such other person or entity shall thereupon become vested with all the rights in respect thereof granted to such Senior Party herein or otherwise, subject, however, to any applicable limitations set forth in such Senior Finance Document.

13

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

Peach County Holdings, Inc.
as Company


By:_____
    Name:
    Title:


[Other Obligors]


The Royal Bank of Scotland plc
as Senior Agent


By:_____
    Name:
    Title:


The Royal Bank of Scotland plc
as Subordinated Agent


By:_____
    Name:
    Title:


[Senior Lenders]


[Subordinated Lenders]

14

## SCHEDULE 1

## SENIOR LENDERS

**SCHEDULE 2**

**SUBORDINATED LENDERS**

11398-02488 BK:3817791.1                                                                                    24 January 2006

## SCHEDULE 3

## NOTICES

11398-02488 BK:3817791.1                                                                            24 January 2006

**EXHIBIT C**

**RESTRUCTURING AGREEMENT**

# RESTRUCTURING AGREEMENT

This Restructuring Agreement is entered into on this 25th day of January, 2006 by and among Peach County Holdings, Inc. and each of its subsidiaries and affiliates identified on Exhibit A hereto (collectively, the "Debtors"); Lloyds TSB Bank plc, The Royal Bank of Scotland plc, and each of the other institutions identified on Exhibit B hereto (collectively, the "Bank Group"); AB Volvo; Volvo Holding Sverige AB ("Volvo Holding"); Volvo Truck and Bus Limited ("Volvo Truck"); Volvo Bus Corporation ("Volvo Bus"); Volvo Trucks North America ("Volvo Trucks North America"); each of Mikael Bratt, Sal Mauro and Tore Backstrom (in their capacity as former directors of the Debtors, collectively, the "Volvo Nominees"); the Henlys Group plc Pension Scheme (the "Pension Trustee"); Danske Bank AS ("Danske"), Silver Oak Capital, LLC ("Silver Oak"), and each of the other institutions identified on Exhibit C hereto (collectively with Danske and Silver Oak, the "Bank Equity Group") and each of the executives of the Company identified on Exhibit D hereto (collectively, "Management").

## Recitals

WHEREAS certain of the parties hereto collectively own all of the common and preferred stock (collectively, the "Stock") of Peach County Holdings, Inc. (the "Company");

WHEREAS the parties hereto have been in discussions with one another concerning the terms under which Volvo Holding would acquire, among other things, the Stock owned by the other parties as part of Volvo Holding's possible acquisition of the Company;

WHEREAS Volvo Holding ultimately determined not to proceed with an acquisition of the Company or the Stock owned by the other parties and publicly announced its intention to write down the value of the Stock in the Company that it owns;

WHEREAS Volvo Bus and the Company are party to a Management Services Agreement dated 18 October 2004 (the "MSA"), pursuant to which the following agreements were entered into: (i) a letter agreement dated May 12, 2005 under which Volvo Bus agreed that it would assist the Company with respect to purchasing, engineering, and manufacturing support (the "Letter Agreement"); (ii) a Logistics Management Agreement to which Volvo Logistics North America Inc. is a party that is set to expire on February 28, 2006 (the "Logistics Management Agree-

ment"); (iii) a Confidentiality Agreement dated January 31, 2005 between Volvo Trucks North America, Blue Bird Corporation and Value Management Group Consulting (the "Confidentiality Agreement"); (iv) an agreement under which the Company is beneficiary of pricing rates with respect to Michelin tires (the "Tire Agreement");

WHEREAS the Company and Volvo Bus wish to terminate forthwith the MSA, the Letter Agreement and all agreements and arrangements entered into by the parties hereto pursuant to the MSA other than the Logistics Management Agreement, the Confidentiality Agreement and the Tire Agreement, but on the understanding that (i) any outstanding authorisations to acquire Volvo parts given by Volvo Bus under the Letter Agreement shall continue to have effect; and (ii) the parties to the Tire Agreement shall not take any steps to terminate the Debtors' status of beneficiary under the Tire Agreement and shall take steps to enable the Debtors to continue to benefit from the pricing rates in the Michelin Tire Agreement, in the case of both (i) and (ii) on mutually acceptable terms to be agreed between the parties thereto; and (iii) the Confidentiality Agreement shall remain in effect in accordance with its terms;

WHEREAS the Debtors, the Bank Group, and the Volvo group have since explored various options for the restructuring of the Debtors' affairs, including the possibility of the Bank Group affording additional liquidity to the Debtors and restructuring its claims against the Debtors; and

WHEREAS each of the parties hereto has agreed to assist in a restructuring of the Debtors (the "Restructuring") upon the terms provided for herein and pursuant to that certain Prepackaged Joint Plan of Reorganization of Blue Bird Body Company and Certain Affiliates, a copy of which is attached hereto as Exhibit D (the "Plan").

### Agreement

Now therefore, based upon the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby as agree as follows:

1.    Recitals.  Each of the recitals in this Agreement is incorporated hereby as if fully set forth herein.

2

2.      Chapter 11 Support.  Pursuant to section 228 of the DGCL, each of Volvo Truck, the Pension Trustee, each member of the Bank Equity Group, and each member of Management (a) is deemed hereby to vote the Stock that it owns in support of the Debtors' commencement of reorganization proceedings pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq (the "Bankruptcy Code") and (b) affirmatively waives any advance notice of any share-holders meeting or vote as may be required by the Debtors' charter, by-laws, or applicable law in order to authorize such filings and agree to take all steps necessary to effect such vote.

3.      Cancellation of Stock.  Each of the parties hereto hereby consents to, and agrees to take all steps necessary to effect, (a) the cancellation of the Stock that it owns pursuant to the terms and conditions of the Plan, and upon the effective date thereof, will be deemed to have waived any and all rights in connection therewith, including with respect to any accrued but unpaid dividends, (b) upon the effective date of the Plan, the termination of any and all shareholder and related agreements relating to the Stock in the Company, including that certain Stockholder Agreement among the Company, certain of its subsidiaries, and its stockholders, dated as of October 18, 2004, and will be deemed thereby to have waived any and all rights or claims in relation thereto in connection with any alleged non-compliance therewith or otherwise, and (c) upon the effective date of the Plan, the waiver of any limitations in the Debtors' existing charters, bylaws, or related agreements respecting the cancellation or issuance of any new securities, which limitations will be deemed deleted and of no further force or effect.

4.      Compromise of Bank Group Claims.  The claims of the Bank Group against the Debtors pursuant to that certain Restructuring Agreement dated October 18, 2004 among Henlys Group plc, the Company, and the Bank Group shall be satisfied, settled, released, and discharged in exchange for (a) an amended debt obligation of the Debtors to the Bank Group in the principal amount of $100 million (plus deferral of certain interest and fees), and (b) issuance by the Company to the Bank Group of all of a new class of common stock of Peach County Holdings, Inc., in each case pursuant to the terms and conditions of the Plan.

5.      Investor Status.  Each member of the Bank Group (each, a "Bank Group Member"), to the extent such party receives shares of a new class of common stock of Peach County Holdings, Inc. (the "New Common Stock") as a result of the transactions contemplated herein:

3

(a)      represents and warrants that it is an "accredited investor" as such term is defined in Rule 501(a) promulgated under the Securities Act of 1933, as amended (the "Securities Act");

(b)      represents and warrants that (i) such Bank Group Member's financial situation is such that it can afford to bear the economic risk of holding the shares of the New Common Stock for an indefinite period of time, (ii) such Bank Group Member can afford to suffer complete loss of its investment in the New Common Stock and (iii) such Bank Group Member's knowledge and experience in financial and business matters are such that it is capable of evaluating the merits and risks of its investment in the New Common Stock;

(c)      acknowledges that it and its representatives have been provided an opportunity to examine all documents and ask questions of, and has received answers thereto from, the Company and its representatives regarding the business, management and financial affairs of the Company and its subsidiaries;

(d)      understands that (i) the New Common Stock to be received pursuant to the transactions contemplated hereby has not been registered under the Securities Act, by reason of its issuance in a transaction exempt from the registration requirements of the Securities Act, (ii) the New Common Stock to be received pursuant to the transactions contemplated hereby must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) the certificates representing the shares of New Common Stock may bear a legend to such effect, (iv) the Company may make a notation on its transfer books to such effect and (v) on any proposed sale or other disposition of the New Common Stock to be received pursuant to the transactions contemplated hereby, such Bank Group Member will be required to furnish to the Company such certification, legal opinion and/or other information that the Company may reasonably require to confirm that the proposed sale or disposition complies with the restrictions described in this Section 5; and

(e)      is receiving the shares of the New Common Stock not with a view toward or for resale in connection with any distribution thereof, or with any intention of distributing or selling the New Common Stock in violation of the Securities Act.  Such Bank Group Member will not sell, offer to sell, otherwise transfer or conduct any hedging transactions involving the New Common Stock (or solicit any offer to buy, purchase or otherwise acquire or take a pledge of any shares of New Common Stock), except in compliance with (i) the Securities Act and the

4

rules and regulations of the U.S. Securities and Exchange Commission thereunder and (ii) applicable state and non-U.S. securities or "blue sky" laws.

6.    <u>Corporate Governance</u>.  The parties hereto agree that in connection with confirmation of the Plan, a revised charter and bylaws for the Company shall be implemented as appropriate and as determined exclusively by the Bank Group as sole owners of all of the new common stock of the reorganized company, and that any and all existing management and equity plans, including (i) that certain Special Management Incentive Plan among the Company, Blue Bird Body Company, and certain members of management, dated as of October 18, 2004, and (ii) that certain Blue Bird Body Company Phantom Equity Plan, dated as of October 18, 2004 (the "Management Plans"), shall be deemed terminated upon confirmation of the Plan.

7.    <u>Incurrence of Debt</u>.  In furtherance of the Restructuring, the parties hereto agree that the Debtors and their subsidiaries may incur indebtedness in excess of any limitations imposed thereon in the Debtors' or their subsidiaries' existing charters, bylaws, or related agreements, and that any such limitations, including any limitations or restrictions of guarantees of indebtedness, are deemed waived, deleted, and of no further force or effect.

8.    <u>UK Pension Liability</u>.  The Pension Trustee agrees that notwithstanding cancellation of its Stock as contemplated by this Agreement and the Plan, the Debtors will satisfy their pension debt liability to the Pension Trustee in installments pursuant to and in accordance with that certain Pension Debt Deed between Henlys Group plc and Henlys Pensions Trustees Limited, dated October 18, 2004, disregarding any acceleration event under the Pension Debt Deed caused by or resulting from the filing of reorganization proceedings under Chapter 11 of the Bankruptcy Code.

9.    <u>Mutual Releases</u>.  Each of the parties hereto and each of their affiliates, principals, employees, agents, officers, directors, representatives, financial advisors, attorneys and other professionals, if any, effective upon the effective date of the Plan, hereby release and discharge one another and are deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged one another for and from any and all claims or causes of action existing as of the date hereof in any manner arising from, based on, or relating to, in whole or in part, Volvo Holding's investment in the Debtors; the management and operation of the Debtors since 2004; the negotiations relating to proposals for a refinancing of the Debtors during 2005 and the reporting and consideration of such negotiations by the directors

5

(including the Volvo Nominees) of the Debtors; the discussions and negotiations relating to the proposed acquisition by Volvo of the Bank Group claims against the Debtors and Stock in the Company owned by the Bank Equity Group, the Pension Trustee, Danske, Silver Oak, and Management; the recapitalization of the corporate group, the MSA, which is hereby terminated forthwith without any liability for either party whether with regard to the past or the future; and any termination of the Management Plans.

10.    Commercial Agreements.  Notwithstanding any other provision of this Agreement to the contrary, effective upon the effective date of the Plan, the parties hereto hereby terminate, without any liability for any party thereto, whether with regard to the past or the future, the Letter Agreement and all agreements and arrangements entered into by the parties hereto pursuant to the MSA other than the Logistics Management Agreement, the Confidentiality Agreement and the Tire Agreement, but on the understanding that (i) any outstanding authorisations to acquire Volvo parts given by Volvo Bus under the Letter Agreement shall continue to have effect; and (ii) the parties to the Tire Agreement shall not take any steps to terminate the Debtors' status of beneficiary under the Tire Agreement and shall take steps to enable the Debtors to continue to benefit from the pricing rates in the Michelin Tire Agreement, in the case of both (i) and (ii), on mutually acceptable terms to be agreed between the parties thereto; and (iii) the Confidentiality Agreement shall remain in effect in accordance with its terms.

11.    Waiver of Notice.  Each party hereto hereby waives any and all notice periods contemplated by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") relating in any way to pursuit of confirmation and implementation of the Plan, including, but not limited to, any and all notice periods referenced in Bankruptcy Rules 2002, 3017, 3018 and 3020(e). Each party's signature hereto evidences such party's consent to expedited consideration of the Plan, including through a process under which the Debtors would request confirmation of the Plan by the Bankruptcy Court presiding over the Debtors' Restructuring on the same day that the Debtors file their Chapter 11 petitions.

12.    Arms' Length.  The parties hereto acknowledge the existence of certain commercial agreements between the Debtors and certain Volvo entities party hereto and certain credit agreements among the Bank Group and certain Debtors, and agree that the transactions contemplated by the Restructuring and the Plan are (a) on terms and conditions substantially as favorable to the Debtors and their subsidiaries as would be obtainable by them in a comparable arms' length

6

transaction with a person other than a stockholder and are fair to the Debtors and (b) are hereby approved in all respects.

13.    <u>Costs and Expenses</u>.  Each party shall bear its own costs with respect to the negotiation and documentation of this Agreement, the Plan, provided that the Debtors shall reimburse Volvo all legal costs of Clifford Chance reasonably incurred by Volvo from and including January 5, 2006 in relation to the negotiation, documentation, or implementation of this Agreement or the Plan, all matters related thereto or contemplated thereby.

14.    <u>Implementation</u>.  This Agreement shall be implemented pursuant to the Plan, and the effectiveness of this Agreement shall be conditioned upon final documentation and funding of a new lending facility by the Bank Group for the benefit of the Debtors upon terms mutually agreeable to the Bank Group and the Debtors and as contemplated by the Plan.

15.    <u>Independent Action</u>.  The parties hereby represent and ac-knowledge that in executing this Agreement, including the releases contained herein, there has been no reliance upon any representation or statement made by anyone with regard to the subject matter, basis, or effectiveness of this Agreement.

16.    <u>Choice of Laws</u>:  This Agreement (and any claims or disputes arising out of or related thereto or to the Restructuring contemplated thereby or to the inducement of any party to enter therein, whether for breach of contract, tortuous conduct, or otherwise and whether predicated on common law, statute or otherwise) shall in all respects be governed by and construed in accordance with the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction.

17.    <u>Singular and Plural</u>:  As used in this Agreement, the singular and plural shall be deemed to include the other whenever the context so indicates or requires.

18.    <u>Interpretation and Construction of Terms</u>:  This agreement has been circulated for editing to all parties, and therefore, shall be deemed to have been drafted jointly by all parties.  Accordingly, any rules pertaining to the construction of contracts to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this settlement agreement.

7

19.    <u>Jurisdiction</u>.  Each party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court with jurisdiction over the Plan, for the purposes of any suit, action or other proceeding arising out of the Restructuring.  Each party agrees to commence any such action, suit or proceeding in such Court.  Each party further agrees that service of any process, summons, notice or documents by U.S. registered mail to such party's respective address shall be effective service of process for any action, suit or proceeding in New York with respect to any matters to which it has submitted to jurisdiction.  Each party irrevocably and unconditionally waives any objections to the laying of venue of any action, suit or proceeding arising out of the Restructuring in such Court and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

20.    <u>Waiver of Jury Trial</u>.  Each party hereby waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under, or in connection with the Restructuring.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

21.    <u>Multiple counterparts</u>:  This Agreement may be executed in multiple counterparts, each of which will constitute an original agreement.

<u>The Debtors</u>

PEACH COUNTY HOLDINGS, INC.

_____

By:  _____
Title:  _____
Dated:_____

BLUE BIRD BODY COMPANY


_____

By: _____
Title: _____
Dated:_____


HENLYS US INVESTMENTS, INC.


_____

By: _____
Title: _____
Dated:_____


HENLYS HOLDING CORP.


_____

By: _____
Title: _____
Dated:_____


BLUE BIRD CORPORATION


_____

By: _____
Title: _____
Dated:_____

BLUE BIRD INVESTMENT CORPORATION

_____

By: _____
Title: _____
Dated:_____


SCHOOL BUS SALES OF ALABAMA, INC.

_____

By: _____
Title: _____
Dated:_____


CANADIAN BLUE BIRD COACH LTD.

_____

By: _____
Title: _____
Dated:_____


BLUE BIRD DE MEXICO S.A. DE C.V.

_____

By: _____
Title: _____
Dated:_____

The Bank Equity Group

BANCA NAZIONALE DEL LAVORO S.P.A.,
    LONDON BRANCH


_____

By:  _____
Title:  _____
Dated:_____


BANK OF AMERICA SECURITIES
    LIMITED


_____

By:  _____
Title:  _____
Dated:_____


THE GOVERNOR AND COMPANY OF
    THE BANK OF SCOTLAND


_____

By:  _____
Title:  _____
Dated:_____


BARCLAYS BANK PLC


_____

By:  _____
Title:  _____
Dated:_____


11

BAYERISCHE HYPO- UND
   VEREINSBANK AG, LONDON BRANCH


_____

By: _____
Title: _____
Dated:_____


BEAR STEARNS BANK PLC


_____

By: _____
Title: _____
Dated:_____


JPMORGAN CORPORATE RESOURCES
   LIMITED


_____

By: _____
Title: _____
Dated:_____


JPMORGAN CHASE BANK, N.A.


_____

By: _____
Title: _____
Dated:_____

NEWSTART FACTORS, INC.


_____

By: _____

Title: _____

Dated:_____


QDRF MASTER LTD


_____

By: _____

Title: _____

Dated:_____


QUADRANGLE DEBT OPPORTUNITIES
    MASTER FUND LTD


_____

By: _____

Title: _____

Dated:_____


RANELAGH NOMINEES


_____

By: _____

Title: _____

Dated:_____

t

SILVER OAK CAPITAL, LLC


_____
By: _____
Title: _____
Dated:_____


WEST REGISTER (INVESTMENTS)
    LIMITED


_____
By: _____
Title: _____
Dated:_____


<u>Bank Group Only</u>

HVB BANQUE LUXEMBOURG SOCIETE
    ANONYME


_____
By: _____
Title: _____
Dated:_____


QUADRANGLE MASTER FUNDING LTD


_____
By: _____
Title: _____
Dated:_____

LLOYDS TSB BANK PLC

_____

By: _____
Title: _____
Dated:_____


THE ROYAL BANK OF SCOTLAND PLC

_____

By: _____
Title: _____
Dated:_____


<u>Volvo Holding</u>

AB VOLVO

_____

By: _____
Title: _____
Dated:_____


VOLVO HOLDING SVERIGE AB

_____

By: _____
Title: _____
Dated:_____

15

VOLVO TRUCK AND BUS LIMITED

By: _____

Title: _____

Dated:_____

VOLVO BUS CORPORATION

By: _____

Title: _____

Dated:_____

VOLVO TRUCKS NORTH AMERICA

By: _____

Title: _____

Dated:_____

MIKAEL BRATT

By: _____

Title: _____

Dated:_____

16

SAL MAURO


_____

By: _____
Title: _____
Dated:_____


TORE BACKSTROM


_____

By: _____
Title: _____
Dated:_____


Pension Trustee

HENLYS PENSION TRUSTEES LIMITED


_____

By: _____
Title: _____
Dated:_____


Management

JEFFRY D. BUST


_____

By: _____
Title: _____
Dated:_____


17

WAYNE F. HUNNELL

_____

By: _____
Title: _____
Dated:_____


JOE BELCASTRO

_____

By: _____
Title: _____
Dated:_____


WAYNE JOSEPH

_____

By: _____
Title: _____
Dated:_____


KIM CASSELL

_____

By: _____
Title: _____
Dated:_____


18

SHELDON WALLACE


_____

By: _____
Title: _____
Dated:_____


KEVIN WOOD


_____

By: _____
Title: _____
Dated:_____


MIKE McCURDY


_____

By: _____
Title: _____
Dated:_____


DENNIS WHITAKER


_____

By: _____
Title: _____
Dated:_____


19

**Exhibit A**

**Subsidiaries of Peach County Holdings, Inc.**

Blue Bird Body Company
Henlys US Investments, Inc.
Henlys Holding Corp.
Blue Bird Corporation
Blue Bird Investment Corporation
School Bus Sales of Alabama, Inc.
Canadian Blue Bird Coach Ltd.
Blue Bird de Mexico S.A. de C.V.

**Exhibit B**

**The Bank Group**

Banca Nazionale del Lavoro S.p.A., London Branco
The Governor and Company of the Bank of Scotland
Barclays Bank PLC
Bayerische Hypo- und Vereinsbank AG, London Branch
Bear Stearns Bank plc
HVB Banque Luxembourg Société Anonyme
JPMorgan Chase Bank
Lloyds TSB Bank plc
Newstart Factors, Inc.
Quadrangle Master Funding Ltd
The Royal Bank of Scotland plc
Bank of America Securities Limited

**Exhibit C**

**Bank Equity Group**

Banca Nazionale del Lavoro S.p.A., London Branch
The Governor and Company of the Bank of Scotland
Barclays Bank PLC
Bayerische Hypo- und Vereinsbank AG, London Branch
Bear Stearns Bank plc
JPMorgan Corporate Resources Limited
JPMorgan Chase Bank
Ranelagh Nominees
Newstart Factors, Inc.
QDRF Master Ltd
Quadrangle Debt Opportunities Master Fund Ltd
West Register (Investments) Limited
Silver Oak Capital, LLC
Danske Bank A/S
Bank of America Securities Limited

**Exhibit D**

**Management**

Jeffry D. Bust                    Sheldon Wallace
Wayne F. Hunnell              Kevin Wood
Joe Belcastro                     Mike McCurdy
Wayne Joseph                    Dennis Whitaker
Kim Cassell

**Exhibit E**

**Plan of Reorganization**

**EXHIBIT D**

**SENIOR SECURED FINANCING FACILITY**

**DRAFT : 24.01.06**

# CREDIT AGREEMENT

**U.S.$52,500,000**

**CREDIT FACILITY**

**for**

**BLUE BIRD BODY COMPANY**

**a subsidiary of**

**PEACH COUNTY HOLDINGS, INC.**

**WITH**

**THE ROYAL BANK OF SCOTLAND PLC
AS AGENT**

# ALLEN & OVERY

**ALLEN & OVERY LLP**

**LONDON**

# CONTENTS

**Clause**                                                                                                            **Page**

1.      Interpretation....................................................................................................... 1
2.      The Facility ........................................................................................................ 17
3.      Purpose .............................................................................................................. 18
4.      Conditions Precedent .......................................................................................... 18
5.      Utilisation - Loans ............................................................................................... 19
6.      Repayment .......................................................................................................... 20
7.      Prepayment and Cancellation ............................................................................. 20
8.      Interest ............................................................................................................... 23
9.      Terms ................................................................................................................. 24
10.     Market Disruption ............................................................................................. 25
11.     Taxes ................................................................................................................. 26
12.     Increased Costs .................................................................................................. 28
13.     Mitigation .......................................................................................................... 29
14.     Payments ........................................................................................................... 30
15.     Guarantee .......................................................................................................... 32
16.     Representations and Warranties ......................................................................... 35
17.     Undertakings ...................................................................................................... 40
18.     Default ............................................................................................................... 51
19.     Security.............................................................................................................. 55
20.     The Administrative Parties ................................................................................. 57
21.     Evidence and Calculations ................................................................................. 61
22.     Fees ................................................................................................................... 62
23.     Indemnities and Break Costs ............................................................................. 62
24.     Expenses ............................................................................................................ 64
25.     Amendments and Waivers .................................................................................. 64
26.     Changes to the Parties ........................................................................................ 65
27.     Disclosure of Information ................................................................................... 69
28.     Set-off ............................................................................................................... 70
29.     Pro Rata Sharing ................................................................................................ 70
30.     Severability ........................................................................................................ 71
31.     Counterparts ...................................................................................................... 71
32.     Notices ............................................................................................................... 72
33.     Language ............................................................................................................ 74
34.     Governing Law ................................................................................................... 74
35.     Enforcement ....................................................................................................... 74

**Schedule**                                                                                                          **Page**

1.      Existing Parties as at the date of this Agreement ............................................... 76
        Part 1        Existing Lenders ....................................................................... 76
        Part 2        Existing Obligors ...................................................................... 77
2.      Conditions Precedent Documents ...................................................................... 78
        Part 1        To be Delivered by Company/Borrower ..................................... 78
        Part 2        To be delivered by an Additional obligor ................................... 82
3.      Calculation of Mandatory Cost ........................................................................... 84
4.      Form of Request .................................................................................................. 86
5.      Form of Transfer Certificate ............................................................................... 87
6.      Form of Accession Agreement ............................................................................ 89
7.      Form of Resignation Request .............................................................................. 90

8.        Form of Compliance Certificate ........................................................................... 91

Signatories......................................................................................................................... 92

**THIS AGREEMENT** is dated [      ] January 2006 and made:

**BETWEEN**:

(1)     **PEACH COUNTY HOLDINGS, INC.** a corporation incorporated under the laws of the State of Delaware in the United States of America (the **Company**);

(2)     **BLUE BIRD BODY COMPANY** a corporation incorporated under the laws of the state of Georgia in the United States as existing borrower (in this capacity **Blue Bird Body Company**);

(3)     **THE SUBSIDIARIES OF THE COMPANY** listed in Part 2 of Schedule 1 (Existing Parties as at the date of this Agreement) as existing guarantors (in this capacity, together with the Company, the **Existing Guarantors**);

(4)     **THE FINANCIAL INSTITUTIONS** listed in Part 1 of Schedule 1 (Existing Parties as at the date of this Agreement) as lenders (the **Existing Lenders**); and

(5)     **THE ROYAL BANK OF SCOTLAND plc** in its capacity as agent for the Lenders (in this capacity the **Agent**).

**IT IS AGREED** as follows:

1.      **INTERPRETATION**

1.1     **Definitions**

        In this Agreement:

        **Accession Agreement** means a letter, substantially in the form of Schedule 6 (Form of Accession Agreement), with such amendments as the Agent and the Company may agree.

        **Acknowledgement and Confirmation Agreement** means the acknowledgement and confirmation agreement dated 6th January, 2003 between Blue Bird Body Company, Brannen Ford Inc., Canadian Blue Bird Coach, Ltd., Ford Motor Company and Ford Motor Credit Company.

        **Additional Borrower** means a member of the Group which becomes a Borrower after the date of this Agreement.

        **Additional Guarantor** means a member of the Group which becomes a Guarantor after the date of this Agreement.

        **Additional Obligor** means an Additional Borrower or an Additional Guarantor.

        **Administrative Party** means the Agent.

        **Affiliate** means a Subsidiary or a Holding Company of a person or any other Subsidiary of that Holding Company.

        **Availability Period** means the period from and including the date of this Agreement to and including the Final Maturity Date.

**Bank of America RV Repurchase Agreement** means the repurchase agreement dated 28th July, 2000 between Fleetwood Credit Corp., Bank of America Speciality Finance, Inc., Bank of America N.A., Bank of America Canada Specialty Group Ltd. and Blue Bird Body Company (as amended).

**Bankruptcy Court** means the United States Bankruptcy Court for the ___ District of _____.

**Barloworld Lease Agreement** means the lease agreement dated 15th October 2002 between Barloworld Fleet Leasing LLC and Blue Bird Corporation (as amended).

**BIA** means the Bankruptcy and Insolvency Act (Canada) and all regulations under it, as amended from time to time.

**Blue Bird Company** means Blue Bird Investment Corporation, Blue Bird Body Company, Canadian Blue Bird Coach, Ltd., Blue Bird Corporation or Bluebird de México S.A. de C.V.

**Borrower** means an Existing Borrower or an Additional Borrower.

**Break Costs** means the amount (if any) which a Lender is entitled to receive under Subclause 23.3 (Break Costs) as compensation if any part of a Loan or overdue amount is repaid or prepaid.

**Bus Trust Agreement** means the trust agreement dated 5th August 1996 between Blue Bird Body Company, as successor to Blue Bird Capital Corporation and William T. Gourley (as amended).

**Business Day** means a day (other than a Saturday or a Sunday) on which banks are open for general business in London and New York and if on that day a payment in or a purchase of a currency is to be made, the principal financial centre of the country of that currency.

**Canadian Benefit Plans** means each employee benefit plan of any nature or kind whatsoever that is not a Canadian Pension plan established, maintained or contributed to by any Obligor or any of its Subsidiaries for its employees or former employees in Canada.

**Canadian Blue Bird Coach, Ltd.** means Canadian Blue Bird Coach, Ltd., a company incorporated under the laws of Ontario, Canada.

**Canadian Pension Plans** means each plan which is considered to be a pension plan for the purposes of any applicable pension benefits standards statute and/or regulation in Canada established, maintained or contributed to by any Obligor or any of its Subsidiaries for its employees or former employees.

**Canadian Subsidiary** means at any time, any member of the Group incorporated in Canada or any province of Canada.

**Cases** means the Chapter 11 cases of Blue Bird Body Company and certain of its Affiliates.

**Cash** means any credit balance on any deposit, savings or current account with a bank or building society in the U.K. or a bank in the United States of America or Canada (or which is readily remittable to a bank in the U.K.) and cash in hand other than: any cash or deposit which is subject to any Security Interest (other than Security Interests of the type classified in Subclause 17.10 (Negative pledge)), or flawed asset arrangement.

**Cash Equivalents** means, at any time:

(a)    certificates of deposit, maturing within one year after the relevant date of calculation, issued by an acceptable bank;

(b)    any investment in marketable obligations issued or guaranteed by the government of the United States of America or by an instrumentality or agency of the government of the United States of America;

(c)    open market commercial paper:

    (i)    for which a recognised trading market exists;

    (ii)    issued in the United States of America;

    (iii)    which matures within one year after the relevant date of calculation; and

    (iv)    which has a credit rating of either A-1 by S&P or Fitch or P-1 by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term debt obligations, an equivalent rating; or

(d)    any other instrument, security or investment approved by the Majority Lenders,

in each case, to which any member of the Group is beneficially entitled at that time and which is capable of being applied against Consolidated Debt.  For this purpose an acceptable bank is a commercial bank or trust company which has a rating of A or higher by S&P or Fitch or A2 or higher by Moody's or a comparable rating from a nationally recognised credit rating agency for its long-term debt obligations or has been approved by the Majority Lenders.

**Chapter 11 Plan** means the Plan of Reorganisation of each of the Obligors under Chapter 11 of the U.S. Bankruptcy Code in the form satisfactory to the Lenders and filed with the Bankruptcy Court.

**Code** means the United States Internal Revenue Code of 1986, as amended, and any rule or regulation issued under it from time to time in effect.

**Commitment** means:

(a)    for an Existing Lender as at the date of this Agreement, the amount set opposite its name in Part 1 of Schedule 1 (Existing Parties as at the date of this Agreement) under the heading Commitments and the amount of any other Commitment it acquires; and

(b)    for any other Lender, the amount of any other Commitment it acquires,

to the extent not cancelled, transferred or reduced under this Agreement.

**Compliance Certificate** means a certificate, substantially in the form of Schedule 8 (Form of Compliance Certificate), duly completed and signed by the Company.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Chapter 11 Plan.

**Consummation of the Plan** means the substantial consummation of the Chapter 11 Plan.

**Control** (including the terms **controlled by** and **under common control with**), with respect to the relationship between or among two or more persons, means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the affairs or management of a person, whether through the ownership of voting stock, as trustee or executor, by contract or otherwise, including, without limitation:

(a)      the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such person, and

(b)      the ownership, directly or indirectly, of a majority of the voting stock of such person.

**Controlled Group** means:

(a)      each Obligor and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with an Obligor, are treated as a single employer under Section 414 of the Code; or

(b)      each Canadian Subsidiary.

**Cooper Services Agreement** means the services agreement dated [    ] between Blue Bird Corporation and its Subsidiaries, Stephen F. Cooper and Kroll Zolfo Cooper LLC.

**Default** means:

(a)      an Event of Default; or

(b)      an event which would be (with the expiry of a grace period, the giving of notice or the making of any determination under the Finance Documents or any combination of them) an Event of Default.

**Dormant Subsidiary** means at any time a member of the Group which:

(a)      is dormant within the meaning in Section 249AA(4) of the Companies Act 1985; or

(b)      not trading at that time and which has gross assets (excluding intra group balances) of less than U.S.$100,000.

**Environmental Approval** has the meaning given to it in Subclause 17.17 (Environmental matters).

**Environmental Law** has the meaning given to it in Subclause 17.17 (Environmental matters).

**ERISA** means the United States Employee Retirement Income Security Act of 1974, as amended.

**Event of Default** means an event specified as such in Clause 18 (Default).

**Existing Borrower** means Blue Bird Body Company.

**Existing Facility Agreement** means the amended and restated U.S.$100,000,000 credit agreement dated on or about [●] January 2006 between, among others, the Company, Blue Bird Body Company, the lenders listed therein and the Royal Bank of Scotland plc as agent.

**Existing Facility Security Document** means any Security Agreement as such term is defined in the Existing Facility Agreement.

**Existing Guarantor** means any company listed under the heading "Existing Guarantors" in Part 2 of Schedule 1 (Existing Parties as at the date of this Agreement).

**Existing Obligor** means the Company, an Existing Borrower or an Existing Guarantor.

**Facility** means the revolving facility referred to in Subclause 2.1(a) (Revolving credit facility).

**Facility Office** means the office(s) notified by a Lender to the Agent:

(a)      on or before the date it becomes a Lender; or

(b)      by not less than five Business Days' notice,

as the office(s) through which it will perform all or any of its obligations under this Agreement.

**Fee Letter** means each letter dated on or about the date of this Agreement between, among others, one or more of the Administrative Parties and the Company setting out the amount of certain fees referred to in this Agreement.

**Final Maturity Date** means:

(a)      the Initial Maturity Date; or

(b)      subject to Subclause 2.1(b) (Revolving credit facility), 30th September 2007.

**Finance Document** means:

(a)      this Agreement;

(b)      a Fee Letter;

(c)      a Transfer Certificate;

(d)      an Accession Agreement;

(e)      a Security Document;

(f)      the Subordination Agreement; or

(g)      any other document designated as such by the Agent and the Company.

**Finance Party** means a Lender or an Administrative Party.

**Financial Indebtedness** means any indebtedness in respect of any obligation whether incurred as principal or surety for the payment or repayment of money whether present or future, actual or contingent, and shall include but not be limited to (without double counting):

(a)      moneys borrowed;

(b)    any debenture, bond, loan note, loan stock, any redeemable preference share or other security;

(c)    any acceptance or documentary credit (including any dematerialised equivalent);

(d)    receivables sold or discounted (otherwise than on a non-recourse basis);

(e)    the acquisition cost of any asset to the extent payable before or after the time of acquisition or possession by the party liable where the advance or deferred payment is arranged primarily as a method of raising finance or financing the acquisition of that asset but excluding normal trade credit outstanding for 180 days or less;

(f)    any lease entered into primarily as a method of raising finance or financing the acquisition of the asset leased;

(g)    any currency swap or interest swap, cap or collar arrangement or any other derivative instrument;

(h)    any amount raised under any other transaction having the primary rather than incidental commercial effect of a borrowing or raising of money;

(i)    any counter indemnity for any guarantee, letter of credit or similar assurance against financial loss issued on behalf of any member of the Group; or

(j)    any guarantee, indemnity or similar assurance against financial loss of any person of a type referred to in paragraphs (a) to (i) (inclusive) above.

**Ford Authorized Converter Pool Agreement** means:

(a)    the Ford authorized converter pool agreement dated 19th September 2001 between Canadian Blue Bird Coach, Ltd., Ford Motor Company of Canada, Limited and Ford Credit Canada Limited; or

(b)    the Ford authorized converter pool agreement dated 5th March 2003 between Ford Motor Company and Blue Bird Body Company.

**Ford Credit Consignment Agreement** means the consignment agreement that is dated 7th September 2001 between Ford Credit Canada Limited, as consignor, and Canadian Blue Bird Coach, Ltd., as consignee.

**Ford Credit Lease Agreement** means the lease agreement dated 20th January, 2003 between Brant Country Ford Sales Ltd. and/or Ford Credit Canada Leasing Company and Canadian Blue Bird Coach, Ltd.

**Ford Inventory Agreement** means the wholesale financing and security agreement dated 6th January 2003 between Ford Motor Credit Company and Blue Bird Body Company.

**Ford Lease Programme Agreement** means the lease program agreement dated 20th November 2001, between Blue Bird Corporation, Blue Bird Body Company and Ford Motor Credit Company.

**GAAP** means accounting principles and practices generally accepted in the United States of America.

**GE Capital RV Repurchase Agreement** means the vendor agreement that is dated 2002 between Deutsche Financial Services Corporation and Blue Bird Body Company.

**GMAC Inventory Agreement** means the inventory loan and security agreement dated 14th December 1995 between General Motors Acceptance Corporation and Blue Bird Body Company (as amended).

**GMAC Wholesale Security Agreement** means the wholesale security agreement dated 26th September 1996 between General Motors Acceptance Corporation and Blue Bird Body Company.

**Group** means the Company and its Subsidiaries.

**Guarantor** means the Company, an Existing Guarantor or an Additional Guarantor.

**Holding Company** of any other person means a company in respect of which that other person is a Subsidiary.

**Increased Cost** means:

(a)     an additional or increased cost;

(b)     a reduction in the rate of return from a Facility or on its overall capital; or

(c)     a reduction of an amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates but only to the extent attributable to that Finance Party having entered into any Finance Document or funding or performing its obligations under any Finance Document.

**Initial Maturity Date** means 30th September 2006.

**ITA** means the Income Tax Act (Canada) and all regulations under it.

**LaSalle Facility Agreement** means the credit facility dated 29th March, 1996 (as amended) provided by LaSalle National Bank to Blue Bird Corporation (successor to Blue Bird Capital Corporation) and its Subsidiaries.

**Lender** means:

(a)     an Existing Lender; or

(b)     any person which becomes a Lender after the date of this Agreement.

**LIBOR** means for a Term of any Loan or overdue amount:

(a)     the applicable Screen Rate; or

(b)     if no Screen Rate is available for the relevant currency or Term of that Loan or overdue amount, the arithmetic mean (rounded upward to four decimal places) of the rates, as supplied to the Agent at its request, quoted by the Reference Banks to leading banks in the London interbank market,

as of 11.00 a.m. on the Rate Fixing Day for the offering of deposits in the currency of that Loan or overdue amount for a period comparable to that Term.

**Loan** means, unless otherwise stated in this Agreement, the principal amount of each borrowing under this Agreement or the principal amount outstanding of that borrowing.

**Local Bank** means Branch Banking & Trust Bank, The Bank of LaFayette, Citizens Bank (Fort Valley) or The Toronto-Dominion Bank.

**Majority Lenders** means at any time, Lenders:

(a)     whose share in the outstanding Loans and whose undrawn Commitments then aggregate 75 per cent. or more of the aggregate of all the outstanding Credits and the undrawn Commitments of all the Lenders;

(b)     if there is no Loan then outstanding, whose undrawn Commitments then aggregate 75 per cent. or more of the Total Commitments; or

(c)     if there is no Loan then outstanding and the Total Commitments have been reduced to zero, whose Commitments aggregated 75 per cent. or more of the Total Commitments immediately before the reduction.

**Mandatory Cost** means the cost of complying with certain regulatory requirements, expressed as a percentage rate per annum and calculated by the Agent under Schedule 3 (Calculation of Mandatory Cost).

**Margin** means:

(a)     when designated **PIK**, 12 per cent. per annum;

(b)     when designated **Cash**, 3 per cent. per annum; and

without any designation the PIK Margin and the Cash Margin together.

**Material Adverse Effect** means a material adverse effect on:

(a)     the business or financial condition of the Company, any Borrower or any Material Subsidiary or the Group as a whole;

(b)     the ability of any Obligor to perform its payment obligations or its obligations under Subclause 17.18 (Financial covenants) under any Finance Document;

(c)     the validity or enforceability of any Finance Document; or

(d)     the rights or remedies of the Finance Parties in respect of a Finance Document which, in the opinion of the Majority Lenders, are material.

**Material Company** means:

(a)     (i)     any Subsidiary of the Company:

(A)     whose EBITDA is equal to 1 per cent. or more of Consolidated EBITDA; or

(B)     whose gross assets, excluding intra group balances, are equal to 1 per cent. or more of the Consolidated Gross Assets of the Group excluding amounts owed to it by other members of the Group as a result of a transfer of trade or business to that other member of the

> Group in circumstances where the creditor has no other assets and is a Dormant Subsidiary,
>
> all as shown (in the case of any Subsidiary) in its most recent annual accounts and (in the case of the Group) in the most recent annual consolidated accounts of the Group; and
>
> (ii)    any other Subsidiary of the Company to whom all or substantially all of the assets or business of a Material Subsidiary are transferred;

(b)    the Company; or

(c)    any Borrower.

**Material Subsidiary** means:

(a)    any Subsidiary of the Company:

> (i)    whose EBITDA is equal to 5 per cent. or more of Consolidated EBITDA; or
>
> (ii)    whose gross assets are equal to 5 per cent. or more of the Consolidated Gross Assets of the Group excluding amounts owed to it by other members of the Group as a result of a transfer of trade or business to that other member of the Group in circumstances where the creditor has no other assets and is a Dormant Subsidiary,
>
> all as shown (in the case of any Subsidiary) in its most recent annual accounts and (in the case of the Group) in the most recent annual consolidated accounts of the Group; and

(b)    any other Subsidiary of the Company to whom all or substantially all of the assets or business of a Material Subsidiary are transferred.

**Maturity Date** means for a Loan the last day of its Term.

**Monthly Management Accounts** or **Monthly Management Accounts Package** means the monthly management accounts to be provided by the Company to the Agent under Subclause 17.2(c) (Financial information), in the form approved by the Agent (acting reasonably) prior to the date of this Agreement but including in any event a profit and loss account for the month- and year-to-date, a balance sheet and a cash flow on a year-to-date basis.

**Multiemployer Plan** means a "multiemployer plan" within the meaning of section 3(37) or 4001(a)(3) of ERISA to which any Obligor or any member of the Controlled Group has an obligation to contribute.

**National Leasing Group Inc. Agreement** means the agreement dated 27th June 2001 between Blue Bird Body Company and National Leasing Group Inc. in connection with, among other things, commercial vehicle leasing.

**Obligor** means a Borrower or a Guarantor.

**Party** means a party to this Agreement.

**PBGC** means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

**PBA** means the Pension Benefits Act of Ontario and all regulations under it as amended from time to time, and any successor legislation.

**Permitted Transaction** means a transaction entered into, indebtedness incurred or Security Interest granted or arising under or in connection with:

(a)     the Ford Lease Programme Agreement, the Ford Credit Lease Agreement, the Tatonka Lease Programme Agreement, a Volvo Agreement, the Bus Trust Agreement or the LaSalle Facility Agreement, in each case on their terms and conditions as at the 9th December 2003 (each an **Existing School Bus Agreement**);

(b)     any other agreement or arrangement under which a Blue Bird Company disposes of a school bus or vehicle manufactured by a Blue Bird Company to a third party by first leasing the school bus or vehicle to the third party and then disposing of its leasehold interest to Ford Credit, Tatonka, Volvo, LaSalle, the trustee under the Bus Trust Agreement, ORIX Financial Services, Inc. or any other financier upon terms which may or may not entitle the financier to require any member of the Group to repurchase the lease or fulfil any obligation, make a payment or otherwise assume any liability concerning the lease (each a **recourse obligation**) if the third party defaults on any of its obligations concerning the lease provided that: (i) any recourse obligation concerning such an agreement or arrangement is not more onerous in any material respect than any recourse obligation under an Existing School Bus Agreement; and (ii) each of those agreements or arrangements is on substantially the same terms and conditions as an Existing School Bus Agreement;

(c)     the GMAC Inventory Agreement, the Ford Inventory Agreement, the Ford Authorized Converter Pool Agreement, the Ford Credit Consignment or the GMAC Wholesale Security Agreement in each case on their terms and conditions as at the 9th December 2003 in all material respects (each an **Existing Inventory Agreement**);

(d)     any other agreement or arrangement entered into with a third party who supplies chassis to a Blue Bird Company on terms by which that third party reserves title in or takes security over the chassis, the vehicle manufactured incorporating the chassis or the receivable generated by selling the chassis provided that each of those agreements or arrangements are on substantially the same terms and conditions as an Existing Inventory Agreement;

(e)     the GE Capital RV Repurchase Agreement or the Bank of America RV Repurchase Agreement, in each case on their terms and conditions as at 9th December 2003 (each an **Existing RV Repurchase Agreement**);

(f)     any other agreement or arrangement under which a Blue Bird Company may be required to repurchase, fulfil any obligation, make a payment or otherwise assume any liability concerning a recreational or other vehicle (each a **recourse obligation**) sold by it to a distributor, where the distributor has financed the purchase by entering into a finance agreement with a third party financier, if it defaults on any of its obligations concerning that finance agreement provided that: (i) any recourse obligation concerning such an agreement or arrangement is not more onerous in any material respect than any recourse obligation under an Existing RV Repurchase Agreement; and (ii) each of those agreements or arrangements is on substantially the same terms and conditions as an Existing RV Repurchase Agreement;

(g)     the agreement or agreements (each an **Existing IRB Agreement**), entered into between Blue Bird Body Company and the Development Authority of Peach County, Georgia, the United States of America (the **DA**) on or about 31st December 2003 pursuant to which Blue Bird Body Company disposed of certain assets to the DA and subsequently leased those assets from the DA pursuant to the "bonds for title" arrangements between Blue Bird Body Company and the DA;

(h)     any other agreement or arrangement entered into pursuant to or in succession to the Existing IRB Agreement and any similar agreement with the DA provided it is on substantially the same terms and with substantially the same parties as an Existing IRB Agreement;

(i)     the Barloworld Lease Agreement;

(j)     the National Leasing Group Inc. Agreement; or

(k)     the Acknowledgement and Confirmation Agreement.

**Plan** means an "employee benefit plan" as defined in section 3(3) of ERISA (i) maintained by any Obligor or any member of the Controlled Group currently or at any time within the last five years, or (ii) to which any Obligor or any member of the Controlled Group is required to make any payment or contribution or has made payments or contributions within the past five years, and any Canadian Pension Plan.

**Pro Rata Share** means:

(a)     for the purpose of determining a Lender's share in a utilisation of a Facility, the proportion which its Commitment under that Facility bears to all the Commitments under that Facility; and

(b)     for any other purpose on a particular date:

    (i)     the proportion which a Lender's share of the Loans (if any) bears to all the Loans;

    (ii)    if there is no such Loan outstanding on that date, the proportion which its Commitment bears to the Total Commitments on that date;

    (iii)   if the Total Commitments have been cancelled, the proportion which its Commitments bore to the Total Commitments immediately before being cancelled; or

    (iv)    when the term is used in relation to a Facility, the above proportions but applied only to the Loans and Commitments for that Facility.

    For the purpose of subparagraph (iv) above, the Agent will determine, in the case of a dispute, whether the term in any case relates to a particular Facility.

**Qualifications** means the relevant qualifications as to matters of law contained in the legal opinions referred to in Schedule 8 (Conditions precedent) to the restructuring agreement dated 18th October 2004 between, among others, Henlys Group plc, the Company and Lloyds TSB Bank plc and The Royal Bank of Scotland plc as arrangers or in Schedule 2 (Conditions Precedent Documents) to this Agreement.

**Rate Fixing Day** means:

(a)     for the first Loan only, the first Utilisation Date;

(b)     in any other case, the second Business Day before the first day of a Term,

or such other day as the Agent determines is generally treated as the rate fixing day by market practice in the relevant interbank market for the currency concerned, as notified by the Agent to the other Parties by not less than five Business Days' notice.

**Reference Banks** means the Agent, Lloyds TSB Bank plc and any other bank or financial institution appointed as such by the Agent after consulting with the Company under this Agreement.

**Repeating Representations** means the representations which are deemed to be repeated under Subclause 16.22 (Times for making representations and warranties).

**Reportable Event** means:

(a)     an event specified as such in section 4043 of ERISA or any related regulation, other than an event in relation to which the requirement to give notice of that event is waived by any regulation; or

(b)     a failure to meet the minimum funding standard under section 412 of the Code or section 302 of ERISA, whether or not there has been any waiver of notice or waiver of the minimum funding standard under section 412 of the Code.

**Request** means a request made by a Borrower for a Loan, substantially in the form of Schedule 4 (Form of Request).

**Retained Group Indemnity** means the indemnity given by the Company to Henlys Group plc and its Subsidiaries on or about 18th October 2004 in respect of certain contingent and actual liabilities.

**Rollover Loan** means one or more Loans:

(a)     to be made on the same day that a maturing Loan is due to be repaid;

(b)     the aggregate amount of which is equal to or less than the maturing Loan;

(c)     in the same currency as the maturing Loan; and

(d)     to be made for the purpose of refinancing a maturing Loan.

**Screen Rate** means for LIBOR, the British Bankers Association Interest Settlement Rate or for the relevant currency and Term displayed on the appropriate page of the Telerate screen selected by the Agent.  If the relevant page is replaced or the service ceases to be available, the Agent (after consultation with the Company and the Lenders) may specify another page or service displaying the appropriate rate.

**Security Agreement** means a U.S. Security Agreement.

**Security Document** means:

(a)     each Security Agreement; or

(b)    any other document evidencing or creating security over any asset of an Obligor to secure any obligation of any Obligor to a Finance Party under the Finance Documents.

**Security Interest** means any mortgage, pledge, lien, charge, assignment, hypothecation, adverse claim, restriction on assignment, transfer or pledge or security interest or any other agreement or arrangement having a similar effect.

**Step 10 Agreement** means the agreement dated on or about 18th October 2004 between Henlys Group plc and the Company relating to the transfer of certain assets and liabilities from Henlys Group plc to the Company.

**Subordination Agreement** means the debt subordination agreement dated [      ]    January 2006 between the Company, the lenders under the Existing Facility Agreement, The Royal Bank of Scotland plc as agent under the Existing Facility Agreement, the Lenders and the Agent.

**Subsidiary** means as to any person, any person (a) of which such person directly or indirectly owns securities or other equity interests representing fifty per cent. or more of the aggregate voting powers, (b) of which such person possesses fifty per cent. or more of the right to elect directors or persons holding similar positions or (c) which such person Controls directly or indirectly through one or more intermediaries.

**Tatonka Lease Programme Agreement** means the lease program agreement dated 27th February 2003 between Blue Bird Corporation, Blue Bird Body Company and Tatonka Capital Corporation.

**Tax** means any tax, levy, remittance, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document.

**Tax Payment** means a payment made by an Obligor to a Finance Party in any way relating to a Tax Deduction or under any indemnity given by that Obligor in respect of Tax under any Finance Document.

**Term** means each period determined under this Agreement by reference to which interest on a Loan or an overdue amount is calculated.

**Termination Event** means:

(a)    the whole or partial withdrawal of any Obligors or any of their Subsidiaries from a Plan during a Plan year;

(b)    the filing of a notice of intent to terminate in whole or in part a Plan or the treatment of a Plan amendment as a termination or partial termination;

(c)    the institution of proceedings by any governmental authority to terminate in whole or in part or have a trustee appointed to administer a Plan; or

(d)    any other event or condition which might reasonably be expected to constitute grounds for the termination or winding up of partial termination or winding up or the appointment of a trustee to administer any Plan.

**Total Commitments** means the aggregate of the Commitments of all the Lenders, being, on the date of this Agreement, the total amount specified as such in Part 1 of Schedule 1 (Existing Parties as at the date of this Agreement).

**Transfer Certificate** means a certificate, substantially in the form of Schedule 5 (Form of Transfer Certificate), with such amendments as the Agent may approve or reasonably require or any other form agreed between the Agent and the Company.

**U.K.** means the United Kingdom.

**Unlawful Payment** means any unlawful payment, commission, bribe, pay-off or kickback.

**U.S.** means the United States of America.

**U.S. Bankruptcy Code** means the U.S. Bankruptcy Code of 1978, as amended.

**U.S. Dollars** or **U.S.$** means the lawful currency of the United States of America.

**U.S. Security Agreement** means:

(a)     any U.S. Stock Pledge Agreement;

(b)     the security agreement between Henlys US Investments, Inc. and the Agent dated on or about the date of this Agreement;

(c)     the security agreement between Henlys Holding Corp. and the Agent dated on or about the date of this Agreement;

(d)     the security agreement between Blue Bird Body Company and the Agent dated on or about the date of this Agreement;

(e)     the security agreement between Blue Bird Corporation and the Agent dated on or about the date of this Agreement;

(f)     the security agreement between Blue Bird Investment Corporation and the Agent dated on or about the date of this Agreement;

(g)     the security agreement between the Company and the Agent dated on or about the date of this Agreement;

(h)     the Walker County deed to secure debt and security agreement between Blue Bird Body Company and the Agent dated on or about the date of this Agreement;

(i)     the Walker County assignment of lease and rents between Blue Bird Body Company and the Agent dated on or about the date of this Agreement;

(j)     the Peach County deed to secure debt and security agreement between Blue Bird Body Company and the Agent dated on or about the date of this Agreement;

(k)     the Peach County assignment of lease and rents between Blue Bird Body Company and the Agent dated on or about the date of this Agreement; or

(l)     the security agreement between School Bus Sales of Alabama, Inc. and the Agent.

**U.S. Stock Pledge Agreement** means:

(a)     the pledge by Henlys US Investments Inc of its shares in Henlys Holding Corp.;

(b)     the pledge by Blue Bird Corporation of its shares in Blue Bird Body Company;

(c)     the pledge by Henlys Holding Corp. of its shares in Blue Bird Corporation;

(d)     the pledge by Blue Bird Body Company of its shares in Blue Bird Investment Corporation;

(e)     the pledge by the Company of its shares in Henlys US Investments, Inc.;

(f)     the pledge by Blue Bird Body Company of 66% of the shares in Canadian Blue Bird Coach, Ltd.; or

(g)     the pledge by Blue Bird Body Company of its shares in School Bus Sales of Alabama, Inc.,

each dated on or about the date of this Agreement.

**Utilisation Date** means each date on which the Facility is utilised.

**Volvo** means AB Volvo or any of its Subsidiaries (including Volvo Truck and Bus Limited).

**Volvo Agreement** means:

(a)     the servicing agreement dated 25th October 2000 between Blue Bird Body Company and Volvo Commercial Finance LLC The Americas;

(b)     the receivables purchase agreement dated 25th October 2000 between Blue Bird Body Company and Volvo Commercial Finance LLC The Americas; or

(c)     the receivables purchase agreement dated 20th December 2000 between Blue Bird Body Company and Volvo Commercial Finance LLC The Americas.

**Wachovia Ancillary Facility** means the U.S.$[4,757,280] letter of credit facility provided by Wachovia to Blue Bird Body Company under which the Wachovia Bilateral Letters of Credit have been issued or renewed.

**Wachovia Bilateral Letters of Credit** means the U.S.$[4,757,280] letters of credit, bid bonds or performance bonds issued by Wachovia at the request of Blue Bird Body Company prior to 9th December 2003 or as may be renewed up to that commitment from time to time.

**Wachovia Security Interest** means any Security Interest over an Obligor's bank accounts granted to Wachovia prior to the date of this Agreement or any Security Interest over an Obligor's bank accounts granted to Wachovia on terms approved by the Agent.

**Wachovia** means Wachovia Bank, National Association.

## 1.2    Construction

(a)    In this Agreement, unless the contrary intention appears, a reference to:

(i)    an **amendment** includes a supplement, restatement, novation or re-enactment and **amended** is to be construed accordingly;

(ii)    **assets** includes any kind of present and future properties, or assets, whether real, personal or mixed, moveable or immovable, tangible or intangible, and revenues and rights of every description;

(iii)    an **authorisation** includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration and notarisation;

(iv)    **disposal** means a sale, transfer, grant, lease or other disposal, whether voluntary or involuntary, and **dispose** will be construed accordingly;

(v)    **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money;

(vi)    **know your customer requirements** is a reference to the identification checks that a Finance Party requests in order to meet its obligations under any applicable law or regulation to identify a person who is (or is to become) its customer;

(vii)    a **person** includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, province, agency, organisation or other entity whether or not having separate legal personality;

(viii)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law but, if not having the force of law, being of a type with which any person to which it applies is accustomed to comply) of any governmental, inter-governmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(ix)    a currency is a reference to the lawful currency for the time being of the relevant country;

(x)    a Default being **outstanding** means that it has not been remedied or waived;

(xi)    a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(xii)    a Clause, a Subclause or a Schedule is a reference to a Clause or subclause of, or a Schedule to, this Agreement;

(xiii)    a Party or any other person includes its successors in title, permitted assigns and permitted transferees;

(xiv)    a Finance Document or another document is a reference to that Finance Document or other document as amended, supplemented, revised, restated or replaced from time to time;

(xv)    a time of day is a reference to London time; and

(xvi)  a reference to **Consolidated EBITDA**, **Consolidated Gross Assets** and **EBITDA** is deemed to be a reference to those terms as agreed by the Lenders in relation to financial covenants agreed pursuant to Subclause 17.18 (Financial covenants).

(b)  Unless the contrary intention appears, a reference to a **month** or **months** is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)  if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)  if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)  notwithstanding subparagraph (i) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)  Unless expressly provided to the contrary in a Finance Document, a person who is not a party to a Finance Document may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999 and, notwithstanding any term of any Finance Document, no consent of any third party is required for any variation (including any release or compromise of any liability) or termination of that Finance Document.

(d)  Unless the contrary intention appears:

(i)  a reference to a Party will not include that Party if it has ceased to be a Party under this Agreement;

(ii)  a word or expression used in any other Finance Document or in any notice given in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement; and

(iii)  any obligation of an Obligor under the Finance Documents which is not a payment obligation remains in force for so long as any payment obligation of an Obligor is or may be outstanding under the Finance Documents.

(e)  The headings in this Agreement do not affect its interpretation.

## 2.    THE FACILITY

### 2.1    Revolving credit facility

(a)  Subject to the terms of this Agreement, the Lenders make available to Blue Bird Body Company a U.S. Dollar revolving credit facility in an aggregate amount equal to the Total Commitments.

(b)  Notwithstanding any cancellation of Commitments, the Lenders may, in their absolute discretion, at any time prior to 30th September 2007 reinstate their Commitments in any amount up to U.S.$52,500,000 in aggregate for such period as the Lenders may specify, by giving notice to the Company through the Agent.

**2.2    Maximum number**

Unless the Agent agrees, a Request may not be given if, as a result, there would be more than 9 Loans in aggregate outstanding under the Facility.

**2.3    Nature of a Finance Party's rights and obligations**

Unless otherwise agreed by all the Finance Parties:

(a)    the obligations of a Finance Party under the Finance Documents are several;

(b)    failure by a Finance Party to perform its obligations does not affect the obligations of any other Party under the Finance Documents;

(c)    no Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents;

(d)    the rights of a Finance Party under the Finance Documents are separate and independent rights;

(e)    a Finance Party may, except as otherwise stated in the Finance Documents, separately enforce those rights; and

(f)    a debt arising under the Finance Documents to a Finance Party is a separate and independent debt.

**3.    PURPOSE**

**3.1    Loans**

Each Loan may only be used for:

(a)    the working capital purposes of Blue Bird Body Company; and

(b)    fees and expenses related to this Agreement, the Existing Facility Agreement, the Consummation of the Plan and the transactions contemplated thereby.

**3.2    No obligation to monitor**

No Finance Party is bound to monitor or verify the utilisation of the Facility.

**4.    CONDITIONS PRECEDENT**

**4.1    Conditions precedent**

A Request may not be given until the Agent has notified the Company and the Lenders that it has received all of the documents and evidence set out in Part 1 of Schedule 2 (Conditions precedent documents – to be delivered by Company/Borrower) in form and substance satisfactory to the Agent.  The Agent must give this notification to the Company and the Lenders promptly upon being so satisfied.

**4.2**    **Further conditions precedent**

The obligations of each Lender to participate in any Loan are subject to the conditions precedent that on both the date of the Request and the Utilisation Date for that Loan:

(a)     the Repeating Representations (excluding that in Subclause 16.6(a) (No default) in the case of a Request for a Rollover Loan) are correct in all material respects; and

(b)     no Default, or in the case of a Rollover Loan, no Event of Default is outstanding or would result from the Loan.

**5.**    **UTILISATION - LOANS**

**5.1**    **Giving of Requests**

(a)    A Borrower may borrow a Loan by giving to the Agent a duly completed Request.

(b)    Notwithstanding any other provision to the contrary in this Agreement, the total Loans borrowed may not exceed U.S.$20,000,000 in aggregate unless the financial covenants have been agreed by the Majority Lenders pursuant to Subclause 17.18 (Financial covenants).

(c)    Unless the Agent otherwise agrees, the latest time for receipt by the Agent of a duly completed Request is (i) 9.00 a.m. on the Utilisation Date for the first Loan only, and (ii) 11.00 a.m. one Business Day before the Rate Fixing Day for any other proposed borrowing.

(d)    Each Request is irrevocable.

**5.2**    **Completion of Requests**

(a)    A Request for a Loan will not be regarded as having been duly completed unless:

(i)     the Utilisation Date is a Business Day falling within the Availability Period;

(ii)    the amount of the Loan requested is:

(A)     a minimum of U.S.$5,000,000 and an integral multiple of U.S.$1,000,000;

(B)     the maximum undrawn amount available under the Facility on the proposed Utilisation Date; or

(C)     such other amount as the Agent may agree;

(iii)   the proposed currency and Term comply with this Agreement.

(b)    Only one Loan may be requested in a Request.

**5.3**    **Advance of Loan**

(a)    The Agent must promptly notify each Lender of the details of the requested Loan and the amount of its share in that Loan.

(b)    The amount of each Lender's share of the Loan will be its Pro Rata Share on the proposed Utilisation Date.

(c)    No Lender is obliged to participate in a Loan if as a result:

(i)      its share in the Loans under the Facility would exceed its Commitment for the Facility; or

(ii)     the Loans would exceed the Total Commitments.

(d)    If the conditions set out in this Agreement have been met, each Lender must make its share in the Loan available to the Agent for Blue Bird Body Company through its Facility Office on the Utilisation Date.

## 6.   REPAYMENT

### 6.1   Repayment of Loans

(a)    Each Borrower must repay each Loan made to it in full on its Maturity Date.

(b)    Subject to the other terms of this Agreement, any amounts repaid under paragraph (a) above may be re-borrowed.

(c)    Any amount outstanding under the Facility must be repaid on either the Initial Maturity Date or in relation to a Loan borrowed after that date, the Final Maturity Date.

## 7.   PREPAYMENT AND CANCELLATION

### 7.1   Mandatory prepayment - illegality

(a)    A Lender must notify the Company promptly if it becomes aware that it is unlawful in any jurisdiction for that Lender to perform any of its obligations under a Finance Document or to fund or maintain its share in any Loan.

(b)    After notification under paragraph (a) above:

(i)     each Borrower must repay or prepay the share of that Lender in each Loan utilised by it on the date specified in paragraph (c) below; and

(ii)     the Commitments of that Lender will be immediately cancelled.

(c)    The date for repayment or prepayment of a Lender's share in a Loan will be:

(i)     the last day of the current Term of that Loan; or

(ii)     if earlier, the date specified by the Lender in the notification under paragraph (a) above and which must not be earlier than the last day of any applicable grace period allowed by law.

### 7.2   Mandatory prepayment - change of control

(a)    For the purposes of this Subclause:

a **Change of Control** occurs if any person or group of persons acting in concert acquires Control of the Company; and **acting in concert** means a group of persons, acting together pursuant to an agreement or understanding (whether formal or informal).

(b)    The Company must promptly notify the Agent if it becomes aware of any Change of Control.

(c)     If:

     (i)     a Change of Control occurs; or

     (ii)    a person other than the holders of the common stock in the Company acquires the right to appoint, directly or indirectly, a director of Blue Bird Body Company,

unless the Majority Lenders otherwise direct, the Agent must if so instructed by any Lender, by notice to the Company:

     (A)     cancel that Lender's Commitments; and

     (B)     declare all outstanding Loans owing to that Lender, together with accrued interest and all other amounts accrued under the Finance Documents, to be immediately due and payable.

Any such notice will take effect in accordance with its terms.

### 7.3    Mandatory prepayment – disposals

(a)     In this Subclause:

**net proceeds** means any amount received by a member of the Group as consideration for a disposal to a person which is not a member of the Group, including:

     (i)     the amount of any intercompany loan repaid to continuing members of the Group; or

     (ii)    any amount received or recovered (following a claim) under any insurance policy for loss or damage to its assets or business unless those proceeds have to be applied in replacement or reinstatement of damaged assets,

less all Taxes and reasonable costs and expenses incurred by members of the Group in connection with the disposal or recovery; and

**relevant disposal** means a disposal, other than a disposal made in the ordinary course of trading.

(b)     The Company must apply (or procure that the application) of an amount equal to the net proceeds of each relevant disposal towards prepaying the Loans.

(c)     Any prepayment under this Subclause must be made within five Business Days of the date of receipt of the proceeds of the relevant disposal or recovery occurred.

(d)     An amount of the Total Commitment equal to the amount to be prepaid will be automatically and permanently cancelled on the date of receipt of the relevant proceeds (whether or not any Loans are outstanding).

### 7.4    Mandatory prepayment - fundraising

(a)     In this Subclause,

     (i)     **net proceeds** means any amount received by a member of the Group on a relevant debt issue or relevant equity issue (as the case may be) less all Taxes and reasonable costs and expenses incurred by members of the Group in connection with that relevant issue;

(ii)    **relevant debt issue** means any incurrence by a member of the Group of Financial Indebtedness of any of the types specified in paragraphs (a), (b) or (c) of the definition of that term; and

(iii)    **relevant equity issue** means any issue, sale or public offering of any equity security or any public or private bond or other capital market issue of a member of the Group.

(b)    The Company shall apply (or procure that there is applied) an amount equal to 100 per cent. of the net proceeds of any relevant debt issue in prepayment of the Loans.

(c)    The Company shall apply (or procure that there is applied) an amount equal to 50 per cent. of the net proceeds of any relevant equity issue received by the [Company] in prepayment of the Loans.

(d)    Any prepayment under this Subclause must be made on the date of receipt of the net proceeds of the relevant issue.

(e)    An amount of the Total Commitment equal to the amount to be prepaid will be automatically and permanently cancelled on the date of receipt of the relevant proceeds (whether or not any Loans are outstanding).

**7.5    Voluntary prepayment**

(a)    Each Borrower may, by giving not less than five Business Days' prior notice to the Agent, prepay (or ensure that a Borrower prepays) the Loans at any time in whole or in part.

(b)    A prepayment of part of a Loan must be in a minimum amount of U.S.$1,000,000 and an integral multiple of U.S.$250,000.

**7.6    Automatic cancellation**

The Commitment of each Lender will be automatically cancelled at the close of business on the last day of the Availability Period.

**7.7    Voluntary cancellation**

(a)    The Company may, by giving not less than five Business Days' prior notice to the Agent, cancel the unutilised amount of the Total Commitments in whole or in part.

(b)    Partial cancellation of the Total Commitments must be in a minimum amount of U.S.$1,000,000 and an integral multiple of U.S.$250,000.

(c)    Any cancellation in part will be applied against the Commitments of the Lenders pro rata.

**7.8    Involuntary prepayment and cancellation**

(a)    If an Obligor is, or will be, required to pay to a Lender a Tax Payment or an Increased Cost, the Company may, while the requirement continues, give notice to the Agent requesting prepayment and cancellation in respect of that Lender.

(b)    After notification under paragraph (a) above:

(i)    a Borrower must repay or prepay that Lender's share in each Loan utilised by it on the date specified in paragraph (c) below; and

(ii)    the Commitments of that Lender will be immediately cancelled.

(c)    The date for repayment or prepayment of a Lender's share in a Loan will be the last day of the current Term for that Loan or, if earlier, the date specified by the Company in its notification.

**7.9    Miscellaneous provisions**

(a)    Any notice of prepayment and/or cancellation under this Agreement is irrevocable and must specify the relevant date(s) and the affected Loans and Commitments.  The Agent must notify the Lenders promptly of receipt of any such notice.

(b)    All prepayments under this Agreement must be made with accrued interest on the amount prepaid.  No premium or penalty is payable in respect of any prepayment except for Break Costs.

(c)    The Majority Lenders may agree a shorter notice period for a voluntary prepayment or a voluntary cancellation.

(d)    Any mandatory prepayment or involuntary prepayment of a Loan may not be re-borrowed.

(e)    No prepayment or cancellation is allowed except in accordance with the express terms of this Agreement.

(f)    No amount of the Total Commitments cancelled under this Agreement may subsequently be reinstated except in accordance with Subclause 2.1(b) (Revolving credit facility).

**8.    INTEREST**

**8.1    Calculation of interest**

The rate of interest on each Loan for each Term is the percentage rate per annum equal to the aggregate of the applicable:

(a)    Margin;

(b)    LIBOR; and

(c)    Mandatory Cost.

**8.2    Payment of interest**

(a)    Except as provided in paragraph (b) below or elsewhere in this Agreement, each Borrower must pay accrued interest on each Loan made to it in cash on the last day of each Term and also, if the Term is longer than six months, on the dates falling at six-monthly intervals after the first day of that Term.  The amount of interest payable in cash will equal the amount of interest accrued at the rate applicable to each Loan during that Term under Subclause 8.1 (Calculation of interest) excluding the portion accrued in respect of the PIK Margin.

(b)    In addition to the cash pay interest referred to in Subclause 8.2(a), the balance of the interest accrued must be repaid in full on 30 September 2007 or if earlier, the date on which all amounts under the Facility become due and payable in full (whether by acceleration or prepayment) or the date on which the Facility is terminated (on the basis that the Lenders will not reinstate the Commitments pursuant to Subclause 2.1(b) (Revolving credit facility).

**8.3**     **Interest on overdue amounts**

(a)     If an Obligor fails to pay any amount payable by it under the Finance Documents, it must immediately on demand by the Agent pay interest on the overdue amount from its due date up to the date of actual payment, both before, on and after judgment.

(b)     Interest on an overdue amount is payable at a rate determined by the Agent to be 2 per cent. per annum above the highest rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan in the currency of the overdue amount. For this purpose, the Agent may (acting reasonably):

     (i)      select successive Terms of any duration of up to three months; and

     (ii)     determine the appropriate Rate Fixing Day for that Term.

(c)     Notwithstanding paragraph (b) above, if the overdue amount is a principal amount of a Loan and becomes due and payable prior to the last day of its current Term, then:

     (i)      the first Term for that overdue amount will be the unexpired portion of that Term; and

     (ii)     the rate of interest on the overdue amount for that first Term will be 1 per cent. per annum above the rate then payable on that Loan.

     After the expiry of the first Term for that overdue amount, the rate on the overdue amount will be calculated in accordance with paragraph (b) above.

(d)     Interest (if unpaid) on an overdue amount will be compounded with that overdue amount at the end of each of its Terms but will remain immediately due and payable.

**8.4**     **Notification of rates of interest**

The Agent must promptly notify each relevant Party of the determination of a rate of interest under this Agreement.

**9.**     **TERMS**

**9.1**     **Selection**

(a)     Each Loan has one Term only.

(b)     Each Borrower must select the Term for a Loan in the relevant Request.

(c)     Subject to the following provisions of this Clause, each Term for a Loan will be one, two, three [or six months] or any other period agreed by the Company and the Majority Lenders (if less than six months) or all the Lenders (if more).

**9.2**     **No overrunning the Final Maturity Date**

If a Term would otherwise overrun the Initial Maturity Date or the Final Maturity Date, it will be shortened so that it ends on that Final Maturity Date.

**9.3**     **Other adjustments**

The Agent and the Company may enter into such other arrangements as they may agree for the adjustment of Terms and the consolidation and/or splitting of Loans.

**9.4    Notification**

The Agent must notify the relevant Borrower and the Lenders of the duration of each Term promptly after ascertaining its duration.

## 10.    MARKET DISRUPTION

**10.1    Failure of a Reference Bank to supply a rate**

If LIBOR is to be calculated by reference to the Reference Banks but a Reference Bank does not supply a rate by 12.00 noon on a Rate Fixing Day, the applicable LIBOR will, subject as provided below, be calculated on the basis of the rates of the remaining Reference Banks.

**10.2    Market disruption**

(a)    In this Clause, each of the following events is a **market disruption event**:

(i)    LIBOR is to be calculated by reference to the Reference Banks but no, or only one, Reference Bank supplies a rate by 12.00 noon on the Rate Fixing Day; or

(ii)    the Agent receives by close of business on the Rate Fixing Day notification from Lenders whose shares in the relevant Loan exceed 30 per cent. of that Loan that the cost to them of obtaining matching deposits in the relevant interbank market is in excess of LIBOR for the relevant Term.

(b)    The Agent must promptly notify the Company and the Lenders of a market disruption event.

(c)    After notification under paragraph (b) above, the rate of interest on each Lender's share in the affected Loan for the relevant Term will be the aggregate of the applicable:

(i)    Margin;

(ii)    rate notified to the Agent by that Lender as soon as practicable, and in any event before interest is due to be paid in respect of that Term, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its share in that Loan from whatever source it may reasonably select; and

(iii)    Mandatory Cost.

**10.3    Alternative basis of interest or funding**

(a)    If a market disruption event occurs and the Agent or the Company so requires, the Company and the Agent must enter into negotiations for a period of not more than 30 days with a view to agreeing an alternative basis for determining the rate of interest and/or funding for the affected Loan and any future Loan.

(b)    Any alternative basis agreed will be, with the prior consent of all the Lenders, binding on all the Parties.

**11.    TAXES**

**11.1    General**

In this Clause:

**Qualifying Lender** means a Lender which is:

(i)      a U.S. Lender;

(ii)     a Treaty Lender; or

(iii)    entitled to receive payments of interest under the Finance Documents without deduction or withholding of any Tax in the United States.

**Tax Credit** means a credit against, deduction from, refund of or reduction of any Tax or any relief or remission for Tax (or its repayment).

**Treaty Lender** means a Lender which is resident (as defined in the appropriate double taxation agreement) in a country with which the U.S. has a double taxation agreement giving residents of that country full exemption from U.S. taxation on interest.

**U.S. Lender** means a Lender which is created or organised under the laws of the United States or any state (including the District of Columbia) thereof.

**11.2    Tax gross-up**

(a)    Each Obligor must make all payments to be made by it under the Finance Documents without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    If:

(i)      a Lender is not, or ceases to be, a Qualifying Lender; or

(ii)     an Obligor or a Lender is aware that an Obligor must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction),

it must promptly notify the Agent.  The Agent must then promptly notify the affected Parties.

(c)    Except as provided below, if a Tax Deduction is required by law to be made by an Obligor or the Agent, the amount of the payment due from the Obligor will be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    Except as provided below, an Obligor is not required to make an increased payment under paragraph (c) above for a Tax Deduction in respect of the tax imposed by the U.S. to a Lender that is not, or has ceased to be, a Qualifying Lender in excess of the amount that the Obligor would have had to pay had the Lender been, or not ceased to be, a Qualifying Lender.

(e)    Paragraph (d) above will not apply if the Lender has ceased to be a Qualifying Lender by reason of any change after the date it became a Lender under this Agreement in (or in the interpretation, administration, or application of) any law or double taxation agreement or any published practice or concession of any relevant taxing authority.

(f)     If an Obligor is required to make a Tax Deduction, that Obligor must make the minimum Tax Deduction allowed by law and must make any payment required in connection with that Tax Deduction within the time allowed by law.

(g)     Within 30 days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, the Obligor making that Tax Deduction or payment must deliver to the Agent for the relevant Finance Party evidence satisfactory to that Finance Party (acting reasonably) that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

**11.3    Tax indemnity**

(a)     Except as provided below, the applicable Obligor must indemnify a Finance Party against any loss or liability which that Finance Party (in its absolute discretion) determines will be or has been suffered (directly or indirectly) by that Finance Party for or on account of Tax in relation to a payment received or receivable (or any payment deemed to be received or receivable) under a Finance Document.

(b)     Paragraph (a) above does not apply to any Tax assessed on a Finance Party under the laws of the jurisdiction in which:

　　　(i)     that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party has a Facility Office and is treated as resident for tax purposes; or

　　　(ii)     that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable by that Finance Party.  However, any payment deemed to be received or receivable, including any amount treated as income but not actually received by the Finance Party, such as a Tax Deduction, will not be treated as net income received or receivable for this purpose.

(c)     A Finance Party making, or intending to make, a claim under paragraph (a) above must promptly notify the applicable Obligor of the event which will give, or has given, rise to the claim.

**11.4    Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party (in its absolute discretion) determines that:

(a)     a Tax Credit is attributable to that Tax Payment or the Tax giving rise to it; and

(b)     it has used and retained that Tax Credit,

the Finance Party must pay an amount to the Obligor which that Finance Party determines (in its absolute discretion) will leave it (after that payment) in the same after-tax position as it would have been if the Tax Payment had not been required to be made by the Obligor.

**11.5    Stamp taxes**

The Company must pay and indemnify each Finance Party against any stamp duty, stamp duty land tax, registration or other similar Tax payable in connection with the entry into,

performance or enforcement of any Finance Document, except for any such Tax payable in connection with the entry into a Transfer Certificate.

**11.6    Value added taxes**

(a)    Any amount (including costs and expenses) payable under a Finance Document by an Obligor is exclusive of any value added tax or any other Tax of a similar nature which might be chargeable in connection with that amount.  If any such Tax is chargeable, the Obligor must pay to the Finance Party (in addition to and at the same time as paying that amount) an amount equal to the amount of that Tax.

(b)    The obligation of any Obligor under paragraph (a) above will be reduced to the extent that the Finance Party determines (acting reasonably) that it is entitled to repayment or a credit in respect of the relevant Tax.

**11.7    U.S. Tax Forms**

(a)    Except as provided below, each Lender must supply to the Agent and each Obligor the U.S. Internal Revenue Service forms that are necessary to enable that Obligor to make payments to that Lender under the Finance Documents without any deduction or withholding in respect of any Tax in the United States of America.

(b)    A Lender must comply with its obligations under paragraph (b) above as soon as practicable after the date it becomes a Party or (if later) the date the Obligor becomes a Party.

(c)    A Lender is not obliged to supply any form under paragraph (b) above if it is unable to do so by reason of any change after the date of this Agreement in (or in the interpretation, administration or application of) any law or regulation or any published practice or concession of any relevant taxing authority.

(d)    An Obligor is not obliged to pay any Tax Payment to a Lender to the extent that the Tax Payment would not have been payable if that Lender had complied with its obligations under this Subclause.

**12.    INCREASED COSTS**

**12.1    Increased Costs**

Except as provided below in this Clause, the Company must pay to a Finance Party the amount of any Increased Cost incurred by that Finance Party or any of its Affiliates as a result of:

(a)    the introduction of, or any change in, or any change in the interpretation, administration or application of, any law or regulation; or

(b)    compliance with any law or regulation,

made after the date of this Agreement.

**12.2    Exceptions**

The Company need not make any payment for an Increased Cost to the extent that the Increased Cost is:

(a)    compensated for under another Clause or would have been but for an exception to that Clause;

(b)    a tax on the overall net income of a Finance Party or any of its Affiliates; or

(c)    attributable to a Finance Party or its Affiliate wilfully failing to comply with any law or regulation.

**12.3    Claims**

A Finance Party intending to make a claim for an Increased Cost must notify the Company promptly of the circumstances giving rise to, and the amount of, the claim.

**13.    MITIGATION**

**13.1    Mitigation**

(a)    Each Finance Party must, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which result or would result in:

(i)    any Tax Payment or Increased Cost being payable to that Finance Party;

(ii)    that Finance Party being able to exercise any right of prepayment and/or cancellation under this Agreement by reason of any illegality; or

(iii)    that Finance Party incurring any cost of complying with the minimum reserve requirements of the European Central Bank,

including transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

(c)    The Company must indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of any step taken by it under this Subclause.

(d)    A Finance Party is not obliged to take any step under this Subclause if, in the opinion of that Finance Party (acting reasonably), to do so would reasonably be expected to be prejudicial to it.

**13.2    Conduct of business by a Finance Party**

No term of this Agreement will:

(a)    interfere with the right of any Finance Party to arrange its affairs (Tax or otherwise) in whatever manner it thinks fit;

(b)    oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it in respect of Tax or the extent, order and manner of any claim; or

(c)    oblige any Finance Party to disclose any information relating to its affairs (Tax or otherwise) or any computation in respect of Tax.

## 14.    PAYMENTS

### 14.1    Place

Unless a Finance Document specifies that payments under it are to be made in another manner, all payments by a Party (other than the Agent) under the Finance Documents must be made to the Agent to its account at such office or bank:

(a)    in the principal financial centre of the country of the relevant currency; or

(b)    as it may notify to that Party for this purpose by not less than five Business Days' prior notice.

### 14.2    Funds

Payments under the Finance Documents to the Agent must be made for value on the due date at such times and in such funds as the Agent may specify to the Party concerned as being customary at the time for the settlement of transactions in the relevant currency in the place for payment.

### 14.3    Distribution

(a)    Each payment received by the Agent under the Finance Documents for another Party must, except as provided below, be made available by the Agent to that Party by payment (as soon as practicable after receipt) to its account with such office or bank:

(i)    in the principal financial centre of the country of the relevant currency; or

(ii)    as it may notify to the Agent for this purpose by not less than five Business Days' prior notice.

(b)    The Agent may apply any amount received by it for an Obligor in or towards payment (as soon as practicable after receipt) of any amount due from that Obligor under the Finance Documents or in or towards the purchase of any amount of any currency to be so applied.

(c)    Where a sum is paid to the Agent under this Agreement for another Party, the Agent is not obliged to pay that sum to that Party until it has established that it has actually received it. However, the Agent may assume that the sum has been paid to it, and, in reliance on that assumption, make available to that Party a corresponding amount.  If it transpires that the sum has not been received by the Agent, that Party must immediately on demand by the Agent refund any corresponding amount made available to it together with interest on that amount from the date of payment to the date of receipt by the Agent at a rate calculated by the Agent to reflect its cost of funds.

**14.4    Currency**

(a)    Unless a Finance Document specifies that payments under it are to be made in a different manner, the currency of each amount payable under the Finance Documents is determined under this Clause.

(b)    Interest is payable in the currency in which the relevant amount in respect of which it is payable is denominated.

(c)    A repayment or prepayment of any principal amount is payable in the currency in which that principal amount is denominated on its due date.

(d)    Amounts payable in respect of costs and expenses are payable in the currency in which they are incurred.

(e)    Each other amount payable under the Finance Documents is payable in U.S. Dollars.

**14.5    No set-off or counterclaim**

All payments made by an Obligor under the Finance Documents must be made without set-off or counterclaim.

**14.6    Business Days**

(a)    If a payment under the Finance Documents is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not) or whatever day the Agent determines is market practice.

(b)    During any extension of the due date for payment of any principal under this Agreement interest is payable on that principal at the rate payable on the original due date.

**14.7    Partial payments**

(a)    If any Finance Party receives an amount, whether through repayment, enforcement proceeds or otherwise insufficient to discharge all the amounts then due and payable by the Obligors under the Finance Documents, that amount must be applied towards the obligations of the Obligors under the Finance Documents in the following order:

(i)    **first**, in or towards payment pro rata of any unpaid fees, costs and expenses of the Administrative Parties under the Finance Documents;

(ii)    **secondly,** in or towards payment pro rata of any other accrued interest or fee that is due and payable under the Finance Documents;

(iii)    **thirdly**, in or towards payment pro rata of any principal amount due and payable under this Agreement; and

(iv)    **fourthly**, in or towards payment pro rata of any other sum due and payable under the Finance Documents.

(b)    The Agent must, if so directed by all the Lenders, vary the order set out in subparagraphs (a)(ii) to (iv) above.

(c)    This Subclause will override any appropriation made by an Obligor.

**14.8    Timing of payments**

If a Finance Document does not provide for when a particular payment is due, that payment will be due within three Business Days of demand by the relevant Finance Party.

**15.    GUARANTEE**

**15.1    Guarantee**

Each Guarantor irrevocably, unconditionally, jointly and severally (and notwithstanding the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditors of any member of the Group):

(a)    as principal obligor, guarantees to each Finance Party prompt performance by each other Obligor of all its payment obligations under the Finance Documents;

(b)    undertakes with each Finance Party that whenever an Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall forthwith on demand by the Agent pay that amount as if that Guarantor instead of that Obligor were expressed to be the principal obligor; and

(c)    indemnifies each Finance Party on demand against any loss or liability suffered by it if any obligation guaranteed by that Guarantor is or becomes unenforceable, invalid or illegal.

**15.2    Continuing guarantee**

This guarantee is a continuing guarantee and will extend to the ultimate balance of all sums payable by each other Obligor under, among other things, the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

**15.3    Reinstatement**

(a)    Where any discharge (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made in whole or in part or any arrangement is made on the faith of any payment, security or other disposition which is avoided or must be restored on insolvency, liquidation or otherwise without limitation, the liability of each Guarantor under this Clause shall continue as if the discharge or arrangement had not occurred.

(b)    Each Finance Party may concede or compromise any claim that any payment, security or other disposition is liable to avoidance or restoration.

**15.4    Waiver of defences**

The obligations of each Guarantor under this Clause will not be affected by any act, omission, matter or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause or prejudice or diminish those obligations in whole or in part, including (whether or not known to it or any Finance Party):

(a)    any time or waiver granted to, or composition with, any Obligor or other person;

(b)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any

formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(c)     any incapacity or lack of powers, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(d)     any variation (however fundamental) or replacement of a Finance Document or any other document or security so that references to that Finance Document in this Clause shall include each variation or replacement;

(e)     any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security, to the intent that each Guarantor's obligations under this Clause shall remain in full force and its guarantee be construed accordingly, as if there were no unenforceability, illegality or invalidity;

(f)     the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditors of any member of the Group; or

(g)     any postponement, discharge, reduction, non-provability or other similar circumstance affecting any obligation of any Obligor under a Finance Document resulting from any insolvency, liquidation or dissolution proceedings or from any law, regulation or order so that each such obligation shall for the purposes of the Guarantor's obligations under this Clause shall be construed as if there were no such circumstance.

## 15.5    Immediate recourse

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause.

## 15.6    Appropriations

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b)     hold in a suspense account bearing interest at a commercial rate any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause.

## 15.7    Non-competition

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, no Guarantor shall, after a claim has been made or by virtue of any payment or performance by it under this Clause.

(a)     be subrogated to any rights, security or moneys held, received or receivable by any Finance Party (or any trustee or agent on its behalf) or be entitled to any right of

contribution or indemnity in respect of any payment made or moneys received on account of that Guarantor's liability under this Clause.

(b)     claim, rank, prove or vote as a creditor of any Obligor or its estate in competition with any Finance Party (or any trustee or agent on its behalf); or

(c)     receive, claim or have the benefit of any payment, distribution or security from or on account of any Obligor, or exercise any right of set-off as against any Obligor,

unless the Agent otherwise directs. Each Guarantor shall hold in trust for and forthwith pay or transfer to the Agent for the Finance Parties any payment or distribution or benefit of security received by it contrary to this Clause or as directed by the Agent.

## 15.8    Release of Guarantors' right of contribution

If any Guarantor ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purposes of any sale or other disposal of that Guarantor:

(a)     that Guarantor will be released by each other Guarantor from any liability whatsoever to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)     each other Guarantor will waive any right it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any right of any Finance Party under any Finance Document or of any other security taken under, or in connection with, any Finance Document by any Finance Party.

## 15.9    Additional security

This guarantee is in addition to and is not in any way prejudiced by any other security now or hereafter held by any Finance Party.

## 15.10    Consideration and enforceability

(a)     Each Guarantor represents, warrants and agrees that:

(i)     it will receive valuable direct and indirect benefits as a result of the transactions financed by the Loans; and

(ii)     these benefits will constitute **reasonably equivalent value** and **fair consideration** as those terms are used in the fraudulent transfer laws.

(b)     Each Guarantor acknowledges and agrees that each of the Finance Parties has acted in good faith in connection with the guarantee granted under this Clause and the transactions contemplated by this Agreement.

(c)     This Clause shall be enforceable against each Guarantor to the maximum extent permitted by the fraudulent transfer laws.

(d)     Each Guarantor's liability under this Clause shall be limited to the extent necessary (but only to such extent) to procure that no obligation of, or transfer by, the Guarantor under this Clause is subject to avoidance and turnover under the fraudulent transfer laws.

(e)  For purposes of this Clause, **fraudulent transfer laws** means applicable United States bankruptcy and State fraudulent transfer and conveyance statutes and the related case law.

(f)  Each representation and warranty in this Subclause:

    (i)  is made by each Guarantor on the date of this Agreement;

    (ii)  is deemed to be repeated by:

        (A)  each Additional Guarantor on the date that Additional Guarantor becomes a Guarantor; and

        (B)  each Guarantor on the date of each Request, each Utilisation Date and the first day of each Term; and

is, when repeated, applied to the circumstances existing at the time of repetition.

## 16.  REPRESENTATIONS AND WARRANTIES

### 16.1  Representations and warranties

Each Obligor makes the representations and warranties set out in this Clause to each Finance Party.

### 16.2  Status

(a)  It is a limited liability company or corporation, duly incorporated or amalgamated, validly existing and, where applicable, in good standing under the laws of the jurisdiction of its incorporation; and

(b)  it and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

### 16.3  Powers and authority

Upon entry of the Confirmation Order, it has the power to enter into and perform, and has taken all necessary action to authorise the entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

### 16.4  Legal validity

Each Finance Document to which it is or will be a party constitutes, or when executed in accordance with its terms will constitute, its legal, valid and binding obligation enforceable subject to the Qualifications.

### 16.5  Non-conflict

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not conflict with:

(a)  any law or regulation or judicial or official order; or

(b)  its constitutional documents; or

(c)     any material document which is binding upon it or any of its Subsidiaries or its assets or any of its Subsidiaries' assets.

**16.6    No default**

(a)     No Default is outstanding or will result from the execution of or the performance of any transactions contemplated by any Finance Document; and

(b)     no other event is outstanding which constitutes (or with the giving of notice or lapse of time could reasonably be expected to constitute) a default under any document which is binding on it or any of its Subsidiaries or any asset of it or any of its Subsidiaries to an extent or in a manner which could reasonably be expected to have a Material Adverse Effect.

**16.7    Authorisations**

Except for registration of each Security Document and after giving effect to the Confirmation Order, all authorisations, licences and approvals required in connection with the entry into, performance, validity and enforceability of, and the transactions contemplated by, the Finance Documents have been obtained or effected (as appropriate) and are in full force and effect.

**16.8    Accounts**

(a)     In the case of the Company, when delivered, the audited consolidated accounts of the Group most recently delivered to the Agent:

(i)     have been prepared in accordance with GAAP consistently applied; and

(ii)    fairly represent the consolidated financial condition of the Group as at the date to which they were drawn up.

(b)     In the case of each Guarantor, its audited accounts most recently delivered to the Agent:

(i)     have been prepared in accordance with accounting principles and practices generally accepted in the jurisdiction of its incorporation consistently applied; and

(ii)    fairly represent its financial condition as at the date to which they were drawn up.

(c)     In the case of the Company, each set of the interim accounts, quarterly accounts and monthly accounts will, when delivered, have been prepared with due care and skill and on a basis consistent with the audited consolidated accounts of the Group but for year-end adjustments.

**16.9    Litigation**

No litigation, arbitration or administrative proceedings, actions, suits or investigations are current, pending or, to its knowledge, pending or threatened against it or any of its Subsidiaries, which (i) is reasonably likely to be determined against such a member and, if so adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) except for the Cases, involves any of the transactions or commitments contemplated by this Agreement.

**16.10   Environmental Matters**

(a)     It and each of its Subsidiaries is in compliance with all laws and regulations applicable to it or its property and all indentures, agreements and other instruments binding upon it or its

property, except where failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    Neither it nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any Environmental Approval, (ii) is subject to or has received notice of any Environmental Claim against or affecting any of them or (iii) knows of any circumstances that could reasonably form the basis of an Environmental Claim against or affecting any of them, except for any such matters which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

## 16.11   ERISA

(a)    Each member of the Controlled Group has fulfilled its obligations under the minimum funding standards of ERISA, the Code or the applicable laws of any other jurisdiction including the PBA with respect to each Plan to which such minimum funding standards apply.

(b)    Each member of the Controlled Group is in compliance in all material respects with the presently applicable provisions of ERISA, the Code or the applicable laws of any other jurisdiction (including the PBA) with respect to each Plan.

(c)    Each Plan complies in all material respects with all applicable requirements of law and regulations.  No Reportable Event other than Reportable Events arising in connection with a reduction in workforce from 2003 to 2004 and the freezing of the Group's pension plan) or Termination Event has occurred with respect to any Plan, and no steps have been taken to reorganise or terminate any Plan or by the Obligors or any member of the Controlled Group to effect a complete or partial withdrawal from any Multiemployer Plan.

(d)    No member of the Controlled Group has:

    (i)    sought a waiver of the minimum funding standard under Section 412 of the Code or otherwise in respect of any Plan;

    (ii)    failed to make any contribution or payment to any Plan, or made any amendment to any Plan, and no other event, transaction or condition has occurred which has resulted or could result in the imposition or creation of a lien (choate or inchoate) in respect of any Obligor or any member of the Controlled Group or its or their property, or the posting of a bond or other security under ERISA or the Code except for such failures, amendments, impositions or postings that would not have a Material Adverse Effect or for contribution amounts that are not yet due; or

    (iii)    incurred any material liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA.

## 16.12   Labour matters

There are no collective bargaining agreements or Multiemployer Plans covering any employees of any Obligor, any Canadian Subsidiary or any member of the Controlled Group, and no Obligor has experienced any strike, walkout, work stoppage or other labour action or disturbance during the past three years.

## 16.13   No Unlawful Payments

No Obligor has in any way violated the United States Foreign Corrupt Practices Act of 1977, as amended, or similar laws of any other applicable jurisdiction in any way that has resulted

in or is reasonably likely to result in imposition of criminal liability or otherwise have a Material Adverse Effect.

**16.14    Investment Company Act**

No Obligor is an **investment company** or a company **controlled** by an **investment company** within the meaning of the United States Investment Company Act 1940, as amended.

**16.15    Public Utility Holding Company Act**

No Obligor is a **holding company** or an **affiliate** of a **holding company** or a **subsidiary company** of a **holding company**, within the meaning of, or otherwise subject to regulation under, the United States Public Utility Holding Company Act of 1935, as amended.

**16.16    Margin stock**

(a)    **Margin Regulations** means Regulations U and X of the Board of Governors of the United States Federal Reserve System.

(b)    No Obligor is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of the Margin Regulations), and no portion of any Loan has been or will be used, directly or indirectly, to purchase or carry margin stock or for any other purpose in violation of the Margin Regulations.

**16.17    Anti-Terrorism**

(a)    In this Subclause:

**Anti-Terrorism Law** means each of:

(i)    Executive Order No. 13224 of September 23, 2001 - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the **Executive Order**);

(ii)    the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act);

(iii)    the Money Laundering Control Act of 1986, Public Law 99-570; and

(iv)    any similar law enacted in the United States of America subsequent to the date of this Agreement.

**Restricted Party** means any person listed:

(i)    in the Annex to the Executive Order;

(ii)    on the "Specially Designated Nationals and Blocked Persons" list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or

(iii)    in any successor list to either of the foregoing.

(b)    To the best of its knowledge, neither it nor any of its Affiliates:

(i)    is, or is controlled by, a Restricted Party;

(ii)    has received funds or other property from a Restricted Party; or

(iii)    is in breach of or is the subject of any action or investigation under any Anti-Terrorism Law.

(c)    It and each of its Affiliates have taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

**16.18    No Limitation on incurring Financial Indebtedness**

It is not subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee Financial Indebtedness.

**16.19    Immunity**

(a)    The execution by it of each Finance Document constitutes, and the exercise by it of its rights and performance of its obligations under each Finance Document will constitute, private and commercial acts performed for private and commercial purposes; and

(b)    it will not be entitled to claim immunity from suit, execution, attachment or other legal process in any proceedings taken in its jurisdiction of incorporation in relation to any Finance Document.

**16.20    No adverse consequences**

(a)    Subject to matters expressly set out in the Qualifications, it is not necessary under the laws of its jurisdiction of incorporation:

(i)    in order to enable any Finance Party to enforce its rights under any Finance Document; or

(ii)    by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in its jurisdiction of incorporation; and

(b)    no Finance Party is or will be deemed to be resident, domiciled or carrying on business in its jurisdiction of incorporation by reason only of the execution, performance and/or enforcement of any Finance Document.

**16.21    Jurisdiction/governing law**

(a)    Subject to matters expressly set out in the Qualifications, its:

(i)    irrevocable submission under this Agreement to the jurisdiction of the courts of England and New York;

(ii)    agreement that this Agreement is governed by English law; and

(iii)    agreement not to claim any immunity to which it or its assets may be entitled,

are legal, valid and binding under the laws of its jurisdiction of incorporation; and

(b)     any judgment obtained in England or in New York will be recognised and be enforceable by the courts of its jurisdiction of incorporation.

**16.22    Times for making representations and warranties**

The representations and warranties set out in this Clause:

(a)     (i)      are made by each Obligor on the date of this Agreement; and

       (ii)     in the case of an Obligor which becomes a Party after the date of this Agreement (with the exception of Subclause 16.5(c) (Non-conflict)) will be deemed to be made by that Obligor on the date it executes an Accession Agreement; and

(b)     (with the exception of Subclause 16.5(c) (Non-conflict)), are deemed to be repeated by each Obligor on the date of each Request, each Utilisation Date and on the first day of each Term with reference to the facts and circumstances then existing.

**17.     UNDERTAKINGS**

**17.1     Duration**

The undertakings in this Clause remain in force from the date of this Agreement for so long as any amount is or may be outstanding under this Agreement or any Commitment is in force.

**17.2     Financial information**

The Company shall supply to the Agent in sufficient copies for all the Lenders:

(a)     as soon as the same are available (and in any event within 120 days of the end of each of its financial years or 210 days in the case of the 2005 financial year):

       (i)      its audited consolidated accounts for that financial year; and

       (ii)     the audited accounts of each Obligor (other than Blue Bird Body Company) for that financial year (if, in the case of an Obligor, such audited accounts are produced);

(b)     as soon as the same are available, and in any event within:

       (i)      210 days of the end of its financial year ending on 30th September 2005; and

       (ii)     90 days of the end of each of its financial years thereafter,

the unaudited consolidated financial statements of Blue Bird Corporation for that financial year;

(c)     as soon as they are available (and in any event within 30 days of the end of each month) its consolidated Monthly Management Accounts and Blue Bird Body Company's Monthly Management Accounts; Monthly Management Accounts covering a month expiring at a quarter end or at half-year will include cumulative accounts for the relevant quarter or half-year (as applicable);

(d)     together with the accounts specified in paragraph (c) above:

(i)      in respect of each quarter, details of non school bus vehicles held on floor plans by distributors (including details of any sales subsidy mechanisms) and details of vehicle lease transfers in the relevant quarter; and

(ii)     in respect of each month, details of Blue Bird Body Company's order book (together with deviations from the year-on-year orders), the key performance indicators of Blue Bird Body Company, all in respect of the relevant month, and a rolling 13-week cash flow forecast

(all in the form agreed prior to the date of this Agreement); and

(e)    as soon as the same is available (and in any case within 30 days of the commencement of each financial year) the Group's annual business plan and budget for that financial year.

### 17.3   Information - miscellaneous

Each Obligor shall supply to the Agent:

(a)    all documents despatched by it to all of its shareholders (or any class of them) or all of its creditors (or any class of them) at the same time as they are despatched;

(b)    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending, and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c)    (i)      promptly, such further information in the possession or control of any member of the Group regarding its financial condition and operations as any Finance Party may reasonably request, other than information which the Company is precluded by law or regulation from disclosing (providing that the Company shall use all reasonable endeavours to obtain all necessary consents, authorisations or waivers for the disclosure thereof to the Agent);

(ii)     if the Company considers a Finance Party's request under subparagraph (i) to be unreasonable in all the circumstances and the relevant request was not made by the Majority Lenders, it may request the Majority Lenders through the Agent to determine whether or not the request is reasonable; the Majority Lenders' determination (if any) shall be conclusive and binding on the Parties; and

(d)    if any member of the Controlled Group:

(i)      gives or is required to give notice to the PBGC of any Reportable Event with respect to any Plan which might constitute grounds for a termination of that Plan under Title IV of ERISA, or knows that the plan administrator of any Plan has given notice of that Reportable Event, a copy of the notice of that Reportable Event given or required to be given to the PBGC;

(ii)     receives notice of complete or partial withdrawal liability under Title IV of ERISA or notice that any Multiemployer Plan is in reorganization, is insolvent or has been terminated, a copy of that notice;

(iii)    receives notice from the PBGC under Title IV of ERISA of an intent to terminate, impose liability (other than for premiums under Section 4007 of ERISA) or the Financial Services Commission of Ontario in respect of, or appoint a trustee to administer, any Plan, a copy of that notice;

(iv)    applies for a waiver of the minimum funding standard under Section 412 of the Code or otherwise, a copy of that application;

(v)    gives notice of intent to terminate any Plan under Section 4041(c) of ERISA or otherwise, a copy of that notice and any other information filed with the PBGC or the Financial Services Commission of Ontario;

(vi)    gives notice of withdrawal from any Plan pursuant to Section 4063 of ERISA, a copy of that notice or otherwise;

(vii)    if so requested by the Agent (acting reasonably), promptly after filing an actuarial report and/or information return with respect to any Canadian Pension Plan, a copy of such report and/or return; or

(viii)    fails to make any payment or contribution to any Plan or makes any amendment to any Plan which has resulted or could result in the imposition of a Security Interest (choate or inchoate) or the posting of a bond or other security, a certificate of the chief financial officer or the chief accounting officer of the applicable Obligor setting forth details of that occurrence and action, if any, which the applicable Obligor or applicable member of the Controlled Group is required or proposes to take,

in sufficient copies for all of the Lenders, if the Agent so requests.

**17.4    Notification of Default**

Each Obligor shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

**17.5    Year end**

No Obligor may change its financial year end unless Clause 17.18 (Financial covenants) has been amended to reflect that change to the satisfaction of the Majority Banks.

**17.6    Know your customer requirements**

(a)    Each Obligor must promptly on the request of any Finance Party supply to that Finance Party any documentation or other evidence which is reasonable requested by that Finance Party (whether for itself, on behalf of any Finance Party or any prospective new Lender) to enable a Finance Party or prospective New Lender to carry out and be satisfied with the results of all applicable know your customer requirements.

(b)    Each Lender must promptly on the request of the Agent supply to the Agent any documentation or other evidence which is reasonably required by the Agent to carry out and be satisfied with the results of all applicable know your customer requirements.

**17.7    Compliance Certificates**

(a)    The Company shall supply to the Agent:

(i)      together with the accounts specified in Subclauses 17.2(a)(i) and (b) (Financial information); and

(ii)     promptly at any other time, if the Agent so requests,

a certificate signed by the Chief Financial Officer on its behalf and the Group certifying that no Default is outstanding or, if a Default is outstanding, specifying the Default and the steps, if any, being taken to remedy it.

(b)      The Company shall supply to the Agent:

(i)      together with the accounts specified in Subclauses 17.2(a)(i) and (b) (Financial information) above and if the Majority Lenders having been provided with a copy of the auditor's fee quotation for the engagement, so require, a Compliance Certificate signed by its auditors, setting out in reasonable detail computations establishing whether or not the Company is in compliance with Subclause 17.18 (Financial covenants) as at the date to which their accounts were drawn up; and

(ii)     together with the accounts specified in Subclauses 17.2(a)(i)(c) (Financial information) above, a Compliance Certificate signed by the Chief Financial Officer on behalf of the Group and of Blue Bird Body Company setting out in reasonable detail computations establishing whether or not the Company is in compliance with Subclause 17.18 (Financial covenants) as at the date those accounts were drawn up.

(c)      The Company must provide the Agent for the Lenders in good time with the auditors' fee quotation referred to in paragraph (b)(i) above or with evidence that the auditors have declined to accept an engagement to sign the Compliance Certificate.

## 17.8    Authorisations

Each Obligor shall promptly:

(a)      obtain, maintain and comply with the terms of; and

(b)      upon request, supply certified copies to the Agent of,

any authorisation required under any law or regulation to enable it to perform its material obligations under, or for the validity or enforceability of, any Finance Document.

## 17.9    Pari passu ranking

Each Obligor shall procure that its obligations under the Finance Documents do and will rank at least *pari passu* with all its other present and future unsecured obligations, except for obligations mandatorily preferred by law applying to companies generally.

## 17.10   Negative pledge

(a)      No Obligor shall, and each Borrower shall procure that no other member of the Group will, create or permit to subsist any Security Interest on any of its assets.

(b)      Paragraph (a) does not apply to:

(i)      a Security Document;

(ii)     any lien (including a banker's lien and right to combine accounts) arising by operation of law in the ordinary course of business and securing amounts not more than 30 days overdue;

(iii)    any Security Interest over goods acquired by any member of the Group in the ordinary course of business arising out of title retention provisions in a supplier's standard conditions of supply entered into by that member of the Group in the ordinary course of its business;

(iv)    any Security Interest which constitutes a contractual right of any bank or financial institution to apply any credit balance maintained by any member of the Group with that bank or financial institution against any other amount payable to such bank or financial institution by that or any other member of the Group pursuant to a cash management or cash pooling scheme entered into by members of the Group with that bank in connection with the relevant Group members' ordinary banking arrangements;

(v)     any Security Interest created on any asset (other than an asset acquired from another member of the Group) acquired by it after the date of this Agreement for the sole purpose of securing indebtedness incurred only to finance or refinance that acquisition;

(vi)    any Security Interest created by any member of the Group existing at and disclosed in writing to and accepted by the Finance Parties prior to the date of this Agreement provided that the amount secured by such Security Interest shall not be increased after the date of such disclosure;

(vii)   any Security Interest created with the approval of the Majority Lenders;

(viii)  any Permitted Transaction;

(ix)    any Wachovia Security Interest;

(x)     any Existing Facility Security Document;

(xi)    any cash cover of up to U.S.\$2,000,000 in aggregate provided for workers' compensation related letters of credit, and

(xii)   any other Security Interests so long as the aggregate amount of Financial Indebtedness secured by those Security Interests does not exceed (together with the amount of outstanding indebtedness permitted under Subclause 17.11 (Transactions similar to security), U.S.\$2,000,000 (or its equivalent in any other currency or currencies) at any time.

## 17.11   Transactions similar to security

(a)    No Obligor shall, and each Borrower shall procure that no other member of the Group will:

(i)     sell, transfer or otherwise dispose of any of its assets on terms whereby it is or may be leased to or re-acquired or acquired by a member of the Group or any of its related entities; or

(ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms, except for the discounting of bills or notes in the ordinary course of trading.

(b)     Paragraph (a) does not apply to nor limit any Permitted Transaction or to any transaction referred to in that paragraph where the aggregate of:

    (i)     the aggregate capital amount outstanding under finance leases entered into in respect of assets disposed of pursuant to a transaction referred to in subparagraph (i) above; and

    (ii)    the aggregate at the relevant time of all recourse referred to in subparagraph (ii) above; and

    (iii)   the aggregate of all Financial Indebtedness secured by Security Interests permitted under Subclause 17.10 (Negative pledge),

does not exceed U.S.$2,000,000 (or its equivalent in any other currency or currencies) at any time.

### 17.12   Disposals

(a)     No Obligor shall, and the Company shall procure that no other member of the Group will, either in a single transaction or in a series of transactions, whether related or not and whether voluntarily or involuntarily, sell, transfer, grant or lease or otherwise dispose of all or any part of its assets.

(b)     Paragraph (a) does not apply to:

    (i)      Permitted Transactions;

    (ii)     disposals made in the ordinary course of trading of the disposing entity;

    (iii)    disposals of cash for any purpose permitted by this Agreement;

    (iv)     disposals between Obligors;

    (v)      disposals of assets in exchange for other assets comparable or superior as to type, value and quality;

    (vi)     disposals from a member of the Group to another member of the Group provided that, where such other member of the Group is not an Obligor and the person making the disposal is an Obligor:

        (A)     such disposal must be on arm's length terms for fair market value; and

        (B)     the annual aggregate consideration payable for all such disposals shall not exceed U.S.$2,500,000;

    (vii)    disposals on arm's length terms of assets not required for the efficient operation of the business of the Group;

    (viii)   disposals of assets not exceeding U.S.$2,500,000 (or its equivalent in other currencies) in aggregate in any one financial year of the Group; and

    (ix)     any other disposal approved by the Majority Lenders.

(c)     Paragraph (b) does not permit the disposal of any asset that is subject to a fixed Security, Interest except in accordance with Subclause 19.7 (Release of security).

**17.13    Mergers, acquisitions and joint ventures**

(a)    No Obligor shall enter into any amalgamation, demerger, merger or reconstruction (other than on terms approved by the Majority Lenders (acting reasonably)).

(b)    No Obligor shall, and each Borrower shall procure that no other member of the Group will, acquire any assets or business or make any investment or enter into or acquire any interest in any joint venture, partnership or similar arrangement, other than:

    (i)    in the ordinary course of trading;

    (ii)    otherwise up to an aggregate annual amount of U.S.$2,000,000 provided that no Default is outstanding;

    (iii)    otherwise as approved by the Majority Lenders;

    (iv)    pursuant to a Permitted Transaction; or

(c)    any investment made by an Obligor pursuant to paragraph (b) may only be in Cash or Cash Equivalents.

**17.14    Restrictions on additional indebtedness**

The Company shall ensure that no member of the Group incurs any Financial Indebtedness except for:

(a)    Financial Indebtedness incurred with the prior consent of the Majority Lenders;

(b)    Financial Indebtedness of a member of the Group to or in favour of any other member of the Group;

(c)    foreign exchange, interest rate or similar hedging arrangements entered into only for the purposes of managing the interest rate and foreign exchange rates of the Group and not for any speculative purpose or pursuant to any financial trading;

(d)    Financial Indebtedness of any member of the Group acquired after the date of this Agreement if:

    (i)    the Financial Indebtedness was incurred prior to the acquisition of the relevant company and otherwise than in contemplation of the acquisition; and

    (ii)    the amount of the Financial Indebtedness immediately prior to the acquisition is not thereafter exceeded; and

    (iii)    such Financial Indebtedness is repaid or discharged in full within 12 months of the date of the acquisition;

(e)    Financial Indebtedness incurred in respect of performance, completion or similar bonds up to an aggregate principal amount outstanding at any time of U.S.$5,000,000 (or its equivalent in other currencies);

(f)    Financial Indebtedness incurred under a Permitted Transaction;

(g)    guarantees given by an Obligor to a third party in respect of the Financial Indebtedness of another Obligor;

(h) Financial Indebtedness under the Finance Documents;

(i) Financial Indebtedness under the Existing Facility Agreement;

(j) Financial Indebtedness under the Wachovia Ancillary Facility; and

(k) any other Financial Indebtedness up to an aggregate principal amount outstanding at any one time of U.S.$5,000,000 (or its equivalent in other currencies).

## 17.15   Compliance with laws

Each member of the Group must comply in all respects with all laws and regulations to which it or its property is subject, except where failure to do so is not reasonably likely to have a Material Adverse Effect.

## 17.16   Change of business

The Company must ensure that no substantial change is made to the general nature of the business of the Company or the Group from that carried on at the date of this Agreement.

## 17.17   Environmental matters

(a) In this Subclause:

**Environmental Approval** means any license, permit, approval, registration or authorisation required by an Environmental Law.

**Environmental Claim** means any claim, action, proceeding, demand or investigation by any person in connection with:

(i) a breach, or alleged breach, of any Environmental Law or Environmental Approval;

(ii) any accident, fire, explosion or other event of any type involving an emission or substance which is capable of causing harm to any living organism or the environment; or

(iii) any other presence, release or migration or any emission or substance which is capable of causing harm to any living organism or the environment including but not limited to asbestos or asbestos-containing materials in any product or at any location, or any other liability or alleged liability relating to any Environmental Law or Environmental Approval.

**Environmental Law** means any law or regulation concerning:

(i) the protection of health and safety;

(ii) the environment; or

(iii) any emission or substance which is capable of causing harm to any living organism or the environment.

(b) Each Obligor must ensure that it is, and has been, in compliance with all Environmental Laws and Environmental Approvals applicable to it or the property over which it has charge, control or management, except where failure to do so is not reasonably likely to have a Material Adverse Effect or result in any liability for a Finance Party.

(c)     Each Obligor must promptly upon becoming aware notify the Agent of:

    (i)     any Environmental Claim current, or to its knowledge, pending or threatened; or

    (ii)     any circumstances reasonably likely to result in an Environmental Claim,

which, if substantiated, is reasonably likely to either have a Material Adverse Effect or result in any liability for a Finance Party.

**17.18    Financial covenants**

(a)     The Company shall comply with financial covenants to be agreed with the Majority Lenders by no later than 30 days from the date of this Agreement for the period ending on the Initial Maturity Date.  Such financial covenants may include:

    (i)     Consolidated EBITDA;

    (ii)     the value of Orders in respect of deliveries during the relevant Order cover period;

    (iii)     no funding requirement in excess of the Total Commitments anticipated during the period of each rolling 13 week cash flow forecast;

(b)     All the terms used or referred to in the definitions used in paragraph (a)(i) and (a)(ii) above will be based on the definitions used in the Existing Facility Agreement.

**17.19    ERISA**

(a)     Each Obligor must promptly upon becoming aware of it notify the Agent of:

    (i)     any Reportable Event;

    (ii)     the termination of or withdrawal from, or any circumstances reasonably likely to result in the termination of or withdrawal from, any Plan subject to Title IV of ERISA or a complete or partial withdrawal from any Multiemployer Plan or any action that might result in complete or partial withdrawal; and

    (iii)     a claim or other communication alleging material non-compliance with any law or regulation relating to any Plan.

(b)     Each Obligor and each member of the Controlled Group must be, and remain, in compliance in all respects with all laws and regulations relating to each of its Plans, where failure to do so is reasonably likely to have a Material Adverse Effect.

(c)     Each Obligor and member of the Controlled Group must ensure that no event or condition exists at any time in relation to a Plan which is reasonably likely to result in the imposition of a Security Interest on any of its assets or which is reasonably likely to have a Material Adverse Effect.

**17.20    Canadian plans**

(a)     For each existing Canadian Pension Plan, each Obligor and its Subsidiaries shall ensure that each plan retains its registered status under and is administered in a timely manner in all respects in accordance with applicable pension plan text and funding agreement, the ITA and all other applicable laws.

(b)     For each Canadian Pension Plan adopted by an Obligor or any of its Subsidiaries after the date of this Agreement which is required to be registered under the ITA or any other applicable laws, that Obligor or Subsidiary shall use its best efforts to seek and receive confirmation in writing from the applicable governmental authority to the effect that the plan is unconditionally registered under the ITA and any other applicable laws.

(c)     For each existing or adopted Canadian Pension Plan and Canadian Benefit Plan, each Obligor and its Subsidiaries shall in a timely fashion perform in all material respects all obligations (including fiduciary, funding, investment and administration obligations) required to be performed in connection with that plan and its funding media where failure to do so could reasonably be likely to have a Material Adverse Effect.

## 17.21   Insurance

Each Obligor shall, and the Company shall procure that each member of the Group will, maintain insurance with financially sound and reputable insurers with respect to its assets of an insurable nature against such risks and in such amounts as are normally maintained by persons who carry on a similar class of business.

## 17.22   Intercompany debt

No member of the Group which is the creditor in respect of any Financial Indebtedness to any other member of the Group may take any action to cause that Financial Indebtedness to become due or to be paid unless the other member of the Group has sufficient readily available cash to pay the sum which is due or demanded.

## 17.23   Bank accounts

No member of the Group may open or maintain an account with a bank or financial institution (other than Wachovia) that is a Local Bank, a Finance Party or an Affiliate of a Finance Party unless such Local Bank, Finance Party or Affiliate of a Finance Party has executed a deposit account control agreement or other applicable security perfecting documentation to the satisfaction of the Agent promptly (but in any event within 30 days of the date of this Agreement (or such later date as the Agent, in its sole discretion, may agree)).

## 17.24   Additional security/further assurance

(a)     Each Obligor shall take whatever action the Agent may require for creating or perfecting security, in a form and substance satisfactory to the Agent, over all or substantially (as the Agent may require) all of the undertaking and assets of any Additional Obligor, this includes:

(i)      the execution of any transfer, conveyance, assignment by way of security or assurance of any property, whether to the Agent or to its nominee; or

(ii)     the giving of any notice, order or direction and the making of any registration,

which, in any such case, the Agent may think expedient, in each case, provided that the extent and terms of such security will be consistent with the security provided by other Obligors in the same jurisdiction (if any) or, if there are none, in accordance with prudent secured lending practice in the relevant jurisdiction and will not in any event be granted if it would give rise to a material risk to the directors of the relevant Obligor incurring personal liability.

(b)     Each Obligor shall take whatever action, including without limitation re-execution, ratification and/or reregistration of any Security Document, the Agent requires (acting

reasonably) to ensure the Security Interests constituted by that Security Document continue for the benefit of the Finance Parties (including an Incoming Lender, as defined in Subclause 26.2 (Assignments and transfers by Lenders) following a transfer by a Finance Party under this Agreement.

(c)     Each Obligor shall use its best efforts to obtain as soon as reasonably practicable within 45 days of the date of this Agreement, the written consent of contractual counterparties who hold the benefit of a negative pledge (granted by the relevant Obligor) for a junior ranking Security Interest (securing, to the extent legally permissible, all amounts under the Finance Documents) to be granted to the Agent.

(d)     In the event that the consent in paragraph (c) above is obtained, the relevant Obligor shall use its best efforts to:

(i)     execute, at its own expense, appropriate documentation to grant the junior ranking Security Interest (securing, to the extent legally permissible, all amounts under the Finance Documents) in favour of the Agent; and

(ii)    take all necessary steps in order to perfect the Security Interest referred to in sub-paragraph (i) above,

as soon as reasonably practicable, but in any event within 30 days of the consent being given.

## 17.25   U.S. Securities Laws

No Obligor may use any part of any Loan to acquire any security in a transaction that is subject to the reporting requirements of section 13 and 14 of the United States Securities Exchange Act of 1934.

## 17.26   Canadian Blue Bird Coach, Ltd.

No member of the Group (other than Canadian Bluebird Coach, Ltd.) may transfer any asset (other than payments for services rendered by Canadian Blue Bird Coach, Ltd. to such a member in the ordinary course of trade) to, nor incur any Financial Indebtedness in respect of, Canadian Blue Bird Coach, Ltd. with a value in excess of an aggregate amount of U.S.$1,000,000, without the prior consent of the Majority Lenders.

## 17.27   Amendment of other documentation

No Obligor shall agree an amendment of the terms of, or consent to waive any of its rights under:

(a)     its Certificate of Incorporation or Bylaws;

(b)     the Cooper Services Agreement;

(c)     the Step 10 Agreement; and

(d)     the Retained Group Indemnity,

except with the prior consent of the Majority Lenders.

**17.28    Transactions with Henlys Group plc**

(a)    No member of the Group may transfer any asset nor pay any money to, nor incur any Financial Indebtedness to or for the account of, nor guarantee or assume any obligation of, or otherwise have any dealings, whether or not for consideration, of any kind, with Henlys Group plc or any of its Affiliates.

(b)    Paragraph (a) does not apply to transactions or obligations under the Step 10 Agreement or the Retained Group Indemnity.

**17.29    Access**

(a)    Upon reasonable notice being given by the Agent, each member of the Group must allow any one or more representatives of the Agent and/or accountants or other professional advisers appointed by the Agent (at the Company's risk and expense) to have access during normal business hours to the properties, assets, books and records of that member of the Group.

(b)    The Agent may not give notice under paragraph (a) above unless it believes that a Default is outstanding or may have occurred or may occur.

**18.    DEFAULT**

**18.1    Events of Default**

Each of the events set out in this Clause is an Event of Default (whether or not caused by any reason whatsoever outside the control of any Obligor or any other person).

**18.2    Non-payment**

An Obligor does not pay on the due date any amount payable by it under the Finance Documents at the place and in the currency in which it is expressed to be payable unless such non-payment is due solely to technical and/or administrative delays in the transmission of funds and such amount is paid within three Business Days of its due date.

**18.3    Breach of other obligations**

(a)    The Company does not comply with any provision of Subclause 17.18 (Financial covenants); or

(b)    An Obligor does not comply with any provision of the Finance Documents (other than those referred to in paragraph (a) above or Subclause 18.2 (Non-payment)) and, if capable of remedy, such default is not remedied within 14 days after the earlier of the relevant Obligor becoming aware of the default and notice of the default being given by the Agent to the Company.

**18.4    Misrepresentation**

A representation, warranty or statement made or repeated in or in connection with any Finance Document or in any document delivered by or on behalf of any Obligor under or in connection with any Finance Document is incorrect in any material respect when made or deemed to be made or repeated and, if the events or circumstances giving rise to the incorrectness are capable of remedy, they are not remedied within 14 days after the date when the representation, warranty or statement was made or repeated.

**18.5    Cross-default**

Any of the following occurs:

(a)    Any Financial Indebtedness of any member of the Group is not paid when due or within:

(A)    any applicable grace period; or

(B)    in the case of an on-demand overdraft facility only, three Business Days of demand;

(b)    an event of default howsoever described occurs under any document relating to Financial Indebtedness of a member of the Group and is continuing unremedied and unwaived;

(c)    any Financial Indebtedness of a member of the Group becomes prematurely due and payable or is placed on demand as a result of an event of default (howsoever described) under the document relating to that Financial Indebtedness;

(d)    any Security Interest securing Financial Indebtedness over any asset of a member of the Group becomes enforceable; or

(e)    any commitment for, or underwriting of, any Financial Indebtedness of a member of the Group is cancelled or suspended as a result of an event of default (howsoever described) under the document relating to that Financial Indebtedness,

unless the aggregate of the Financial Indebtedness referred to in paragraphs (a) to (e) (inclusive) above is less than an aggregate amount of U.S.$2,000,000  (or its equivalent in any other currency).

**18.6    Insolvency**

(a)    Any Material Company is, or is deemed for the purposes of any law to be, unable to pay its debts as they fall due or insolvent, or admits its inability to pay its debts as they become due;

(b)    Any Material Company suspends making payments on all or any class of its debts or announces an intention to do so, or a moratorium is declared in respect of any of its indebtedness;

(c)    Any Material Company by reason of actual or anticipated financial difficulties, begins negotiations with one or more of its creditors with a view to the readjustment or rescheduling of any of its indebtedness; or

(d)    If a moratorium occurs in respect of any Material Company, the ending of the moratorium will not remedy any Event of Default caused by the moratorium.

**18.7    Insolvency proceedings**

(a)    Except as provided below, any of the following occurs in respect of any Material Company:

(i)    it makes a general assignment for the benefit of creditors;

(ii)    it commences a voluntary case or proceeding under any U.S. Bankruptcy Code;

(iii)   an involuntary case or proceeding under any U.S. Bankruptcy Code is commenced against it and is not controverted within 30 days or is not dismissed or stayed within 90 days after commencement of the case;

(iv)   any step (not including the taking of advice or engaging in preliminary discussions or analysis) whether by a third party or by any Material Company is taken with a view to a moratorium or a composition, assignment or similar arrangement with any of its creditors;

(v)   a meeting of its shareholders, directors or other officers is convened for the purpose of considering for approval any resolution for, to petition for or to file documents with a court or any registrar for, its liquidation, winding-up, administration or dissolution or any such resolution is passed;

(vi)   any person presents a petition or proposal, or files documents with a court or any registrar (other than a petition or documents relating to a case or proceeding described in paragraph (ii) or (iii) above), for its liquidation, winding-up, administration or dissolution and this petition is not contested in good faith and with due diligence and discharged or struck out within seven days;

(vii)   an order for its liquidation, winding-up, administration or dissolution is made;

(viii)   any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer is appointed in respect of it or any of its assets;

(ix)   its shareholders, directors or other officers request the appointment of, or give notice of their intention to appoint, a liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator or similar officer; or

(x)   any other analogous step or procedure is taken in any jurisdiction.

(b)   Paragraph (a) does not apply to:

(i)   any step or procedure in connection with a solvent reconstruction of any Material Company on terms approved by the Majority Lenders; or

(ii)   any such event occurring in relation to a Dormant Subsidiary.

**18.8   Enforcement of Security Interests**

Any steps are taken to enforce any Security Interest over any part of the assets of any Material Company with a value in excess of U.S.$50,000.

**18.9   Creditors' process**

Any attachment, sequestration, distress or execution affects any material asset of any Material Company and is not discharged within 14 days.

**18.10   Analogous proceedings**

Subject to Subclause 18.16 (Canadian Bankruptcy Laws) in the case of any Material Company incorporated in Canada, there occurs, in relation to any Material Company, any

event anywhere which corresponds with any of those mentioned in Subclauses 18.6 (Insolvency) to 18.9 (Creditors' process) (inclusive).

**18.11  Cessation of business**

The Company or any Material Subsidiary ceases, or threatens to cease, to carry on all or a substantial part of its business (other than as a result of or in connection with a disposal of its business or assets permitted by Subclause 17.12 (Disposals)), to an extent or in a manner which could reasonably be expected to have a Material Adverse Effect.

**18.12  Unlawfulness**

It is or becomes unlawful for any Obligor to perform any of its obligations under the Finance Documents.

**18.13  Guarantees**

The guarantee of any Guarantor is not effective or is alleged by an Obligor to be ineffective for any reason.

**18.14  Ownership of the Guarantors**

Any Obligor (other than the Company) is not or ceases to be a Subsidiary of the Company otherwise than pursuant to a transaction including a release of that Obligor in accordance with Subclause 26.8 (Resignation of an Obligor (other than the Company)).

**18.15  Material adverse change**

Any event or series of events occurs which could reasonably be expected to have a Material Adverse Effect.

**18.16  Canadian Bankruptcy Laws**

(a)    Any Material Company commences a voluntary case or proceeding under the BIA or the Companies' Creditors Arrangement Act (Canada) or other similar law (collectively **Canadian Bankruptcy Laws**); or

(b)    an involuntary case under any Canadian Bankruptcy Law is commenced against any Material Company and (i) the petition is not controverted within 30 days or (ii) is not dismissed or stayed within 90 days after commencement of the case; or

(c)    a custodian, conservator, receiver, monitor, interim receiver, liquidator, assignee, trustee, sequestrator or other similar official is appointed under any Canadian Bankruptcy Law or for all or substantial part of the property of any Material Company.

**18.17  ERISA**

(a)    Any event or condition that could reasonably be expected to result in any member of the Controlled Group incurring a material liability under ERISA to the United States Internal Revenue Service or to the PBGC or other applicable laws of any other jurisdiction, including the PBA; or

(b)    an **accumulated funding deficiency** (as that term is defined in section 412 of the United States Internal Revenue Code of 1986, as amended, or section 302 of ERISA), whether or not

waived, by reason of the failure of member of the Controlled Group to make a contribution to a Plan.

### 18.18 Subordination Agreement

Any Obligor fails to comply with its obligations under the Subordination Agreement.

### 18.19 Acceleration

(a) If an Event of Default described in Subclause 18.7 (Insolvency proceedings) or Subclause 18.16 (Canadian Bankruptcy Laws) occurs, the Total Commitments will, if not already cancelled under this Agreement, be immediately and automatically cancelled and all amounts outstanding under the Finance Documents will be immediately and automatically due and payable.

(b) On and at any time after the occurrence of an Event of Default the Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

    (i) cancel the Total Commitments; and/or

    (ii) declare that all or part of any amounts outstanding under the Finance Documents are:

        (A) immediately due and payable; and/or

        (B) payable on demand by the Agent acting on the instructions of the Majority Lenders.

## 19. SECURITY

### 19.1 Agent as trustee

Unless expressly provided to the contrary, the Agent holds any security created by a Security Document on trust for the Finance Parties.

### 19.2 Responsibility

The Agent is not liable or responsible to any other Finance Party for:

(a) any failure in perfecting or protecting the security created by any Security Document; or

(b) any other action taken or not taken by it in connection with any Security Document,

unless directly caused by its gross negligence or wilful misconduct.

### 19.3 Title

The Agent may accept, without enquiry, the title (if any) an Obligor may have to any asset over which security is intended to be created by any Security Document.

### 19.4 Possession of documents

The Agent is not obliged to hold in its own possession any Security Document, title deed or other document in connection with any asset over which security is intended to be created by a Security Document.

**19.5  Investments**

Except as otherwise provided in any Security Document, all moneys received by the Agent under a Security Document may be invested in the name of, or under the control of, the Agent in any investments selected by the Agent.  Additionally, those moneys may be placed on deposit in the name of, or under the control of, the Agent at any bank or institution (including itself) and upon such terms as it may think fit.

**19.6  Approval**

Each Finance Party confirms its approval of each Security Document.

**19.7  Release of security**

(a)  If:

(i)  a Guarantor ceases to be a member of the Group; or

(ii)  a Guarantor is released from all its obligations under the Finance Documents,

in a manner allowed by this Agreement, any security created by that Guarantor over its assets under the Security Documents will be released.

(b)  If a disposal of any asset subject to security created by a Security Document is made to a person (which is and will remain) outside the Group in the following circumstances:

(i)  the Majority Lenders agree to the disposal;

(ii)  the disposal is allowed by the terms of the Finance Documents and will not result or could not reasonably be expected to result in any breach of any term of any Finance Document;

(iii)  the disposal is being made at the request of the Agent in circumstances where any security created by the Security Documents has become enforceable; or

(iv)  the disposal is being effected by enforcement of a Security Document,

the asset being disposed of will be released from any security over it created by a Security Document.  However, the proceeds of any disposal (or an amount corresponding to them) must be applied in accordance with the requirements of the Finance Documents (if any).

(c)  If the Agent (acting reasonably) is satisfied that a release is allowed under this Subclause, the Agent must execute and instruct any co-security agent or delegated security agent to execute and deliver (at the request and expense of the relevant Obligor) any document which is reasonably required to achieve that release.  Each other Finance Party irrevocably authorises the Agent (and any co-security agent or delegated security agent) to execute and deliver any such document.

**19.8  Co-security Agent**

(a)  The Agent may appoint a separate security agent or a co-security agent in any jurisdiction outside England and Wales:

(i)     if the Agent (acting reasonably) considers that without the appointment the interests of the Lenders under the Finance Documents might be materially and adversely affected;

(ii)    for the purpose of complying with any law, regulation or other condition in any jurisdiction; or

(iii)   for the purpose of obtaining or enforcing a judgment or enforcing any Finance Document in any jurisdiction.

(b)     Any appointment under this Subclause will only be effective if the security agent or co-security agent confirms to the Agent and the Company in form and substance satisfactory to the Agent that it is bound by the terms of this Agreement as if it were the Agent.

(c)     The Agent may remove any security agent or co-security agent appointed by it and may appoint a new security agent or co-security agent in its place.

(d)     The Company must pay to the Agent any reasonable remuneration paid by the Agent to any security agent or co-security agent appointed by it, together with any related costs and expenses properly incurred by the security agent or co-security agent.

## 20.     THE ADMINISTRATIVE PARTIES

### 20.1    Appointment and duties of the Agent

(a)     Each Finance Party (other than the Agent) irrevocably appoints the Agent to act as its agent under the Finance Documents.

(b)     Each Finance Party irrevocably authorises the Agent to:

(i)     perform the duties and to exercise the rights, powers and discretions that are specifically given to it under the Finance Documents, together with any other incidental rights, powers and discretions; and

(ii)    execute each Finance Document expressed to be executed by the Agent.

(c)     The Agent has only those duties which are expressly specified in the Finance Documents. Those duties are solely of a mechanical and administrative nature.

### 20.2    No fiduciary duties

Except as specifically provided in a Finance Document, nothing in the Finance Documents makes an Administrative Party a trustee or fiduciary for any other Party or any other person. No Administrative Party need hold in trust any moneys paid to it for a Party or be liable to account for interest on those moneys.

### 20.3    Individual position of an Administrative Party

(a)     If it is also a Lender, each Administrative Party has the same rights and powers under the Finance Documents as any other Lender and may exercise those rights and powers as though it were not an Administrative Party.

(b)     Each Administrative Party may:

(i)    carry on any business with any Obligor or its related entities (including acting as an agent or a trustee for any other financing); and

(ii)    retain any profits or remuneration it receives under the Finance Documents or in relation to any other business it carries on with any Obligor or its related entities.

## 20.4    Reliance

An Administrative Party may:

(a)    rely on any notice or document believed by it to be genuine and correct and to have been signed by, or with the authority of, the proper person;

(b)    rely on any statement made by any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify;

(c)    engage, pay for and rely on professional advisers selected by it (including those representing a Party other than the Agent); and

(d)    act under the Finance Documents through its personnel and agents.

## 20.5    Majority Lenders' instructions

(a)    The Agent is fully protected if it acts on the instructions of the Majority Lenders (or the specified majorities) in the exercise of any right, power or discretion or any matter not expressly provided for in the Finance Documents.  Any such instructions given by the Majority Lenders (or other majority) will be binding on all the Lenders.  In the absence of instructions, the Agent may act as it considers to be in the best interests of all the Lenders (or all relevant Lenders, as applicable).

(b)    The Agent may assume that unless it has received notice to the contrary, any right, power, authority or discretion vested in any Party or the Majority Lenders (or other majority) has not been exercised.

(c)    The Agent is not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings in connection with any Finance Document.

(d)    The Agent may require the receipt of security satisfactory to it, whether by way of payment in advance or otherwise, against any liability or loss which it may incur in complying with the instructions of the Majority Lender (or other majority).

## 20.6    Responsibility

(a)    No Administrative Party is responsible to any other Finance Party for the adequacy, accuracy or completeness of:

(i)    any Finance Document or any other document; or

(ii)    any statement or information (whether written or oral) made in or supplied in connection with any Finance Document.

(b)    Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender confirms that it:

(i)     has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of each Obligor and its related entities and the nature and extent of any recourse against any Party or its assets); and

(ii)    has not relied exclusively on any information provided to it by any Administrative Party in connection with any Finance Document.

**20.7    Exclusion of liability**

(a)    No Administrative Party is liable or responsible to any other Finance Party for any action taken or not taken by it in connection with any Finance Document, unless directly caused by its gross negligence or wilful misconduct.

(b)    No Party (other than the relevant Administrative Party) may take any proceedings against any officer, employee or agent of an Administrative Party in respect of any claim it might have against that Administrative Party or in respect of any act or omission of any kind by that officer, employee or agent in connection with any Finance Document.  Any officer, employee or agent of that Administrative Party may rely on this Subclause and enforce its terms under the Contracts (Rights of Third Parties) Act 1999.

(c)    Nothing in this Agreement will oblige any Administrative Party to satisfy any "know your customer" requirement in relation to the identity of any person on behalf of any Finance Party.

(d)    Each Finance Party confirms to each Administrative Party that it is solely responsible for any "know your customer" requirements it is required to carry out and that it may not rely on any statement in relation to those requirements made by any other person.

**20.8    Default**

(a)    The Agent is not obliged to monitor or enquire whether a Default has occurred.  The Agent is not deemed to have knowledge of the occurrence of a Default.

(b)    If the Agent:

(i)     receives notice from a Party referring to this Agreement, describing a Default and stating that the event is a Default; or

(ii)    is aware of the non-payment of any principal or interest or any fee payable to a Lender under this Agreement,

it must promptly notify the Lenders.

**20.9    Information**

(a)    The Agent must promptly forward to the person concerned the original or a copy of any document which is delivered to the Agent by a Party for that person.

(b)    Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(c)    Except as provided above, the Agent has no duty:

      (i)      either initially or on a continuing basis to provide any Lender with any credit or other information concerning the risks arising under or in connection with the Finance Documents (including any information relating to the financial condition or affairs of any Obligor or its related entities or the nature or extent of recourse against any Party or its assets) whether coming into its possession before, on or after the date of this Agreement; or

      (ii)     unless specifically requested to do so by a Lender in accordance with a Finance Document, to request any certificate or other document from any Obligor.

(d)     In acting as the Agent, the agency division of the Agent is treated as a separate entity from its other divisions and departments. Any information acquired by the Agent which, in its opinion, is acquired by it otherwise than in its capacity as the Agent may be treated as confidential by the Agent and will not be treated as information possessed by the Agent in its capacity as such.

(e)     The Agent is not obliged to disclose to any person any confidential information supplied to it by or on behalf of a member of the Group solely for the purpose of evaluating whether any waiver or amendment is required in respect of any term of the Finance Documents.

(f)     Each Obligor irrevocably authorises the Agent to disclose to the other Finance Parties any information which, in its opinion, is received by it in its capacity as the Agent.

## 20.10    Indemnities

(a)     Without limiting the liability of any Obligor under the Finance Documents, each Lender must indemnify the Agent for that Lender's Pro Rata Share of any loss or liability incurred by the Agent in acting as the Agent, except to the extent that the loss or liability is caused by the Agent's gross negligence or wilful misconduct.

(b)     The Agent may deduct from any amount received by it for a Lender any amount due to the Agent from that Lender under a Finance Document but unpaid.

## 20.11    Compliance

Each Administrative Party may refrain from doing anything (including disclosing any information) which might, in its opinion, constitute a breach of any law or regulation or be otherwise actionable at the suit of any person, and may do anything which, in its opinion, is necessary or desirable to comply with any law or regulation.

## 20.12    Resignation of an Administrative Party

(a)     The Agent may resign and appoint any of its Affiliates as successor Agent by giving notice to the Lenders and the Company.

(b)     Alternatively, the Agent may resign by giving notice to the Lenders and the Company, in which case the Majority Lenders following consultation with the Company may appoint a successor Agent.

(c)     If no successor Agent has been appointed under paragraph (b) above within 30 days after notice of resignation was given, the Agent may appoint a successor Agent.

(d)     The person(s) appointing a successor Agent must, if practicable, consult with the Company prior to the appointment. Any successor Agent must have an office in the U.K.

(e)  The resignation of the Agent and the appointment of any successor Agent will both become effective only when the successor Agent notifies all the Parties that it accepts its appointment. On giving the notification, the successor Agent will succeed to the position of the Agent and the term **Agent** will mean the successor Agent.

(f)  The retiring Agent must, at its own cost, make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as the Agent under the Finance Documents.

(g)  Upon its resignation becoming effective, this Clause will continue to benefit the retiring Agent in respect of any action taken or not taken by it in connection with the Finance Documents while it was the Agent, and, subject to paragraph (f) above, it will have no further obligations under any Finance Document.

(h)  The Majority Lenders may, by notice to the Agent, require it to resign under paragraph (b) above.

### 20.13    Relationship with Lenders

(a)  The Agent may treat each Lender as a Lender, entitled to payments under this Agreement and as acting through its Facility Office(s) until it has received not less than five Business Days' prior notice from that Lender to the contrary.

(b)  The Agent may at any time, and must if requested to do so by the Majority Lenders, convene a meeting of the Lenders.

(c)  The Agent must keep a register of all the Parties and supply any other Party with a copy of the register on request.  The register will include each Lender's Facility Office(s) and contact details for the purposes of this Agreement.

### 20.14    Agent's management time

If the Agent requires, any amount payable to the Agent by any Party under any indemnity or in respect of any costs or expenses incurred by the Agent under the Finance Documents after the date of this Agreement may include the cost of using its management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Agent may notify to the relevant Party.  This is in addition to any amount in respect of fees or expenses paid or payable to the Agent under any other term of the Finance Documents.

### 20.15    Notice period

Where this Agreement specifies a minimum period of notice to be given to the Agent, the Agent may, at its discretion, accept a shorter notice period.

## 21.    EVIDENCE AND CALCULATIONS

### 21.1    Accounts

Accounts maintained by a Finance Party in connection with this Agreement are *prima facie* evidence of the matters to which they relate for the purpose of any litigation or arbitration proceedings.

**21.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under the Finance Documents will be, in the absence of manifest error *prima facie* evidence of the matters to which it relates.

**21.3    Calculations**

Any interest or fee accruing under this Agreement accrues from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 or 365 days or otherwise, depending on what the Agent determines is market practice.

**22.    FEES**

**22.1    Agent's fee**

The Company must pay to the Agent for its own account an agency fee in the manner agreed in the Fee Letter between the Agent and the Company.

**22.2    Commitment fee**

(a)    The Company must pay a commitment fee computed at the rate of 0.50 per cent. per annum on the undrawn, uncancelled amount of each Lender's Commitment.

(b)    Accrued commitment fee is payable quarterly in arrear from the date of this Agreement. Accrued commitment fee is also payable to the Agent for a Lender on the date its Commitment is cancelled in full.

**22.3    Arrangement fee**

The Company must pay to the Agent for the account of the Lenders an arrangement fee in the manner agreed in the Fee Letter between the Agent and the Company.

**23.    INDEMNITIES AND BREAK COSTS**

**23.1    Currency indemnity**

(a)    The Company must, as an independent obligation, indemnify each Finance Party against any loss or liability which that Finance Party incurs as a consequence of:

(i)    that Finance Party receiving an amount in respect of an Obligor's liability under the Finance Documents; or

(ii)    that liability being converted into a claim, proof, judgment or order,

in a currency other than the currency in which the amount is expressed to be payable under the relevant Finance Document.

(b)    Unless otherwise required by law, each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency other than that in which it is expressed to be payable.

**23.2    Other indemnities**

(a)    The Company must indemnify each Finance Party against any loss or liability which that Finance Party incurs as a consequence of:

    (i)    the occurrence of any Event of Default;

    (ii)    any failure by an Obligor to pay any amount due under a Finance Document on its due date, including any resulting from any distribution or redistribution of any amount among the Lenders under this Agreement;

    (iii)    (other than by reason of negligence or default by that Finance Party) a Loan not being made after a Request has been delivered for that Loan;

    (iv)    a Loan (or part of a Loan) not being prepaid in accordance with a notice of prepayment; or

    (v)    any other loss or liability any Finance Party incurs in connection with the transactions contemplated by this Agreement, including but not limited to any actual or prospective Environmental Claim against or affecting any Finance Party which involves or relates in any way to the current or former properties, activities or operations of the Company or any of its Subsidiaries or any of their respective predecessors.

The Company's liability in each case includes any loss or expense on account of funds borrowed, contracted for or utilised to fund any amount payable under any Finance Document, any amount repaid or prepaid or any Loan.

(b)    The Company must indemnify the Agent against any loss or liability incurred by the Agent as a result of:

    (i)    investigating any event which the Agent reasonably believes to be a Default; or

    (ii)    acting or relying on any notice which the Agent reasonably believes to be genuine, correct and appropriately authorised.

**23.3    Break Costs**

(a)    Each Borrower must pay to each Lender its Break Costs.

(b)    Break Costs are the amount (if any) determined by the relevant Lender by which:

    (i)    the interest which that Lender would have received for the period from the date of receipt of any part of its share in a Loan or an overdue amount to the last day of the applicable Term for that Loan or overdue amount if the principal or overdue amount received had been paid on the last day of that Term;

exceeds

    (ii)    the amount which that Lender would be able to obtain by placing an amount equal to the amount received by it on deposit with a leading bank in the appropriate interbank market for a period starting on the Business Day following receipt and ending on the last day of the applicable Term.

(c)     Each Lender must supply to the Agent for the relevant Borrower details of the amount of any Break Costs claimed by it under this Subclause.

## 24.     EXPENSES

### 24.1    Initial costs

The Company must pay to each Administrative Party the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with the negotiation, preparation, printing, execution and syndication of the Finance Documents.

### 24.2    Subsequent costs

The Company must pay to the Agent the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with:

(a)     the negotiation, preparation, printing and execution of any Finance Document (other than a Transfer Certificate) executed after the date of this Agreement; and

(b)     any amendment, waiver or consent requested by or on behalf of an Obligor or specifically allowed by this Agreement.

### 24.3    Enforcement costs

The Company must pay to each Finance Party the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of, or the preservation of any rights under, any Finance Document.

## 25.     AMENDMENTS AND WAIVERS

### 25.1    Procedure

(a)     Except as provided in this Clause, any term of the Finance Documents may be amended or waived with the agreement of the Company and the Majority Lenders.  The Agent may effect, on behalf of any Finance Party, an amendment or waiver allowed under this Clause.

(b)     The Agent must promptly notify the other Parties of any amendment or waiver effected by it under paragraph (a) above.  Any such amendment or waiver is binding on all the Parties.

### 25.2    Exceptions

(a)     An amendment or waiver which relates to:

(i)      the definition of Majority Lenders in Clause 1.1 (Definitions);

(ii)     an extension of the date of payment of any amount to a Lender under the Finance Documents;

(iii)    a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fee or other amount payable to a Lender under the Finance Documents;

(iv)     an increase in, or an extension of, a Commitment or the Total Commitments;

(v)      a release of an Obligor (otherwise than as expressly provided under this Agreement);

(vi)    release of any Security Document other than in accordance with the terms of the Finance Documents;

(vii)   a term of a Finance Document which expressly requires the consent of each Lender;

(viii)  the right of a Lender to assign or transfer its rights or obligations under the Finance Documents; or

(ix)    this Clause,

may only be made with the consent of all the Lenders.

(b)    An amendment or waiver which relates to the rights or obligations of an Administrative Party may only be made with the consent of that Administrative Party.

### 25.3 Change of currency

If a change in any currency of a country occurs (including where there is more than one currency or currency unit recognised at the same time as the lawful currency of a country), the Finance Documents will be amended to the extent the Agent (acting reasonably and after consultation with the Company) determines is necessary to reflect the change.

### 25.4 Waivers and remedies cumulative

The rights of each Finance Party under the Finance Documents:

(a)    may be exercised as often as necessary;

(b)    are cumulative and not exclusive of its rights under the general law; and

(c)    may be waived only in writing and specifically.

Delay in exercising or non-exercise of any right is not a waiver of that right.

## 26.    CHANGES TO THE PARTIES

### 26.1 Assignments and transfers by Obligors

No Obligor may assign or transfer any of its rights and obligations under the Finance Documents without the prior consent of all the Lenders.

### 26.2 Assignments and transfers by Lenders

(a)    A Lender (the **Transferring Lender**) may at any time assign or transfer (including by way of novation) any of its rights and obligations under this Agreement to any other bank or financial institution or to a trust fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **Incoming Lender**).

(b)    Unless the Company and the Agent otherwise agree, a transfer of part of a Commitment or the rights and obligations under this Agreement by the Transferring Lender must be in a minimum amount of U.S.$1,000,000.

(c)    The consent of the Company is required for any assignment or transfer unless the Incoming Lender is another Lender or an Affiliate of a Lender.  The consent of the Company must not

be unreasonably withheld or delayed.  The Company will be deemed to have given its consent five Business Days after the Company is given notice of the request unless it is expressly refused by the Company within that time.

(d)     The Company may not withhold its consent solely because the assignment or transfer might increase the Mandatory Cost.

(e)     A transfer of obligations will be effective only if either:

    (i)     the obligations are novated in accordance with the following provisions of this Clause; or

    (ii)    the Incoming Lender confirms to the Agent and the Company in form and substance satisfactory to the Agent that it is bound by the terms of this Agreement as a Lender. On the transfer becoming effective in this manner the Transferring Lender will be released from its obligations under this Agreement to the extent that they are transferred to the Incoming Lender.

(f)     Unless the Agent otherwise agrees, the Incoming Lender must pay to the Agent for its own account, on or before the date any assignment or transfer occurs, a fee of U.S.$1,500.

(g)     Any reference in this Agreement to a Lender includes an Incoming Lender but excludes a Lender if no amount is or may be owed to or by it under this Agreement.

(h)     Nothing in this Agreement prohibits a Lender from assigning without notice or cost all or any part of its rights and benefits under this Agreement to a United States Federal Reserve Bank as security for borrowing from that United States Federal Reserve Bank provided that no such assignments release a Lender from any of its obligations under this Agreement.

**26.3    Register**

The Agent, as agent for the Company solely for the purposes of this paragraph, shall maintain a book-entry registration transfer system (the **Register**) for the purpose of all transfers made pursuant to Clause 26.2 or Clause 26.4.   Notwithstanding any other provision of this Agreement, the transfer of all or any part of the rights and/or obligations under the Finance Document shall not be effective until such transfer is recorded on the Register and prior to such recordation all amounts owing to the Transferring Lender with respect to such rights and/or obligations shall remain owing to the Transferring Lender.   The registration of the assignment, novation or transfer of all or any part of rights and/or obligations under the Finance Documents shall be recorded by the Agent on the Register only upon the acceptance by the Agent of a properly executed and delivered Transfer Certificate pursuant to Clause 26.4 and the satisfaction of the requirements of Clause 26.2 (at which time the Agent shall be required to register the relevant transfer on the Register).

**26.4    Procedure for transfer by way of novations**

(a)     In this Subclause:

**Transfer Date** means, for a Transfer Certificate, the later of:

    (i)     the proposed Transfer Date specified in that Transfer Certificate; and

    (ii)    the date on which the Agent executes that Transfer Certificate.

(b)     A novation is effected if:

    (i)     the Transferring Lender and the Incoming Lender deliver to the Agent a duly completed Transfer Certificate; and

    (ii)    the Agent executes it.

The Agent must execute as soon as reasonably practicable a Transfer Certificate delivered to it and which appears on its face to be in order.

(c)     Each Party (other than the Transferring Lender and the Incoming Lender) irrevocably authorises the Agent to execute any duly completed Transfer Certificate on its behalf.

(d)     On the Transfer Date:

    (i)     the Incoming Lender will assume the rights and obligations of the Transferring Lender expressed to be the subject of the novation in the Transfer Certificate in substitution for the Transferring Lender; and

    (ii)    the Transferring Lender will be released from those obligations and cease to have those rights.

## 26.5    Limitation of responsibility of Transferring Lender

(a)     Unless expressly agreed to the contrary, a Transferring Lender is not responsible to an Incoming Lender for the legality, validity, adequacy, accuracy, completeness or performance of:

    (i)     any Finance Document or any other document; or

    (ii)    any statement or information (whether written or oral) made in or supplied in connection with any Finance Document,

and any representations or warranties implied by law are excluded.

(b)     Each Incoming Lender confirms to the Transferring Lender and the other Finance Parties that it:

    (i)     has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of each Obligor and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in this Agreement; and

    (ii)    has not relied exclusively on any information supplied to it by the Transferring Lender in connection with any Finance Document.

(c)     Nothing in any Finance Document requires a Transferring Lender to:

    (i)     accept a re-transfer from an Incoming Lender of any of the rights and obligations assigned or transferred under this Clause; or

    (ii)    support any losses incurred by the Incoming Lender by reason of the non-performance by any Obligor of its obligations under any Finance Document or otherwise.

26.6    **Costs resulting from change of Lender or Facility Office**

If:

(a)    a Lender assigns or transfers any of its rights and obligations under the Finance Documents or changes its Facility Office; and

(b)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to pay a Tax Payment or an Increased Cost,

then, unless the assignment, transfer or change is made by a Lender to mitigate any circumstances giving rise to the Tax Payment, Increased Cost or a right to be prepaid and/or cancelled by reason of illegality, the Obligor need only pay that Tax Payment or Increased Cost to the same extent that it would have been obliged to if no assignment, transfer or change had occurred.

26.7    **Additional Obligors**

(a)    If one of the wholly-owned Subsidiaries of the Company is to become an Additional Obligor, then the Company must (following consultation with the Agent) deliver to the Agent the relevant documents and evidence listed in Schedule 2 (Conditions Precedent Documents – to be delivered by an Additional Obligor).

(b)    The prior consent of the Majority Lenders is required if the Additional Obligor is an Additional Borrower and is incorporated in a jurisdiction outside the U.S.

(c)    The relevant Subsidiary will become an Additional Obligor when the Agent notifies the other Finance Parties and the Company that it has received all of the documents and evidence referred to in paragraph (a) above in form and substance satisfactory to it.  The Agent must give this notification as soon as reasonably practicable.

(d)    Delivery of an Accession Agreement, executed by the relevant Subsidiary and the Company, to the Agent constitutes confirmation by that Subsidiary and the Company that the Repeating Representations are then correct.

26.8    **Resignation of an Obligor (other than the Company)**

(a)    In this Subclause, **Resignation Request** means a letter in the form of Schedule 7 (Form of Resignation Request), with such amendments as the Agent may approve or reasonably require.

(b)    The Company may request that an Obligor (other than the Company) ceases to be an Obligor by giving to the Agent a duly completed Resignation Request.

(c)    The Agent must accept a Resignation Request and notify the Company and the Lenders of its acceptance if either:

    (i)    (A)    in the case of a Guarantor, the Majority Lenders have consented to the Resignation Request; or

            (B)    it is not aware that a Default is outstanding or would result from the acceptance of the Resignation Request; and

            (C)    no amount owed by that Obligor under this Agreement is still outstanding.

(ii)     in the case of a Guarantor, all of the capital stock of such Guarantor is disposed of in a transaction permitted by the terms of the Finance Documents.

(d)     The Obligor will cease to be a Borrower and/or a Guarantor, as appropriate, when the Agent gives the notification referred to in paragraph (c) above.

(e)     An Obligor (other than the Company) may also cease to be an Obligor in any other manner approved by the Majority Lenders.

**26.9     Changes to the Reference Banks**

If a Reference Bank (or, if a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Agent must (in consultation with the Company) appoint another Lender or an Affiliate of a Lender to replace that Reference Bank.

**26.10     Affiliates of Lenders**

(a)     Each Lender may fulfil its obligations in respect of any Loan through an Affiliate if:

(i)     the relevant Affiliate is specified in this Agreement as a Lender or becomes a Lender by means of a Transfer Certificate in accordance with this Agreement; and

(ii)     the Loans in which that Affiliate will participate are specified in this Agreement or in a notice given by that Lender to the Agent and the Company.

In this event, the Lender and the Affiliate will participate in Loans in the manner provided for in subparagraph (ii) above.

(b)     If paragraph (a) above applies, the Lender and its Affiliate will be treated as having a single Commitment and a single vote, but, for all other purposes, will be treated as separate Lenders.

**27.     DISCLOSURE OF INFORMATION**

(a)     Each Finance Party must keep confidential any information supplied to it by or on behalf of any Obligor in connection with the Finance Documents.  However, a Finance Party is entitled to disclose information:

(i)     which is publicly available, other than as a result of a breach by that Finance Party of this Clause;

(ii)     in connection with any legal or arbitration proceedings;

(iii)     if required to do so under any law or regulation;

(iv)     to a governmental, banking, taxation or other regulatory authority;

(v)     to its professional advisers;

(vi)     to the extent allowed under paragraph (b) below;

(vii)     to another Obligor; or

(viii)     with the agreement of the relevant Obligor.

(b)     A Finance Party may disclose to an Affiliate or any person with whom it may enter, or has entered into, any kind of transfer, participation or other agreement in relation to this Agreement (a **participant**):

(i)      a copy of any Finance Document; and

(ii)     any information which that Finance Party has acquired under or in connection with any Finance Document.

(c)     However, before a participant may receive any confidential information, the Finance Party must notify the Company and the participant must agree with the relevant Finance Party to keep that information confidential on the terms of paragraph (a) above.

(d)     This Clause supersedes any previous confidentiality undertaking given by a Finance Party in connection with this Agreement prior to it becoming a Party.

## 28.    SET-OFF

A Finance Party may set off any matured obligation owed to it by an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any obligation (whether or not matured) owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 29.    PRO RATA SHARING

### 29.1   Redistribution

If any amount owing by an Obligor under this Agreement to a Lender (the **recovering Lender**) is discharged by payment, set-off or any other manner other than through the Agent under this Agreement (a **recovery**), then:

(a)     the recovering Lender must, within three Business Days, supply details of the recovery to the Agent;

(b)     the Agent must calculate whether the recovery is in excess of the amount which the recovering Lender would have received if the recovery had been received by the Agent under this Agreement; and

(c)     the recovering Lender must pay to the Agent an amount equal to the excess (the **redistribution**).

### 29.2   Effect of redistribution

(a)     The Agent must treat a redistribution as if it were a payment by the relevant Obligor under this Agreement and distribute it among the Lenders, other than the recovering Lender, accordingly.

(b)     When the Agent makes a distribution under paragraph (a) above, the recovering Lender will be subrogated to the rights of the Finance Parties which have shared in that redistribution.

(c)     If and to the extent that the recovering Lender is not able to rely on any rights of subrogation under paragraph (b) above, the relevant Obligor will owe the recovering Lender a debt which is equal to the redistribution, immediately payable and of the type originally discharged.

(d)     If:

      (i)     a recovering Lender must subsequently return a recovery, or an amount measured by reference to a recovery, to an Obligor; and

      (ii)     the recovering Lender has paid a redistribution in relation to that recovery,

each Finance Party must reimburse the recovering Lender all or the appropriate portion of the redistribution paid to that Finance Party, together with interest for the period while it held the re-distribution.  In this event, the subrogation in paragraph (b) above will operate in reverse to the extent of the reimbursement.

## 29.3    Exceptions

Notwithstanding any other term of this Clause, a recovering Lender need not pay a redistribution to the extent that:

(a)     it would not, after the payment, have a valid claim against the relevant Obligor in the amount of the redistribution; or

(b)     it would be sharing with another Finance Party any amount which the recovering Lender has received or recovered as a result of legal or arbitration proceedings, where:

      (i)     the recovering Lender notified the Agent of those proceedings; and

      (ii)     the other Finance Party had an opportunity to participate in those proceedings but did not do so or did not take separate legal or arbitration proceedings as soon as reasonably practicable after receiving notice of them.

## 30.    SEVERABILITY

If a term of a Finance Document is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)     the legality, validity or enforceability in that jurisdiction of any other term of the Finance Documents; or

(b)     the legality, validity or enforceability in other jurisdictions of that or any other term of the Finance Documents.

## 31.    COUNTERPARTS

Each Finance Document may be executed in any number of counterparts.  This has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**32.**    **NOTICES**

(a)    In writing

    (i)    Any communication in connection with a Finance Document must be in writing and, unless otherwise stated, may be given:

    (ii)    in person, by post, fax or any other electronic communication approved by the Agent; or

    (iii)    if between the Agent and a Lender and the Agent and the Lender agree, by e-mail or other electronic communication.

(b)    For the purpose of the Finance Documents, an electronic communication will be treated as being in writing.

(c)    Unless it is agreed to the contrary, any consent or agreement required under a Finance Document must be given in writing.

**32.2    Contact details**

(a)    Except as provided below, the contact details of each Party for all communications in connection with the Finance Documents are those notified by that Party for this purpose to the Agent on or before the date it becomes a Party.

(b)    The contact details of the Company and each other Obligor for this purpose are:

| | |
|---|---|
| Address: | Peach County Holdings, Inc.<br>402 Blue Bird Boulevard,<br>Fort Valley, CA 31030,<br>USA |
| Fax number: | 478 822 2456 |
| Attention: | Chief Financial Officer |

(c)    The contact details of the Agent for this purpose are:

*In respect of operational and mechanical matters:*

| | |
|---|---|
| Address: | The Royal Bank of Scotland plc<br>Loans Administration Unit<br>2 ½ Devonshire Square<br>London EC2M 4BB |
| Fax number: | 020 7615 7673 |
| Attention: | Neil Burrough |

*In respect of non-operational matters (waivers/covenant compliance):*

| | |
|---|---|
| Address: | The Royal Bank of Scotland plc<br>Syndicated Loans Agency<br>Level 7 |

135 Bishopsgate
London EC2M 3UR

Fax Number:    020 7085 4564

Attention:    Tony Bennett

(d)    Any Party may change its contact details by giving five Business Days' notice to the Agent or (in the case of the Agent) to the other Parties.

(e)    Where a Party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

## 32.3    Effectiveness

(a)    Except as provided below, any communication in connection with a Finance Document will be deemed to be given as follows:

    (i)    if delivered in person, at the time of delivery;

    (ii)    if posted, five days after being deposited in the post, postage prepaid, in a correctly addressed envelope; and

    (iii)    if by fax, when received in legible form.

(b)    A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

(c)    A communication to the Agent will only be effective on actual receipt by it.

## 32.4    Obligors

(a)    All communications under the Finance Documents to or from an Obligor must be sent through the Agent.

(b)    All communications under the Finance Documents to or from an Obligor (other than the Company) must be sent through the Company.

(c)    Each Obligor (other than the Company) irrevocably appoints the Company to act as its agent:

    (i)    to give and receive all communications under the Finance Documents;

    (ii)    to supply all information concerning itself to any Finance Party; and

    (iii)    to sign all documents under or in connection with the Finance Documents.

(d)    Any communication given to the Company in connection with a Finance Document will be deemed to have been given also to the other Obligors.

(e)    The Agent may assume that any communication made by the Company is made with the consent of each other Obligor.

33. **LANGUAGE**

(a)     Any notice given in connection with a Finance Document must be in English.

(b)     Any other document provided in connection with a Finance Document must be:

   (i)     in English; or

   (ii)    (unless the Agent otherwise agrees) accompanied by a certified English translation. In this case, the English translation prevails unless the document is a statutory or other official document.

34. **GOVERNING LAW**

   This Agreement is governed by English law.

35. **ENFORCEMENT**

35.1 **Jurisdiction**

(a)     The English courts have exclusive jurisdiction to settle any dispute in connection with any Finance Document.

(b)     Notwithstanding paragraph (a) above, any New York State court or Federal court sitting in the City and County of New York also has jurisdiction to settle any dispute in connection with any Finance Document and, for the benefits of the Finance Parties, each Obligor submits to the jurisdiction of those courts.

(c)     The English and New York courts are the most appropriate and convenient courts to settle any such dispute and each Obligor waives objection to those courts on the grounds of inconvenient forum or otherwise in relation to proceedings in connection with any Finance Document.

(d)     This Clause is for the benefit of the Finance Parties only.  To the extent allowed by law, a Finance Party may take:

   (i)     proceedings in any other court; and

   (ii)    concurrent proceedings in any number of jurisdictions.

35.2 **Service of process**

(a)     Each Obligor not incorporated in England and Wales irrevocably appoints Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX as its agent under the Finance Documents for service of process in any proceedings before the English courts.

(b)     Each Obligor not incorporated in New York State irrevocably appoints Corporation Service Company, 1133 Avenue of the Americas, Suite 310, New York, NY10036 as its agent for service of process in any proceedings before any court located in the State of New York.

(c)     If any person appointed as process agent is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately appoint another agent on terms acceptable to the Agent.  Failing this, the Agent may appoint another agent for this purpose.

(d)    Each Obligor agrees that failure by a process agent to notify it of any process will not invalidate the relevant proceedings.

(e)    This Clause does not affect any other method of service allowed by law.

**35.3    Waiver of immunity**

Each Obligor irrevocably and unconditionally:

(a)    agrees not to claim any immunity from proceedings brought by a Finance Party against it in relation to a Finance Document and to ensure that no such claim is made on its behalf;

(b)    consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)    waives all rights of immunity in respect of it or its assets.

**35.4    Waiver of trial by jury**

EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH ANY FINANCE DOCUMENT OR ANY TRANSACTION CONTEMPLATED BY ANY FINANCE DOCUMENT.   THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO TRIAL BY COURT.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

**SCHEDULE 1**

**EXISTING PARTIES AS AT THE DATE OF THIS AGREEMENT**

**PART 1**

**EXISTING LENDERS**

| Existing Lender | Commitment  (U.S. Dollars) |
|---|---|
| Lloyds TSB Bank plc | 20,000,000 |
| The Royal Bank of Scotland plc | 15,000,000 |
| Quadrangle Master Funding Ltd | 10,000,000 |
| Barclays Bank plc | 7,500,000 |
| **Total Commitments** | **52,500,000** |

## PART 2

## EXISTING OBLIGORS

**Existing Borrower**

Blue Bird Body Company


**Existing Guarantors**

Peach County Holdings, Inc.

Blue Bird Body Company

Blue Bird Corporation

Henlys US Investments Inc.

Henlys Holding Corp.

Blue Bird Investment Corporation

School Bus Sales of Alabama, Inc.

**SCHEDULE 2**

**CONDITIONS PRECEDENT DOCUMENTS**

**PART 1**

**TO BE DELIVERED BY COMPANY/BORROWER**

1.    **Obligors**

1.1    A copy of a resolution of the board of directors of each Obligor:

    (a)    approving the terms of, and the transactions contemplated by, this Agreement and each other Finance Document to which it is a party;

    (b)    authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf;

    (c)    authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices to be signed and/or despatched by it under, or in connection with, the Finance Documents; and

    (d)    approving the [Chapter 11 Plan and filing for protection under Chapter 11 of the U.S. Bankruptcy Code with the Bankruptcy Court for [          ].

1.2    If required by the by-laws of the Company, a copy of a resolution of the stockholders of the Company approving the terms of, and the transactions contemplated by, the Finance Documents as required by the by-laws of the Company.

1.3    A certificate from the secretary or other authorised officer of each Obligor:

    (a)    attaching a copy of the certificate of incorporation and by-laws of such Obligor;

    (b)    attaching a copy of the resolution referred to in paragraph 1.1 above, certifying that such resolution was duly adopted and has not been altered, amended, rescinded or revoked, and certifying that no conflicting resolutions have been adopted;

    (c)    certifying that each signatory to the Finance Documents on behalf of that Obligor is a duly elected, qualified and acting officer of such Obligor and has been duly authorised to execute and deliver the Finance Documents on behalf of such Obligor;

    (d)    providing a specimen of the signature of each person authorised by the resolution referred to in paragraph 1.1 above to sign the Finance Documents and to sign and/or despatch all documents and notices to be signed and/or despatched by such Obligor;

    (e)    certifying that each copy document provided in respect of such Obligor is correct, complete, and in full force and effect as at a date no earlier than the date of this Agreement;

    (f)    to the extent not covered in a relevant legal opinion, certifying that the shares of any Obligor or any of their Subsidiaries pledged under any U.S. Stock Pledge Agreement to which such Obligor is a party were duly authorised, and are validly issued, fully paid, and non-assessable; and

(g)    to the extent not covered in a relevant legal opinion, certifying that such Obligor is in good standing under the laws of the state in which it is incorporated/organised.

1.4    A certificate from the secretary of Blue Bird Body Company certifying that the borrowing of the Total Commitments in full would not cause any borrowing limit binding on it to be exceeded.

1.5    Evidence that the agent of the Obligors under this Agreement for service of process in England and Wales has accepted its appointment.

1.6    Evidence that the agent of the Obligors under this Agreement for service of process in New York has accepted its appointment.

1.7    A certificate from the secretary of state of the state of incorporation/organisation of each Obligor certifying that such Obligor is in good standing as at 9 January 2006, together with a bring down certificate as at the date of this Agreement.

1.8    A certificate dated the date of this Agreement signed by an officer of the Company certifying that immediately after this Agreement takes effect there will be no Default (as therein to be defined).

## 2.    Security Documents and ancillary documents

2.1    The following Security Document(s) each (unless otherwise indicated) duly executed by the parties to it and dated on or about the date of this Agreement:

(a)    the Security Agreements.

2.2    Stock/share certificates for each Obligor and, duly executed/endorsed stock/share transfer forms in blank.

2.3    [*Other perfection formalities?*] [*UCC filings/mortgages*]

## 3.    Other documents and evidence

3.1    A duly executed copy of the Subordination Agreement.

3.2    A duly executed copy of the restructuring agreement dated on or about the date of this Agreement between, among others, the Company, Volvo Holding Sverige AB, the Henleys Group plc Pension Scheme, Danske Bank AS, Silver Oak Capital, LLC, each of the executives of the Company identified therein, Lloyds TSB Bank plc, The Royal Bank of Scotland plc and each of the other institutions identified therein.

3.3    The Fee Letters duly countersigned by the Company and Blue Bird Body Company (as the case may be).

3.4    A duly executed copy of the Cooper Services Agreement.

3.5    [A copy of a resolution of the board of directors of Canadian Blue Bird Coach, Ltd. authorising the transfer of 66 per cent. of its shares in accordance with the terms of the applicable U.S. Stock Pledge Agreement.]

**4.      Legal opinions**

4.1      A legal opinion of Allen & Overy LLP, London, legal advisers as to English law to the Agent, addressed to the Lenders.

4.2      A legal opinion of Allen & Overy LLP, New York, legal advisers as to New York law to the Agent, addressed to the Lenders.

4.3      A legal opinion of Skadden, Arps, Slate, Meagher & Flom LLP, legal advisers to the Obligors, addressed to the Lenders.

4.4      A legal opinion of Kilpatrick Stockton LLP, Georgia, legal advisers as to Georgia law to the Obligors, addressed to the Lenders.

4.5      A legal opinion of Jones Vargas, Nevada, legal advisers as to Nevada law to the Obligors, addressed to the Lenders.

**5.      Payments**

5.1      Evidence that all fees and expenses then due and payable from the Company under this Agreement and under or in connection with the Existing Facility Agreement have been or will be paid by the first Utilisation Date.

5.2      Evidence that all expenses of the Co-ordinators under the Existing Facility Agreement have been or will be paid by the first Utilisation Date.

5.3      A copy of any other authorisation or other document, opinion or assurance which the Agent has notified the Company is necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, any Finance Document or for the validity and enforceability of any Finance Document.

**6.      Chapter 11 Plan**

6.1      The entry by the Bankruptcy Court for the [    ] District of [    ] (the **Bankruptcy Court**) of an order or orders in form and substance satisfactory to the Agent and by no later than 30 January 2006 (collectively, the **Order**):

(a)      confirming the Chapter 11 Plan of each of the Obligors (collectively, the **Confirmation Order**),

(b)      approving the disclosure statement with respect to the Chapter 11 Plan;

(c)      approving the [commitment letters] and draft of the Existing Facility Agreement and this Agreement (the **Facilities**)] and approving all aspects of the Facilities and finance documents evidencing the Facilities and the transactions contemplated thereby, including without limitation the payment of all fees thereunder; and

(d)      being in full force and effect.

6.2      All conditions precedent to the effectiveness of the Chapter 11 Plan having been satisfied (or, with the prior written consent of the [Agents for each of the Facilities], which shall not be unreasonably withheld, waived in accordance with the terms of the Chapter 11 Plan) in the reasonable judgment of each of the Agents for the Facilities]), and the substantial

consummation (as defined in Section 1101 of the Code) of the Chapter 11 Plan shall have occurred simultaneously with the closing of the Facilities.

**7.    Equity**

7.1    Issuance of equity to the Lenders by way of stock representing 30 per cent. of the equity in the Company (the **Shares**) on a fully diluted basis.

7.2    A copy of all necessary corporate authorisations.

7.3    Stock certificates representing the Shares.

**PART 2**

**TO BE DELIVERED BY AN ADDITIONAL OBLIGOR**

1.      An Accession Agreement, duly executed by the Company and the Additional Obligor.

2.      A certified copy of the constitutional documents of the Additional Obligor.

3.      A certified copy of a resolution of the board of directors of the Additional Obligor approving the terms of, and the transactions contemplated by, the Accession Agreement.

4.      A certified copy of a resolution of the board of directors of the Additional Obligor:

  (a)      approving the terms of, and the transactions contemplated by, the Agreement and resolving that it execute the Accession Agreement;

  (b)      authorising a specified person or persons to execute the Accession Agreement on its behalf; and

  (c)      authorising a specified person or persons, on its behalf, to sign and endorse Bills and to sign and/or despatch all other documents and notices to be signed and/or despatched by it under or in connection with the Finance Documents.

5.      A certificate of a director of the Additional Obligor confirming that the borrowing of the Total Commitments in full would not cause any borrowing limit binding on it to be exceeded.

6.      A copy of any other authorisation or other document, opinion or assurance which the Agent reasonably considers to be necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, the Accession Agreement or for the validity and enforceability of any Finance Document.

7.      A specimen of the signature of each person authorised by the resolution referred to in paragraph 4 above.

8.      If available, the latest audited accounts of the Additional Obligor.

9.      A certificate of an authorised signatory of the Additional Obligor certifying that each copy document specified in this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Agreement.

10.      Evidence that the process agent referred to in Subclause 35.2 (Service of process) (or a substitute agent acceptable to the Agent) has accepted their appointment.

11.      Accession document duly executed effecting the Additional Obligor's accession to the Subordination Agreement.

**Legal opinions**

12.      A legal opinion of Allen & Overy LLP, legal advisers to the Agent, addressed to the Finance Parties.

13. If the Additional Obligor is incorporated in a jurisdiction outside England, a legal opinion of legal advisers reasonably acceptable to the Agent in the jurisdiction of incorporation of the Additional Obligor, addressed to the Finance Parties.

**Security Document(s)**

14. Security Document(s) over one or more of its assets, duly executed by the Additional Obligor.

15. A copy of any notices required to be sent under the Security Document(s).

16. If, and to the extent relevant:

    (a)  Share certificates in the name of the Agent, duly executed and stamped stock transfer forms in blank and the updated register of members of the relevant company whose shares are being charged.

    (b)  Title deeds/searches.

    (c)  Evidence that the procedure contemplated by sections 155-158 of the Companies Act 1985 has been completed in relation to any relevant Finance Document.

    (d)  Evidence of insurance cover in compliance with this Agreement and/or the Security Document(s).

    (e)  Consents from holders of negative pledges.

**Other documents and evidence**

17. Evidence that all expenses due and payable from the Company under this Agreement in respect of the Accession Agreement have been paid.

18. A copy of any other authorisation or other document, opinion or assurance which the Agent has notified the Company is necessary or desirable in connection with the entry into and performance of, and the transactions contemplated by, the Accession Agreement or for the validity and enforceability of any Finance Document.

## SCHEDULE 3

## CALCULATION OF MANDATORY COST

1.      **General**

The Mandatory Cost is the weighted average of the rates for each Lender calculated below by the Agent on the first day of a Term. The Agent must distribute each amount of Mandatory Cost among the Lenders on the basis of the rate for each Lender.

2.      **For a Lender lending from a Facility Office in the U.K.**

(a)      The relevant rate for a Lender lending from a Facility Office in the U.K. is calculated in accordance with the following formula:

for any other Loan:

$$\frac{E \times 0.01}{300} \text{ per cent. per annum}$$

where on the day of application of the formula:

E        is calculated by the Agent as being the average of the rates of charge supplied by the Reference Banks to the Agent under paragraph (d) below and expressed in pounds per £1 million.

(b)      For the purposes of this paragraph 2:

(i)      **fees rules** means the then current rules on periodic fees in the Supervision Manual of the FSA Handbook; and

(ii)      **tariff base** has the meaning given to it in the fees rules.

(c)      Each rate calculated in accordance with a formula is, if necessary, rounded upward to four decimal places.

(d)      (i)      Each Reference Bank must supply to the Agent the rate of charge payable by that Reference Bank to the Financial Services Authority under the fees rules (calculated by that Reference Bank as being the average of the rates of charge within fee-block Category A1 (Deposit acceptors) applicable to that Reference Bank but, for this purpose, applying any applicable discount and ignoring any minimum fee required under the fees rules) and expressed in pounds per £1 million of the tariff base of that Reference Bank.

(ii)      Each Reference Bank must promptly notify the Agent of any change to the rate of charge.

(e)      (i)      Each Lender and each Reference Bank must supply to the Agent the information required by it to make a calculation of the rate for that Lender or Reference Bank. The Agent may assume that this information is correct in all respects.

(ii)      If a Lender or a Reference Bank fails to do so, the Agent may assume that the Lender's or that Reference Bank's obligations in respect of cash ratio deposits, special

deposits and the fees rules are the same as those of a typical bank from its jurisdiction of incorporation with a Facility Office in the U.K.

(iii)    The Agent has no liability to any Party if its calculation over or under compensates any Lender.

**3.    For a Lender lending from a Facility Office in a Participating Member State**

(a)    The relevant rate for a Lender lending from a Facility Office in a Participating Member State is the percentage rate per annum notified by that Lender to the Agent as its cost of complying with the minimum reserve requirements of the European Central Bank.

(b)    If a Lender fails to specify a rate under paragraph (a) above, the Agent will assume that the Lender has not incurred any such cost.

**4.    Changes**

The Agent may, after consultation with the Company and the Lenders, notify all the Parties of any amendment to this Schedule which is required to reflect:

(a)    any change in law or regulation; or

(b)    any requirement imposed by the Bank of England, the Financial Services Authority or the European Central Bank (or, in any case, any successor authority).

Any notification will be, in the absence of manifest error, conclusive and binding on all the Parties.

## SCHEDULE 4

## FORM OF REQUEST

To:     The Royal Bank of Scotland plc as Agent

From:   Blue Bird Body Company

Date:   [                    ]

**Blue Bird Body Company– U.S.$52,500,000 Credit Agreement dated [            ], 2006** (the **Agreement**)

1.     We refer to the Agreement.  This is a Request.

2.     We wish to borrow a Loan on the following terms:

      (a)     Utilisation Date: [                    ].

      (b)     Amount: [                    ].

      (c)     Term: [                    ].

3.     Our payment instructions are: [                    ].

4.     We confirm that each condition precedent under the Agreement which must be satisfied on the date of this Request is so satisfied.

5.     This Request is irrevocable.

6.     The Borrower is Blue Bird Body Company.

7.     We confirm that the borrowing is to be used for: (i) the working capital purposes of the Blue Bird Body Company; and (ii) fees and expenses related to this Agreement, the Existing Facility Agreement, the Consummation of the Plan and the transactions contemplated thereby.

By:


Blue Bird Body Company

Authorised Signatory

**SCHEDULE 5**

**FORM OF TRANSFER CERTIFICATE**

To:      [The Royal Bank of Scotland plc] as Agent

From:   [THE TRANSFERRING LENDER] (the **Transferring Lender**) and [THE INCOMING LENDER] (the **Incoming Lender**)

Date:    [                    ]

**Blue Bird Body Company– U.S.$52,500,000 Credit Agreement dated [          ], 2006** (the **Agreement**)

We refer to the Agreement.  This is a Transfer Certificate.

1.      The Transferring Lender transfers by novation to the Incoming Lender the Transferring Lender's rights and obligations referred to in the Schedule below in accordance with the terms of the Agreement.

2.      The proposed Transfer Date is [      ].

3.      The administrative details of the Incoming Lender for the purposes of the Agreement are set out in the Schedule.

4.      The Incoming Lender confirms that it has (or will on the respective transfer date) enter into an accession agreement in respect of the Subordination Agreement, as provided in such agreement.

5.      This Transfer Certificate is governed by English law.

## THE SCHEDULE

**Rights and obligations to be transferred by novation**
[insert relevant details, including applicable Commitment (or part)]

**Administrative details of the Incoming Lender**
[insert details of Facility Office, address for notices and payment details etc.]

[**TRANSFERRING LENDER**]                    [**INCOMING LENDER**]

By:                                          By:

The Transfer Date is confirmed by the Agent as [          ].

[The Royal Bank of Scotland plc] as Agent

By:

**SCHEDULE 6**

**FORM OF ACCESSION AGREEMENT**

To:       [The Royal Bank of Scotland plc] as Agent

From:   Peach County Holdings, Inc. and [Proposed Borrower/Proposed Guarantor]

Date:    [                    ]

**Blue Bird Body Company– U.S.$52,500,000 Credit Agreement**
**dated [              ], 2006 (the Agreement)**

We refer to the Agreement.  This is an Accession Agreement.

[Name of company] of [address/registered office] agrees to become an Additional Borrower/Guarantor and to be bound by the terms of the Agreement as an Additional Borrower/Guarantor.

This Accession Agreement is governed by English law.

Peach County Holdings, Inc.

**SCHEDULE 7**

**FORM OF RESIGNATION REQUEST**

To:        [The Royal Bank of Scotland plc] as Agent

From:    Peach County Holdings, Inc. and [relevant Obligor]

Date:      [                    ]

**Blue Bird Body Company – U.S.$52,500,000 Credit Agreement dated [          ], 2006 (the Agreement)**

1.        We refer to the Agreement.  This is a Resignation Request.

2.        We request that [resigning Obligor] be released from its obligations as [a/an] [Obligor/Borrower/Guarantor] under the Agreement.

3.        We confirm that no Default is outstanding or would result from the acceptance of this Resignation Request.

4.        We confirm that as at the date of this Resignation Request no amount owed by [resigning Obligor] under the Agreement is outstanding.

5.        This Resignation Request is governed by English law.

Peach County Holdings, Inc.                    [Relevant Obligor]

By:                                                              By:

The Agent confirms that this resignation takes effect on [                  ].

[The Royal Bank of Scotland plc] as Agent

By:

**SCHEDULE 8**

**FORM OF COMPLIANCE CERTIFICATE**

To:        [The Royal Bank of Scotland plc] as Agent

From:   Peach County Holdings, Inc.

Date:    [        ]

**Blue Bird Body Company– U.S.$52,500,000 Credit Agreement
dated [        ], 2006 (the Agreement)**

1.        This is a Compliance Certificate (as defined in the Agreement).

2.        We confirm that: *[to be agreed]*

3.        We set out below calculations establishing the figures in paragraph 2 above:

          [                    ]

4.        We confirm that no Default is outstanding at the relevant date.[1]

By:

Peach County Holdings, Inc.

[We confirm the accuracy of the figures in paragraph 2 above, and the calculations set out in paragraph 3 above.

By:

[Auditors to the Company]][2]

---

[1] If this statement cannot be made, the certificate should identify any Default that is outstanding and the steps, if any, being taken to remedy it.

[2] Only include in certificate provided with accounts specified in Subclauses 17.2(a)(i) and 17.2(b).

## SIGNATORIES

**Borrower**

**BLUE BIRD BODY COMPANY**

By:


**Guarantors**

**PEACH COUNTY HOLDINGS, INC.**

By:


**BLUE BIRD BODY COMPANY**

By:


**BLUE BIRD CORPORATION**

By:


**BLUE BIRD INVESTMENT CORPORATION**

By:


**HENLYS HOLDING CORP**

By:


**HENLYS US INVESTMENTS INC.**

By:


**SCHOOL BUS SALES OF ALABAMA, INC.**

By:

**The Lenders**

**THE ROYAL BANK OF SCOTLAND PLC**

By:

**LLOYDS TSB BANK PLC**

By:

**QUADRANGLE MASTER FUNDING LTD**

By:

**BARCLAYS BANK PLC**

By:

**Agent**

**THE ROYAL BANK OF SCOTLAND plc**

By:

**EXHIBIT E**

**CERTIFICATE OF INCORPORATION AND BYLAWS**

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
OF

PEACH COUNTY HOLDINGS, INC.

\* \* \* \* \*

Peach County Holdings, Inc., a Delaware corporation (the "Corporation") hereby certifies as follows:

      1.    The name of the Corporation is Peach County Holdings, Inc. The date of the filing of its original Certificate of Incorporation with the Secretary of State of Delaware was September 10, 2004. An Amended and Restated Certificate of Incorporation was filed with the Secretary of State of Delaware on October 14, 2004. A Second Amended and Restated Certificate of Incorporation was filed with the Secretary of State of Delaware on October 18, 2004.

      2.    On January [ ], 2006, the Corporation and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of [Nevada] (the "Bankruptcy Court") (Case No. [___]). This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 245 and 303 of the DGCL, pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the Joint Plan of Reorganization under Chapter 11 of Title 11 of the United States Code of [Blue Bird Body Company] et al. (the "Plan"), as confirmed on [date], 2006 by order (the "Order") of the Bankruptcy Court. Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the Order of the Bankruptcy Court having jurisdiction under the Bankruptcy Code for the formation of the Corporation.

      3.    The text of the Certificate of Incorporation as hereby and heretofore amended or supplemented is hereby restated to read as herein set forth in full:

      FIRST: The name of the Corporation is Peach County Holdings, Inc.

      SECOND: The address of its registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle (zip code 19808). The name of its registered agent at such address is Corporation Service Company.

      THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("Delaware Law" or "DGCL").

1

FOURTH:

(a)    Authorized Shares.  The total number of shares of capital stock which the Corporation shall have authority to issue is [_____], all of which shares shall be Common Stock having a par value of $0.01 (the "Common Stock").  Pursuant to Section 1123 of the Bankruptcy Code, notwithstanding any other provision contained herein to the contrary, the Corporation shall not issue non-voting equity        securities.

(b)    Common Stock.  All shares of Common Stock will be identical with respect to the rights and privileges to which the holders thereof are entitled.

(1)    Voting Rights.  Except as set forth herein or as otherwise required by law, each holder of an outstanding share of Common Stock shall be entitled to vote on each matter on which the stockholders of the Corporation shall be entitled to vote, including the election of directors, and each holder of Common Stock shall be entitled to one vote for each share of Common Stock held by such holder.

(2)    Dividends and Distributions.  The Board of Directors of the Corporation (the "Board of Directors") may cause dividends to be paid to the holders of shares of Common Stock out of funds legally available for the payment of dividends by declaring an amount per share as a dividend.  When and as dividends or other distributions (including without limitation any grant or distribution of rights to subscribe for or purchase shares of capital stock or securities or indebtedness convertible into capital stock of the Corporation) are declared, whether payable in cash, in property or in shares of stock of the Corporation, the holders of Common Stock shall be entitled to share equally, share for share, in such dividends or other distributions.

(3)    No Preemptive Rights.  The holders of shares of Common Stock shall have no preemptive or preferential rights of subscription to any shares of any class of capital stock of the Corporation or any securities convertible into or exchangeable for shares of any class of capital stock of the Corporation.

FIFTH:

(a)    The business and affairs of the Corporation shall be managed by or under the direction of a Board of Directors consisting of not less than three nor more than fifteen directors, the exact number of directors to be determined from time to time solely by resolution adopted by the affirmative vote of a majority of the entire Board of Directors.

(b)    Each director shall serve for a one-year term ending on the date of the annual meeting of stockholders next following the annual meeting at which such director was elected.  Notwithstanding the foregoing, each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.  In no event will a decrease in the number of directors shorten the term of any incumbent director.

2

(c)    There shall be no cumulative voting in the election of directors. Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

(d)    Vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors shall be filled solely by a majority of the directors then in office (even if less than a quorum) or by the sole remaining director.

SIXTH:  The Board of Directors shall have the concurrent power with the stockholders to adopt, amend or repeal the bylaws of the Corporation.

SEVENTH:  Special meetings of the stockholders may be called by the Board of Directors, the Chairman of the Board of Directors or the Chief Executive Officer of the Corporation and by any officer of the Corporation at the request in writing of stockholders owning a majority of the total voting power of all outstanding capital stock of the Corporation then entitled to vote generally in the election of directors.

EIGHTH:  (a)  No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. Any repeal or modification of this Article EIGHTH by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

(b)    The Corporation shall indemnify its directors and officers to the fullest extent authorized or permitted by law, as now or hereafter in effect, and such right to indemnification shall continue as to a person who has ceased to be a director or officer of the Corporation and shall inure to the benefit of his or her heirs, executors and personal and legal representatives; provided, however, that, except for proceedings to enforce rights to indemnification, the Corporation shall not be obligated to indemnify any director or officer (or his or her heirs, executors or personal or legal representatives) in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized or consented to by the Board of Directors. The right to indemnification conferred by this Article EIGHTH shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any proceeding in advance of its final disposition.

(c)    The Corporation may, to the extent authorized from time to time by the Board of Directors, provide rights to indemnification and to the advancement of expenses to employees and agents of the Corporation similar to those conferred in this Article EIGHTH to directors and officers of the Corporation.

3

(d)    The rights to indemnification and to the advance of expenses conferred in this Article EIGHTH shall not be exclusive of any other right which any person may have or hereafter acquire under this Certificate of Incorporation, the By-Laws of the Corporation, any statute, agreement, vote of stockholders or disinterested directors or otherwise.

NINTH:  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF, the undersigned has duly executed this Amended and Restated Certificate of Incorporation of Peach County Holdings, Inc. this [___] day of [_____], 2006.

PEACH COUNTY HOLDINGS, INC.


By: _____
Authorized Officer

AMENDED AND RESTATED

BYLAWS

OF

PEACH COUNTY HOLDINGS, INC.

\* \* \* \* \*

ARTICLE I

OFFICES

Section 1.    <u>Registered Office</u>.    The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 2.    <u>Other Offices</u>.    The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

Section 3.    <u>Books</u>.    The books of the Corporation may be kept within or without of the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

ARTICLE II

MEETINGS OF STOCKHOLDERS

Section 1.    <u>Time and Place of Meetings</u>.    All meetings of stockholders shall be held at such place, either within or without the State of Delaware, on such date and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a designation by the Board of Directors).

Section 2.    <u>Annual Meetings</u>.    Annual meetings of stockholders, commencing with the year 2007, shall be held to elect directors and transact such other business as may properly be brought before the meeting.

1

Section 3.    <u>Special Meetings</u>.  Special meetings of stockholders may be called by the Board of Directors, the Chairman or the Chief Executive Officer of the Corporation and by any officer of the Corporation at the request in writing of stockholders owning a majority of the total voting power of all outstanding capital stock of the Corporation then entitled to vote generally in the election of directors.

Section 4.    <u>Notice of Meetings and Adjourned Meetings; Waivers of Notice; Business at Meetings</u>.  (a)  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended ("Delaware Law"), such notice shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting.  Unless these bylaws otherwise require, when a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.   If the adjournment is for more than 30 days, or after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

(b)    A written waiver of any such notice signed by the person entitled thereto, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(c)    Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 5.    <u>Quorum</u>.  Unless otherwise provided under the certificate of incorporation or these bylaws and subject to Delaware Law, the presence, in person or by proxy, of the holders of a majority of the outstanding capital stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business.  A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or by proxy, shall have the power to adjourn the meeting from time to time, in the manner provided in Section 4, until a quorum shall be present or represented.

Section 6.    <u>Voting</u>

(a)    Unless otherwise provided in the certificate of incorporation and subject to Delaware Law, each stockholder shall be entitled to one vote for each outstanding share of capital stock of the Corporation held by such stockholder.  Unless otherwise provided in

2

Delaware Law, the certificate of incorporation or these bylaws, the affirmative vote of a majority of the total number of votes of the shares of capital stock of the Corporation present, in person or by proxy, at a meeting of stockholders and entitled to vote on the subject matter shall be the act of the stockholders, other than with respect to the election of directors.  Except as otherwise provided in the certificate of incorporation and these bylaws, directors shall be elected by a plurality of the votes cast at the meeting and entitled to vote on the election of directors.

(b)    Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to a corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after one year from its date, unless the proxy provides for a longer period.

Section 7.    Consent of Stockholders in Lieu of Meeting

.    Unless otherwise provided in the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding capital stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section 7 to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation as provided above in this Section 7.

Section 8.    <u>Organization</u>.  At each meeting of stockholders, the Chairman, if one shall have been elected, (or in his absence or if one shall not have been elected, the Chief Executive Officer) shall act as chairman of the meeting.  The Secretary (or in his absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting) shall act as secretary of the meeting and keep the minutes thereof.

Section 9.    <u>Order of Business</u>.  The order of business at all meetings of stockholders shall be as determined by the chairman of the meeting.

Section 10.    <u>Notice of Business</u>.  At any meeting of the stockholders, only such business shall be conducted as shall have been brought before the meeting (a) by or at the direction of the Board of Directors or (b) in the case of an annual meeting of stockholders, by any stockholder of the Corporation who is a stockholder of record at the time of giving of the notice provided for in this Section 10, who shall be entitled to vote at such meeting and who complies with the notice procedures set forth in this Section 10 and such business must be a proper subject for stockholder action under Delaware Law.  For business to be properly brought before an annual meeting of stockholders by a stockholder, the stockholder must have given timely notice thereof in writing to the secretary of the Corporation.  To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than 60 days nor more than 90 days prior to the meeting; provided, however, that in the event that less than 70 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of the meeting or such public disclosure was given or made, whichever first occurs.  A stockholder's notice to the secretary shall set forth as to each matter the stockholder proposes to bring before the meeting (a) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (b) the name and address, as they appear on the Corporation's books, of the stockholder proposing such business, (c) the class and number of shares of the Corporation which are beneficially owned by the stockholder and (d) any material interest of the stockholder in such business.  Notwithstanding anything in the bylaws to the contrary, no business shall be conducted at a stockholder meeting except in accordance with the procedures set forth in this Section 10, and no business shall be brought by a stockholder before a special meeting of stockholders.  The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting and in accordance with the provisions of the bylaws, and if he should so determine, he shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

Section 11.    <u>Nomination of Directors</u>.  Only persons who are nominated in accordance with the procedures set forth in these bylaws shall be eligible to serve as directors.  Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders (a) by or at the direction of the Board of Directors or (b) by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in this Section 11, who shall be entitled to vote for the election of directors at the meeting and who complies with the notice procedures set forth in this Section 11.  Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the secretary of the Corporation.  To be timely, a

stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than 60 days nor more than 90 days prior to the meeting; provided, however, that in the event that less than 70 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of the meeting or such public disclosure was given or made, whichever first occurs.  Such stockholder's notice shall set forth (a) as to each person whom the stockholder proposes to nominate for election or reelection as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934 (including, if applicable, such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); and (b) as to the stockholder giving the notice (i) the name and address, as they appear on the Corporation's books, of such stockholder, (ii) the class and number of shares of the Corporation which are beneficially owned by such stockholder, (iii) a description of all arrangements or understandings between such stockholder and each proposed nominee and any other person or persons (including their names and addresses) pursuant to which the nomination(s) are to be made by such stockholder and (iv) any other information relating to such stockholder that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Section 14A under the Securities Exchange Act of 1934.  At the request of the Board of Directors, any person nominated by the Board of Directors for election as a director shall furnish to the secretary of the Corporation that information required to be set forth in a stockholder's notice of nomination which pertains to the nominee.  No person shall be eligible to serve as a director of the Corporation unless nominated in accordance with the procedures set forth in this bylaw.  The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the procedures prescribed by the bylaws, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded.

## ARTICLE III

## DIRECTORS

Section 1.    <u>General Powers</u>.  Except as otherwise provided in Delaware Law or the certificate of incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 2.    <u>Number, Classes, Term of Office, etc</u>.  The Board of Directors shall consist of not less than three nor more than fifteen directors, with the exact number of directors to be determined from time to time solely by resolution adopted by the affirmative vote of a majority of the entire Board of Directors.  Except as otherwise provided in the certificate of incorporation, each director shall serve for a one-year term ending on the date of the annual meeting of stockholders next following the annual meeting at which such director was elected.  Notwithstanding the foregoing, each director shall hold office until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or

removal. In no event will a decrease in the number of directors shorten the term of any incumbent director. Directors need not be stockholders.

Section 3. <u>Quorum and Manner of Acting</u>. Unless the certificate of incorporation or these bylaws require a greater number, a majority of the total number of directors serving as directors shall constitute a quorum for the transaction of business, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. When a meeting is adjourned to another time or place (whether or not a quorum is present), notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Board of Directors may transact any business which might have been transacted at the original meeting. If a quorum shall not be present at any meeting of the Board of Directors, the directors present at such meeting may adjourn the meeting, from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4. <u>Time and Place of Meetings</u>. The Board of Directors shall hold its meetings at such place, either within or without the State of Delaware, and at such time as may be determined from time to time by the Board of Directors (or the Chairman in the absence of a determination by the Board of Directors).

Section 5. <u>Annual Meeting</u>. The Board of Directors shall meet for the purpose of electing officers and transacting other business, as soon as practicable after each annual meeting of stockholders, on the same day and at the same place where such annual meeting shall be held. Notice of such meeting need not be given. In the event such annual meeting is not so held, the annual meeting of the Board of Directors may be held at such place either within or without the State of Delaware, on such date and at such time as shall be specified in a notice thereof given as hereinafter provided in Section 7 of this Article III or in a waiver of notice thereof signed by any director who chooses to waive the requirement of notice.

Section 6. <u>Regular Meetings</u>. After the place and time of regular meetings of the Board of Directors shall have been determined and notice thereof shall have been once given to each member of the Board of Directors, regular meetings may be held without further notice being given.

Section 7. <u>Special Meetings</u>. Special meetings of the Board of Directors may be called by the Chairman, the Chief Executive Officer or the President and shall be called by the Chairman, the Chief Executive Officer, the President or the Secretary on the written request of any director. Notice of special meetings of the Board of Directors shall be given to each director at least two days before the date of the meeting in such manner as is determined by the Board of Directors.

Section 8. <u>Waiver of Notice</u>. Whenever any notice is required by law, the certificate of incorporation or these bylaws to be given to any director or member of a committee, a waiver thereof in writing, signed, by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except where the person

attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

Section 9.    <u>Committees</u>.  The Board of Directors may elect from the directors an executive committee, a compensation committee and an audit committee and may, by resolution passed by a majority of the whole Board, designate one or more other committees, each committee to consist of one or more of the directors of the Corporation.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 10.    <u>Action by Consent</u>.  Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 11.    <u>Telephonic Meetings</u>.    Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee thereof, may participate in a meeting of the Board of Directors, or such committee, as the case may be, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

631478.04-New York Server 1A - MSW

Section 12.    <u>Resignation</u>.    Any director may resign at any time by giving written notice to the Board of Directors or to the Secretary of the Corporation.  The resignation of any director shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 13.    <u>Vacancies</u>.    Unless otherwise provided in the certificate of incorporation, vacancies on the Board of Directors resulting from death, resignation, removal or otherwise and newly created directorships resulting from any increase in the number of directors may be filled solely by a majority of the directors then in office (even if less than a quorum) or by the sole remaining director.  Each director so elected shall hold office until the next annual election and until their successors are duly elected and qualified, or until their earlier death, resignation or removal.  If there are no directors in office, then an election of directors may be held in accordance with Delaware Law.  Unless otherwise provided in the certificate of incorporation, when one or more directors shall resign from the Board, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have the power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in the filling of other vacancies.

Section 14.    <u>Removal</u>.    Except as otherwise required by applicable law, any director or the entire Board of Directors may be removed from office by the stockholders with the affirmative vote of the holders of not less than a majority of the total voting power of all outstanding capital stock of the Corporation then entitled to vote generally in the election of directors.

Section 15.    <u>Compensation</u>.    Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have authority to fix the compensation of directors, including fees and reimbursement of expenses.

ARTICLE IV

OFFICERS

Section 1.    <u>Principal Officers</u>.    The principal officers of the Corporation shall be a Chairman, a Chief Executive Officer, a President, one or more Vice Presidents, a Treasurer and a Secretary who shall have the duty, among other things, to record the proceedings of the meetings of stockholders and directors in a book kept for that purpose.  The Corporation may also have such other principal officers, including one or more Controllers, as the Board may in its discretion appoint.  One person may hold the offices and perform the duties of any two or more of said offices, except that no one person shall hold the offices and perform the duties of President and Secretary.

Section 2.    <u>Election and Term of Office</u>.    The principal officers of the Corporation shall be elected annually by the Board of Directors at the annual meeting thereof. Each such officer shall hold office until his successor is elected and qualified, or until his earlier

death, resignation or removal. Any vacancy in any office shall be filled in such manner as the Board of Directors shall determine.

Section 3.    <u>Subordinate Officers</u>.    In addition to the principal officers enumerated in Section 1 of this Article IV, the Corporation may have one or more Assistant Treasurers, Assistant Secretaries and Assistant Controllers and such other subordinate officers, agents and employees as the Board of Directors may deem necessary, each of whom shall hold office for such period as the Board of Directors may from time to time determine. The Board of Directors may delegate to any principal officer the power to appoint and to remove any such subordinate officers, agents or employees.

Section 4.    <u>Removal</u>.    Any officer may be removed, with or without cause, at any time, by resolution adopted by the Board of Directors.

Section 5.    <u>Resignations</u>.    Any officer may resign at any time by giving written notice to the Board of Directors (or to a principal officer if the Board of Directors has delegated to such principal officer the power to appoint and to remove such officer). The resignation of any officer shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 6.    <u>Chairman</u>.    The Chairman shall preside at all meetings of the Board of Directors and of shareholders, shall be responsible for the observation by the Corporation of these by-laws and shall have such other duties as shall be set forth in the resolution of the Board by which the appointment of the Chairman is made.

Section 7.    <u>Chief Executive Officer</u>.    The Chief Executive Officer shall have general supervision over the business and operations of the Corporation and may perform any act and execute any instrument for the conduct of such business and operations. In the Chairman's absence, the Chief Executive Officer shall preside at all meetings of the Board and of the shareholders.

Section 8.    Powers and Duties of Other Officers.  The other officers of the Corporation shall have such powers and perform such duties incident to each of their respective offices and such other duties as may from time to time be conferred upon or assigned to them by the Board of Directors.

ARTICLE V

GENERAL PROVISIONS

Section 1.    Fixing the Record Date.  (a)  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day preceding the day on which notice is given, or, if notice is waived, at the close of business on the day preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 2.    Dividends.  Subject to limitations contained in Delaware Law and the certificate of incorporation, the Board of Directors may declare and pay dividends upon the shares of capital stock of the Corporation, which dividends may be paid in cash, in property or in shares of the capital stock of the Corporation.

Section 3.    Fiscal Year.  The fiscal year of the Corporation shall be determined by the Board of Directors.

Section 4.    <u>Corporate Seal</u>.    The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 5.    <u>Voting of Stock Owned by the Corporation</u>.    The Board of Directors may authorize any person, on behalf of the Corporation, to attend, vote at and grant proxies to be used at any meeting of stockholders of any corporation (except this Corporation) in which the Corporation may hold stock.

Section 6.    <u>Amendments</u>.    These bylaws or any of them, may be altered, amended or repealed, or new bylaws may be made, by the Board of Directors or by the affirmative vote of the holders of a majority of the total voting power of all outstanding capital stock of the Corporation then entitled to vote generally in the election of directors.

631478.04-New York Server 1A - MSW

**EXHIBIT B**

**LIQUIDATION ANALYSIS**

**Blue Bird Body Company and Certain Affiliates**
**Hypothetical Orderly Liquidation Analysis**
**As of January 28, 2006**
**(in thousands of dollars)**

| | Estimated Book Value | Lower Estimate $ | Lower Estimate % Recovered | Higher Estimate $ | Higher Estimate % Recovered |
|---|---|---|---|---|---|
| Value recovered - net of brokerage commissions: | | | | | |
| Cash | $ 4,262 | $ 4,262 | 100.0% | $ 4,262 | 100.0% |
| LC collateral | 3,341 | 3,341 | 100.0% | 3,341 | 100.0% |
| Accounts receivable | 13,390 | 6,695 | 50.0% | 10,042 | 75.0% |
| Leases held for sale | 6,225 | 3,112 | 50.0% | 4,669 | 75.0% |
| Inventories, net of reclamation | 63,877 | 17,444 | 27.3% | 31,929 | 50.0% |
| Other current assets | 1,800 | | 0.0% | | 0.0% |
| Machinery & equipment | 31,817 | 2,864 | 9.0% | 7,159 | 22.5% |
| Land and buildings | 6,826 | 2,566 | 37.6% | 3,208 | 47.0% |
| Other assets | 106,792 | 900 | 0.8% | 900 | 0.8% |
| Goodwill | 108,446 | | 0.0% | | 0.0% |
| | $ 346,777 | $ 41,185 | 11.9% | $ 65,510 | 18.9% |
| | | | | | |
| Costs associated with liquidation | | | | | |
| Payroll, Payroll Taxes & Insurance | | 3,000 | | 3,000 | |
| Utilities | | 1,050 | | 1,050 | |
| Property Insurance | | 2,000 | | 2,000 | |
| Real Property Taxes | | 1,000 | | 1,000 | |
| Legal & Professional Fees | | 5,000 | | 5,000 | |
| Facility Security & Maintenance | | 400 | | 400 | |
| Miscellaneous | | 500 | | 500 | |
| Trustee Fees | | 1,042 | | 1,725 | |
| WARN Act | | 15,000 | | | |
| | | 28,992 | | 14,675 | |
| | | | | | |
| Net proceeds available for creditors | | $ 12,193 | | $ 50,835 | |
| | | | | | |
| Secured claims | | | | | |
| Letter of credit providers | $ 3,341 | $ 3,341 | 100.0% | $ 3,341 | 100.0% |
| Secured debt | 211,000 | 8,852 | 4.2% | 47,494 | 22.5% |
| Other claims | 300,186 | - | 0.0% | - | 0.0% |

The following summarizes estimated recoveries under liquidation compared with estimated recoveries under the Plan:

| | Liquidation Lower | Liquidation Higher | Plan |
|---|---|---|---|
| Class I Bank Group Claims | 4.2% | 22.5% | 84.8% (a) |
| Class 2 Other Secured Claims | 100.0% | 100.0% | 100.0% |
| Class 3 Other Priority Claims | 0.0% | 0.0% | 100.0% |
| Class 4 General Unsecured Claims | 0.0% | 0.0% | 100.0% |
| Class 5 Intercompany Claims | 0.0% | 0.0% | 100.0% |
| Class 6 Interests | 0.0% | 0.0% | 0.0% |

(a)  Based upon 5 times projected 2008 EBITDA of $38,486 less estimated pension liability of $13,600 as of Sep 30, 2008

EXHIBIT B-1

**Blue Bird Body Company and Certain Affiliates**
**Hypothetical Orderly Liquidation Analysis**
**Summary of Significant Assumptions**
**As of January 28, 2006**

Set forth below is a Hypothetical Orderly Liquidation Analysis (the "Analysis") of Blue Bird Body Company and Certain Affiliates(the "Debtors"), assuming a hypothetical Chapter 7 liquidation in which a court-appointed trustee (the "Trustee") would liquidate the assets of the Debtors, commencing on January 28, 2006. The projected month-end January 28, 2006 financials are used for valuation purposes. The liquidation analysis has been prepared solely for purposes of estimating the proceeds available in a Chapter 7 liquidation of the Debtors to illustrate that the Plan of Reorganization meets the "Best Interest" test and provides at least equal or greater value to all impaired classes of creditors and equity interest holders than would be provided in a hypothetical conversion to a Chapter 7 liquidation. Nothing contained in the Analysis is intended to or may constitute a concession by, or admission of, the Debtors for any other purposes.

Underlying the Analysis are a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors and any Chapter 7 trustee. Accordingly, there can be no assurance that the values assumed in the following analyses would be realized if the Debtors were in fact liquidated. In addition, any liquidation that would be undertaken would necessarily take place in future circumstances that cannot presently be predicted.

General assumptions:

a) The Debtors' developed their estimates of recovery percentages assuming a lower and higher recovery scenario (the "Lower Case" and the "Higher Case," respectively), assuming an orderly liquidation of assets over a six-month period for current assets, machinery and equipment and a two-year period for land and buildings. There can be no assurance, however, that the liquidation could be completed in the time period assumed or that the recoveries assigned to the assets would in fact be realized.

b) Nature and timing of sales – Under Section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and convert the property of the estate as expeditiously as is compatible with the best interests of the parties-in-interest. The liquidation analyses assume that there would be pressure to complete the sales process within the periods described above. The need to convert property to cash rapidly may have an adverse impact on the proceeds realized from the sale of the Debtors' assets.

c) Discount factor applied to assets – The precise discount to attribute to assets in a Chapter 7 case proceeding cannot be computed on the basis of any known empirical data. Accordingly, for purposes of these liquidation analyses, assets were valued based on the Debtors' best estimates, which would vary on an asset to asset basis.

d) It is possible that a Chapter 7 proceeding could result in liquidation expenses being greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation.

e) Estimated claims – This analysis was prepared to show estimated net proceeds available to all classes of creditors identified and defined in the Disclosure Statement. No analysis has been performed regarding the validity of the security interests of the secured claimants or the value of the claims of any of the creditors of the Debtors, and no opinion regarding the validity of these claims or security interests should be inferred. Based upon the values and assumptions utilized in this liquidation analysis, there would be no recovery for any creditor junior in priority to secured claims of the pre petition Banks.

f) It is assumed that there will not be any income or transfer tax liabilities resulting from a Chapter 7 proceeding.

EXHIBIT B-2

**Blue Bird Body Company and Certain Affiliates**
**Hypothetical Orderly Liquidation Analysis**
**Summary of Significant Assumptions**
**As of January 28, 2006**

g) It is possible that one or more of the creditors assumed to be junior in priority to the secured lenders will challenge the priority of payment reflected in the Analysis. In the case of a challenge, it is believed that the Debtors may incur substantial, additional professional fees and that, if one or more such challenges should prove successful, value shown on the Analysis as flowing to the secured debt might flow to other creditors.

Specific assumptions:

1.  The Trustee would be paid an amount equal to 3% of the proceeds from asset sales, net of brokerage commissions. The Trustee would use the services of various brokers to sell the inventory, machinery and equipment and real estate. It is assumed that brokerage fees will be 10% of the proceeds from the sales of inventory, machinery and equipment and 6% of the proceeds from sales of real estate.

2.  Cash is assumed recoverable at 100% in both high and low liquidation scenarios.

3.  Liquidation values for Canadian Blue Bird Coach, Ltd. (CBBC) and Canadian Blue Bird Body Company have been assumed to be trapped in Canada for the benefit of their creditors.

4.  Accounts Receivable – The accounts receivable are assumed to be impaired; it is believed that customers will not pay in full because the Debtors will no longer provide maintenance support or honor warranty obligations. The discount applied is 50% in the Lower Case and 25% in the Higher Case.

5.  Inventory – Inventory is sub divided into several categories. Values are derived from the subcategory mix as of month end December 31, 2005. Separate recovery values have been established for each subcategory. Recovery percentages are based upon the respective market for the given inventory. In addition, it is believed that substantial portions of the inventory may be subject to reclamation claims, which are assumed to be effectively senior to all other claims and would, therefore, reduce the value of inventory otherwise available to secured creditors. For purposes of the Analysis, the following discounts have been applied to the estimated book value of inventory:

|  | Reclamation Claims | | Valuation Discount | |
| --- | --- | --- | --- | --- |
|  | **Lower Case** | **Upper Case** | **Lower Case** | **Upper Case** |
| Raw materials | 50% | 25% | 75% | 50% |
| Work in process | 25% | 0% | 70% | 60% |
| Finished goods | 25% | 0% | 40% | 25% |
| Parts | 50% | 25% | 20% | 20% |
| Purchased Chassis/Shells | 50% | 25% | 20% | 20% |
| Other | 0% | 0% | 100% | 100% |

The valuation discount is an estimate of the difference between the book value of the inventory available after "reclaimed" inventory has been returned to the vendor and what a buyer would pay for the inventory in a chapter 7 auction.

6.  Leases receivable – Leases receivable consist of leases held for sale, which are assumed to realize the same percentage of book value as accounts receivable. Leases sold to third parties with recourse to the Debtors are excluded from the Analysis. Because the leases were sold with recourse, these assets are reflected on the financial statement of the Debtors; however, the purchaser of the leases is believed to have an effective security interest in these assets and no value would be available to other creditors of the Debtors.

7.  Property, Plant and Equipment – Plant, Property and Equipment is divided into land, building, and machinery and equipment. Values are derived from the mix as of December 31, 2005. Separate recovery

EXHIBIT B-3

**Blue Bird Body Company and Certain Affiliates**
**Hypothetical Orderly Liquidation Analysis**
**Summary of Significant Assumptions**
**As of January 28, 2006**

values have been established for each subcategory. Recovery values were assigned based upon the market, demand, condition and location for each of the assets.

8.  Other Assets – With the exception of small amount recoverable from life insurance policies owned by the Debtors, the other assets, including trademarks, customer lists and business processes are believed to be worthless in chapter 7 liquidation.

9.  Recoveries for bankruptcy avoidance actions – The Company has not conducted a thorough study of potential avoidance actions. However, it is believed that the bulk of the payments to employees, taxing authorities and vendors were made in the ordinary course and avoidance actions are unlikely to generate material additional value for the estate.

10. Cost to Liquidate – Assumes that liquidation will occur for two years at the Company's facilities and corporate headquarters. In addition to the Trustee fees and brokerage commissions discussed above, liquidation expenses consist of:
    - Cost for attorneys and accountants employed by the Trustee, estimated at $5 million.
    - Cost related to facilities, including utilities, insurance and property taxes, and on-going payroll, estimated at approximately $8 million.
    - For illustrative purposes only, WARN Act costs are included in the Low Case but not the High Case. However, creditors should expect efforts by employee groups to recover WARN Act costs in both scenarios.

11. Claims – are estimated as follows:
    - Approximately $3.4 million related to letters of credit issued on behalf of the Debtors. These obligations are secured by the cash pledged by the Debtors and are assumed to be satisfied by that cash.
    - Approximately $211 million in secured bank debt, which is assumed to receive all of the remaining value realized, net of liquidation costs and professional fees.
    - Approximately $232 million in priority and other unsecured claims, which are assumed to receive nothing.

EXHIBIT B-4

**EXHIBIT C**

**PROJECTIONS**

**Blue Bird Body Company and Certain Affiliates**
**Consolidated Projected Statements of Operations**
**($ 000)**

| | | For Fiscal Year Ended | | | |
|---|---|---|---|---|---|
| | SEPT 2006 | SEPT 2007 | SEPT 2008 | SEPT 2009 | SEPT 2010 |
| Net sales | $ 588,910 | $ 627,555 | $ 714,695 | $ 759,796 | $ 797,521 |
| Cost of sales | 548,898 | 562,230 | 621,975 | 650,522 | 670,726 |
| Gross profit | 40,012 | 65,325 | 92,720 | 109,274 | 126,795 |
| Selling, general and administative expenses: | | | | | |
| Sales and advertising | 14,297 | 13,754 | 13,949 | 14,207 | 14,531 |
| Warranty expense | 8,402 | 7,741 | 9,014 | 9,643 | 10,400 |
| Other | 49,061 | 42,579 | 43,417 | 44,535 | 45,933 |
| Net interest expense | 7,037 | 3,667 | 3,267 | 2,867 | 2,267 |
| Lease (income) expense | (627) | 111 | 111 | 111 | 111 |
| Other - net | (1,082) | 184 | 184 | 184 | 184 |
| Income before provision for income taxes | (37,076) | (2,711) | 22,778 | 37,727 | 53,369 |
| Provision for income taxes | 13,829 | 1,011 | (8,496) | (14,072) | (19,907) |
| Net income (loss) | $ (23,247) | $ (1,700) | $ 14,282 | $ 23,655 | $ 33,462 |

EXHIBIT C-1

**Blue Bird Body Company and Certain Affiliates**
**Consolidated Projected Balance Sheets**
**($ 000)**

|  | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|
|  | SEPT 2006 | SEPT 2007 | SEPT 2008 | SEPT 2009 | SEPT 2010 |
| **ASSETS** | | | | | |
| CURRENT ASSETS | | | | | |
| Cash & Equivalents | $ 10,555 | $ 10,428 | $ 14,494 | $ 28,740 | $ 54,666 |
| Outside Receivables | 15,199 | 15,500 | 16,000 | 16,500 | 17,000 |
| L/C Collateral | 8,700 | 8,700 | 8,700 | 8,700 | 8,700 |
| Leases Receivable | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Discounted Leases Receivable | 25,000 | 20,000 | 15,000 | 10,000 | 5,000 |
| Inventory | 88,698 | 90,698 | 92,198 | 93,304 | 94,237 |
| Prepaid Expenses | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 |
| Other Current Assets | 2,471 | 1,494 | 1,494 | 1,494 | 1,494 |
| Total Current Assets | 155,809 | 152,006 | 153,072 | 163,924 | 186,283 |
| LEASES RECEIVABLE | | | | | |
| Long-Term Leases Receivable | 3,250 | 3,250 | 3,250 | 3,250 | 3,250 |
| Discounted LT Leases Receivable | 35,000 | 25,000 | 15,000 | 5,000 | 0 |
| FIXED ASSETS | | | | | |
| Fixed Assets | 57,546 | 62,546 | 74,946 | 79,946 | 84,946 |
| Accumulated Depreciation | (13,622) | (20,514) | (27,856) | (35,648) | (43,440) |
| Fixed Assets - Net | 43,924 | 42,032 | 47,090 | 44,298 | 41,506 |
| OTHER ASSETS | | | | | |
| Other Assets | 104,939 | 103,050 | 93,549 | 79,890 | 73,219 |
| Goodwill | 108,446 | 108,446 | 108,446 | 108,446 | 108,446 |
| Debt Issue Costs | 2,942 | 1,547 | 0 | 0 | 0 |
| Total Other Assets | 216,327 | 213,043 | 201,995 | 188,336 | 181,665 |
| TOTAL ASSETS | $ 454,310 | $ 435,331 | $ 420,407 | $ 404,808 | $ 412,704 |

EXHIBIT C-2

**Blue Bird Body Company and Certain Affiliates**
**Consolidated Projected Balance Sheets**
**($ 000)**

| | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|
| | SEPT 2006 | SEPT 2007 | SEPT 2008 | SEPT 2009 | SEPT 2010 |
| **LIABILITIES & STOCKHOLDER'S EQUITY** | | | | | |
| <u>CURRENT LIABILITIES</u> | | | | | |
| Facility B Debt | $ 25,000 | $ 30,000 | $ 20,000 | $ - | $ - |
| Outstanding Checks | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| Discounted Lease Debt | 25,000 | 20,000 | 15,000 | 10,000 | 5,000 |
| Accounts Payable | 63,594 | 61,051 | 61,051 | 61,051 | 61,051 |
| Accrued Liabilities | 44,529 | 48,379 | 46,306 | 48,018 | 26,418 |
| Income Taxes Payable | 9,329 | 9,796 | 10,285 | 10,800 | 15,340 |
| Deferred Income Taxes | 10,274 | 10,375 | 11,224 | 12,631 | 14,622 |
| Other Current Liabilities | 1,606 | 1,606 | 1,606 | 1,606 | 1,606 |
| Total Current Liabilities | 187,332 | 189,207 | 173,472 | 152,106 | 132,037 |
| | | | | | |
| <u>LONG-TERM LIABILITIES</u> | | | | | |
| | | | | | |
| Term Debt | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Discounted Lease Debt | 35,000 | 25,000 | 15,000 | 5,000 | 0 |
| Deferred Income Taxes | 32,990 | 33,141 | 34,416 | 36,527 | 39,513 |
| Other Long-Term Liabilities | 57,267 | 47,962 | 43,216 | 33,217 | 29,734 |
| Total Long-Term Liabilities | 225,257 | 206,103 | 192,632 | 174,744 | 169,247 |
| | | | | | |
| <u>STOCKHOLDER'S EQUITY</u> | | | | | |
| | | | | | |
| Total Stockholder's Equity | 41,721 | 40,021 | 54,303 | 77,958 | 111,420 |
| | | | | | |
| TOTAL LIABILITIES & EQUITY | $ 454,310 | $ 435,331 | $ 420,407 | $ 404,808 | $ 412,704 |

EXHIBIT C-3

**Blue Bird Body Company and Certain Affiliates**
**Consolidated Projected Statements of Cash Flows**
**($ 000)**

|  | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
|  | SEPT 2006 | SEPT 2007 | SEPT 2008 | SEPT 2009 | SEPT 2010 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | |
| Net Income (Loss) | $ (23,247) | $ (1,700) | $ 14,282 | $ 23,655 | $ 33,462 |
| Adjustments to reconcile net income to net cash | | | | | |
| provided by operating activities: | | | | | |
| Depreciation / Amortization | 12,092 | 12,092 | 12,542 | 11,363 | 11,363 |
| Change in Goodwill | 0 | 0 | 0 | 0 | 0 |
| Deferred Income Taxes | (14,283) | (1,478) | 8,006 | 13,558 | 8,029 |
| Increase in CSVLI | 1,207 | 0 | 0 | 0 | 0 |
| Loss / (Gain) from Sale of Assets | (2) | 0 | 0 | 0 | 0 |
| | | | | | |
| (Increase)/Decrease in Assets: | | | | | |
| Outside Receivables | 7,412 | (301) | (500) | (500) | (500) |
| Inventory | (11,482) | (2,000) | (1,500) | (1,106) | (933) |
| Prepaid Expenses | (280) | 0 | 0 | 0 | 0 |
| Other Current Assets | 130 | 977 | 0 | 0 | 0 |
| Other Assets - Net | 1,134 | (186) | (34) | 48 | 48 |
| | | | | | |
| Increase/(Decrease) in Liabilities: | | | | | |
| Accounts Payable | (3,375) | (2,543) | 0 | 0 | 0 |
| Accrued Liabilities | 8,863 | 3,850 | (2,073) | 1,712 | (21,600) |
| Income Taxes Payable | 446 | 467 | 489 | 515 | 4,540 |
| Other Current Liabilities | (1,005) | 0 | 0 | 0 | 0 |
| Other LT Liabilities | (11,287) | (9,305) | (4,746) | (9,999) | (3,483) |
| Other | (21) | 0 | 0 | 0 | 0 |
| | | | | | |
| Cash Provided by (Used in) Operating Activities | (33,697) | (127) | 26,466 | 39,246 | 30,926 |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | |
| Capital Expenditures | (3,400) | (5,000) | (12,400) | (5,000) | (5,000) |
| L/C Collateral | (5,359) | 0 | 0 | 0 | 0 |
| Leases Receivable | 594 | 0 | 0 | 0 | 0 |
| Proceeds from Sale of Assets | 2 | 0 | 0 | 0 | 0 |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | |
| Borrowing (Payments) on Debt | (53,000) | 5,000 | (10,000) | (20,000) | 0 |
| Additional Paid in Capital / Stock Purchase | 86,000 | 0 | 0 | 0 | 0 |
| Dividends Paid | 4,200 | 0 | 0 | 0 | 0 |
| | | | | | |
| Effect of Exchange Rate Fluctuations | (17) | 0 | 0 | 0 | 0 |
| | | | | | |
| Net Increase (Decrease) in Cash | (4,677) | (127) | 4,066 | 14,246 | 25,926 |
| | | | | | |
| Cash at beginning of period | 15,232 | 10,555 | 10,428 | 14,494 | 28,740 |
| | | | | | |
| Cash at end of period | $ 10,555 | $ 10,428 | $ 14,494 | $ 28,740 | $ 54,666 |

EXHIBIT C-4

**Blue Bird Body Company and Certain Affiliates**
**Projected Financial Statements**
**Materials Risks**

**2006-2010**

The financial results of the Reorganized Debtors are subject to a number of material risks, including, but not limited to, those specified below.

### 1. Possible Economic Slowdown

The possibility of a slowdown in economic growth of the United States or a recession in the United States could result in a decrease in demands for Blue Bird's products.

### 2. Competitive Conditions

The Blue Bird school bus business is highly competitive. The Blue Bird school bus business competes with two competitors who are financially strong and capable of competing effectively. The competitors may take actions to match new product introductions and other initiatives. The competitors may be willing to reduce prices and accept lower profit margins to compete with Blue Bird. As a result of this competition, Blue Bird could lose market share and sales and suffer losses, which could have a material adverse effect on Blue Bird's future performance.

### 3. Need to Develop New Products

Blue Bird school bus business must develop innovative new products to increase sales and regain profitability. It may not be able to meet its schedules for future product development. Failure to develop and manufacture successful new products could have a material adverse effect on future financial performance.

### 4. Customers

Blue Bird school bus business has no long-term supply contracts with any of its direct customers or distributors. As a result, it must receive a continuous flow of new orders from its distributors and direct customers. New orders may become increasingly difficult to secure if competitors continue to aggressively recruit its distributors. Blue Bird has responded to the challenges to its distributor organization. However, Blue bird cannot make assurances that the strategic relationships will result in increased sales or earnings. Furthermore, on-time delivery and satisfactory customer service is becoming increasingly important.

### 5. Critical Raw Materials and Components

Raw materials and components constitute a significant portion of the cost of the goods. Factors, which are largely beyond Blue Bird's control, such as movements in commodity prices for the specific material Blue Bird requires, may affect the future cost of such raw materials and components. In addition, any inability of Bird Bird's suppliers to timely deliver raw materials and components or any unanticipated change in Blue Bird's suppliers could be disruptive and costly. A significant failure by the school bus business and coachworks to contain raw material or component costs could have a material adverse effect on future financial performance. In addition, delays or cancellations by suppliers could adversely affect results.

### 6. Production Related Risks

To realize sales and operating profits at anticipated levels, Blue Bird must manufacture, source and deliver in a timely manner products of high quality. Among others, the following factors may have a negative effect on Blue Bird's ability to do these things: labor difficulties; scheduling and transportation difficulties; management dislocation; substandard product quality, which can result in higher warranty, product liability and product recall costs; delays in development of quality new products; changes in laws and regulations, including environmental laws and occupational health and safety laws; and changes in the availability and cost of labor. Possible resulting product liability expenses may consist of insurance, litigation fees and damages and/or settlement costs, as well as other costs including legal fees and penalties, (if any) and lost business and/or good will of product recalls.

### 7. Reliance on Key Personnel

Blue bird's operations and prospects depend in large part on the performance of its senior management team. There can be no assurance that Blue Bird would be able to find qualified replacements for any of these individuals if their services were no longer available. The loss of the services of one or more members of the Blue Bird senior

EXHIBIT C-5

**Blue Bird Body Company and Certain Affiliates**
**Projected Financial Statements**
**Materials Risks**

**2006-2010**

management team could further delay recovery and have a material adverse effect on the business, financial condition and results of operations.

### 8.    Adverse Publicity

Adverse publicity or news coverage relating to the Reorganized Debtors may negatively impact the Reorganized Debtors' efforts to establish and promote name recognition and a positive image.

### 9.    Projected Financial Information

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Business Plan and the validity of the other assumptions contained therein.  These projections reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors and Blue Bird's school bus and coachworks business' performance, certain assumptions with respect to competitors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors.  In addition, the risk factors outlined herein and unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors.  Although Blue Bird believes that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

EXHIBIT C-6